```
                    UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK
        ----------------------------:
        HEI LI, et al.,              : Case No.: 24-cv-7401
                        Plaintiff,   :
            v.                       :
        GREATCARE, INC., et al.      : New York, New York
                                     : February 19, 2025
                        Defendants   :
        ----------------------------:
```

               TRANSCRIPT AND STATUS CONFERENCE HEARING

            BEFORE THE HONORABLE KATHARINE H. PARKER

                 UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For Plaintiffs:      NATIONAL CENTER FOR LAW AND
                     ECONOMIC JUSTICE
                     BY:  Carmela Huang, Esq.
                     50 Broadway - Suite 1500
                     New York, New York 10004

                     GETMAN SWEENEY & DUNN, PLLC
                     BY:  Karen Kithan Yau, Esq.
                     260 Fair Street
                     Kingston, New York 12401

For Defendant:       LAW OFFICE OF JOSE A MUNIZ
Greatcare            BY:  Jose A. Muniz, Esq.
                     81-31 Baxter Avenue
                     Elmhurst, New York 11373

For Defendant:       BRENLLA, LLC
CenterLight          BY:  George F. Brenlla, Esq.
                     250 Park Avenue - 7th Floor
                     New York, New York 10177




Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
          THE DEPUTY CLERK:  Calling Case 24-cv-7401;


      AMM TRANSCRIPTION SERVICE - 631.334.1445

Li v. Greatcare, Incorporated.

Counsel for the plaintiffs, please make your appearance for the record.

MS. HUANG:  Carmela Huang, from the National Center for Law and Economic Justice, and Karen Yau from Getman, Sweeney & Dunn.  Good afternoon.

THE COURT:  Good afternoon.

THE DEPUTY CLERK:  And beginning with the counsel for defendant, Greatcare, please make your appearance.

MR. MUNIZ:  Yes.  Jose Muniz for Greatcare.  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

THE DEPUTY CLERK:  And counsel for CenterLight, appearing by phone, please make your appearance for the record.

MR. BRENLLA:  Good afternoon, Judge.  George Brenlla for CenterLight Healthcare.

THE COURT:  Good afternoon.

All right.  This case has been referred to me for general pre-trial supervision and to resolve a dispute over the potential default that was -- the certificate of default was entered only against Greatcare.

So what I want to do today is just talk about a schedule for discovery in the case, and then we can talk about whether this default certificate should be lifted.

First, I'd like to hear from plaintiffs' counsel about this case and about the discovery that you anticipate needing in the case. So why don't you start.

MS. HUANG: Thank you, Your Honor.

This case involves 14 plaintiffs who are all home care aides. They worked 24-hour shifts where they were only paid for 13 hours per shift.

This case alleges that defendant, Greatcare, which is a licensed home care services agency, jointly employed the plaintiffs, along with managed long-term care companies that are essentially insurance companies that authorize care services for carer's advance -- the carer's advance that plaintiffs cared for.

THE COURT: So the plaintiffs were live-ins?

MS. HUANG: Yes, they were.

THE COURT: And did they work four days a week? How many days a week do they typically work?

MS. HUANG: It varies. I think the average

was around two to three days per week, but we do have some plaintiffs who worked one day a week, and some worked as many as seven days a week.

THE COURT:  And for those days that they worked, they were just around the clock?

MS. HUANG:  Yes, that's right, Your Honor.

The allegations are that our plaintiffs cared for recipients who had such high needs that they were unable to obtain five hours of continuous, uninterrupted sleep and three hours of meal times. Oftentimes, their care recipients required meals during the night, assistance with toileting. Sometimes they needed turning and repositioning every two hours as required by their care plan.

So we have named CenterLight as one of the MLTC defendants, and we've also named 14 Doe defendants.  Many of the plaintiffs have interacted with the MLTC that authorized the care services and wrote the care plans that they were required to follow, but are not entirely sure what the names of the MLTCs are.

So as to your question about what sort of discovery will be required in this case, we will initially require discovery into the identities of the MLTCs that are associated with each of the care

episodes.

THE COURT:  So their employer, though, was Greatcare?  Greatcare is scheduling and doing payroll and that type of thing?

MS. HUANG:  That's correct, Your Honor.

