UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HEI LI, ZHU H.L. LIN, LI CHEN, XIU
F. CHEN, MEI F. CHEN, HUI HE, HUI
LI, ZHAN J. LI, HUI X. RUAN, JIAN
R. XIAO, MEI Z. XIAO, MU Z.
ZHANG, BI Y. ZHENG, XIU X. ZHU,

       **Plaintiffs**

-against-

GREATCARE, INC., CENTERLIGHT
HEALTHCARE, INC., and SENIOR
WHOLE HEALTH OF NEW YORK,
INC.,

       **Defendants.**

**Case No. 24-CV-7401 (LTS) (KHP)**

**AMENDED COMPLAINT**

Plaintiffs Hei Li, Zhu H.L. Lin, Li Chen, Xiu F. Chen, Mei F. Chen, Hui He, Hui

Li, Zhan J. Li, Hui X. Ruan, Jian R. Xiao, Mei Z. Xiao, Mu Z. Zhang, Bi Y. Zheng, and

Xiu X. Zhu (collectively, "Plaintiffs"), by their attorneys, allege as follows:

## PRELIMINARY STATEMENT

1. Plaintiffs are all home care aides who provided "live-in" services to elderly,

vulnerable, and disabled Medicaid recipients. To provide this care, Plaintiffs worked

multiple, consecutive 24-hour shifts per week.

2. Plaintiffs are also victims of wage theft. Though they did not receive five

hours of continuous, uninterrupted sleep or three full hours of meal breaks per shift,

their employers paid them for no more than 13 hours per 24-hour shift in violation of

the Fair Labor Standards Act ("FLSA") and its implementing regulations and the New York Labor Law ("NYLL") as set forth by the Court of Appeals in *Andryeyeva v. New York Health Care, Inc.*, 33 N.Y.3d 152, 182 (2019).

3.     Each Plaintiff was employed jointly by the licensed home care services agency ("LHCSA") GreatCare, Inc. ("GreatCare") and a managed long-term care plan ("MLTC") under contract with the New York State Department of Health ("NYSDOH") to provide long-term care services to Medicaid recipients.

4.     CenterLight Healthcare, Inc. ("CenterLight") and Senior Whole Health of New York, Inc. ("Senior Whole Health") (together, the "MLTC Defendants") (together with GreatCare, "Defendants") provided in-home personal care services to Medicaid care recipients who were members of their plans by contracting for the services of home care aides through GreatCare.

5.     While GreatCare handled many of the day-to-day aspects of hiring home care aides, assigning the aides to care recipients, and managing payroll for the aides, the MLTC Defendants retained the right to control, and in fact did control, the hours, hourly pay, duties, assignments, and schedules of the home care aides hired by GreatCare to provide care services to their members.

6.     The MLTC Defendants made key decisions that determined the terms and conditions of employment, including the aides' pay, work, and workplace conditions. Among other things, the MLTC Defendants determined: (i) whether the aides would be

2

paid for 13 hours or more for each 24-hour shift worked; (ii) whether the aides would work a single 24-hour shift or shifts of shorter duration; (iii) whether the aides would be eligible for overtime pay; (iv) whether the aides had adequate sleeping accommodations at the homes of their care recipients; and (v) the scope, amount, and frequency of care provided by the aides, which the MLTC Defendants revisited at least every six months.

7.     For its part, GreatCare implemented the MLTCs' decisions. It hired aides, including Plaintiffs, assigned them to specific care recipients, set their weekly work schedules, was responsible for overall supervision and training, and paid them – all within the parameters set by the MLTCs.

8.     Plaintiffs worked almost continuously throughout their 24-hour, "live-in" shifts, assisting their care recipients with all activities of daily living. Plaintiffs supervised and monitored their care recipients ceaselessly to keep them healthy and safe.

9.     Plaintiffs performed critical jobs with compassion, perseverance, and patience – even at the sacrifice of their own physical and psychological health – while they were being exploited by their employers, who took advantage of Plaintiffs' status as Chinese immigrants who speak, read, or write little English in order to perpetuate wage theft against them.

10.     By law, GreatCare and the MLTCs are required to pay Plaintiffs for all 24 hours of their shifts. Instead, GreatCare and the MLTCs paid Plaintiffs for only 13 hours

per each 24-hour shift even though they knew that Plaintiffs' care recipients required around-the-clock attention and assistance that made it impossible for Plaintiffs to receive adequate sleep and meal breaks.

11. GreatCare and the MLTCs paid Plaintiffs less than the minimum wage, systemically deprived Plaintiffs of overtime, and ultimately paid Plaintiffs less than half of what they were actually owed.

12. GreatCare and the MLTCs violated the FLSA and NYLL by failing to pay Plaintiffs (1) the statutorily mandated wage rate for all compensable time and (2) overtime pay at not less than one and one-half (1.5) times their regular rate of pay for all hours worked in excess of forty (40) in a workweek.

13. Additionally, GreatCare and the MLTCs failed to compensate Plaintiffs at the minimum compensation level required by the New York Home Care Worker Wage Parity Act ("Wage Parity Act"), N.Y. Pub. Health Law § 3614-c.

14. GreatCare and the MLTCs also violated the NYLL by failing to pay Plaintiffs "spread of hours" premiums and to provide Plaintiffs with legally required notices of pay rates and pay statements. As a result, Plaintiffs did not know what their hourly pay rates were, what allowances were being claimed by GreatCare and the MLTCs, and, in many cases, even how much they were paid per week.

4

15.     Plaintiffs therefore seek unpaid wages and overtime, compensatory damages, liquidated damages, pre-judgment and post-judgment interest, and attorneys' fees and costs.

## VENUE AND JURISDICTION

16.     The Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 29 U.S.C. § 201 et seq., 29 U.S.C. § 216, and 28 U.S.C. § 1331.

17.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

18.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## PARTIES

*The Plaintiffs*

19.     Plaintiff Hei Li is a 63-year-old woman who resides in Brooklyn, New York. Ms. Li was employed by GreatCare from approximately June 10, 2017 until approximately December 30, 2022 as a home care aide.

20.     During her period of employment with GreatCare, Ms. Hei Li was jointly employed by GreatCare and CenterLight from approximately June 10, 2017 until approximately October 31, 2021.

21.     Plaintiff Zhu H. L. Lin is a 57-year-old woman who resides in Queens, New York. Ms. Lin was employed by GreatCare from approximately March 13, 2015 to approximately March 8, 2021 as a home care aide providing in-home personal care services.

22.     During her period of employment with GreatCare, Ms. Zhu H. L. Lin was jointly employed by GreatCare and CenterLight from approximately March 29, 2015 to April 5, 2015, from approximately February 29, 2016 to approximately June 27, 2016, and from approximately February 9, 2017 to approximately February 23, 2017.

23.     Ms. Zhu H. L. Lin was also jointly employed by GreatCare and Senior Whole Health from approximately March 13, 2015 until approximately November 3, 2015, from approximately June 2, 2016 to approximately May 29, 2018, and from approximately June 3, 2018 until approximately March 8, 2021.

24.     Plaintiff Li Chen is a 61-year-old woman who resides in New York, New York. Ms. Chen was employed by GreatCare from approximately July 1, 2014 until approximately May 18, 2020 as a home care aide providing in-home personal care services.

25.     During her period of employment with GreatCare, Ms. Li Chen was jointly employed by GreatCare and CenterLight from approximately February 9, 2015 until December 7, 2015 and from approximately March 18, 2016 until approximately May 3, 2016.

6

26.     Ms. Li Chen was also jointly employed by GreatCare and Senior Whole Health from approximately January 2, 2015 until approximately April 28, 2017 and from approximately November 8, 2019 until approximately March 18, 2020.

27.     Plaintiff Mei F. Chen is a 68 -year-old woman who resides in Brooklyn, New York. Ms. Chen was employed by GreatCare for varying dates from approximately March 6, 2016 to approximately January 4, 2019 as a home care aide providing in-home personal care services.

28.     During her period of employment with GreatCare, Ms. Mei F. Chen was jointly employed by GreatCare and Senior Whole Health from approximately January 2, 2019 to approximately January 4, 2019.

29.     Plaintiff Xiu F. Chen is a 61-year-old woman who resides in Queens, New York. Ms. Chen has been employed by GreatCare and one of the MLTC Defendants from approximately February 19, 2016 to approximately October 31, 2024 as a home care aide providing in-home personal care services.

30.     During her period of employment with GreatCare, Ms. Xiu F. Chen was jointly employed by GreatCare and CenterLight from approximately February 26, 2016 until April 26, 2016.

31.     Ms. Xiu F. Chen was also jointly employed by GreatCare and Senior Whole Health from approximately February 19, 2016 until approximately March 30, 2021 and from approximately October 6, 2022 until approximately February 16, 2023.

32.     Plaintiff Hui He is a 68-year-old woman who resides in Brooklyn, New York. Ms. He was employed by GreatCare from approximately July 2, 2016 to approximately July 11, 2020 as a home care aide providing in-home personal care services.

33.     During her period of employment with GreatCare, Ms. Hui He was jointly employed by GreatCare and CenterLight from December 14, 2018 to December 15, 2018.

34.     Ms. Hui He was also jointly employed by GreatCare and Senior Whole Health from approximately July 2, 2016 until approximately September 7, 2017 and on December 21, 2018.

35.     Plaintiff Hui Li is a 56-year-old woman who resides in Queens, New York. Ms. Li was employed by GreatCare from approximately July 18, 2015 until approximately April 6, 2023 as a home care aide providing in-home personal care services.

36.     During her period of employment with GreatCare, Ms. Hui Li was jointly employed by GreatCare and Senior Whole Health from approximately September 2, 2015 through approximately October 26, 2018, and on February 3, 2023.

