UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK
------------------------------:

HEI LI, et al.,                      : Case No.: 24-cv-7401

                    Plaintiffs,:

        v.                           :

GREATCARE, INC., et al.,        : New York, New York

                    Defendant. : December 1, 2025

------------------------------:


        TRANSCRIPT OF STATUS CONFERENCE HEARING

     BEFORE THE HONORABLE KATHARINE H. PARKER

          UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For Plaintiffs:           NATIONAL CENTER FOR LAW
                          AND ECONOMIC JUSTICE
                          BY:  Carmella Huang, Esq.
                          50 Broadway - Suite 150
                          New York, New York 10004

For Plaintiffs:           GETMAN SWEENEY & DUNN PLLC
                          BY:  Karen K. Yau, Esq.
                               Caroline Friedman, Esq.
                          260 Fair Street
                          Kingston, New York 10004

FOR DEFENDANT:            LAW OFFICE OF JOSE A. MUNIZ
Greatcare                 BY:  Jose A. Muniz, Esq.
                          81-31 Baxter Avenue
                          Elmhurst, NY 11373


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

     AMM TRANSCRIPTION SERVICE - 631.334.1445

APPEARANCES (Continued)


For Defendant:              BRENLLA, LLC
CenterLight Health          BY:  George F. Brenlla, Esq.
System                      250 Park Avenue - 7th Floor
                            New York, New York 10177


For Defendant:              STRADLEY RONON STEVENS &
Senior Whole Health         YOUNG
                            BY:  Kaitlyn Grajek, Esq.
                            One Riverfront Plaza
                            Newark, New Jersey 07102

THE DEPUTY CLERK:  Calling Case: 24-cv-7401, Li v. Greatcare, Incorporated.

Beginning with counsel for the plaintiffs, please make your appearance for the record.

MS. HUANG:  Carmela Huang, from the National Center for Law and Economic Justice, for the plaintiffs.

Good morning, your Honor.

THE COURT:  Good morning.

MS. YAU:  Good morning, your Honor.  This is Karen Yau, from Getman Sweeney & Dunn, and with me is my colleague, Caroline Friedman.

THE COURT:  Hi.

THE DEPUTY CLERK:  And for the defendants, counsel for Greatcare defendant, please make your appearance for the record.

MR. MUNIZ:  Yes.  Jose Muniz for Greatcare.

Good morning, your Honor.

THE DEPUTY CLERK:  And counsel for CenterLight, please make your appearance.

MR. BRENLLA:  Good morning, your Honor. George Brenlla for CenterLight Health System.

THE DEPUTY CLERK:  And counsel for Senior Whole Health, please make your appearance.

MS. GRAJEK:  Good morning, your Honor.

Kaitlyn Grajek, of Stradley Ronon Stevens & Young, on behalf of Senior Whole Health.

THE COURT: Okay. So we were supposed to be having a settlement conference. Guess that's not happening.

You made a demand? You made a specific demand for each of your plaintiffs?

MS. HUANG: We have not yet, your Honor.

THE COURT: Well, under my rules, you're supposed to make a demand.

MS. HUANG: Well, your Honor, the counsel for Greatcare had notified us about a month ago that his client was not going to be available for a settlement conference and had not indicated any --

THE COURT: I want you to make a demand for each of your plaintiffs.

MS. HUANG: All right, your Honor.

THE COURT: They don't need documents to make a demand because they are using their memory of how many hours that they worked.

MS. HUANG: We have provided very detailed damages calculations that are based on all of the payroll records that we've received and also the records that we got from HHAeXchange showing the specific hours that they worked. So our demand will

be very, very close to the calculations that we provided.

THE COURT:  Okay.  So for each of the 14 -- 14 plaintiffs; is that right?

MS. HUANG:  That's right.

THE COURT:  For each of the 14, do you now have -- you have wage records for them?

MS. HUANG:  We do not have wage records, your Honor, but we have reconstructed what are approximately -- what we believe to be very close to wage records.

THE COURT:  For each of the 14?

MS. HUANG:  For each of the 14.

THE COURT:  And for each of the 14, do you know who they worked for?  Did they either work for one or more of these defendants?

MS. HUANG:  Yes, all 14 plaintiffs worked for Center -- sorry -- worked for Greatcare.  Some of them have worked for CenterLight.  Some of them worked for Senior Whole Health.  And some of them were doing work under other non-defendant MLTCs.  We have identified all of that, and that is all spelled out in the amended complaint as well.

THE COURT:  Okay.  So you have received documents from third-party subpoenas?

MS. HUANG:  That's correct.

THE COURT:  What have you received from third-party subpoenas?

MS. HUANG:  Primarily the information we're depending on is through a database called HHAeXchange, which is a system that the -- which Greatcare and all the MLTCs use to communicate, and is also used by Greatcare to track time data, also reimbursements.

So if Greatcare is seeking reimbursement for work performed by one of our plaintiffs, from one of the MLTCs, that information gets put into HHAeXchange.  So we received several spreadsheets from HHAeXchange that provides all of that data in great detail.

THE COURT:  Oh, okay.  So after somebody does a shift or a week of shifts for a patient, then the employing entity will put this information in for reimbursement?