So we are alleging that there is a vertical employment relationship where Greatcare was situated in the middle between the managed long-term care company and the plaintiffs.  And Greatcare was responsible for directly hiring the employees, for managing their payroll, for setting their weekly schedule, but the managed long-term care companies were the ones who made the decisions regarding the actual care duties that the aides were required to fulfill.  The managed long-term care companies were the ones who decided whether the care shifts would be 24 hours in length or if they would be shorter in length; that it would, for example, be 12-hour shifts done by two aides over a 24-hour period versus --

THE COURT:  What's the difference between the managed long-term care company and then just long-term care insurance?

MS. HUANG:  Managed long-term care company, MLTC, is a term of art that's used in New York

State.  The New York State Department of Health describes the companies that it contracts with to provide Medicaid live-in services or home care services as managed long-term care companies.

THE COURT:  I see.  So the patients themselves -- this is part of Medicaid or Medicare?

MS. HUANG:  That's right.  Each of these plaintiffs provided care services under Medicaid.

THE COURT:  Under Medicaid.  So they're getting reimbursed -- that managed long-term care companies are getting reimbursed by Medicaid?

MS. HUANG:  The managed long-term care companies -- and forgive me if this is a little bit in the weeds.

THE COURT:  That's okay.  I just want to understand.

MS. HUANG:  Sure.  The managed long-term care companies are under contract with the State Department of Health, and they set rates at a capitated rate based on their entire membership.

THE COURT:  I see.

MS. HUANG:  And so that rate is predetermined.

THE COURT:  I see.

MS. HUANG:  And managed long-term care

companies have a different relationship with the licensed home care agencies like Greatcare, and in -- where an agency like Greatcare will seek reimbursement from an MLTC for the services that it provides. But the MLTC doesn't seek reimbursement from the State. It gets that capitated rate from the outset.

THE COURT: Okay. Got it. Based on the patients that ultimately are served by this, the aides who are hired by and assigned by Greatcare.

MS. HUANG: The MLTCs get a capitated rate that's based on a projection of their entire membership and, sort of, projected number of hours, care hours, that they'll provide.

THE COURT: Okay.

MS. HUANG: It's not tied to a specific --

THE COURT: Person.

MS. HUANG: -- person or specific --

THE COURT: Right. But they'll say, we estimate we're going to have 100 patients over this year period, so based on that -- and we estimate that all of them need 24/7 care.

MS. HUANG: Correct.

THE COURT: And then they'll get the number. And then based on the people that they're

serving, they'll say, hey, Greatcare, find me -- find me some aides to take care of these people.

MS. HUANG:  That's absolutely correct, Your Honor.

THE COURT:  Okay.

MS. HUANG:  Except there are no MLTCs that solely provide care services to people who need 24-hour, live-in care because the business model would be -- like, all of the MLTCs that used to provide care services on a 24-hour basis only found it impossible to manage their businesses and stay profitable.  So, right now, every MLTC has, like, a variety of recipients who have varying needs --

THE COURT:  Gotcha.

MS. HUANG:  -- some who are on a more serious range, who require 24-hour services, and others who require just, like, a few hours a day.

THE COURT:  I see.

And for the individual patient that qualifies for a Medicare-covered aide, who makes a decision as to the level of care that particular patient needs?

MS. HUANG:  That is a decision made by the managed long-term care companies, by the MLTCs.

THE COURT:  Oh, okay.

MS. HUANG:  So per regulation, the MLTCs are required to do assessments of the care recipients at least every three months --

THE COURT:  I see.

MS. HUANG:  -- to determine whether the previous authorization still meets the needs of the recipient.  And there are also requirements that the care plan that's generated is what's called a person-centered care plan that is developed in collaboration with the care recipient and care recipient's family to, sort of, meet the goals and needs of the care recipient.

THE COURT:  Okay.  And are the folks -- the patients who receive the care, are they all under age 65, then?  Because otherwise Medicare has programs for, like, nursing and so forth.

MS. HUANG:  Some of the patients -- no Your Honor.  The majority of the care recipients were quite elderly.

THE COURT:  Oh.

MS. HUANG:  Some in their, you know, 80s, 90s.

THE COURT:  Oh.

MS. HUANG:  Even, I think, one who was almost 100 or -- if not 100 years old.  They qualify

for long-term care, long-term care services under what's called a dual plan. So they're both Medicaid and Medicare dual eligible.

THE COURT: Oh, okay.

MS. HUANG: But long-term care services like 24-hour services can only be received if a person is also on a Medicaid plan. Medicare doesn't cover long-term care at this level.