37.     Plaintiff Zhan J. Li is a 62-year-old woman who resides in Queens, New York. Ms. Li was employed by GreatCare from approximately September 24, 2016 until approximately March 7, 2021 as a home care aide providing in-home personal care services.

38. During her period of employment with GreatCare, Ms. Zhan J. Li was jointly employed by GreatCare and CenterLight from approximately September 24, 2016 until approximately October 24, 2016 and from approximately November 12, 2020 until approximately November 19, 2020.

39. Ms. Zhan J. Li was also jointly employed by GreatCare and Senior Whole Health from approximately October 31, 2016 until approximately September 17, 2020 and from approximately December 20, 2020 until March 7, 2021.

40. Plaintiff Hui X. Ruan is a 70-year-old woman who resides in Staten Island, New York. Ms. Ruan was employed by GreatCare from approximately March 29, 2015 until September 2, 2023 as a home care aide providing in-home personal care services.

41. During her period of employment with GreatCare, Ms. Hui X. Ruan was jointly employed by GreatCare and CenterLight from April 8, 2018 until May 6, 2018.

42. Ms. Hui X. Ruan was also jointly employed by GreatCare and Senior Whole Health from approximately March 5, 2016 until approximately May 4, 2019, from approximately July 14, 2019 until approximately August 4, 2019, and from approximately February 26, 2022 until approximately September 2, 2023.

43. Plaintiff Jian R. Xiao is a 54-year-old woman who resides in Queens, New York. Ms. Xiao was employed by GreatCare from approximately November 10, 2020 until approximately August 20, 2023.

9

44.     Plaintiff Mei Z. Xiao is a 64-year-old woman who resides in New York, New York. Ms. Xiao was employed by GreatCare from approximately May 2, 2018 to approximately August 18, 2023 as a home care aide providing in-home personal care services.

45.     Plaintiff Mu Z. Zhang is a 53-year-old woman who resides in Queens, New York. Ms. Zhang has been employed by GreatCare from approximately January 1, 2015 to the present date as a home care aide providing in-home personal care services.

46.     During her period of employment with GreatCare, Ms. Mu Z. Zhang was jointly employed by GreatCare and CenterLight on February 21, 2015 and from approximately August 2, 2021 until approximately August 11, 2021.

47.     Ms. Mu Z. Zhang was also jointly employed by GreatCare and Senior Whole Health from approximately January 1, 2015 until June 5, 2025.

48.     Plaintiff Bi Y. Zheng is a 52-year-old woman who resides in New York, New York. Ms. Zheng was employed by GreatCare from approximately October 18, 2018 to approximately August 20, 2021 as a home care aide providing in-home personal care services.

49.     Plaintiff Xiu X. Zhu is a 66-year-old woman who resides in Brooklyn, New York. Ms. Zhu was jointly employed by GreatCare and Senior Whole Health from approximately September 9, 2017 until approximately February 11, 2021 as a home care aide providing in-home personal care services.

10

*The Defendants*

50.    Defendant GreatCare is a New York corporation that specializes in providing in-home care personal care services to care recipients, also referred to as members, across the greater New York area. GreatCare maintains its principal place of business at 110 West 34th Street, Suite 1207, New York, New York. At all relevant times, GreatCare was Plaintiffs' employer.

51.    Defendant CenterLight is a New York corporation that authorizes services to New York state enrollees of Medicaid. CenterLight is under contract with the NYSDOH to provide in-home personal care services to people receiving Medicaid. CenterLight employed Plaintiffs Hei Li, Zhu H. L. Lin, Li Chen, Xiu F. Chen, Hui He, Zhan J. Li, Hui X. Ruan, and Mu Z. Zhang.

52.    Defendant Senior Whole Health is a for-profit corporation incorporated in the State of New York that authorizes services to New Yorkers who are dually-eligible to receive both Medicare and Medicaid. Senior Whole Health is under contract with the NYSDOH to provide in-home personal care services to people receiving Medicaid and Medicare. Senior Whole Health employed Plaintiffs Zhu H. L. Lin, Li Chen, Mei F. Chen, Xiu F. Chen, Hui He, Hui Li, Zhan J. Li, Hui X. Ruan, Mu Z. Zhang, and Xiu X. Zhu.

11

*FLSA Coverage*

53.   At all the times stated herein, Defendants are and have been employers within the meaning of 29 U.S.C. §§ 203(d) and 203(g).

54.   At all times stated herein, Defendants are and have been enterprises within the meaning of 29 U.S.C. § 203(r).

55.   At all times stated herein, Defendants have been enterprises engaged in commerce or in the production of goods or services for commerce within the meaning of 29 U.S.C. § 203(s)(1), in that said enterprises have and have had employees engaged in commerce or in the production of good for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person, and in that said enterprises have and have had an annual gross volume of sale made or business done of not less than $500,000.

56.   At all times hereinafter mentioned, Plaintiffs were employed in domestic service in households and were individual employees engaged in commerce or in the production of goods for commerce as required by 29 U.S.C. § 207 and as defined by 29 U.S.C. § 202(a).

## STATEMENT OF FACTS

57.   The MLTC Defendants receive Medicaid funding from the NYSDOH to provide in-home personal care services to eligible New Yorkers.

58.    The MLTC Defendants assess and authorize recipients who are members of their plans to receive defined levels of personal care services. As part of the authorization process, the MLTC Defendants complete a social assessment for each of their members, which includes an evaluation of the member's home and the availability of adequate sleeping accommodations for a home health aide.

59.    The MLTC Defendants also complete a social assessment for each of their members, which includes an evaluation of whether a home health aide providing personal care services would be likely to obtain, on a regular basis, five hours daily of uninterrupted sleep during an eight-hour period of sleep.

60.    Members with the highest level of need may be authorized for 24-hour home care services in the form of either "live-in" 24-hour services or continuous services.

61.    Continuous services, also known as "split-shift" services, are defined as:

> the provision of uninterrupted care, by more than one personal care aide, for more than 16 hours in a calendar day for a patient who, because of the patient's medical condition, needs assistance during such calendar day with toileting, walking, transferring, turning and positioning, or feeding and needs assistance with such frequency that a live-in 24-hour personal care aide would be unlikely to obtain, on a regular basis, five hours daily of uninterrupted sleep during the aide's eight hour period of sleep.

18 N.Y.C.R.R. § 505.14(a)(2).

62.    "Live-in" 24-hour services are defined as "the provision of care by one…aide for a patient…whose need for assistance is sufficiently infrequent that a live-

13

in 24-hour…aide would be likely to obtain, on a regular basis, five hours daily of uninterrupted sleep during the aide's eight hour period of sleep." 18 N.Y.C.R.R. § 505.14(a)(4).

63.   Before "live-in" 24-hour services may be authorized, the MLTC Defendants are required to evaluate whether their member's homes have sleeping accommodations for a home care aide.

64.   State Medicaid regulations do not permit the MLTC Defendants to authorize "live-in" 24-hour services if the member's home does not have adequate sleeping accommodations for a home health aide; instead, split-shift care must be authorized. 18 N.Y.C.R.R. § 505.14(b)(2)(iii)(*c*).

65.   The MLTC Defendants knew or should have known that almost all of their members who received personal care services from the Plaintiffs who were jointly employed by them required assistance so regularly that those Plaintiffs could not obtain more than two or three hours of sleep each time they worked a 24-hour shift. Additionally, the MLTC Defendants knew or should have known that most of these members did not have adequate sleeping accommodations in their homes. Nevertheless, the MLTC Defendants mis-authorized these members for "live-in" 24-hour services only.

66.   The MLTC Defendants also developed plans of care in collaboration with these members (or these members' representatives, family members, or caretakers) that

specified the type, scope, amount, and frequency of assistance that would be delivered as part of the member's person-centered care plan.

67. The MLTC Defendants' care plans were shared with their members and GreatCare and formed the basis of the work duties of the Plaintiffs who were jointly employed by them.

68. The MLTC Defendants were required by law to reassess the authorizations and care plans for their members at least every six months.

69. Per contract, the MLTC Defendants required GreatCare to assign home care aides in strict accordance with the authorizations issued. Therefore, GreatCare was required to schedule only one aide to work an entire 24-hour shift, alone, whenever the MLTC Defendants decided to authorize "live-in" services instead of split-shift services.

70. Plaintiffs were required to work continuously during each 24-hour shift, providing uninterrupted care for 24-hour periods, in accordance with the care plans developed by the MLTC Defendants and the other MLTCs who contracted with GreatCare, because of the MLTCs' deliberate or willfully negligent decision to authorize Plaintiffs' care recipients for "live-in" services instead of split-shift services.

71. Per contract, the MLTC Defendants reimbursed GreatCare for each "live-in" authorization, or case, worked by the Plaintiffs who were jointly employed by them at a rate that covered those Plaintiffs' wages for only 13 out of every 24 hours worked.

This payment scheme meant that, for each 24-hour shift worked by those Plaintiffs, the MLTC Defendants left 11 work hours uncompensated.

72.   Not only were the rates set by the MLTC Defendants unable to cover all of the compensable hours worked by the Plaintiffs who were jointly employed by them for each 24-hour shift, the rates were insufficient to cover those Plaintiffs' overtime wages.

73.   GreatCare was required to request permission from the MLTCs whenever GreatCare sought to pay Plaintiffs for more than 13 hours per each 24-hour shift worked or if GreatCare sought to pay overtime wages.

74.   For its part, GreatCare hired Plaintiffs, assigned them to specific care recipients, set Plaintiffs' weekly work schedules, handled their payroll and taxes, determined the personnel policies applicable to Plaintiffs, and paid Plaintiffs within the parameters set by the MLTCs.

75.   GreatCare was also responsible for ensuring that Plaintiffs received the skills training required by the MLTCs and complied with any other policies or procedures set, or directions provided, by the MLTCs.

76.   GreatCare had the power to terminate Plaintiffs' employment with the agency.

77.   The MLTC Defendants had the power to remove those Plaintiffs it jointly employed from work assignments with their members.