MS. HUANG:  That is approximately correct.

So there is a telephone system that each of our plaintiffs have to use to check in daily, and that information gets inputted into HHAeXchange. And I don't really totally understand, sort of, the background, you know, what happens behind the

scenes, but HHAeXchange aggregates that information, and then I believe, in some form or another, facilitates communication between Greatcare and the MLTCs to submit reimbursement requests.

THE COURT:  Okay.  But there -- it's a reimbursement for the hours worked?

MS. HUANG:  Correct.

THE COURT:  That's what is happening?

MS. HUANG:  That's correct.

THE COURT:  Okay.  So you now should have, essentially, the information to reconstruct the hours.

MS. HUANG:  That's correct, your Honor.

THE COURT:  Okay.

MS. HUANG:  What we don't have is, we don't have payroll documents.  So we have subpoenaed Empeon, which is the payroll company, but our subpoena has gotten nowhere.

We've requested that Greatcare provide those payroll documents, and they have provided some, but not for the entire period.  So there are some periods where we have no payroll documents, but for those periods of time, we still have the HHAeXchange information.

THE COURT:  Okay.  So if you need to compel

compliance with a third-party subpoena, then that motion to compel should be served within two weeks of today, and I'll give the third party two weeks to respond. No reply.

And I'm going to ask you to serve a copy of my order setting this briefing schedule on that third-party entity so that they're aware of the motion.

MS. HUANG: In addition to Empeon, we did also serve third-party subpoenas on the other non-defendant MLTCs for assessments, for care plans, for notes. Those are the document -- that's the documentation that the MLTCs maintain for their periodic assessments and are used by the MLTCs to determine the authorizations for the care recipients, so whether the consumers would receive 24-hour live-in services or services of other types.

And those assessments are performed by nurses. They have clinical information. The assessments that we've received from CenterLight so far are exactly what we thought they would be. They're very revealing. They have nurses -- the nurse assessor saying that the CenterLight member, for instance, was unable to sleep at night, you know, needed assistance with toileting, two to three

hours, requested meals at midnight, also demonstrates that the nurse was providing specific instruction to our plaintiff on how to provide care to the particular consumer.

So we have those third-party subpoenas that are out to the non-defendant MLTCs. We have two that have already been returned to us. We are still waiting for, I think, five more of the MLTCs to turn over their documents. I think we're in a -- we are in a process of, sort of, working out the details for how to exchange the documents, but we will also move to compel those documents as well as we do.

THE COURT: When did you serve those subpoenas?

MS. HUANG: The subpoenas were served -- I will pull up the exact date for you.

THE COURT: More than 30 days ago?

MS. HUANG: Yes, your Honor.

THE COURT: Okay.

So two weeks to move to compel for those and two weeks for an opposition. No reply.

And, again, you'll have to serve my order with the briefing schedule on those third parties. And they may -- if it turns out that they produce the things within the time, then you don't have to

AMM TRANSCRIPTION SERVICE - 631.334.1445

file a motion.

MS. HUANG:  Okay.  Thank you, your Honor.

THE COURT:  All right?

MS. HUANG:  We will do that.

THE COURT:  Okay.

MS. HUANG:  I mean, significantly, those documents are the same documents that we have requested from Senior Whole Health because Senior Whole Health is the MLTC that jointly employed the great majority of the plaintiffs in this case.  I think they jointly employed 9 out of the 14.

THE COURT:  Okay.

MS. HUANG:  We asked for care documents, care plans, assessments, notes.  Senior Whole Health has said that those documents are irrelevant and has said that it will not produce them.  And I think that is one very significant topic for us to discuss --

THE COURT:  Why do these other MLTCs have the documents?  Why would they have redundant documents?

MS. HUANG:  They're not redundant documents, your Honor.

So each person who received home care services is connected to a particular MLTC.  It's

AMM TRANSCRIPTION SERVICE - 631.334.1445

essentially their insurance company.  And some of our clients provided care to patients who did not have either Senior Whole Health or CenterLight as their insurance company.  That's why they're the non-defendant MLTCs.  But they still have these documents that can prove that our clients worked continuously throughout the 24-hour shift.

For instance, as I was explaining with the CenterLight documents, that the particular member needed assistance with toileting, you know, several times per night or needed their body to be turned and repositioned every two hours to prevent the development of bed sores.  That kind of information appears in the assessments and the care notes.

So it is not duplicative information of what CenterLight and Senior Whole Health has because we're talking about different members, different patients.  Senior Whole Health has information regarding, let's see -- one, two, three, four, five -- six patients who were cared for by nine of our plaintiffs, and that's the information that we have not yet received from Senior Whole Health; that among other documents as well.

THE COURT:  So these other non-defendant entities, do they have information on the same

patients or different patients?

MS. HUANG:  There are some patients who were originally with one of the non-defendant MLTCs and then switched to Senior Whole Health, so they will have some documentation, but it's not for the same period of time.