THE COURT: Right. Right. Right. Yeah. I didn't know Medicaid covered it at that level. I knew Medicare did not cover long-term care. Okay.

Okay. So you're essentially saying that Greatcare is a joint employer with MLTC.

MS. HUANG: That's right.

THE COURT: That's what you believe.

And do you know how many MLTCs there are in New York?

MS. HUANG: I think currently there are around 20 MLTCs that have contracts with the State of New York, but that number has varied over time.

THE COURT: Okay. And so you just don't know the specific ones that worked with Greatcare.

MS. HUANG: That's correct.

THE COURT: For your plaintiffs.

MS. HUANG: That's correct.

THE COURT:  But you believe that defendant, CenterLight, is one of them?

MS. HUANG:  That's correct, Your Honor.

One of the plaintiffs is very clear that she interacted with nurses from CenterLight who came to do the frequent assessments of her care recipients.

THE COURT:  Okay.  Okay.  So you have 14 individual clients, and they're saying that they weren't paid minimum wage and overtime.

MS. HUANG:  That's correct, Your Honor.

THE COURT:  Okay.  Got it.

And so discovery -- I cut you off when you were talking about discovery.  You're talking about learning the identities of the other John Doe defendants, MLTCs, and --

MS. HUANG:  Initially --

THE COURT:  -- payroll information, I guess?

MS. HUANG:  That's right, Your Honor.

Initially, we would require discovery to determine the identities of the other MLTC defendants.  We would also require information which show how the plaintiffs were being paid, the rate, the frequency, et cetera, but we would also require

discovery into the actual care plans.  And so the communications between the MLTCs and Greatcare --

THE COURT:  For the patients that your clients cared for.

MS. HUANG:  That's correct, Your Honor.

The idea is that the care plan -- so when the managed long-term care companies create the care plans, they have to meet with the care recipients and have assessments.  And during that assessment -- during those assessments, the managed long-term care representative, usually a nurse, will ask the care recipient or the aide or something -- anyone who can answer the questions, how are you doing?  What are your needs?  How often do you use the bathroom at night?

And these assessments will show that it was impossible for these aides to obtain five hours of continuous, uninterrupted sleep --

THE COURT:  I see.  The care plans are going to show the tasks that are needed, the care tasks that are needed.

MS. HUANG:  Correct.  It will show the tasks that were needed, but also that the managed long-term care companies knew at the time that they did the assessments that a 24-hour live-in

authorization was going to result in plaintiffs working all 24 hours.

THE COURT: Yeah.

MS. HUANG: And that really these care recipients with their level of needs should have gotten what are called split-shift authorizations, where they would have gotten two aides working two 12-hour shifts.

THE COURT: Yep. Okay. Gotcha.

Okay. So, Greatcare, going to turn to you. So you've now come into the case. There's the -- what was the delay? Why didn't you initially respond -- your client initially respond to the complaint?

MR. MUNIZ: Your Honor, I, myself, came on the case, I believe, the middle of December, communicated with counsel, entered notice of appearance. And I had difficulty -- technical difficulties registering ECF or else I would have filed it a lot sooner. I filed it, I believe, 12th or the 13th of January, but I communicated with my client, the individual person who's the owner of Greatcare, and she -- I told her what she needs to gather. I told her to gather all the names of the patients and whatever care plans, et cetera, that's

probably going to be discovered and going to have to turn over, so I've already started the ball rolling on that.  And so I was a little surprised that counsel, plaintiffs' counsel, was so, you know, insistent upon getting a default certificate when I'm trying to get everything together, and I came late to the case.

Why my client delayed, I don't know.  I know she's a busy person, but I told her, you know, in federal court -- when you're in federal court, you have to really be diligent about --

THE COURT:  Yes, that's correct.

MR. MUNIZ:  -- about those matters.

So I impressed that upon her, Your Honor. So I hope that the certificate can be set aside. We're, in good faith, going to be providing whatever necessary discovery --

THE COURT:  Do you know or do you have -- have you been able to learn which MLTCs your client interacted with?

MR. MUNIZ:  That's something -- I'm going to have to sit down with her because I have not discussed that with her.  I will discuss it with her now that I know that plaintiffs' counsel is going in that direction.  So I will get that

AMM TRANSCRIPTION SERVICE - 631.334.1445

information.

THE COURT: Right. I mean, I assume that your client would get paid or invoice the MLTC.

MR. MUNIZ: Right. I know she has a contract with the State for Medicaid.

THE COURT: Okay.