16

*Working Conditions of Hei Li*

78.    Plaintiff Hei Li began working for GreatCare and CenterLight on approximately June 17, 2017.

79.    From the time she began her joint employment with GreatCare and CenterLight in June 2017 until approximately October 2021, Defendants scheduled Ms. Hei Li to work one 24-hour shift per week providing "live-in" personal care services to Mr. C., an elderly man living in Queens, New York.

80.    During this period, Ms. Hei Li was also employed by CenterLight and a different, non-defendant home care agency named True Care to provide "live-in" services to Mr. C. two to three additional days per week.

81.    During the day, Ms. Hei Li primarily assisted Mr. C. with cooking, reminding him to take his medications, and helping him with outdoor exercise.

82.    On most nights, Mr. C. did not sleep many hours or continuously. Frequently, Mr. C. stayed awake all night–playing music, eating food, talking on the telephone, and generally being active.

83.    During most 24-hour shifts, between 7pm and 7am, Mr. C. required assistance with toileting at least four times, or approximately every three hours.

84.    Each night that Ms. Hei Li provided "live-in" services to Mr. C., Mr. C. would request Ms. Hei Li to cook him a meal in the middle of the night.

85.   Even on the rare occasions when Mr. C. slept more soundly and required less assistance with toileting during the night, Ms. Hei Li slept no more than 2 to 3 hours on a couch in Mr. C.'s living room.

86.   Mr. C.'s home offered no sleeping accommodation for Ms. Hei Li other than the living room couch.

87.   At least once a month and on occasion more frequently, a nurse named Ms. Ding, who was employed by CenterLight, visited Mr. C.'s home to speak to Mr. C. and Ms. Hei Li.

88.   During each visit, Ms. Hei Li reported to Nurse Ding that Mr. C. wanted to eat meals in the middle of the night. Ms. Hei Li also reported to Nurse Ding that Mr. C. needed very frequent toileting assistance during the night.

89.   While providing care services to Mr. C., Ms. Hei Li did not receive 8 hours of sleep per 24-hour shift and Ms. Hei Li did not receive five continuous, uninterrupted hours of sleep per 24-hour shift.

90.   While providing care services to Mr. C., Ms. Hei Li did not receive three full hours of completely duty-free meal breaks; each of Ms. Hei Li's meal breaks was no more than thirty minutes.

91.   At the end of each 24-hour shift, Ms. Hei Li was required to dial-in activity codes by phone. The codes Ms. Hei Li dialed-in were assigned to her by GreatCare and

did not include codes for reporting night work, inadequate sleep, or inadequate meal breaks.

92. Though all 24 hours of Ms. Hei Li's shifts were compensable, GreatCare and CenterLight did not pay Ms. Hei Li for more than 13 hours. Ms. Hei Li received no compensation for 11 hours of each 24-hour shift.

93. GreatCare and CenterLight did not inform Ms. Hei Li that she had a right to be paid for all 24-hour shifts if she did not receive adequate sleep or meal breaks.

94. During Ms. Hei Li's employment at GreatCare, GreatCare supervisors often required Ms. Hei Li to sign or check documents that were in English and that she did not understand and for which no explanation was provided.

95. GreatCare and CenterLight did not provide Ms. Hei Li wage notices or complete and accurate pay statements. As a result, Ms. Hei Li did not know how much she was being paid, what her hourly rate of pay was, whether she was receiving overtime wages, and what allowances or deductions GreatCare and CenterLight were claiming.

96. As a result of GreatCare and CenterLight's failures to provide Ms. Hei Li with the notices and statements required by Section 195 of the NYLL, Ms. Hei Li did not become aware that GreatCare and CenterLight were violating her rights to receive the minimum wage and overtime for all 24-hours of the shifts she worked until approximately 2022.

97.    Throughout the time she was employed by GreatCare and CenterLight, Ms. Hei Li did not receive overtime pay from CenterLight, though Ms. Hei Li worked more than forty hours per week between GreatCare and True Care.

98.    Throughout the time she was employed by GreatCare and CenterLight, Ms. Hei Li did not receive "spread of hours" pay when she worked a spread of more than ten hours per shift.

99.    Throughout the time she was employed by GreatCare and CenterLight to work 24-hour, "live-in" shifts, Ms. Hei Li was paid less than the statutory minimum wage.

100.    Throughout the time she was employed by GreatCare and CenterLight, Ms. Hei Li was paid less than the total hourly compensation required by the Wage Parity Act.

101.    In March 2021, Mr. C.'s authorized care hours were reduced from 24 hours to 10 hours per day. Shortly afterwards, his care hours were reduced to 8 hours per day. Mr. C.'s hours were then further reduced to just 6 hours per day. Ms. Hei Li's work hours were reduced accordingly until approximately December 2022, when Ms. Hei Li stopped working for GreatCare.

102.    On or about July 20, 2022, Ms. Hei Li filed a complaint with the New York State Department of Labor ("NYSDOL") regarding her employers' NYLL violations, effectively tolling the statute of limitations on her NYLL claims.

20

*Working Conditions of Zhu H.L. Lin, Zhan J. Li, and Xiu X. Zhu*

103.   Plaintiffs Zhu H.L. Lin, Xiu X. Zhu, and Zhan J. Li were employed by GreatCare and Senior Whole Health to work as a care team, providing care services to Ms. C., an elderly woman who lived in Manhattan, New York.

104.   Ms. Lin provided care services to Ms. C. from March 2016 through March 2021 when Ms. C. passed away. Initially, Ms. Lin worked one to two 24-hour shifts per week. Beginning in approximately 2019, Ms. Lin worked three consecutive 24-hour shifts per week.

105.   Ms. Zhu also provided care services to Ms. C. from September 2017 through February 2021. Throughout this period, Ms. Zhu worked three consecutive 24-hour shifts per week.

106.   Starting in December 2020 through March 2021, Ms. Zhan J. Li joined Ms. Lin and Ms. Zhu in providing 24-hour, "live-in" care services to Ms. C. Ms. Zhan J. Li worked one 24-hour shift each week.

107.   In caring for Ms. C., Ms. Lin, Ms. Zhan J. Li, and Ms. Zhu's responsibilities included cooking, cleaning, toileting, bathing, and feeding Ms. C., and reminding her to take medications for her medical conditions, including using the nebulizer for her asthma.

108. Ms. C. had many serious health conditions, including dementia. She had no set sleep schedule. Ms. C. often forgot when she last ate or used the toilet. Thus, she would frequently want to eat or use the toilet again.

109. Ms. Lin, Ms. Zhan J. Li, and Ms. Zhu were required to attend to Ms. C. at all times to prevent Ms. C. from falling because Ms. C. had experienced falls, which once resulted in serious injury to Ms. C.'s face. Ms. C. frequently tried to get up from the bed to use the portable toilet, including at nighttime, which required Ms. Lin, Ms. Zhan J. Li, and Ms. Zhu's immediate assistance.

110. Although Ms. C. also preferred to use her bedside commode, Ms. C. also wore a diaper, which Ms. Lin, Ms. Zhan J. Li, and Ms. Zhu were required to check and change every 2-3 hours, even during the nighttime.

111. Ms. C. lived in a studio apartment. The only sleeping accommodation provided to Ms. Lin, Ms. Zhan J. Li, and Ms. Zhu was a stiff sofa a few steps away from Ms. C.'s bed that provided Plaintiffs with no privacy or respite.

112. While caring for Ms. C., Ms. Lin, Ms. Zhan J. Li, and Ms. Zhu did not receive 8 hours of sleep per 24-hour shift and did not receive five continuous, uninterrupted hours of sleep per 24-hour shift.

113. While caring for Ms. C., Ms. Lin, Ms. Zhan J. Li, and Ms. Zhu did not receive three full hours of completely duty-free meal breaks. They were at most able to get a half-hour of break for lunch and dinner each.

114.   Though all 24-hours of Ms. Lin, Ms. Zhan J. Li, and Ms. Zhu's shifts were compensable, while providing care services to Ms. C., they were not paid for more than 13 hours when they worked a "live-in" shift. Ms. Lin, Ms. Zhan J. Li, and Ms. Zhu received no compensation for 11 hours of each 24-hour shift.

115.   At the end of each 24-hour shift, Plaintiffs were required to dial-in activity codes by phone. The codes Plaintiffs dialed-in were assigned to them by GreatCare and did not include codes for reporting night work, inadequate sleep, or inadequate meal breaks.

116.   Prior to December 2020, Ms. Zhan J. Li was also employed by GreatCare and, at varying times jointly by Senior Whole Health, CenterLight, and/or other MLTCs whenever she provided care services to the members of the respective MLTCs, including a couple, Mr. P. and Ms. P., who lived in Manhattan.

117.   For several years from 2017 to approximately 2020, Ms. Zhan J. Li worked three consecutive 24-hour shifts per week providing services to Mr. P and Ms. P.

118.   Ms. Zhan J. Li cleaned and cooked for the couple and helped transfer Ms. P. from her bed to the couch. Ms. P. was mostly confined to her bed, and Ms. Zhan J. Li had to help Ms. P. with changing her diaper or toileting at least twice a night.

119.   Ms. Zhan J. Li slept in a bed in the same room as Mr. P and Ms. P. Throughout the time that Ms. Zhan J. Li worked for the couple, she did not sleep for 8

23

hours or obtain 5 hours of continuous sleep per 24-hour shift. Ms. Zhan J. Li did not receive three full hours of meal breaks per 24-hour shift.