So, for example, a particular patient may have had received services from 2015 to 2020, and from 2015 to 2017, it may have received those services from Aetna, so Aetna will have the clinical information for 2015 to 2017.  And then from 2017 to 2020, they will have received services from Senior Whole Health, and then Senior Whole Health will have the clinical documentation from 2017 to 2020.  And we can imagine that a person's, sort of, health needs will shift during that period of time.

THE COURT:  Right.

MS. HUANG:  So even though it is the same person, because it is not the same period of time, we can't draw the same sort of inferences from the documents.

THE COURT:  And how many of the plaintiffs did work with CenterLight?

MS. HUANG:  We have one plaintiff who -- the majority of her claims are with CenterLight.  I

think there are about five other plaintiffs who did work for CenterLight, but it was relatively de minimis.  It was a week or two weeks.  Three weeks at most.

THE COURT:  So there are some plaintiffs that you only have employed by Greatcare?

MS. HUANG:  That's correct, your Honor.

THE COURT:  You don't have a joint employer against an MLTC because you don't know who the MLTC was?

MS. HUANG:  There are three plaintiffs who worked for an MLTC that is no longer functioning.

THE COURT:  Okay.

Okay.  And your clients haven't been deposed yet?

MS. HUANG:  One has been deposed.  The plaintiff who worked for CenterLight has been deposed.

THE COURT:  Okay.

MS. HUANG:  The remaining plaintiffs have not yet been deposed.

THE COURT:  Okay.  And so they speak different Chinese dialects?

MS. HUANG:  That's correct, your Honor.

THE COURT:  And have you provided the

information of what dialect each speaks?

MS. HUANG:  Yes, your Honor, we have.  And thank you for bringing this up because we have had conversations with Greatcare about the importance of providing an interpreter for the deposition that is able to speak the same dialect that our clients speak, and we have had some mild disagreement around the importance of providing an interpreter that does, in fact, speak our clients' language.

We obviously think it's extremely important.  Some of our clients have had very little formal schooling and really do not understand Mandarin, which is the -- sort of, the main language of mainland China.

They really do require interpretation in their specific dialect in order to understand the questions that are being posed to them, but we have heard from Greatcare's counsel and also their representative, Barbara Wang, that they may insist on having the interpretation be done in Mandarin.

THE COURT:  Well, how did they communicate with Greatcare?

MS. HUANG:  I don't --

THE COURT:  Or CenterLight?

MS. HUANG:  I don't really --

AMM TRANSCRIPTION SERVICE - 631.334.1445

THE COURT:  Do they communicate for their jobs in Mandarin?

MS. HUANG:  The plaintiffs do not really communicate with the MLTCs.

So the communication with Greatcare -- honestly, I think that they do communicate, to some degree, in Mandarin, but the communications with Greatcare have been very, very sparse; generally, just telling them when to show up, when to come into the office to get their, you know, annual trainings. Not extensive conversations.

THE COURT:  Okay.  So I assume you use an interpreter to speak with your clients --

MS. HUANG:  That's correct, your Honor.

THE COURT:  -- who are knowledgeable in the particular dialect?

MS. HUANG:  Yes, your Honor.  We have been using interpretation.

THE COURT:  Okay.  And so where do you get your interpreters?

MS. HUANG:  We have been hiring interpreters that are --

THE COURT:  From an agency?

MS. HUANG:  Correct.  And we have provided those names to defense.

THE COURT: Okay. All right. Fine.

So I just -- I want to just talk about the depositions for a second because the defendants want to depose the plaintiffs, I assume, right?

MR. BRENLLA: Yes, your Honor.

THE COURT: Okay. So you only get one chance to depose them. It's your problem if you don't supply the correct interpreter. So it makes no sense to me why you wouldn't provide an interpreter with a particular dialect that the plaintiff is saying she needs. It just doesn't make any sense.

And you're going to waste your money and your time because if -- and it doesn't even matter if they spoke to your client in Mandarin. If they say they need a particular dialect, get the dialect, otherwise the deposition is going to be no good to you.

At trial, you would have to provide that, too. You would have to provide somebody with the correct dialect, period. End of story, right?

MR. BRENLLA: Your Honor, we agree, when we depose the plaintiff, we provide an appropriate interpreter.

THE COURT: So what's the issue? Is there

AMM TRANSCRIPTION SERVICE - 631.334.1445

an issue?

MR. BRENLLA:  It's not an issue with settling, your Honor.

THE COURT:  What's the issue?

MR. MUNIZ:  We haven't -- respectfully, we haven't had any depositions yet, but my office is getting Mandarin, and there's one other for January 9th called Taishanese.

THE COURT:  So you're willing to --

MR. MUNIZ:  Yeah.

THE COURT:  You're willing to get an interpreter of the --

MR. MUNIZ:  Absolutely.

THE COURT:  Okay.  Fine.  So then there's not an issue.

MR. MUNIZ:  We will do it.  We are using a service, and --

THE COURT:  Well, we're here in New York. There's a kazillion languages spoken, and there's also services.

MR. MUNIZ:  Right.

THE COURT:  So there's -- and the Court is very familiar with this because we have to have interpreters for our criminal duty in all kinds of different dialects that aren't necessarily, you

know, spoken by that many people.