MR. MUNIZ: That, she has.

THE COURT: Okay.

MR. MUNIZ: Medicare, obviously, as counsel pointed out, does not do long-term care, but I imagine there's certain expenses that they do get reimbursed for, whether it's taking blood or those kind of things I imagine they may get reimbursed for, or can at least request reimbursement for that.

THE COURT: Okay. All right.

And I take it that any discovery you would need would be any indication that the plaintiffs have of their hours worked or pay and depositions, potentially?

MR. MUNIZ: Correct, Your Honor.

And any sort of document -- anything that Greatcare provided for them to sign.

THE COURT: Okay.

MR. MUNIZ: Authorizations, plans, et cetera. I requested the same with my client for

all the named plaintiffs.

THE COURT: Okay. All right.

So now we're going to go to Mr. Brenlla from CenterLight.

I don't know if you've been able to hear everything. Your client, I guess, interacts with Greatcare; is that correct?

MR. BRENLLA: Yes, Judge. I mean, I think what the plaintiffs' counsel said was mostly correct, other than the joint employership.

Basically, we act as an intermediary insurance company. There's an initial assessment of a participant, and then based on the kind of guidelines by the Department of Health, that participant is given a level of care. And we contract with different agencies. Greatcare happens to be one of them. And Greatcare provides the level of care.

Putting aside the issue of joint employer, there is one plaintiff that took care of one patient or participant that utilized CenterLight pretty much as the insurance company. We have a pending motion to dismiss that claim.

We also have a motion to sever because, quite frankly, there's only one plaintiff out of 14

that remotely worked on a participant that was insured by CenterLight. And our motion before the district court judge -- in addition to the motion to dismiss, there's a motion to sever because for us to be involved in a case where there's 13 other plaintiffs that have nothing to do with CenterLight is quite patently unfair and a waste of resources, so that motion is pending before the district court judge.

THE COURT: Do you have evidence that you can provide that shows that the majority of the plaintiffs didn't -- or patients didn't have care or insurance through you?

Can you provide an affidavit or something like that? I mean, this wouldn't be the first case where there's multiple defendants.

MR. BRENLLA: Yes. We got all the information from Greatcare itself with respect to the plaintiffs and who they took care of, what participants they took care of. And then once Greatcare sent us the participants, then we looked at our side as to who had CenterLight pretty much as a managed long-term care plan. And then based on Greatcare's sending us all the participants that all the plaintiffs worked on and then looking at those

names, we submitted -- we realized there's only one. In fact, there's only one alleged in the complaint.

So the answer is yes, we can submit an affidavit.  Part of it also is we relied upon the information provided to us by Greatcare as to who the plaintiffs took care of, what participants they took care of, otherwise we would not know.

So, for example, if Your Honor took care of a participant and Greatcare didn't tell us, we would never know.

THE COURT:  Well, what -- I thought you were interviewing.  You're sending out assessors.

MR. BRENLLA:  We are sending assessors for the initial care plan, but we don't know who actually is taking care of that participant.  So, for example, for a particular participant --

THE COURT:  I don't understand.  How would you not know who was taking care of the participant?

MR. BRENLLA:  Because with that participant, we would analyze and say, okay, that participant needs four hours a day, according to services.  Then we would contract with a different agency to provide those services.

THE COURT:  An agency such as Greatcare.

MR. BRENLLA:  Correct.  We wouldn't

necessarily know Jane Smith or John Smith is the actual person.

THE COURT:  That doesn't make any sense to me, what you're saying.  You're going out and you're saying, Jane Smith needs four hours of care, now we're going to contract with Greatcare to provide that care for Jane Smith.  What am I missing?

MR. BRENLLA:  Greatcare would --

MS. HUANG:  Your Honor, if I could --

THE COURT:  All right.  The plaintiffs' counsel is going to say something.

MR. BRENLLA:  -- we wouldn't necessarily know who the employee is.

MS. HUANG:  There's some of what Mr. Brenlla said that I would agree with.  So I think probably the most straightforward way of finding out which MLTCs are involved in this matter would be to obtain the information from Greatcare because there are -- most of the home care agencies use very sophisticated database systems in order to track the care and the reimbursement.  That's also how they communicate with the MLTCs.  And so what Greatcare could do is it could pull up the names of all of the plaintiffs, find out all of the care recipients who our plaintiffs provided care to, and

it could find out which MLTCs were associated with each of those plaintiffs.