120.  Sometime during the period that Ms. Zhan J. Li worked for the couple, a coordinator called her and asked her to go by the office. She was given log forms to complete about her sleep and meal hours each week. The coordinator instructed Ms. Zhan J. Li to write down that she received at least 6 hours of sleep and 1 hour for meals using a sample in Chinese that the coordinator gave her and to submit these logs weekly. She followed the coordinator's instructions. When Ms. Zhan J. Li forgot to complete these logs, a coordinator would instruct Ms. Zhan J. Li to go into the office and sign a stack of completed log forms. The coordinator told her that Ms. Zhan J. Li was making her job "very difficult" if she did not sign them. Even though the information was not correct, Ms. Zhan J. Li signed the forms because she believed it was necessary to keep her job.

121.  Sometime during Ms. Lin's employment, a coordinator also called her and told her to come into the office. There a coordinator told her that every HHA who worked 24-hour shifts had to fill out log forms that would show that the aide received five continuous hours of sleep whether or not that was the amount of sleep really received.

122.  Ms. Lin told the coordinator that she did not know how to complete the log form. The coordinator told her to complete her sleep and meal hours by copying the

24

information on a sample in Chinese. Even though the information was not correct, Ms. Lin completed the forms as requested because she believed it was necessary to keep her job.

123.   Sometime during Ms. Zhu's employment, she too was given logs to fill out about her sleep and meal hours.

124.   During Ms. Lin, Ms. Zhan J. Li, and Ms. Zhu's employment at GreatCare, GreatCare supervisors often required Ms. Lin, Ms. Zhan J. Li, and Ms. Zhu to sign or check documents that were in English, unexplained, blank, or not fully filled in that they did not understand and for which no explanation was provided.

125.   When they first began working for Defendants, Ms. Lin and Ms. Zhu were not informed that they would be paid for only 13 hours per 24-hour shift.

126.   Ms. Lin did not know that she was not going to be paid for 24 hours of work until she received her first paycheck. When she received her paycheck that paid her for only 13 hours of each 24-hour shift, she questioned the coordinator. The coordinator told her, "All [home health] agencies pay this much. Didn't you know?"

127.   Mr. Zhan J. Li also did not know that she was only going to be paid for 13 hours of work until she received her first paycheck.

128.   None of the Defendants informed Ms. Lin, Ms. Zhan J. Li, or Ms. Zhu that they had a right to be paid for all 24 hours of their shifts if they did not receive adequate sleep or meal breaks.

129.   Neither Ms. Lin, Ms. Zhan J. Li, nor Ms. Zhu received wage notices or complete and accurate pay statements while they were employed by Defendants. As a result, they were not aware of how much they were being paid, what their hourly rate of pay was, whether they were receiving overtime wages, and what allowances or deductions Defendants were claiming.

130.   As a result of Defendants' failures to provide Ms. Lin, Ms. Zhan J. Li, and Ms. Zhu with the notices and statements required by Section 195 of the NYLL, Plaintiffs did not become aware that the Defendants were violating their rights to receive the minimum wage and overtime for all 24-hours of the shifts worked until approximately 2021 or 2022.

131.   Throughout the time they were employed by Defendants, Ms. Lin, Ms. Zhan J. Li, and Ms. Zhu did not receive overtime pay when they worked more than forty hours per week.

132.   Throughout the time they were employed by Defendants, Ms. Lin, Ms. Zhan J. Li, and Ms. Zhu did not receive "spread of hours" pay when they worked a spread of more than ten hours per shift.

133.   Throughout the time they were employed by Defendants, Ms. Lin, Ms. Zhan J. Li, and Ms. Zhu were paid less than the statutory minimum wage and less than the total hourly compensation required by the Wage Parity Act.

26

134.   Ms. Lin, Ms. Zhan J. Li, and Ms. Zhu each filed complaints with the NYSDOL regarding their employer's NYLL violations, effectively tolling the statute of limitations on their NYLL claims: Ms. Lin filed her complaint on or about May 25, 2023; Ms. Zhan J. Li filed her complaint on or about September 8, 2022; and Ms. Zhu filed her complaint on or about January 3, 2022.

***Working Conditions of Li Chen, Xiu F. Chen and Mu Z. Zhang***

135.   Plaintiffs Li Chen, Xiu F. Chen, and Mu Z. Zhang were employed by GreatCare and Senior Whole Health to work as a care team, providing care services to Ms. W., an elderly woman who lived in Queens, New York.

136.   Ms. Li Chen provided care services to Ms. W. from January 2015 through February 2016. During this period, she worked three consecutive 24-hour shifts per week.

137.   Ms. Xiu F. Chen provided care services to Ms. W. from February 2016 until March 2021. Throughout this period, Ms. Xiu F. Chen worked three consecutive 24-hour shifts per week.

138.   Ms. Zhang provided care services to Ms. W. from January 2015 until March 2021. Ms. Zhang alternated between one, two, and three consecutive 24-hour shifts per week.

139.   In fact, Ms. Li Chen and Ms. Zhang began caring for Ms. W. prior to January 2015 when Ms. W. was receiving care services from another non-defendant

27

home care agency named Amazing Home Care. In 2015, when Ms. W. switched service providers from Amazing to GreatCare, Ms. Li Chen and Ms. Zhang sought employment with GreatCare so that they would be able to continue to provide care services to Ms. W.

140. Ms. W. went to bed each night at approximately midnight. From the time Ms. W. went to bed until the time that she ate breakfast at approximately 8am or 9am, Ms. W. required assistance using her bedside commode every two to three hours. Each occasion of toileting assistance lasted approximately 20-30 minutes.

141. During the period of time they provided care services to Ms. W., Plaintiffs met with nurses who came to Ms. W.'s home to conduct assessments every six months. Some nurses were employed by Senior Whole Health; some were employed by GreatCare. On more than once occasion, Plaintiffs told the nurses about Ms. W.'s consistent and frequent toileting needs throughout the night.

142. Ms. W. passed away in March 2021. For the last six months of her life, Ms. W. had difficulty sleeping. Often she did not fall asleep until 1am, only to wake up at 3 or 4am to use the bathroom. She then slept and woke up intermittently until 6 or 7am.

143. Though Ms. W. lived in a two-bedroom apartment and Ms. Li Chen, Ms. Xiu F. Chen, and Ms. Zhang had the use of one bedroom as their private sleeping quarters, Ms. W.'s consistent and eventually constant nighttime needs prevented Ms. Li

28

Chen, Ms. Xiu F. Chen, and Ms. Zhang from ever obtaining 8 hours of sleep during their 24-hour shifts.

144. While providing care to Ms. W., Ms. Li Chen, Ms. Xiu F. Chen, and Ms. Zhang did not receive five continuous hours of uninterrupted sleep.

145. While providing care to Ms. W., Ms. Li Chen, Ms. Xiu F. Chen, and Ms. Zhang did not receive three full hours of completely duty-free meal breaks.

146. Though all 24-hours of Ms. Li Chen's, Ms. Xiu F. Chen's, and Ms. Zhang's shifts were compensable, while providing care services to Ms. W., Plaintiffs were not paid for more than 13 hours when they worked a "live-in" shift; Plaintiffs received no compensation for 11 hours of each 24-hour shift.

147. At the end of each 24-hour shift, Plaintiffs were required to dial-in activity codes by phone. The codes Plaintiffs dialed-in were assigned to them by GreatCare and did not include codes for reporting night work, inadequate sleep, or inadequate meal breaks.

148. During Ms. Li Chen's, Ms. Xiu F. Chen's, and Ms. Zhang's employment at Great Care, GreatCare supervisors often required Ms. Lin, Ms. Zhan J. Li, and Ms. Zhu to sign or check documents that were in English, unexplained, blank, or not fully filled in that they did not understand and for which no explanation was provided.

29

149. After Ms. W. passed away in March 2021, Ms. Xiu F. Chen and Ms. Zhang continued to work for GreatCare and, at varying times for Senior Whole Health whenever they provided care services to Senior Whole Health's members.

150. Defendants did not inform Ms. Li Chen, Ms. Xiu F. Chen, and Ms. Zhang that they had a right to be paid for all 24-hour shifts if they did not receive adequate sleep or meal breaks.

151. Neither Ms. Li Chen, Ms. Xiu F. Chen, nor Ms. Zhang received wage notices or complete and accurate pay statements while they were employed by Defendants. As a result, Plaintiffs were not aware of how much they were being paid, what their hourly rate of pay was, whether they were receiving overtime wages, and what allowances or deductions GreatCare and Senior Whole Health were claiming.

152. As a result of Defendants' failures to provide Ms. Li Chen, Ms. Xiu F. Chen, and Ms. Zhang with the notices and statements required by Section 195 of the NYLL, Plaintiffs did not become aware that Defendants were violating their rights to receive the minimum wage and overtime for all 24-hours of the shifts worked until approximately 2021 or 2022.

153. Throughout the time they were employed by Defendants, Ms. Li Chen, Ms. Xiu F. Chen, and Ms. Zhang did not receive overtime pay when they worked more than forty hours per week.

154.   Throughout the time they were employed by Defendants, Ms. Li Chen, Ms. Xiu F. Chen, and Ms. Zhang did not receive "spread of hours" pay when they worked a spread of more than ten hours per shift.

155.   Throughout the time they were employed by Defendants, Ms. Li Chen, Ms. Xiu F. Chen, and Ms. Zhang were paid less than the statutory minimum wage and less than the total hourly compensation required by the Wage Parity Act.

156.   Ms. Li Chen, Ms. Xiu F. Chen, and Ms. Zhang each filed complaints with the NYSDOL regarding their employers' NYLL violations, effectively tolling the statute of limitations on their NYLL claims: Ms. Li Chen filed her complaint on or about May 1, 2021; Ms. Xiu F. Chen filed her complaint on or about August 3, 2022; and Ms. Zhang filed her complaint on or about September 12, 2023.

157.   On April 2024, an unidentified employee of GreatCare called Ms. Zhang and aggressively asked her, "Do you think we owe you money?" Ms. Zhang became frightened and hung up the call.