So they're available, so get the one -- get the interpreters -- or use the interpreter -- the agency that the plaintiff suggests. It doesn't -- the interpreter is a neutral person. It doesn't matter. They have to be sworn in to say that they're going to be interpreting correctly.

MR. BRENLLA: Your Honor, if I may?

THE COURT: Uh-huh.

MR. BRENLLA: Also, CenterLight had -- we realized that the main plaintiff was working for another agency, claiming working for CenterLight. We had subpoenaed that agency's records. We have not received --

THE COURT: Well -- so we'll get to yours in a second.

MR. BRENLLA: Oh, okay.

THE COURT: I'm going to finish up with the plaintiffs, what they need, and then we'll go to each of the things that you need.

Okay. So for the depositions, get them on the calendar. 14. I imagine that they're going to take a little bit longer because of the interpreter, although typically, with these kinds of depositions, they're not that long because you're really just

focused on how many hours they worked, when they worked and what were they doing?  Were they interrupted in the middle of the night?

That's really -- that's the core information.  You may want to -- I'm not telling you how to do your deposition, but that's the core information, obviously.

MS. HUANG:  Your Honor, if I may, so Greatcare noticed the deposition for 6 of the 14 plaintiffs.

THE COURT:  Okay.

MS. HUANG:  And we do have those calendared.

THE COURT:  Okay.  So those are set.  You have the dates.

MS. HUANG:  Yes.

THE COURT:  Okay.  So are you taking the remaining depositions and remaining plaintiffs?

MR. BRENLLA:  Well, your Honor, there are, I think, three to four who are allegedly -- and we obviously dispute that they work for CenterLight -- have claims against CenterLight.  Those are for a week or two, at most, according to the calculations. So I have scheduled with plaintiffs' counsel a -- our own mini settlement discussions on Monday,

right?  On Monday to see if we could resolve those. There are about a week or two, allegedly.

THE COURT:  Okay.

MR. BRENLLA:  So we're hoping that we can at least get a lot of those little, mini ones --

THE COURT:  Okay.

MR. BRENLLA:  -- out of the way.  And if we can, then, obviously, there will be no need for CenterLight to depose them.

THE COURT:  Okay.  Within two weeks of today, if there are going to be any additional plaintiff depositions, then you have to have dates on the calendar.

So if the other defendants want to depose the other plaintiffs who don't yet have deposition dates, get those dates on the calendar.

The depositions don't have to occur in two weeks, but the dates have to be scheduled within two weeks, before the close of the discovery deadline.

Okay.  What about affirmative depositions that you're taking?  Are those scheduled?

MS. HUANG:  Yes, those are also scheduled.

THE COURT:  Okay.  So those are set.

MS. HUANG:  Yes.

THE COURT:  Okay.

MS. HUANG: Sorry. Let me rephrase.

We have affirmative depositions scheduled for Greatcare. We recently served requests for admission on CenterLight and will not depose CenterLight unless there is a need to based on their responses to the request for admission.

THE COURT: Okay.

MS. HUANG: We have not gotten sufficient information from Senior Whole Health to notice any depositions. We have gotten no documents. We have gotten no names.

THE COURT: Well, you might just have to take their deposition.

MS. HUANG: Yes, your Honor.

THE COURT: So, you know, you can do a 30(b)(6) if you want. That's perfectly acceptable to proceed that way.

MS. HUANG: Yes, your Honor.

THE COURT: And you have enough information, I think, to at least conduct a deposition, and you can also follow up from that deposition with document requests.

MS. HUANG: Yes, your Honor.

THE COURT: So get something on the calendar because discovery is -- the deadline is

coming up.

Okay.  So let's talk now about what -- I understand there's a dispute with Senior Whole Healthcare.  I'm going to just table that for a second.

I want to understand what each of the defendants needs.  So let's just start with CenterLight.

MR. BRENLLA:  Yes, your Honor.

We had been -- subpoenaed a company called True Care, and we had learned during the plaintiffs' deposition that she worked mostly for True Care and was alleging that she worked for CenterLight.  We had subpoenaed True Care.  Maybe a day or two after the deposition, we had sent notices to counsel. We've not received anything.

So, kind of, similar to what your Honor's ruling was with respect to the two weeks?

THE COURT:  Yeah.  So two weeks from today, you have a motion to compel.

MR. BRENLLA:  Yes, your Honor.

THE COURT:  And you'll have to serve it on True Care.

MR. BRENLLA:  Yes, your Honor.

THE COURT:  And they will have two weeks to

respond.  No reply.  That may cause them to produce documents, obviating the motion.  Okay.

That's the only third party?

MR. BRENLLA:  For settling.

THE COURT:  Okay.

All right.  Is there anything else outstanding, from your perspective, besides the depositions?

MR. BRENLLA:  No, your Honor.

THE COURT:  Okay.  Let's move on to Greatcare.

Anything outstanding from your perspective?

MR. MUNIZ:  No, Judge.

We have set up numerous depositions through December and January, right up to the end of January, including the client.  And I believe we did get a second date.  My client has just been as agreeable and amenable as she continues to be.  So whatever dates we can continue the second date, which is likely, we're more than happy to provide a second date if that's necessary.