And it sounds like maybe Mr. Brenlla has taken those steps and has determined that only one plaintiff provided care to a care recipient who was associated with CenterLight.  But right now we only have Mr. Brenlla's representation.  We would like to see the --

THE COURT:  Right.  You need an affidavit.

But in any event, your client who did work for a CenterLight-associated patient still has a claim for -- a wage claim.

MS. HUANG:  Yes, Your Honor.  We have opposed CenterLight's motion to sever.

THE COURT:  Right.  So -- yeah.  Okay.  So --

MR. BRENLLA:  I think it's correct, Judge, but I can only rely upon what Greatcare sent.  So Greatcare sent us all the plaintiffs and who they took care of.

THE COURT:  Well, it seems to me that at least at this point, no severance makes sense until there's some discovery and some actual evidence of which patient was affiliated with which MLTC, and then you all can make a decision.

Or alternatively, CenterLight can show that information to plaintiffs' counsel, and if you want to have a negotiated settlement to get out of that, you can leave Greatcare with the rest of the plaintiffs, I suppose.

That's a possibility as well, I suppose, right?

MS. HUANG:  That is something we could discuss.

THE COURT:  Yeah.

MR. BRENLLA:  We would not settle, but we can certainly share the information that Greatcare provided us, but --

THE COURT:  Yeah.  Well, I think that it makes sense after this conference for counsel to talk about that because if you can settle some of the plaintiffs' claims, that could narrow the scope of discovery and, of course, get quicker resolution of the case to everybody's benefit.  So it might be -- that might be an avenue, let me suggest, that counsel explore, at least with respect to this one patient.  But in the meantime, let me set a schedule for discovery, okay.

I'm going to set a schedule for discovery to be closed by the end of September of this year.

And in the next 60 days, I want Greatcare to provide the information to plaintiffs' counsel regarding the MLTCs that are implicated by these particular plaintiffs.  And the amendment to the pleading should be made within 90 days to clarify who the John Doe MLTCs are.  Okay.

MR. BRENLLA:  Judge, can CenterLight also receive that information?

THE COURT:  Of course.  You're still a party in the case.

MR. BRENLLA:  Okay. Okay. Yeah.  No, because you -- okay.  You just said to the plaintiff.  I just want to make sure that we would receive it as well.

THE COURT:  Yes.

And in that 60-day period, CenterLight should also provide the information that it has to the other parties to demonstrate that you think you're affiliated with only one of the plaintiffs.

MR. BRENLLA:  Correct.  Correct, Judge.

THE COURT:  Provide that.  Provide that information, okay.

Do the plaintiffs anticipate any experts being needed in this case?

MS. HUANG:  Not at this time, Your Honor.

THE COURT:  Okay.

And I assume then that neither of the defendants is thinking expert testimony is needed.

MR. MUNIZ:  Not at this time, Your Honor.

THE COURT:  Yeah.  Okay.

MR. BRENLLA:  No, Judge.

THE COURT:  Okay.  So I want you all to serve -- no initial disclosures have been done yet, right?

MR. BRENLLA:  No, Your Honor.  CenterLight has not answered the complaint yet because --

THE COURT:  Okay.  Initial disclosures should be served in 21 days from today.  And the parties should also exchange initial document requests and interrogatories, if you want, but, of course, our district, as you may know, restricts the type of interrogatories that can be asked at the beginning of a case.

And what I'd like is a status letter in 30 days, joint status letter.  It seems to me that it's probably premature to have a settlement conference right now, but if you want to have a settlement conference and you talk a little bit about that and you want to ask for one in your 30-day status letter, I'll go ahead and set up a settlement

conference; otherwise, I'll just keep asking you for settlement conferences.

So under my rules, I don't allow you to just file motions willy-nilly. Write a letter to me. If there's something that you can't resolve on discovery, write a letter and say you need a conference and describe what the dispute is. You have to have exhausted the meet and confer process before I'm going to let you file a motion, and I'm going to try to resolve it at a conference to minimize costs for everybody and to speed the case along, okay?

It seems like most of the depositions of the plaintiffs would probably be -- probably half days, right? Or maybe it would be more. But this seems like this is essentially a wage-and-hour case, so the testimony shouldn't be too long.

But because -- I assume defendants are going to want to depose each of the plaintiffs; is that right?

MR. MUNIZ: Yes, Your Honor.

THE COURT: Okay.

MR. BRENLLA: Not for me, Judge.