*Working Conditions of Mei F. Chen*

158.   Plaintiff Mei F. Chen worked for GreatCare from March 2016 to January 2019.

159.   From approximately March 6, 2016 until April 17, 2017, Ms. Mei F. Chen worked two consecutive 24-hour shifts per week providing care services to Ms. L., a 100-year-old woman who lived in Manhattan, New York.

31

160.   Each night that Ms. Mei F. Chen provided care services to Ms. L., Ms. L. required toileting assistance at least three times per night. Each occasion of toileting assistance lasted between 30 minutes and one hour and required Ms. Mei F. Chen to stay with Ms. L. the entire time.

161.   The only sleeping accommodation provided to Ms. Mei F. Chen was a bed placed just a few steps away from Ms. L.'s bed that provided no privacy or respite.

162.   On at least one occasion, Ms. Mei F. Chen reported to a coordinator at GreatCare that she could not sleep at night because of Ms. L.'s frequent need for assistance. The coordinator responded, "The work is just like this. Old people are just like this."

163.   While providing care services to Ms. L., Ms. Mei F. Chen did not receive 8 hours of sleep per 24-hour shift and Ms. Mei F. Chen did not receive five continuous, uninterrupted hours of sleep per 24-hour shift.

164.   While providing care services to Ms. L., Ms. Mei F. Chen did not receive three full hours of completely duty-free meal breaks.

165.   At the end of each 24-hour shift, Ms. Mei F. Chen was required to dial-in activity codes by phone. The codes Ms. Mei F. Chen dialed-in were assigned to her by GreatCare and did not include codes for reporting night work, inadequate sleep, or inadequate meal breaks.

166. Though all 24-hours of Ms. Mei F. Chen's shifts were compensable, while providing care services to Ms. L., Ms. Mei F. Chen was not paid for more than 13 hours when she worked a "live-in" shift; Ms. Mei F. Chen received no compensation for 11 hours of each 24-hour shift.

167. When she first began working for GreatCare, Ms. Mei F. Chen was not informed that she would be paid for only 13 hours per 24-hour shift.

168. Ms. Mei F. Chen was not informed by GreatCare that she had a right to be paid for all hours of her 24-hour shifts if she did not receive adequate sleep or meal breaks.

169. Ms. Mei F. Chen did not receive wage notices or pay statements while she was employed by GreatCare. As a result, Ms. Mei F. Chen was not aware of how much she was being paid, what her hourly rate of pay was, whether she was receiving overtime wages, and what allowances or deductions GreatCare was claiming.

170. During Ms. Mei F. Chen's employment at Great Care, GreatCare supervisors often required Ms. Mei F. Chen to sign or check documents that were in English and that she did not understand and for which no explanation was provided.

171. As a result of GreatCare's failures to provide Ms. Mei F. Chen with the notices and statements required by Section 195 of the NYLL, Ms. Mei F. Chen did not become aware that GreatCare was violating her rights to receive the minimum wage and overtime for all 24-hours of the shifts she worked until approximately 2022.

33

172. Throughout the time she was employed by GreatCare, Ms. Mei F. Chen did not receive overtime pay though Ms. Mei F. Chen worked more than forty hours per week.

173. Throughout the time she was employed by GreatCare, Ms. Mei F. Chen did not receive "spread of hours" pay though she worked a spread of more than ten hours per shift.

174. Throughout the time she was employed by GreatCare to work 24-hour, "live-in" shifts, Ms. Mei F. Chen was paid less than the statutory minimum wage.

175. Throughout the time she was employed by GreatCare, Ms. Mei F. Chen was paid less than the total hourly compensation required by the Wage Parity Act.

176. On or about May 1, 2022, Ms. Mei F. Chen filed a complaint with the NYSDOL regarding her employers' NYLL violations, effectively tolling the statute of limitations on her NYLL claims.

### Working Conditions of Hui He

177. Plaintiff Hui He worked for GreatCare and, at varying times jointly for GreatCare and Senior Whole Health and/or CenterLight whenever she provided care services for the MLTC Defendants' members, from approximately July 2016 through approximately July 2020.

178. Ms. He only worked 24-hour shifts; she usually worked on Thursdays, Fridays, and Saturdays.

179. During her employment, Ms. He cared for several patients. For some of them, she worked as a substitute aide, filling in for the care recipients' regular aides for brief periods. For two of the care recipients, Ms. He provided services for more than one year each.

180. One of Ms. He's long-term care recipients was Mr. L., a man in his late 80's who lived with his wife, Auntie M., in Lower Manhattan. Ms. He provided care services to Mr. L. until he passed away.

181. Mr. L. had advanced dementia and serious mobility problems and was confined to bed most of the time. He had a bad temper and was often aggressive.

182. Mr. L. slept only during the day. Because Mr. L. did not sleep at night, Ms. He did not either.

183. As Mr. L. was confined to his bed, Ms. He was required to assist Mr. L. in turning and repositioning his body every two hours to prevent bedsores. Ms. He was also required to change Mr. L.'s diaper every two hours. If the bedding was soiled, Ms. He had to change the bedding as well.

184. With Auntie M.'s help, Ms. He would lift Mr. L. into his wheelchair regularly to wheel him into the bathroom and bathe him.

185. Because Mr. L. had trouble eating regular food, Ms. He fed him milk every half hour to every one-and-half hour or upon his request.

186.   In addition, Ms. He was responsible for preparing food, cleaning, doing laundry, and reminding Mr. L. to take his medications.

187.   During the period Ms. He cared for Mr. L., she slept on a fold-out cot that she set up each night in the living room. Ms. He had no privacy.

188.   After Mr. L. passed away, Ms. He cared for an elderly woman, who lived in New York City.

189.   Ms. He's care recipient could not walk, nor could she talk very much. She had serious mobility issues that prevented her from leaving her bed. As a result, Ms. He was required to turn and reposition her care recipient's body every 2 hours regularly. Ms. He also changed her care recipient's diaper every 2 hours as well as any bedding that may have become soiled.

190.   In addition, Ms. He was responsible for cooking, cleaning, doing laundry, and reminding her care recipient to take her medications.

191.   At this care recipient's home, her care recipient's husband slept in the bedroom while Ms. He's care recipient slept in the living room. The only sleeping accommodation available to Ms. He was a sofa in the living room that provided her with no privacy and was placed so near to the patient's bed that Ms. He's toes touched the toes of her care recipient when she lay down on the sofa.

192.   While providing care services to her care recipients, Ms. He did not receive 8 hours of sleep per 24-hour shift and Ms. He did not receive five continuous, uninterrupted hours of sleep per 24-hour shift.

193.   While providing care services to her care recipients, Ms. He did not receive three full hours of completely duty-free meal breaks. At most, Ms. He was only able to take a half hour for each meal.

194.   Though all 24 hours of Ms. He's shifts were compensable, while providing care services to her care recipients, Ms. He was not paid for more than 13 hours when she worked a "live-in" shift; Ms. He received no compensation for 11 hours of each 24-hour shift.

195.   Ms. He was not informed by Defendants that she had a right to be paid for all 24-hour shifts if she did not receive adequate sleep or meal breaks.

196.   Ms. He did not receive wage notices in Chinese or complete and accurate pay statements while she was employed by Defendants. As a result, Ms. He was not aware of how much she was being paid, what her hourly rate of pay was, whether she was receiving overtime wages, and what allowances or deductions Defendants were claiming.

197.   As a result of Defendants' failures to provide Ms. He with the wage notices in an appropriate language and complete and accurate pay statements required by Section 195 of the NYLL, Ms. He did not become aware that Defendants were violating

her rights to receive the minimum wage and overtime for all 24-hours of the shifts she worked until approximately 2022.

198. At the end of each 24-hour shift, Ms. He was required to dial-in activity codes by phone. The codes to report activities were assigned to Ms. He by GreatCare and did not include codes for reporting night work, inadequate sleep, or inadequate meal breaks.

199. During Ms. He's employment at Great Care, GreatCare supervisors often required Ms. He to sign or check documents that were in English and that she did not understand and for which no explanation was provided.

200. Throughout the time she was employed by Defendants, Ms. He did not receive overtime pay even though Ms. He worked more than forty hours per week.

201. Throughout the time she was employed by Defendants, Ms. He did not receive "spread of hours" pay though she worked a spread of more than ten hours per shift.

202. Throughout the time she was employed by Defendants to work 24-hour, "live-in" shifts, Ms. He was paid less than the statutory minimum wage.

203. Throughout the time she was employed by Defendants, Ms. He was paid less than the total hourly compensation required by the Wage Parity Act.

204. On or about September 1, 2022, Ms. He filed a complaint with the NYSDOL regarding her employers' NYLL violations, effectively tolling the statute of limitations on her NYLL claims.

*Working Conditions of Hui Li*

205. Plaintiff Hui Li worked for GreatCare and, at varying times jointly for Senior Whole Health whenever she provided care services to Senior Whole Health's members, from July 2015 until April 2023. From July 2017 until approximately July 2018, Ms. Hui Li worked four consecutive 24-hour shifts per week. From approximately July 2018 until November 2018, Ms. Hui Li worked three consecutive 24-hour shifts per week.

206. For much of her joint employment by GreatCare and Senior Whole Health, Ms. Hui Li provided care services to Mr. and Ms. P., an elderly husband and wife couple living in Manhattan, New York.

207. Each night that Ms. Hui Li worked a 24-hour shift, Ms. P. required toileting assistance every one to two hours. Frequently during these toileting occasions, Ms. Hui Li had to wash Ms. P.'s bedsheets in the bathtub because of toileting accidents.

208. Ms. P. was also confined to her bed and so required assistance with turning and repositioning her body every two hours, including throughout the night, to prevent bedsores.

209.   Mr. P. did not require nighttime toileting assistance. But because Mr. and Ms. P. lived in a studio apartment, when Mr. P. woke up to use the bathroom, he would turn on the lights and wake up Ms. P. and disturb any rest Ms. Hui Li was able to obtain. Mr. P. woke up to use the bathroom at least two times per night.