THE COURT:  Okay.  Great.

Anything else?

MR. MUNIZ:  No, your Honor.

THE COURT:  Okay.

So now let's go to Senior Whole Healthcare. You're the newest defendant. And you can, I think, move it on the -- or other side there.

Yeah. Okay. Yeah, maybe switch seats.

Okay. So you filed a motion to dismiss.

MS. GRAJEK: Yes, your Honor.

THE COURT: But discovery is not stayed during a motion to dismiss.

MS. GRAJEK: I understand.

THE COURT: So if you're intending to make a motion, it's denied.

MS. GRAJEK: I understand.

THE COURT: You got to participate in discovery. We're going forward.

And so you have received the discovery that has been exchanged thus far?

MS. GRAJEK: I believe so, your Honor. We have.

THE COURT: Okay. And so what I'm hearing is that there are nine of the plaintiffs that did some work for your client. And have you figured out the dates of those employments?

MS. GRAJEK: So this morning, actually, plaintiffs' counsel was kind enough to provide a cheat sheet of sorts to me, which will certainly

help in our efforts to call through documents.

THE COURT:  Okay.

MS. GRAJEK:  We're still in the meet and confer process.  I was trying to connect with plaintiffs' counsel in advance of today's conference, but that didn't work out.

We will work together in terms of discovery.  We did contemplate seeking a stay.  Understood that that's off the table.  But we are -- because we are, kind of, condensing discovery efforts into such a short period --

THE COURT:  Yeah.

MS. GRAJEK:  -- we did alternatively want to ask your Honor if we could have a little bit of a discovery extension.

The current fact discovery deadline, I think, is January 30th --

THE COURT:  Right.

MS. GRAJEK:  -- which is -- with the holidays and just the condensed nature of how we're trying to --

THE COURT:  Well, what else do you need?

I mean, you're just collecting documents.  It's pretty simple.

MS. GRAJEK:  Well, we have to review the

documents.  There is, you know, a private component of all this because there is -- the care records are -- relate to our patients, and so it's like that -- it's a bit more complex than a regular wage and hour matter, so ...

THE COURT:  Sure.  I understand.  But we do have a protective order in the case, so all of the documents should be protected in that way.  And I don't think that there's any HIPAA concern insofar as this is a litigation, and there is a protective order in place.

MS. GRAJEK:  Understood, your Honor.

I think, in terms of the documents, now that we have specific names that we can search for, that will, hopefully, certainly cut down on the time of calling the documents and reviewing them.  Then the next step, obviously, is deposing plaintiffs.

We would like to depose every plaintiff that has asserted a claim against Senior Whole Health in this matter, so just reviewing documents in advance of that.  But we, obviously, have been trying to catch up to speed and participate --

THE COURT:  Yeah.

MS. GRAJEK:  -- where we can, so we'll continue to do that.

THE COURT: So in addition to this, does this cheat sheet that you got have documents, Bates numbers or anything like that?

MS. GRAJEK: It doesn't. It has names, dates of birth, dates of alleged employment, which we dispute, and the names. Yeah, the names.

THE COURT: Okay. So what I would ask plaintiffs' counsel to do is to identify those records that pertain to these nine plaintiffs that you -- because you have records that you received that you said put together their hours worked and who the patients are and so forth.

MS. HUANG: Yes, your Honor. We have spreadsheets that we've received from HHAeXchange that we've already provided to --

THE COURT: I understand, but you should -- instead of just provide, I want you to tell counsel, this spreadsheet or this portion of the spreadsheet relates to this, this plaintiff and this plaintiff.

MS. HUANG: Okay.

THE COURT: And I want you to be a little bit more detailed. Since you brought them in so late, get them up to speed of which documents pertain to which clients, okay?

MS. HUANG: We're happy to do that.

THE COURT:  So if you can do that, that would be helpful.

MS. HUANG:  We only have the spreadsheet.

THE COURT:  Okay.

MS. HUANG:  To be clear, it's just the spreadsheet.  And we'll send it to Senior Whole Health.

THE COURT:  Okay.  That's fine.

If you could, just break out which portion of the spreadsheet or spreadsheets apply to which of the -- you know, each of the --

MS. HUANG:  Yes.  We already have it.

THE COURT:  -- that would be very helpful.

MS. HUANG:  Yes, we will.

THE COURT:  And are there third-party documents besides the spreadsheets that relate to these plaintiffs or that's it?

MS. YAU:  We have not reviewed all of the documents that we received from the non-MLTCs, but whenever we receive them, we share them with the defendants.

THE COURT:  I see.  Okay.  All right.

And also, the other defendants -- I guess it's only Greatcare that would have identified documents pertaining to each of the plaintiffs.

AMM TRANSCRIPTION SERVICE - 631.334.1445

Have you produced documents pertaining to each of the plaintiffs?

MR. MUNIZ:  Judge, respectfully, we provided thousands and thousands of pages.  Anything they requested, we sent over.  And anything that we get that's new, that we happen to receive anything new, we provide it.  We've provided, I think, about 6,000 pages.

THE COURT:  Right.  But have you grouped them by plaintiff; these documents go to this plaintiff; these documents go to ...