THE COURT: Okay.

So I'm not going to put any limits on --

AMM TRANSCRIPTION SERVICE - 631.334.1445

there is a 10-deposition limit, but obviously I'm going to permit a deposition of each of the plaintiffs, for defendant to depose those.

I assume that plaintiffs' counsel will be wanting to take some 30(b)(6) depositions, maybe, of Greatcare and some of the MLTCs.

MS. HUANG:  Yes, Your Honor.

THE COURT:  Yeah.  Okay.  Once you learn who those are.  Great.

Let's just next talk about setting aside the certificate of default.

As you know, the standard is pretty -- the Second Circuit case law says that cases should be resolved on their merits rather than a default, and so, therefore, courts often excuse an initial default, particularly when, as here, the defendant, who initially didn't appear, has appeared now with counsel and is participating in good faith.  And so my view is that, under the applicable standard, the certificate of default should be set aside or vacated and discovery should continue.

I'm going to keep monitoring this case closely.  Like I said, I want a status letter in 30 days, and I expect counsel for all parties to cooperate in discovery and that there won't be any

further need for any kind of default motion, but right now we -- at the outset, you ought to figure out who these other MLTCs are, so let's focus on that.

Is there anything else from plaintiffs' counsel?

MS. HUANG:  Your Honor, we agree that the case should move forward and we would like to move quickly into discovery.  I think that our principal concern that maybe you've already addressed here is the difficulties in communicating with defendant Greatcare in particular.

Mr. Muniz had said that he was surprised that we had filed a certificate of default, but as our January 21 letter outlines very clearly, there should have been no surprise.  We made it very clear after previous deadlines that we were going to escalate to filing a certificate of default.

THE COURT:  Right.

MS. HUANG:  It has been somewhat inexplicable to us, some of his refusals, particularly his refusal to file an answer by ECF when requested.  And the answer that he did -- that Greatcare eventually did file is only four pages long, and our complaint is 60 pages.  The answer

does not address any of the allegations with any level of specificity.

We had requested that Greatcare consider filing an amended answer that meets the requirements of Rule 8 and were rejected in that request. So I think, with your close supervision, maybe we can avoid some of these issues, but plaintiffs are principally concerned about unnecessary and vexatious litigation --

THE COURT: Well, look, Rule 37 sanctions can be issued if Greatcare now declines to follow deadlines, meet court orders, and engages in inappropriate discovery conduct. Rule 37 sanctions can be a default judgment -- a striking of the answer, and a default judgment.

But now you're here, and you've said you're going to participate in good faith, which I trust is going to happen.

MR. MUNIZ: That's correct, Your Honor.

THE COURT: I trust you've resolved your issues with ECF.

MR. MUNIZ: I have. So --

THE COURT: Okay. And maybe you ought to talk with your client and take a look at that answer because, I mean, it's to your advantage if the

answer isn't appropriate, but your clients -- I don't know whether -- and I haven't taken a look at it, but if you want to file an amended pleading, you should take a look at that.

But there will be an opportunity -- you're going to have to -- you may be amending the pleadings anyway once you learn about the MLTC identities, right?

MS. HUANG:  Yes, Your Honor.

THE COURT:  So there may be some -- so that's going to be 90 days from now, and then there will have to be another answer to the amended pleading.  So let's try to be efficient for everybody's sake and try to keep the litigation costs low as much as possible, especially because I think this case should get to a settlement, if you can, after some initial discovery, okay?

MS. HUANG:  Thank you, Your Honor.

MR. MUNIZ:  Yes, Judge.

THE COURT:  All right.

Anything further from Greatcare?

MR. MUNIZ:  No, Your Honor.  Thank you.

THE COURT:  Anything further from CenterLight?

MR. BRENLLA:  No, Judge.

THE COURT:  All right.  I'm going to issue a scheduling order after this conference, and I'll look forward to your status letter in 30 days, okay.

MR. BRENLLA:  Thank you, Judge.

THE COURT:  Okay.

0o0

C E R T I F I C A T E


     I, Adrienne M. Mignano, certify that the foregoing transcript of proceedings in the case of Li, et al v. Greatcare, Inc., et al.; Docket #24CV7401 was prepared using digital transcription software and is a true and accurate record of the proceedings.


Signature    *Adrienne M. Mignano*

          ADRIENNE M. MIGNANO, RPR


Date:        February 27, 2025


AMM TRANSCRIPTION SERVICE - 631.334.1445