210.   Ms. Hui Li did not receive eight hours of sleep during her 24-hour shifts. While providing care services to Mr. and Ms. P., Ms. Hui Li could only obtain about two hours of continuous, uninterrupted sleep.

211.   During her period of employment providing services to Mr. and Ms. P., Ms. Hui Li met with a nurse employed by GreatCare two or three times.

212.   Ms. Hui Li informed the nurse that she could not sleep at night because Ms. P. frequently requested assistance. When Ms. Hui Li asked the nurse if she was required to get up at night to assist Ms. P., the nurse responded that Ms. Hui Li was required to respond to Ms. P.'s needs at all hours of her shift.

213.   Besides a couch in Mr. and Ms. P.'s studio apartment, Mr. and Ms. P.'s home offered no other sleeping accommodation available for Ms. Hui Li that could provide her with privacy or respite.

214.   While providing care services to Mr. and Ms. P., Ms. Hui Li did not receive three full hours of completely duty-free meal breaks.

215.   At the end of each 24-hour shift, Ms. Hui Li was required to dial-in activity codes by phone. The codes Ms. Hui Li dialed-in were assigned to her by GreatCare and

did not include codes for reporting night work, inadequate sleep, or inadequate meal breaks.

216.   Though all 24-hours of Ms. Hui Li's shifts were compensable, while providing care services to Ms. P., Ms. Hui Li was not paid for more than 13 hours when she worked a "live-in" shift; Ms. Hui Li received no compensation for 11 hours of each 24-hour shift.

217.   When she first began working for Defendants, Ms. Hui Li was not informed that she would be paid for only 13 hours per 24-hour shift.

218.   Ms. Hui Li was not informed by Defendants that she had a right to be paid for all 24-hour shifts if she did not receive adequate sleep or meal breaks.

219.   Ms. Hui Li did not receive wage notices or complete and accurate pay statements while she was employed by Defendants. As a result, Ms. Hui Li was not aware of how much she was being paid, whether she was receiving overtime wages, and what allowances or deductions Defendants were claiming.

220.   As a result of Defendants' failures to provide Ms. Hui Li with the notices and statements required by Section 195 of the NYLL, Ms. Hui Li did not become aware that Defendants were violating her rights to receive the minimum wage and overtime for all 24-hours of the shifts she worked until approximately 2022.

221. During Ms. Hui Li's employment at GreatCare, GreatCare supervisors often required Ms. Hui Li to sign or check documents that were in English and that she did not understand and for which no explanation was provided.

222. Throughout the time she was employed by Defendants, Ms. Hui Li did not receive overtime pay from Defendants though Ms. Hui Li worked more than forty hours per week.

223. Throughout the time she was employed by Defendants, Ms. Hui Li did not receive "spread of hours" pay though she worked a spread of more than ten hours per shift.

224. Throughout the time she was employed by Defendants to work 24-hour, "live-in" shifts, Ms. Hui Li was paid less than the statutory minimum wage.

225. Throughout the time she was employed by Defendants, Ms. Hui Li was paid less than the total hourly compensation required by the Wage Parity Act.

226. On or about October 30, 2022, Ms. Hui Li filed a complaint with the NYSDOL regarding her employers' NYLL violations, effectively tolling the statute of limitations on her NYLL claims.

227. After filing her NYSDOL complaint, Ms. Hui Li received a call from Ms. Huang, a woman who identified herself as the "boss" of GreatCare. Ms. Huang told Ms. Hui Li, "Don't listen to what other people tell you."

*Working Conditions of Hui X. Ruan*

228.   Plaintiff Hui X. Ruan was employed by GreatCare and, at varying times jointly by CenterLight and/or Senior Whole Health whenever she provided care services to the MLTC Defendants' members, from approximately March 2015 until approximately September 2023.

229.   Throughout her employment, Ms. Ruan provided long-term 24-hour care services to many individuals.

230.   From approximately March 2016 to approximately December 2017, Ms. Ruan provided 24-hour care services to an elderly woman who lived in Queens, New York who Ms. Ruan referred to as "Po Po," which translates into "grandmother" in English.

231.   For approximately 70% of the time that Ms. Ruan provided services to Po Po, Ms. Ruan worked three consecutive 24-hour shifts per week.

232.   For approximately 30% of the time that Ms. Ruan provided services to Po Po, Ms. Ruan worked five consecutive 24-hour shifts per week.

233.   Ms. Ruan worked so many days per week because the other aide assigned to care for Po Po was frequently absent from her work shifts and Po Po's daughter begged Ms. Ruan to assist her mother.

234.   During each 24-hour shift worked by Ms. Ruan, Po Po required toileting assistance every one to two hours throughout the night.

43

235. During the period of time that Ms. Ruan provided care services to Po Po, a nurse came every two or three months to assess Po Po.

236. Some of the nurses who came to assess Po Po spoke only English and could not communicate directly with Ms. Ruan. These nurses called Po Po's daughter to conduct the assessment.

237. Some of the nurses spoke Cantonese and spoke directly to Ms. Ruan. The nurses asked Ms. Ruan what assistance she provided at night. Ms. Ruan explained that the work was very difficult because Po Po woke up every hour at night. The nurses also asked many questions about Po Po's health, activities, and medication.

238. On one occasion, when Ms. Ruan repeated that her work was very difficult because she had to assist Po Po every hour at night, the nurse responded, "Yes, yes. I understand. Thank you, you're good."

239. From January 2018 to May 2019, Ms. Ruan provided 24-hour care services to Ms. C., an elderly woman who lived in Flushing, New York.

240. During each 24-hour shift that Ms. Ruan worked providing services to Ms. C., Ms. C. slept for only two hours in the afternoon after eating lunch. Ms. C. did not sleep at night. Instead, Ms. C. was most active at night, watching television, requesting meals, and requiring assistance with toileting.

241. Each night that Ms. Ruan provided services to Ms. C., Ms. Ruan had to provide toileting assistance to Ms. C. every one to two hours.

242.   Approximately six months after Ms. Ruan began providing services to Ms. C., a nurse came to conduct an assessment of Ms. C. Because the nurse spoke only English, Ms. C.'s daughter provided interpretation.

243.   The nurse asked many questions regarding Ms. C.'s health and activities. Ms. Ruan explained that she found it very difficult to provide care services to Ms. C. because of Ms. C.'s high needs, especially during the night.

244.   From approximately October 2019 to February 2020, Ms. Ruan provided services to another care recipient. During this period, Ms. Ruan worked only 8-hour shifts, 5 days per week.

245.   From approximately March 2020 to December 2021, Ms. Ruan provided 24-hour care services to Ms. C., an elderly woman who lived in Manhattan, New York.

246.   During this period, Ms. Ruan worked two consecutive 24-hour shifts per week.

247.   Ms. C. suffered from strong delusions during the night that prevented her from sleeping. She often shook the rail to her bed, made loud noises, and shouted, "Fire!"

248.   Ms. C.'s neighbors frequently complained about the noise Ms. C. made at night. At least three times per week, Ms. C.'s daughter came to the building where her mother lived to apologize to the neighbors.

249.   Each night, Ms. Ruan assisted Ms. C. with toileting at least every two hours.

250. Ms. C. lived in a studio apartment, and Ms. Ruan was provided with only a sofa on which to sleep.

251. On multiple occasions, Ms. Ruan was working when a nurse came to conduct an assessment of Ms. C.

252. One of the nurses was the Cantonese-speaking nurse Ms. Ruan had previously encountered while providing care services to Po Po. This nurse asked Ms. Ruan questions about the care services she provided to Ms. C. during the night. Ms. Ruan explained that she could not sleep at night because of Ms. C.'s condition and needs. The nurse responded, "Oh, I understand. It's very difficult. You are a very good person."

253. After Ms. C. passed away in December 2021, GreatCare assigned Ms. Ruan to six hours of work per week and on one occasion, for approximately two weeks, Ms. Ruan was assigned to provide "live-in" 24-hour care services to a husband-and-wife pair.

254. In 2023, Ms. Ruan retired from work.

255. While providing 24-hour care services to her care recipients, Ms. Ruan did not receive 8 hours of sleep per 24-hour shift and Ms. Ruan did not receive five continuous, uninterrupted hours of sleep per 24-hour shift.

256. While providing 24-hour care services to her care recipients, Ms. Ruan did not receive three full hours of completely duty-free meal breaks.

257.    At the end of each 24-hour shift, Ms. Ruan was required to dial-in activity codes by phone. The codes Ms. Ruan dialed-in were assigned to her by GreatCare and did not include codes for reporting night work, inadequate sleep, or inadequate meal breaks.

258.    Though all 24-hours of Ms. Ruan's shifts were compensable, while providing care services to her care recipients, Ms. Ruan was not paid for more than 13 hours when she worked a "live-in" shift; Ms. Ruan received no compensation for 11 hours of each 24-hour shift.

259.    Ms. Ruan was not informed by Defendants that she had a right to be paid for all hours of her 24-hour shifts if she did not receive adequate sleep or meal breaks.

260.    Ms. Ruan complained about her lack of sleep to the coordinators of GreatCare multiple times. Each time, Ms. Ruan would request a different work assignment because she was completely unable to sleep at night. Each time, GreatCare's coordinators gave Ms. Ruan essentially the same response: "24-hour work is all like this. If you want to work, then work. If you don't like it, get another job."

261.    During Ms. Ruan's employment at GreatCare, GreatCare supervisors often required Ms. Ruan to sign or check documents that were in English and that she did not understand and for which no explanation was provided.

262.    Ms. Ruan did not receive wage notices or complete and accurate pay statements while she was employed by Defendants. As a result, Ms. Ruan was not

47

aware of how much she was being paid, what her hourly rate of pay was, whether she was receiving overtime wages, and what allowances or deductions Defendants were claiming.