MR. MUNIZ:  I believe we have, your Honor, because my client, Ms. Huang, is a very detailed individual.  I think she has broken it down for them, and we provided them with a jump drive --

THE COURT:  Okay.

MR. MUNIZ:  -- of all of that.

If there's any issue, if they want additional specificity, whatever they request, I try to provide it through my colleague.

THE COURT:  Okay.  So if you have information -- if you are able to provide a breakdown of which documents relate to the nine plaintiffs who allegedly worked for Senior Whole Health, if you could just provide that to their

counsel just to help get them up to speed.

MR. MUNIZ:  Okay.

THE COURT:  Same thing goes for CenterLight, but probably there's not overlapping there.

Okay.  So I'm not inclined to extend discovery right now because I don't think that these -- I don't think that the depositions require a ton of preparation, actually.  They're just -- they're pretty basic.

MS. GRAJEK:  Just getting dates on the calendar.

THE COURT:  Yeah.

MS. GRAJEK:  From the back-and-forth e-mails that I've reviewed, we didn't have November for the plaintiffs.  So a lot of the December dates have been taken, and January.  And I noted that dates were starting to be proposed in February, which is concerning to me because we do have the January 30th deadline.

THE COURT:  Yeah.  You need to get the dates in January.  If there's some problem and, you know, one or two people need to be taken in February, let me know, but try to get them all scheduled for January, okay?  But I'm not inclined

to extend discovery at the moment.

Okay.  So there's discovery that you have requested of Senior Whole Health.  They're obviously reviewing things.  And you have a meet and confer scheduled, right, for later today?

MS. HUANG:  Senior Whole Health proposed some dates for this week that we could meet and confer, so ...

THE COURT:  Okay.  So I think it's premature to really have a whole back and forth about this because you need to have that meet and confer and try to work that out.

But, in general, I do find that it is appropriate to produce some of the care plans.  The plaintiffs have articulated why they are relevant.  They are relevant because the plaintiffs are saying they didn't have enough time to sleep, that they had -- they were interrupted, and the care plans show whether the patient was getting up or not.  And that's one of the only documents that would show that, and so that's why they need that.

And, frankly, it could help you as well because if it shows that the patient's sleeping through the night, then their claim is incorrect that they weren't getting up in the middle of the

night, right?

MS. GRAJEK:  This is the first that we heard an explanation of why the care plans may contain all of that information, this morning.  We did reach out to plaintiffs' counsel before our initial production deadline to try and discuss that.

THE COURT:  Yeah.

So what I'd like you to do is have the meet and confer, and I'd like you to send me a letter in a week to identify if there's any outstanding disputes.  Hopefully, there will be none and we can just -- you can just move on to the depositions.

Now, it sounds like some of the defendants may be considering a summary judgment motion; is that correct?

MR. BRENLLA:  Yes, your Honor.

THE COURT:  And you are doing that because why?

MR. BRENLLA:  Well, because there is no -- despite the allegations made before your Honor, there is no evidence that we are a joint -- CenterLight is a joint employer.

And there's one -- I mean, there's an allegation that the nurse would come periodically to a participant's house and assess the participant,

AMM TRANSCRIPTION SERVICE - 631.334.1445

and that's somehow a joint employer because an aide may have been there.

THE COURT:  I see.  So Greatcare is sending the nurse and CenterLight has the aide?

MR. BRENLLA:  No.  Other way around. Greatcare is sending the aide.  CenterLight would send a nurse periodically to see how the participant is doing.

THE COURT:  Sure.  Right.

MR. BRENLLA:  When the nurse happened to be there, an aide was listening to the extent --

THE COURT:  Sure.

MR. BRENLLA:  -- the aide could understand.

THE COURT:  Sure.  Sure.

MR. BRENLLA:  I mean, that's the claim for joint employership.

THE COURT:  I see.

MR. BRENLLA:  That's the entire claim.

And with respect to -- I mean, and also with respect to the care plan, the care plans don't say, on December 30th, particular participant didn't sleep.  And so, therefore, to say that the care plans demonstrate that is absolutely almost -- is not true.

More importantly on the motion is, the

AMM TRANSCRIPTION SERVICE - 631.334.1445

participants, as I think one of the plaintiffs' counsel said, would phone in every day and say whether the participants slept or not; that way, to know the time because there's no way anyone would know, unless you're in someone's home, whether a participant slept.

THE COURT:  Of course.  Yeah.

MR. BRENLLA:  And the instructions were both -- in all sorts of languages.  And so the aide would call in and say, person slept, person didn't sleep, and then, therefore, I get X hours of that hours, the aide herself.  And they're all -- you know, did that.

So to allege that I phoned in because no one else knew and said they slept, and now I'm saying they didn't sleep, well, there's case law on that.  So ...

THE COURT:  Okay.  So you can make --

MR. BRENLLA:  Yeah.

THE COURT:  You can make the motion on that.

Okay.  So what I -- and I assume once Senior Whole Health goes through the record, you're going to have a similar type of claim on summary judgment?

MS. GRAJEK:  Correct, your Honor.  A motion to dismiss.