263.   As a result of Defendants' failures to provide Ms. Ruan with the notices and statements required by Section 195 of the NYLL, Ms. Ruan did not become aware that Defendants were violating her rights to receive the minimum wage and overtime for all 24-hours of the shifts she worked until approximately 2022.

264.   Throughout the time she was employed by Defendants, Ms. Ruan did not receive overtime pay, though Ms. Ruan worked more than forty hours per week.

265.   Throughout the time she was employed by Defendants, Ms. Ruan did not receive "spread of hours" pay though she worked a spread of more than ten hours per shift.

266.   Throughout the time she was employed by Defendants to work 24-hour, "live-in" shifts, Ms. Ruan was paid less than the statutory minimum wage.

267.   Throughout the time she was employed by Defendants, Ms. Ruan was paid less than the total hourly compensation required by the Wage Parity Act.

268.   On or about May 12, 2022, Ms. Ruan filed a complaint with the NYSDOL regarding her employers' NYLL violations, effectively tolling the statute of limitations on her NYLL claims.

*Working Conditions of Jian R. Xiao, Mei Z. Xiao, and Bi Y. Zheng*

269.   Plaintiffs Jian R. Xiao, Mei Z. Xiao, and Bi Y. Zheng were employed by GreatCare and a non-defendant MLTC to work as a care team, providing care services to Ms. Y., an elderly woman who lives in Manhattan, New York.

270.   Ms. Jian R. Xiao first started providing care services to Ms. Y. three consecutive 24-hour shifts per week in November 2020.

271.   Ms. Mei Z. Xiao first started providing care services to Ms. Y. three consecutive 24-hour shifts per week in May 2018. Ms. Mei Z. Xiao took an approximately one-year leave of absence from work between May 2022 to May 2023.

272.   Ms. Zheng provided care services to Ms. Y. from October 2018 to August 2021 during which time she worked three consecutive 24-hour shifts per week.

273.   Throughout the time that Ms. Jian R. Xiao, Ms. Mei Z. Xiao, and Ms. Zheng has or had provided services to Ms. Y., Ms. Y. has required toileting assistance approximately 5 to 7 times per night. Ms. Y. also suffers pains and cramps during the night, requiring Plaintiffs to massage her or assist her with medication.

274.   A second bed was placed next to Ms. Y.'s bed for Ms. Jian R. Xiao, Ms. Mei Z. Xiao, and Ms. Zheng to use to rest. Plaintiffs' bed and Ms. Y.'s bed were separated by just Ms. Y.'s bedside commode.

275.   While providing care services to Ms. Y., Ms. Jian R. Xiao, Ms. Mei Z. Xiao, and Ms. Zheng did not obtain eight hours of sleep per 24-hour shift. Plaintiffs also did not obtain five hours of continuous, uninterrupted sleep per 24-hour shift.

276.   While providing care services to Ms. Y., Ms. Jian R. Xiao, Ms. Mei Z. Xiao, and Ms. Zheng did not receive three hours of completely duty-free meal breaks per 24-hour shift.

277.   A nurse calls Ms. Y. every six months. Ms. Zheng has told the nurse that Ms. Y. is unable to sleep at night because of her frequent needs. On multiple occasions, Ms. Jian R. Xiao and Mei Z. Xiao have also spoken with nurses. Both Plaintiffs reported Ms. Y.'s frequent nighttime needs to the nurse.

278.   Twice, prior to February 2019, Ms. Mei Z. Xiao went to GreatCare's headquarters on 34th Street to report to a coordinator that she was unable to sleep at night because of Ms. Y.'s frequent toileting needs. Ms. Xiao stated her belief that the taxing nature of the work was affecting her health and requested that she be assigned to a different care recipient.

279.   GreatCare's coordinator refused to reassign Ms. Y. Instead, the coordinator responded, "That's what doing this work is like. That's what caring for old people is like."

280.   Around this time, a nurse went to Ms. Y.'s home for an hours-long nighttime assessment. The nurse was present in Ms. Y.'s home from approximately 6pm to 5am and sat in Ms. Y.'s living room the entire time.

281.   The nurse did not speak any Chinese languages and did not interview either Ms. Y. or Ms. Mei Z. Xiao.

282.   From her position in the living room, the nurse was unable to look directly into Ms. Y's bedroom to observe the care services that Ms. Mei Z. Xiao was providing, including help with using the bedside commode. However, the nurse should have been able to hear that Ms. Y. and Ms. Mei Z. Xiao were active throughout the entire night.

283.   Soon afterwards, in February 2019, Ms. Mei Z. Xiao collapsed from cardiac arrest and received emergency bypass surgery. Ms. Mei Z. Xiao's doctor attributed her dangerously poor health to her inability to obtain sleep at night.

284.   Ms. Mei Z. Xiao took approximately one to two months off to recuperate. During this time, she again requested that GreatCare assign her to a different care recipient. GreatCare again refused. Ms. Mei Z. Xiao was told that she should get another job if she did not want to continue providing care services to Ms. Y.

285.   Unable to endure any additional loss of income, after her period of recuperation, Ms. Mei Z. Xiao returned to work. However, in May 2022, Ms. Mei Z. Xiao suffered another cardiac incident that required a second emergency bypass surgery.

51

286.   After Ms. Mei Z. Xiao recuperated for approximately one year, and in or about May 2023, she returned to work for GreatCare providing care services to Ms. Y.

287.   Though all 24-hours of Ms. Jian R. Xiao, Ms. Mei Z. Xiao, and Ms. Zheng's shifts are compensable, while providing care services to Ms. C., they are or were not paid for more than 13 hours when they worked a "live-in" shift; Ms. Jian R. Xiao, Ms. Mei Z. Xiao, and Ms. Zheng received no compensation for 11 hours of each 24-hour shift.

288.   At the end of each 24-hour shift, Plaintiffs were required to dial-in activity codes by phone. The codes Plaintiffs dialed-in were assigned to them by GreatCare and did not include codes for reporting night work, inadequate sleep, or inadequate meal breaks.

289.   During the time that Ms. Jian R. Xiao, Ms. Mei Z. Xiao, and Ms. Zheng were employed by GreatCare, GreatCare supervisors often required Ms. Jian R. Xiao, Ms. Mei Z. Xiao, and Ms. Zheng to sign or check documents that were in English and that they did not understand and for which no explanation was provided.

290.   GreatCare did not inform Ms. Jian R. Xiao, Ms. Mei Z. Xiao, and Ms. Zheng that they had a right to be paid for all hours of a 24-hour shift if they did not receive adequate sleep or meal breaks.

291.   Ms. Jian R. Xiao did not receive wage notices or complete and accurate pay statements while she was employed by GreatCare. Ms. Xiao M. Zheng and Ms. Zheng

52

did not receive wage notices or pay statements while they were employed by GreatCare. As a result, Plaintiffs were not aware of how much they were being paid, what their hourly rate of pay was, whether they were receiving overtime wages, and what allowances or deductions GreatCare was claiming.

292.   As a result of GreatCare's failures to provide Ms. Jian R. Xiao, Ms. Mei Z. Xiao, and Ms. Zheng with the notices and statements required by Section 195 of the NYLL, Plaintiffs did not become aware that GreatCare was violating their rights to receive the minimum wage and overtime for all 24-hours of the shifts worked until approximately 2022 or 2023.

293.   Throughout the time they were or have been employed by GreatCare, Ms. Lin, Ms. Zhan J. Li, and Ms. Zhu have not received overtime pay when they worked more than forty hours per week.

294.   Throughout the time they were or have been employed by GreatCare, Ms. Jian R. Xiao, Ms. Mei Z. Xiao, and Ms. Zheng have not received "spread of hours" pay when they worked a spread of more than ten hours per shift.

295.   Throughout the time they were or have been employed by GreatCare, Ms. Jian R. Xiao, Ms. Mei Z. Xiao, and Ms. Zheng were or have been paid less than the statutory minimum wage and less than the total hourly compensation required by the Wage Parity Act.

296.  Ms. Ms. Jian R. Xiao, Ms. Mei Z. Xiao, and Ms. Zheng have each filed complaints with the NYSDOL regarding their employers' NYLL violations, effectively tolling the statute of limitations on their NYLL claims: Ms. Jian R. Xiao and Ms. Mei Z. Xiao filed their complaints on or about May 18, 2023; Ms. Zheng filed her complaint on or about November 21, 2022.

297.  In July 2023, an unidentified person from GreatCare called Ms. Jian R. Xiao. The person said to Ms. Jian R. Xiao, "Do we owe you money? You are sleeping and you want to get paid? You're fired! Don't come back to work tomorrow!"

298.  That same day, another unidentified person from GreatCare called Ms. Y.'s daughter and told the daughter that GreatCare was giving Ms. Y. one month to switch to a different home care services provider.

299.  As a result, Ms. Jian R. Xiao and Ms. Mei Z. Xiao continued to work their usual weekly schedules for GreatCare until August 2023, when Ms. Y. moved to non-defendant Queens Homecare Agency. Since Ms. Y. moved to Queens Homecare Agency, Ms. Jian R. Xiao and Ms. Mei Z. Xiao continue to care for Ms. Y.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**For Failure to Pay Minimum Wage Under the Fair Labor Standards Act**
**(Plaintiffs Xiu F. Chen, Hei Li, Hui Li, Hui X. Ruan, Jian R. Xiao, Mei Z. Xiao, Mu Z. Zhang)**

300.  Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs as if fully set forth herein.

54

301.   Plaintiffs were employees of Defendants, and Defendants were Plaintiffs' employers, within the meaning of the FLSA. 29 U.S.C. § 203.

302.   Since January 1, 2015, home care aides, including those providing personal care services, employed by third-party agencies or employers must be paid the minimum wage. 29 U.S.C. § 209; 29 C.F.R. § 552.109(a).