THE COURT:  Right.  Well, on a motion to dismiss, the Court has to consider -- can't consider things outside of the pleading, so that's --

MS. GRAJEK:  Yes.

THE COURT:  -- of course --

MS. GRAJEK:  Yes.  I understand.

THE COURT:  -- the biggest issue here.

Okay.  So summary judgment motions will be due 30 days after close of fact discovery, with opposition 30 days thereafter, and reply 15 days thereafter.

Does Greatcare anticipate filing any motion for summary judgment?

MR. MUNIZ:  Judge, I'm not sure because when we hold the depositions, at that point, I'm going to have a better -- since most of the claims is against our -- you know, our clients, I would have to review the transcript to see if it's appropriate for summary judgment.

THE COURT:  Okay.

MR. MUNIZ:  I won't waste the Court's time.

THE COURT:  Right.

I mean, the problem with the wage and hour

AMM TRANSCRIPTION SERVICE - 631.334.1445

is, if it's a dispute about the hours, that's usually --

MR. MUNIZ:  Exactly.

THE COURT:  -- got to go to trial.  Yeah.  Okay.

But you'll be subject to the same schedule.  If you want to file a motion for summary judgment, that's going to be the schedule for it, okay?

MR. MUNIZ:  Yes.

THE COURT:  All right.

MS. HUANG:  Your Honor, plaintiffs do also intend to file a motion for summary judgment against CenterLight as well.

THE COURT:  Okay.  In that case then, you're -- then what I would say is you would do a cross-motion 30 days after, and then I would do 30 days after that for any opposition and reply in support, and then 15 days thereafter for a reply.

Is it only against CenterLight that you're seeking?

Are you intending to move for summary judgment against all of the defendants?

MS. HUANG:  At this point we don't know.  It would depend on the information that we receive from the other non-defendant MLTCs and Senior Whole

Health.

THE COURT:  And what's the summary judgment motion?

MS. HUANG:  The summary judgment motion will be on whether CenterLight was a joint employer, on the question of CenterLight's joint employment with --

THE COURT:  Well, how can that be decided on summary judgment?

MS. HUANG:  Well, we have very definitive information based on the documentation.  We have what are called "supervision notes" from the CenterLight nurse assessor.  We also have a contractual agreement between CenterLight and Greatcare where CenterLight reserves the -- it reserves the power to supervise the personal care aides and how they provide the care, which is reinforced by the assessment notes where we have evidence of the nurse assessor giving our particular plaintiff specific instructions on how to provide care to the CenterLight member.

THE COURT:  Yeah, that doesn't necessarily make that a -- it sounds like there could be disputed issues of fact on this issue.  I just -- I'm not going to prevent anybody from filing a

motion or a cross-motion, but there could be issues of fact that require joint employer to go to a jury because that's a mixed question of facts, fact and law.  Okay.

All right.  In terms of settlement, let's get back to that.

You've provided detailed information.  You should make a specific demand for each of the plaintiffs for the defendants.  I don't know if some of the demands are going to be, you know, to -- you know, X amount.  We don't care who pays what.

You can set it out how you feel is appropriate, but you should make those demands before the end of this month and so that the defendants have enough time to consider them.  And if you want to have a settlement conference, then you should -- we'll get one on the table, okay?

You have something to say about that?

MR. BRENLLA:  Yes, your Honor.

I just -- we're scheduled to meet with plaintiffs' counsel on Monday.

THE COURT:  Yeah.  You can work it out on your own.

MR. BRENLLA:  I'm expecting depositions, which are expensive to have translators and

interpreters.  Maybe the settlement meeting should be a little before the end of the month because the parties are expending significant dollars for --

THE COURT:  Well, it behooves the plaintiffs to make the demands as quickly as possible because, as attorneys' fees go up, it makes settlement more difficult.

And, frankly, you're spending your own time.  And if you're not successful in some of your claims, that's your own time that, you know, could be spent better elsewhere, potentially.

So if you can make a demand sooner, then I would encourage, strongly encourage you to do so.

MS. HUANG:  Yes, we will.

THE COURT:  Okay.

All right.  And if you -- if you all can work out a settlement on your own, fantastic.  That's great.  I encourage you to do that.  You can always consent to me for purposes of a Cheeks review.  That's an option.  And -- yes?

MR. BRENLLA:  I just have one question to ask.

Some plaintiffs don't have an FLSA claim just because you're outside of the statute of limitations.

AMM TRANSCRIPTION SERVICE - 631.334.1445

THE COURT:  Okay.

MR. BRENLLA:  Some may have a New York State Labor Law claim.  And that's the reason I asked --

THE COURT:  So you're saying some don't have jurisdiction to bring a claim in this court?

MR. BRENLLA:  Well, yeah.  Say we argued that.  Yeah, I mean, when we started our affirmative defense -- regardless, we don't believe that there is jurisdiction.  But let's assume that we settle with people who don't have an FLSA claim --

THE COURT:  Yeah.

MR. BRENLLA:  -- but have a New York State Labor Law claim.

THE COURT:  Yeah.

MR. BRENLLA:  Is a Cheek motion required?