303.   Defendants failed to pay Plaintiffs Xiu F. Chen, Hei Li, Hui Li, Hui X. Ruan, Jian R. Xiao, Mei Z. Xiao, and Mu Z. Zhang at the applicable legal minimum hourly wage, in violation of 29 U.S.C. § 206(a).

304.   Defendants' failure to pay Plaintiffs Xiu F. Chen, Hei Li, Hui Li, Hui X. Ruan, Jian R. Xiao, Mei Z. Xiao, and Mu Z. Zhang the lawfully minimum hourly wage was or is willful.

305.   Due to Defendants' FLSA violations, Plaintiffs Xiu F. Chen, Hei Li, Hui Li, Hui X. Ruan, Jian R. Xiao, Mei Z. Xiao, and Mu Z. Zhang are entitled to recover from Defendants, jointly and severally during the periods in which they were employers, Plaintiffs' unpaid minimum wages and liquidated damages, as well as reasonable attorneys' fees, costs associated with this action, and interest.

## SECOND CAUSE OF ACTION
### For Failure to Pay Minimum Wage Under the New York Labor Law

306.   Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs as if fully set forth herein.

307.   At all times relevant to this action, Plaintiffs were employees within the meaning of the NYLL, including but not limited to NYLL §§ 2 and 651.

308.   NYLL requires that employers pay their employees specified minimum hourly wages. NYLL § 652.

309.   Defendants failed to pay Plaintiffs at the applicable legal minimum hourly wage, in violation of NYLL § 652 and supporting regulations and orders of the NYSDOL.

310.   Due to Defendants' NYLL violations, Plaintiffs are entitled to recover from Defendants, jointly and severally during the periods in which they were employers, Plaintiffs' unpaid minimum wages and liquidated damages, as well as reasonable attorneys' fees, costs associated with this action, and interest.

**THIRD CAUSE OF ACTION**
**For Failure to Pay Overtime Wages Under the Fair Labor Standards Act**
**(Plaintiffs Xiu F. Chen, Hei Li, Hui Li, Hui X. Ruan, Jian R. Xiao, Mei Z. Xiao, and Mu Z. Zhang)**

311.   Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs as if fully set forth herein.

312.   Plaintiffs were employees of Defendants, and Defendants were Plaintiffs' employers, within the meaning of the FLSA. 29 U.S.C. § 203.

313.   Since January 1, 2015, home care aides, including those providing personal care services, employed by third-party agencies or employers must be paid overtime compensation at an hourly rate of one and one-half times the minimum wage or regular

56

rate of pay, whichever is greater, for all hours worked in excess of 40 per week. 29

U.S.C. § 207; 29 C.F.R. § 551.109(a).

314.   Defendants failed to pay Plaintiffs Xiu F. Chen, Hei Li, Hui Li, Hui X. Ruan,

Jian R. Xiao, Mei Z. Xiao, and Mu Z. Zhang overtime wages at one and one-half times

their regular rate for each hour worked in excess of 40 per week, in violation of 29

U.S.C. § 207.

315.   Defendants' failure to pay Plaintiffs Xiu F. Chen, Hei Li, Hui Li, Hui X.

Ruan, Jian R. Xiao, Mei Z. Xiao, and Mu Z. Zhang lawful overtime wages was willful.

316.   Due to Defendants' FLSA violations, Plaintiffs Xiu F. Chen, Hei Li, Hui Li,

Hui X. Ruan, Jian R. Xiao, Mei Z. Xiao, and Mu Z. Zhang are entitled to recover from

Defendants, jointly and severally during the periods in which they were employers,

Plaintiffs' unpaid overtime wages and liquidated damages, as well as reasonable

attorneys' fees, costs associated with this action, and interest.

**FOURTH CAUSE OF ACTION**
**For Failure to Pay Overtime Wages Under the New York Labor Law**

317.   Plaintiffs reallege and incorporate by reference all allegations in all

preceding paragraphs as if fully set forth herein.

318.   At all times relevant to this action, Plaintiffs were employed by Defendants

within the meaning of the NYLL, including but not limited to NYLL §§ 2 and 651.

319.   Since January 1, 2015, home care aides, including those providing personal

care services, employed by third-party agencies or employers must be paid overtime

compensation at an hourly rate of 150% the minimum wage or regular rate of pay, whichever is greater, for all hours worked in excess of 40 per week. NYLL § 652; 12 N.Y.C.R.R. §§ 142-2.2, 142-3.2; 29 C.F.R. § 551.109(a).

320.  Defendants failed to pay Plaintiffs overtime wages at an hourly rate of 150% of at least the minimum wage for each hour worked in excess of 40 per week, in violation of NYLL § 652 and 12 N.Y.C.R.R. §§ 142-2.2 and 142-3.2.

321.  Due to Defendants' NYLL violations, Plaintiffs are entitled to recover from Defendants, jointly and severally during the periods in which they were employers, Plaintiffs' unpaid overtime wages and liquidated damages, as well as reasonable attorneys' fees, costs associated with this action, and interest.

## FIFTH CAUSE OF ACTION
### For Failure to Pay Spread of Hours Under the New York Labor Law

322.  Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs as if fully set forth herein.

323.  Plaintiffs were employed by Defendants within the meaning of the NYLL, including but not limited to NYLL §§ 2 and 651.

324.  Employees are entitled to receive one hour's pay at the basic minimum wage rate for any day in which the spread of hours exceeds 10 hours. 12 N.Y.C.R.R. §§ 142-2.4, 142-3.4.

325.  Defendants failed to pay Plaintiffs spread of hours pay each day Plaintiffs worked a spread in excess of 10 hours.

326.   Due to Defendants' NYLL violations, Plaintiffs are entitled to recover from Defendants, jointly and severally during the periods in which they were employers, Plaintiffs' unpaid spread of hours pay and liquidated damages, as well as reasonable attorneys' fees, costs associated with this action, and interest.

## SIXTH CAUSE OF ACTION
### For Failure to Comply with Notice Requirements

327.   Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs as if fully set forth herein.

328.   Defendants failed to comply with NYLL § 195, which sets out notice and recordkeeping requirements governing employers in the State of New York, and 12 N.Y.C.R.R. §§ 142-2.6 and 142-3.6 governing the records that Defendants are required to maintain and preserve.

329.   Defendants failed to provide Plaintiffs with wages notices in English and/or their primary language setting forth Plaintiffs' rate of pay, the basis for determining that rate, and any allowances claimed against Defendants' minimum wage obligations, in violation of NYLL § 195(1)(a).

330.   Due to these violations, Plaintiffs are entitled to recover from Defendants, jointly and severally during the periods in which they were employers, $50 for each workday that the violations occurred, up to a total of $5,000 per Plaintiff, together with costs and reasonable attorneys' fees, and any other relief that this Court deems necessary and appropriate. NYLL § 198(1-b).

59

## SEVENTH CAUSE OF ACTION
### For Failure to Comply with Wage Statement Requirements

331.  Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs as if fully set forth herein.

332.  Defendants failed to provide Plaintiffs with detailed and accurate wage statements with each payment of wages, in violation of NYLL § 195(3).

333.  Due to these violations, Plaintiffs are entitled to recover from Defendants, jointly and severally during the periods in which they were employers, $250 for each workday that the violations occurred, up to a total of $5,000 per Plaintiffs, together with costs and reasonable attorneys' fees, and any other relief that this Court deems necessary and appropriate. NYLL § 198(1-d).

## EIGHTH CAUSE OF ACTION
### For Failure to Pay Wages as Required by the New York Home Care Worker Wage Parity Act

334.  Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs as if fully set forth herein.

335.  Pursuant to the New York Home Care Worker Wage Parity Act ("Wage Parity Act"), N.Y. Pub. Health Law § 3614-c, and state contractual obligations, Defendants were required to certify and did certify that it paid Plaintiffs wages and/or wage supplements as specified by the Act.

336.  The agreements to pay Plaintiffs as required by the Wage Parity Act were made for the benefit of Plaintiffs.

60

337.  By failing to pay Plaintiffs for each hour worked, Defendants breached their obligations to pay Plaintiffs all wages they were due as required by the Wage Parity Act and cause injury to Plaintiffs.

338.  Plaintiffs, as third-party beneficiaries of Defendants' contracts with NYSDOH to pay wages as required by the Wage Parity Act, are entitled to relief for this breach of contractual obligation plus interest.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that a judgment be granted as follows:

(a) Declaring Defendants' conduct complained of herein to be in violation of Plaintiffs' rights under the FLSA, NYLL, and New York common law;

(b) Awarding Plaintiffs unpaid minimum wages and overtime wages due under the FLSA, NYLL, and New York common law;

(c) Awarding Plaintiffs spread of hours pay under the NYLL;

(d) Awarding Plaintiffs damages due to notice of pay rate violations under the NYLL;

(e) Awarding Plaintiffs damages due to wage statement violations under the NYLL;

(f) Awarding Plaintiffs liquidated damages;

(g) Awarding Plaintiffs pre-judgment and post-judgment interest;

(h) Awarding Plaintiffs the costs associated with this action, together with

reasonable attorneys' fees; and

(i) Awarding such other relief as this Court deems just and proper.


Dated:  August 18, 2025          NATIONAL CENTER FOR LAW AND
        New York, New York       ECONOMIC JUSTICE

                                 /s/ *Carmela Huang*
                                 Carmela Huang
                                 Claudia Wilner
                                 50 Broadway, 15th Floor
                                 New York, NY 10004-3821
                                 (646) 393-3048
                                 huang@nclej.org
                                 wilner@nclej.org

                                 GETMAN, SWEENEY & DUNN, PLLC
                                 Karen Kithan Yau
                                 260 Fair Street
                                 Kingston, NY 12401
                                 (845) 255-9370
                                 kyau@getmansweeney.com

                                 *Counsel for Plaintiffs*