THE COURT:  No.

MR. BRENLLA:  Okay.

THE COURT:  That's only for the Fair Labor Standards Act.

MR. BRENLLA:  That's what you were referring to with plaintiffs' counsel.

THE COURT:  Right.

Okay.  So -- and Cheek review is not required for Rule 68 either.  It is required for

Rule 41 dismissals.  That's what all the circuit case law says.

So if you -- if there is a Cheek settlement that you need my review, you are -- you have an option to consent to me for purposes of review of that.  I just want to remind you of that option.

Okay.  And if you want to have a settlement conference with me, you should let me know that before the end of December, and I'll get one on the calendar, okay?  But I'm not going to delay discovery or stay discovery pending any settlement discussions.

All right.  Anything else from plaintiffs?

MS. HUANG:  Your Honor, we do have some outstanding documents that we requested from CenterLight that we have not yet received, which we outlined in our multiple status letters.  We received care plans and assessments, those documents for the period of 2015 to 2019, but nothing from 2020, 2021 and 2022.

THE COURT:  And have you exhausted the meet and confer process?

MS. HUANG:  We have.  CenterLight's counsel has represented that those documents do not exist, which is where we're at right now.

THE COURT:  Okay.

MR. BRENLLA:  We produced -- I mean, like --

THE COURT:  You produced some documents from those years?

MR. BRENLLA:  Absolutely.  There was over 6- or 7,000 documents just on patient records.  Never mind everything else, just on patient confidential records.  I can meet and confer again, but, like, there's -- we produced --

THE COURT:  You think you've done an exhaustive search for what you have?

MR. BRENLLA:  Yes.  I'm scheduled to meet with them again on Monday --

THE COURT:  Okay.

MR. BRENLLA:  -- to discuss settlement --

THE COURT:  Why don't you have that meet and confer.  And if they -- if counsel has said they've done a search and they just don't have the documents, even if they're required by law to have the documents -- I mean, a lot of employers don't have wage records, even though they're required by law to have the wage records.

I mean, that's -- then you have an inference in your favor, right, because in terms of

New York Labor Law --

MS. HUANG: Yes, your Honor.

THE COURT: So the employer's got the burden of proving the hours worked or not worked.

MS. HUANG: Yes, your Honor. These documents are a little bit different, as I've explained the substance. And it is hard to understand why CenterLight would have documents going back to 2015 but not the ones that are more recent, 2022, 2021 --

THE COURT: Yeah.

MS. HUANG: -- when the Medicaid laws and regulations also require them to maintain those records.

THE COURT: Yeah.

MS. HUANG: But we will speak to CenterLight's counsel.

THE COURT: Yeah. As I don't -- I don't know that it makes sense to have any kind of motion to compel if counsel is saying they've done what they think is a reasonable search and -- because I assume counsel is aware of the Medicaid rules.

MS. HUANG: And perhaps there's a --

MR. BRENLLA: Yeah. And --

THE COURT: Right? And whatever is

AMM TRANSCRIPTION SERVICE - 631.334.1445

required.  So your clients got what they've got.

MR. BRENLLA:  Yes.  And --

MS. HUANG:  And perhaps there's a misunderstanding because if Mr. Brenlla says that he has produced documents within that time period and we are very certain that he has not, maybe we need to review the documents together.

THE COURT:  Yeah.  Yeah.  So why don't you meet and confer.  Maybe you can settle the claims.  It doesn't sound like there's that much with CenterLight.

Okay.  Anything else from plaintiffs' perspective?

MS. HUANG:  No, your Honor.

THE COURT:  Okay.  Anything else from any of the defendants' perspectives?

MR. MUNIZ:  No, your Honor.  Thank you.

MR. BRENLLA:  No, your Honor.

THE COURT:  No?  Okay.  Very good.

Chris, can we have a status conference in January?  Maybe second week.  Second week.

December 14, 3 -- oh, January.  Sorry.

January 14, 3:00 p.m.

MR. BRENLLA:  That's fine.

THE COURT:  If I need to have a --

MR. MUNIZ:  Oh, I'm sorry.  That day I can't.  I have a deposition I ...

THE COURT:  Okay.  All right.

22nd.  January 22nd at 3:00 p.m.?

MR. MUNIZ:  That's perfect.

THE COURT:  Okay.  That should be a final conference, unless something unexpected happens.

MR. MUNIZ:  Okay.  What was the time on that?

THE COURT:  3:00 p.m.  And I'll put that in a scheduling order after this conference.

Okay.  So if there's nothing else, happy holidays, everybody.  See you in January.  See you next year, so they say.

0o0

AMM TRANSCRIPTION SERVICE - 631.334.1445

C E R T I F I C A T E


    I, Adrienne M. Mignano, certify that the foregoing transcript of proceedings in the case of Li, et al. v. Greatcare, Inc. et al.; Docket #24CV7401 was prepared using digital transcription software and is a true and accurate record of the proceedings.


Signature   *Adrienne M. Mignano*
            _____
            ADRIENNE M. MIGNANO, RPR


Date:       December 11, 2025


AMM TRANSCRIPTION SERVICE - 631.334.1445