Q511WAND

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

HEI LI, *et al.*,

                Plaintiffs,

        v.                    24 CV 7401 (LTS)(KHP)

GREATCARE, INC., *et al.*,

                Defendants.
------------------------------x
        Continued Deposition Under Oath of **BARBARA**

  **WANG**, held on May 1, 2026, at 10:08 a.m., at the

  United States Courthouse, Southern District of

  New York, 500 Pearl Street, New York, New York,

  before Khristine D. Sellin, RDR-CRR-CRC-CSR,

  Notary Public in and for the State of New York.


                      APPEARANCES

GETMAN SWEENEY & DUNN, PLLC
     Attorneys for Plaintiffs
BY:   KAREN K. YAU, ESQ.
      CAROLINE FRIEDMAN, ESQ.

NATIONAL CENTER FOR LAW AND ECONOMIC JUSTICE
     Attorneys for Plaintiffs
BY:   CARMELA HUANG, ESQ.

LAW OFFICE OF JOSE A. MUNIZ
     Attorneys for Defendant GreatCare, Inc.
BY:   JOSE A. MUNIZ, ESQ.

STRADLEY RONON STEVENS & YOUNG, LLP
     Attorneys for Defendant Senior Whole Health
BY:   KAITLYN GRAJEK, ESQ.

BRENLLA, LLC
     Attorneys for Defendant CenterLight Health
BY:   GEORGE F. BRENLLA, ESQ.


                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

MS. YAU:  First, please be reminded to silence your electronic devices.

This deposition is a continuation of the deposition that took place on January 7, 2026, pursuant to Rule 30 of the Federal Rules of Civil Procedure.  I'm Karen Yau from Getman Sweeney & Dunn.  With me is Carmela Huang from the National Center for Law and Economic Justice; and Caroline Friedman, also from Getman, Sweeney & Dunn.

BARBARA WANG, being previously duly sworn, continued testifying as follows:

EXAMINATION

BY MS. YAU:

Q.    I would like to remind you, Ms. Wang, that you're still under oath.  Do you remember your oath?

A.    Yes.

Q.    Do you remember the instructions that I gave you the last time?

A.    What instruction, for last night, or the instructions you gave to me prior, you know, on January 7th?

Q.    The instructions that I gave you on January 7th; for example, asking you not to use

Q511WAND                    Wang - By Ms. Yau

gestures, and when you're answering the

question, answer it with yes or no instead of

uh-huh.  Those are some examples.

A.    Okay.

Q.    Do you remember those instructions?

A.    I think I remember.

Q.    Yes or no?

A.    Yes.

Q.    Okay.  Great.

Do you understand that you must

testify truthfully and completely and not leave

out any relevant information?

A.    Yes.

Q.    Do you have any physical conditions

that prevent you from understanding and

answering my questions today?

A.    No.

Q.    Now you had just suffered an injury—

A.    Yes.

Q.    —in February.

A.    Yes.

Q.    Are you taking medications for that

injury?

A.    No, not anymore.

Q.    Okay.  Is there anything else that

would prevent you from testifying truthfully and completely today?

A.   Is there anything else what?

Q.   That would prevent you, that would stop you—

A.   Okay.

Q.   —from testifying truthfully.

A.   No.

Q.   Please allow me to finish my question—

A.   Okay.

Q.   —before you answer.

Is there anything else that would stop you from testifying truthfully and completely today?

A.   No.

Q.   After the last deposition, besides Mr. Muniz or other counsel that you have had, have you talked to anyone else about your deposition?

A.   No.

Q.   Okay.  For the rest of the deposition, I'm going to be asking you to be testifying in your role as the corporate representative of GreatCare unless I indicate otherwise.  Do you

understand that?

        A.    I understand.

        Q.    Do you understand that testifying as
the corporate representative for GreatCare will
bind your answers to GreatCare?

        A.    Yes.

        Q.    Sometimes during this deposition I
will use the terms "patients" and "members"
interchangeably.  Do you understand that?

        A.    I understand.

        Q.    And sometimes when I say "providers,"
I'm referring to GreatCare and other home health
agencies, otherwise known as licensed home care
services agencies.  Do you understand that?

        A.    I understand.

        Q.    Okay.  When did GreatCare start
contracting with CenterLight?

        A.    I don't remember when, but I think I
remember that I send you the contract, right?

        Q.    You did send us the contract.

        A.    Yeah, I don't remember.

        Q.    You don't remember the time.

        A.    The date, yes.

        Q.    Okay.  Does GreatCare still contract
with CenterLight?

Q511WAND                        Wang - By Ms. Yau

A.    Yes.

Q.    Who drafted the contracts between GreatCare and CenterLight?

A.    CenterLight.

Q.    Were you allowed to negotiate the terms of the contract?

A.    I think we were allowed to negotiate a rate, but normally they have a standard rate.

Q.    Okay.  Were you able to negotiate any other terms besides the rates in the contract?

A.    What kind of terms?

Q.    The length of time, your reporting obligations.  Were you able to negotiate over any other terms in the contract?

A.    I think the contract is a standard contract for everyone, for all the home care agencies, so there, we had just to follow all the rules; for example, like authorizations, that's it.  Those are nothing terms that I have to negotiate with them.

Q.    Did you in fact negotiate any other terms?  Even though you don't feel the need to, did you actually do any of it?

A.    I don't think I need to do that because that's a standard contract for everyone

Q511WAND                    Wang - By Ms. Yau

five-minute break, and we will be right back.

                (Recess from 10:54 a.m. to 10:59 a.m.)

        Q.    Ms. Wang, we're going to go back on
the record.

                You don't have to worry about the
documents for now.  I'm going to be asking you
questions that are not relating to the exhibits
for now.

        A.    Okay.

                MS. YAU:  Ms. Court Reporter, would
you please read back what Ms. Wang's last answer
to me was.

                (Record read)

                MS. YAU:  Ms. Court Reporter, if it's
not in the last answer, it's a couple of answers
back; Ms. Wang mentioned that she used faxes.
Could you see if you can find that answer and
read it back to me.

                (Record read)

BY MS. YAU:

        Q.    When you use the fax, right, to notify
Senior Whole Health of New York, do you use an
actual fax machine or do you use e-fax?

        A.    Oh, actual fax machine; by my
knowledge is using the actual machine.

Q511WAND                       Wang - By Ms. Yau

Q.    Does GreatCare save that notification?

A.    Yes, I save it, and also I think last time already answer your production documents, already sent it to you guys.

Q.    Where do you save the notifications?

A.    In the office.

Q.    Do you save these notifications in a patient folder?

A.    No, in the separate binder.

Q.    A separate binder.  Is it a single binder?  How many binders are you talking about?

A.    I think—I don't know.  I don't—I don't know, because it's like a single binder. It's like a big binder and you put whatever, because normally it's like that—we sent communication, for example, like this patient's live-in case, and the patient only need two hours, we have to send it—this is a state required, and because the code has to be changed from T1020 to T1019, we need authorization to bill the certain amount of hours.  So that's why we have to get authorization.  We've sent a fax, the result is we get an authorization, and then, you know, we put in the system, then we can set up a schedule in the calendar.

Q511WAND                    Wang - By Ms. Yau

Q.    Ms. Wang——

A.    Yeah.

Q.    ——what I'm asking you is simply, where do you put those notifications?  You testified that you put it into a binder; am I correct?

A.    Correct.

Q.    So these binders, does it cover a specific patient?

A.    No.  All the patients, all the fax information, and then we save in the one binder.

Q.    Did you produce all of the communications with Senior Whole Health of New York and CenterLight from this binder?

A.    That I don't re——I don't recall. Whatever I have and I just produced to you.

Q.    Are you testifying that you don't remember the steps that you took in order to find the documents that are responsive to plaintiffs' request?

A.    Plaintiffs' requests?  What do you mean?

Q.    Plaintiffs' document requests.

A.    What plaintiffs' document requests?

Q.    Ms. Wang, I'm just asking you.  You said you don't remember whether you searched the

Q511WAND                    Wang - By Ms. Yau

responses from the insurance company?

A.   The authorization?  Yeah.

Q.   For example, the authorization.

A.   Authorization, we save in the HHA
Exchange.

Q.   Do you save it anywhere else?

A.   No.

Q.   Speaking of authorizations, Senior
Whole Health of New York decides whether to
authorize a patient for live-in services,
correct?

A.   Senior Whole Health provider, what is
it?

Q.   Senior Whole Health of New York
decides whether to authorize the patient for
live-in services; am I right?

        MS. GRAJEK:  Objection.

A.   Yes.

Q.   Okay.  And GreatCare is required to
follow up the authorization, correct?

A.   Correct.

Q.   Does GreatCare have the power to
change the authorization?

A.   No, of course not.

Q.   Does GreatCare have the power to

to have a training, and then they would deliver
to us; that's depending on the state required.

Q.    Does Senior Whole Health of New York
perform audits of GreatCare?

MS. GRAJEK:  Objection.

A.    Yeah, I think.

Q.    And what does Senior Whole Health of
New York check during the audits?

A.    Check during the audit?  Check out the
patient file and, yeah, check out the aides
file.

Q.    What about the patient files does
Senior Whole Health of New York check?

A.    The patient file and——the patient
file, they check out the medical orders from
doctor.

Q.    Keep going.

A.    Yeah.  Check on medical order from
doctors.

Q.    Anything else?

A.    That's the major information.

Q.    What about the aides file, what does
Senior Whole Health of New York check in the
aides file?

MS. GRAJEK:  Objection.

A.    When they audit, we just give them the file. Whether, how, or what kind of information they check, I do not know.

Q.    Does Senior Whole Health of New York let GreatCare know in advance that they are going to do an audit?

A.    Yeah. They call us and tell us that, when they will come, to the office.

Q.    Does Senior Whole Health of New York provide a report of its audit?

A.    Not I'm aware of it, and they just tell us their patient——the specific name of the patient and aides file.

Q.    Does CenterLight perform audits of GreatCare?

A.    You mean similar audits?

Q.    Exactly.

A.    Yeah.

Q.    And what does CenterLight check during its audits?

A.    Same thing.

Q.    Are you testifying that CenterLight also checked patient files as well as aides files?

A.    Yes.

Q511WAND                    Wang - By Ms. Yau

Q.    Does CenterLight let GreatCare know in advance that it is going to audit?

A.    Yeah, normally they just make a time, make sure we have someone available there to give them file.

Q.    And how does CenterLight tell you that it is about to conduct an audit?

A.    They just tell us, okay, you're fine.

Q.    Do they call you?  Do they email you?

A.    I don't recall, and if they don't ask to continue to provide information, then we are fine.

Q.    Have you provided the plaintiffs with the aides file?

A.    The plaintiffs, aides file, I don't recall.  They are randomly to pick up the patient and the aides file.  They are not let us know until they come to our office.

Q.    Have you provided the aides files for the plaintiffs in response to their document request in this case?

A.    Would you please repeat.

Q.    Have you provided the aides files for the plaintiffs in response to their document requests in this case?

A.    Yes.  I provided the aides file information.

Q.    What's contained in the aides file?

A.    For example, location and physical, yes, those are the file, and fingerprint information, and those—whatever required in their—in the aides file.

Q.    Did you provide the entire content of the aides file?

A.    Yeah.

Q.    Does GreatCare have meetings with community engagement specialists at Senior Whole Health of New York, regularly?

A.    What is it?

Q.    Does GreatCare have meetings with the community engagement specialist at Senior Whole Health of New York on a regular basis?

A.    What do you mean on regular basis? You mean every month or every—or what do you mean regular basis?

Q.    Every six months?

A.    We do have a—we do have a rep from Senior Whole Health and then they reach us if something happens and then let them know. Normally, you know, yeah, they reach me.

Q.   Who attends these meetings besides the——

A.   Me.  Only me.

Q.   What do you discuss during those meetings?

A.   Normally discuss their service and what they offer, what their service are.  And if they have a new program, they let us know.

Q.   What else do you discuss?

A.   That's it.

Q.   Several of the plaintiffs in this case worked on mutual cases, correct?

A.   Yeah, only one mutual case I saw.

Q.   Okay.  Which one?

A.   ███

Q.   Okay.  The ███ case.

The mutual case is ██████████ and ██████████; am I right?

A.   Yeah, correct.

Q.   Mr. and Mrs. ███ lived in a studio apartment; isn't that right?

A.   Before, I don't know their living conditions, and if you said they're living studio, it is.  And I called——be frank with you, I called couple weeks ago, to find out what's

happening with their case, with their son and

daughter, and they said they lived in studio and

later on they moved to a one-bedroom apartment.

Q.   Ms. Wang, what else did you discuss

with Mr. and Mrs. ███ children during that

phone call?

A.   I asked them what's happened about the

husband——the dad, and then they said, I said——

Q.   Go ahead.

A.   ——I asked, I said, does your dad not

ask the aides to work in the evening?  They said

no, never.

Q.   Why did you ask that question?

A.   Because I received the documents from

you send it to me and I saw one of the patient

need to, whatever, every two hours, change

diaper or something.  I remember that.  And I

asked.  I want to find out what's going on.

Q.   Who did you talk to?  You referred to

Mr. and Mrs. ███ children.  Who exactly is it?

A.   I forgot their names.  I forgot their

name.  I just called their son or daughter and

then I forgot the name.

Q.   Male or female, please.  Is it a male

or female that you spoke with?

Q511WAND                           Wang - By Ms. Yau

A.     Both.

Q.     Both.

A.     Yeah.

Q.     You said earlier that you talked to them about whether Mr. ██ needed an aide during the nighttime; is that your testimony?

A.     I asked them whether they have aides working them in the evening.  They said no.

Q.     What do you mean by do you have aides working for them in the evening?

A.     As the plaintiff complained, they working with the patient in the evening, right?  Overnight, right?  I was asking them, it is true or not.  They said it's not true.

Q.     Is that why you called them?

A.     Yeah.

Q.     Do you call any other patients or patients' family to ask similar questions?

A.     See the—I think I submitted the patient declaration letter, and those patients, of course we called.  That's why they wrote, they signed the documents, to stating, and to clarify aides not working for the evening.

Q.     Other than the times that you called the patients or the patient's family to see

whether the aides had to work overnight, did you look into the actual hours that the aides worked?

A.   What do you mean?

Q.   Besides those phone calls—

A.   Yeah.

Q.   —did you use any other method to find out if the aides actually worked overnight?

A.   The aides have a signed time sheet. The time sheet documented what time they sleep, what time they take their meals.

Q.   Are you aware that studio apartments are not considered adequate sleeping accommodations for aides working a live-in shift?

MS. GRAJEK:  Objection.

A.   That is not what we can control because that's insurance company, according to the state law, and go evaluate the aides' environment, condition environment, and they need to get approved by state.

Q.   Are you testifying then it is the insurance company—

A.   Yeah.

Q.   Let me finish the question.

Q511WAND                          Wang - By Ms. Yau

and it's Bates stamped GC 07—

A.    Hold on.  You said which one?

Q.    I.

A.    It's different, the other one.  The other one, right?

Q.    Yes.  It's a photo album that has 24, 25 exhibits in there.

A.    Okay.  It says our nurse visit.  I. Okay.  Which page?

Q.    Let me identify for the record the Bates stamp number is GC 07.28.2025-003919 through GC 07.28.2025-003930.

A.    Okay.

MR. BRENLLA:  Do these people have a confidentiality order?  These say Confidential on them.

MS. YAU:  These documents were provided to us by GreatCare.

A.    Yes.

Q.    This is a nursing assessment by a nurse from GreatCare; am I correct?

A.    Correct.

Q.    And these nursing notes are for ███ ███████; am I correct?

A.    Correct.

Q.   I want you to look at the page Bates stamped 3922.

A.   Okay.  Yes.

Q.   These are nursing notes from May 25, 2019, correct?

A.   It says so, yes.

Q.   On page 003922, there are some notes.

A.   Yeah.

Q.   Actually, before we talk specifically about 003922, let's talk about the entire document first.

A.   Okay.

Q.   Does GreatCare's nurse conduct a visit of each patient at GreatCare?

A.   You mean visit each patient, right?

Q.   Yes.

A.   Yeah.

Q.   How frequently do these visits happen?

A.   Most likely it's like a half——a half year.

Q.   And how long do these visits usually last?

A.   Doing the visit or what?

Q.   During the visit.

A.   Oh, that's——I don't know.  That's

Q511WAND                     Wang - By Ms. Yau

depending on the nurse, depending on the

patient.  And some patient want to ask a nurse a

lot of question, they probably spent like more

hours; and some patient, they don't want the

aides, they don't want the nurse to stay their

house so long, and then after the aides—the

nurse finished an evaluation, they will leave.

It's out of my control.  It's—I'm not a nurse.

Q.    Does GreatCare keep the notes from

these nurse visits?

A.    Yeah, these notes is from nurse.

Q.    Where does GreatCare keep those notes?

A.    In the patient's file.

Q.    And are you testifying that they are

kept in a paper format in the binder?

A.    Not binder.  In the patient—in the

patient file, the folder.

Q.    Is the folder a paper folder or is it

electronic?

A.    It's a paper folder.

Q.    Okay.  Now turning to page 003922.

You see on the bottom—

A.    Hold on.  00 what?  22.  Oh, okay.

Q.    003922.

A.    Okay. Got it.  Bottom.  Okay.

Q511WAND                        Wang - By Ms. Yau

Q.    There are some handwritings at the very bottom, like to Service Schedule.  That handwriting seems to be different from the handwriting before that.

A.    I don't see different.  I don't see different.

Q.    You don't see any difference in the handwriting between what's on the bottom as opposed to the handwriting before that on the page?

A.    Yes.  I don't see what's the difference.

Q.    Like to the service schedule, it says, "4 days x 24 hours.  Living-in case 13 hours per day, 8 a.m. to 8 a.m., 3 hours mealtime, 8 hours sleeping time (5 hours uninterrupted sleep time)."

A.    Yeah.

Q.    Who put that note in it?

A.    Nurse.  Nurse.

Q.    On Exhibit I, right, this particular exhibit, there's no notation from the nurse that the nurse gave instructions to the aide about how to care for ███ is there?

A.    This, because the—the—first of all,

Q511WAND                    Wang - By Ms. Yau

Q.    Hold on.

Okay.  3928.

A.    Yeah.

Q.    So again, the handwriting on 3928, on the bottom, "Living-in case 13 hours per day, 8 a.m. to 8 a.m., 3 hours mealtime, 8 hours sleeping time (5 hours uninterrupted sleep time)," this is not the same handwriting as the rest of the notes, is it?

A.    I think it's the same thing.  I didn't see any difference.  I recognize the handwriting from nurse.

Q.    I'm going to show you Exhibit J.

A.    J.  Let me see.

Okay.  Yes.

Q.    Sorry.  Just to go back, you said that the handwriting for the entire page of 3928 is the same, correct?

A.    Yes.

Q.    And that the nurse wrote this part.

A.    Yes, the nurse has to wrote the part.

Q.    Okay.  So you are testifying that the nurse wrote this part of the document.

A.    Yes.

Q.    All right.  Now let's turn to

Exhibit J.

So Exhibit J is Bates stamped SWHNY 004048 to 4049.  And it's a report concerning ▮▮▮▮▮▮▮▮, and it's from September 4, 2019.

A.    Okay.

Q.    It is the same year as Exhibit I.

A.    Exhibit I?

Q.    Exhibit I was the one we just looked at.

A.    Okay.

Q.    And that was from May 2019.  And these assessment notes are from September 2019.

A.    Okay.

Q.    If you turn to Section F.

A.    Yes, I saw it.  The yellow line?

Q.    No, not F.  I'm so sorry.  J.

A.    J?

Q.    Yeah.  It's Exhibit J, in Section F.

A.    Okay.

Q.    I've highlighted the last line under Section F.  Could you read it into the record.

A.    Yeah.  "Member needs assist change position every 2 hours to avoid——" I think it's "ulcer."

Q.    If the aide needs to help the member

Q511WAND                    Wang - By Ms. Yau

with changing her position every two hours, how is the aide able to get five hours of uninterrupted sleep?

A.    This is not document.  They have to do like in 24 hours.  Usually, in this kind of case, the aides——the patient in the evening has a diaper and the aides doesn't need to change every two hours.  Otherwise, the patient would get tired.  So that's for the morning, that's for the daytime, they need to do that.

And also, this is like a short-term patient, as I understand that patient, because fell down, they have a certain period of this issue, but it's not all the time.

Q.    Ms. Wang, are you testifying that Ms. ▇▇▇ is a short-term patient?

A.    Not short-term patient.  Because the——the patient, she——because I think——I think she fell down, and, you know, it's a temporary, like a change in position, but I know that patient has a diaper in the evening.  Patient also need a rest.  And——

Q.    Ms. Wang, changing——

MR. BRENLLA:  Are you cutting her off?

Q.    Turning a patient——

Q511WAND                    Wang - By Ms. Yau

A.    Yes.

Q.    ——is different from wearing a diaper, isn't it?

A.    Okay.  Yeah.

MS. YAU:  Okay.  Let's break for lunch.  It's 1:02.

(Lunch recess, 1:02 p.m. to 1:44 p.m.)

BY MS. YAU:

Q.    Ms. Wang, did anything happen over the lunch break that would stop you from testifying truthfully and completely?

A.    No.

Q.    Let's take a look at page Bates stamped 3928 again of Exhibit I.

A.    Okay.

Q.    You said that you believe that the handwriting at the bottom of that page, where it is written "Living-in case," was written by the same person who wrote all of the rest of the notes about that section; am I correct?

A.    Yeah.

Q.    Okay.  And you're testifying that it was the nurse who wrote these notes, correct?

A.    Correct.

Q.    And did she make those notes at the

Q511WAND                    Wang - By Ms. Yau

same time she conducted the visit, meaning on

October 16, 2019?

          A.    You mean the care plan?

          Q.    The notes on the bottom of 3928, do

you believe were written at the same time as the

rest of the notes about that?

          A.    I can check the document.  Because I

didn't see document, I cannot tell, you know,

she wrote or not, but she should.  If the

live-in, she should write the note.

          Q.    She should write the notes at the same

time?

          A.    What do you mean at the same time?

What note she write at the same time?  What

document she need to write at the same time?

          Q.    So at the bottom of 3928, right, we

agree that it was written 4 days x 24 hours,

etc., correct?

          A.    October 16, 2019, she wrote, right?

That's what you said?

          Q.    No.  This date is dated May 2019.  And

my question is:  Did she write those notes on

3928 at the same time as she wrote the rest of

the notes?

          A.    I'm not her.  I don't know.  Because

this is not what I can see that when she write. She assessed the patient, so in the morning or in the evening, she write, I don't know.  I don't know.  I don't check the time because, you know, this is her report.

Q.   Would you please look at 3926 then.

A.   Okay.  29 what?

Q.   No.  3926.

A.   26.  Okay.

Yeah.  What?

Q.   Give me one moment, please.

So you're looking at 3926 right now, right?

A.   Mm-hmm.

Q.   Would you say that the notes on 3926 are written by the same nurse?

A.   Yeah, it's the same nurse.

Q.   And let's go back to page 3923.  And would those notes be written by the same nurse as well?

A.   If she signed her name, that's her name, that's her note.

Q.   And do you believe that she wrote those notes on 3923 on the same date that she visited the patient?

Q511WAND                     Wang - By Ms. Yau

their son live with them?

A.    They live nearby.

Q.    The question, yes or no, do they live with—

A.    No.

Q.    Okay.  Does the daughter live with her parents?

A.    No.

Q.    Okay.

A.    If the daughter or son live with them, then that's not called live-in.

Q.    So how does Mr. ▮▮▮▮ son know whether the plaintiffs got the sleep and meal breaks?

A.    Because his mom, his mom is there. The patient live with his wife.

Q.    Does Mr. ▮▮▮ or his son read English?

A.    That, I don't—I don't recall.  I don't know.

Q.    Do they read in Chinese?

A.    I don't—I think they read in Chinese.

Q.    Okay.  Then why isn't the letter in Chinese then?

A.    If we—if we produce to whomever, public or lawyer or something, this has to be written in English, and then the—the lawyer

Q511WAND                    Wang - By Ms. Yau

doesn't read Chinese.

Q.   So were the letters prepared for lawyers?

A.   No.  This letter is not prepared for lawyer.  Right now it's for lawyer, but before, we just have our own record to verify.

Q.   Then why did you worry about lawyers being able to read them or not?

A.   Why we worry about it?  Because all the—the record is supposed to be—this is America.  It's supposed to be English.  We are not living in China.

Q.   Was the letter prepared in case GreatCare is sued?

A.   Yes.

Q.   And isn't it true that you got Mr. ███ and his son to sign this letter by lying to them that the aides were actually suing the family and not GreatCare?

A.   No.  No.  Actually, at the time that we didn't get a suit, because see, dated March 31, 2023.  We get sued 2024; is that correct?

Q.   I get to ask the questions.  And you just testified that you spoke with the family a

Q511WAND                    Wang - By Ms. Yau

few weeks ago.

A.    Yes.

Q.    What if I tell you that the family will testify that they signed the letter because they thought they were being sued, the family was being sued?

A.    No.  That's impossible.  And when we talked to the patient, we told that GreatCare get sued and not——we didn't get sued, we just verify, because we didn't get sued yet.  That's nothing that GreatCare got sued.  We just verify that your father, your mom, need any aides for the evening service or not, and then these aides get three hours mealtime or not, did the aides get five hours uninterrupted sleeping time or not.  That's what we asked them.  So we never get sued yet.  How come we tell them and that they will get sued?

Q.    These letters were dated 2023, right?

A.    Yeah.

Q.    The plaintiffs in this case filed New York State Department of Labor complaints in 2021, 2022, 2023; isn't that right?

A.    I don't think 2021.  2022, I remember; definitely not the two years.  And whether, what

Q511WAND                    Wang - By Ms. Yau

year, what date, I'm not quite sure, but once I get that information, we gather all the documents and we——

Q. Ms. Wang——

A. Yeah.

Q. ——the question is——and if you don't know the answer, that's okay.

A. Okay.

Q. ——when the plaintiffs filed the DOL complaints.

A. I don't remember.

Q. Okay. But by 2023, hadn't the plaintiffs already filed the complaints at the New York State Department of Labor?

A. I think so.

Q. Okay. Let's turn to Exhibit CC, and that's the other photo. If you need, I will help you navigate.

A. Hold on. Which one? They have AA, BB, CC. Oh, CC. Okay.

Q. CC. And let me identify for the record, Exhibit CC is Bates stamped GC 03.01.2025-234. All right?

A. Yes.

Q. And this is a declaration letter

supposedly signed by Hei Li's patient's wife,

███████████ wife; am I correct?

A.    Yes.

Q.    What's the name and the signature on Exhibit CC?

A.    What is the name, the wife name?

Q.    The wife's name.

A.    ███████████ .

Q.    Can you spell it for the record.

A.    ███████████████ .

Q.    Okay.  What if I tell you that ██████ ██████ wife is prepared to testify that she never signed the letter that you're looking at?

A.    That's impossible.  That's impossible.

Q.    Is it your testimony that ███████████ wife signed this letter?

A.    Yeah.

Q.    Okay.  I would like to show you Exhibit DD.

A.    Okay.

Q.    It is a redacted copy of a photograph page from a passport.  The photograph of a woman is on it.  Do you know who this woman is?

A.    I don't know.

Q.    So it's a one-page document.  I will

Q511WAND                    Wang - By Ms. Yau

continue, it would speak, talking to the aides,

asking aides to do certain service.  There's no

documentation to show the aides working in the

evening.

Q.   Okay.  Ms. Wang, isn't it true that

you also used misleading methods to get similar

letters from Ms. ████████

MR. BRENLLA:  Objection.

A.   I never misleading people, and those

are all we confirm with the patient family

member, like a daughter.

Q.   Okay.  Please answer my question yes

or no, okay?  You don't have to go through the

long question.

A.   No.

Q.   Let me ask, isn't it true that you

collected these letters in order to prepare for

a lawsuit or a Department of Labor investigation

against GreatCare?

A.   We prepared this.  We prepared this

letter to send it to Department of

Health——Department of Labor, I'm sorry,

Department of Labor, for investigation.

Q.   Okay.  So is it yes or no?

A.   Yes.

couple of documents from the New York State

Department of Labor, but I will identify that

properly on the record.  And for the defense,

what we'll do is we will re-Bates stamp them and

then share with you.

BY MS. YAU:

Q.    Ms. Wang, are you ready?

A.    Yeah, okay.

Q.    So Ms. Wang, the aides make a phone
call to report when they have arrived at the
patient's home to begin their live-in shifts;
isn't that right?

A.    You mean clock in, clock out?

Q.    They make a phone call to clock in and
clock out.

A.    Yes, they make a—yeah, we have
a—things we use in the system, the clock in,
clock out, that's required.

Q.    Okay.  And the aides use the same
method, as you said, to clock out, when they
finish a live-in shift, correct?

A.    Yeah.

Q.    And when did this practice of calling
in to report when the shifts begin and end
start?

Q511WAND                     Wang - By Ms. Yau

A.    They getting to patient house, they can start clock in, and the out, they left patient house, they can clock out.

Q.    Let me rephrase the question.

This method of clocking in and clocking out, when did it start?

A.    Oh, that, I don't recall.

Q.    Was the practice begun before 2015?

A.    I don't recall, but actually, it's many, many years ago already start clock in, clock out.

Q.    Was it before 2018?

A.    I don't recall.

Q.    Was it before 2020?

A.    I don't recall.

Q.    Before this method, right, how did the aides report their working time?

A.    They using time sheet.

Q.    Okay.  And how many years have you used this method of time sheets?

A.    How many years?  We always using the time sheet in case if patient──the system has a little issue or patient phone has an issue, they always have──carry their time sheet in case if the clock in, clock out cannot successful, they

have to fill out time sheet.

Q.    Are you testifying then that the time sheet method has always existed?

A.    Yeah, it's always existed.

Q.    Did it start when GreatCare began as an agency?

A.    Yeah.

Q.    So are you testifying that the aides always have to clock in and fill out a paper time sheet?

A.    Yeah, for live-in case.

Q.    And are those time sheets supposed to be signed by the patients as well?

A.    Those time sheets doesn't need to sign by patient.  Those time—because if the aides clock in, clock out and the successfully, they still fill out time sheet to indicate they really have uninterrupted five hours sleeping time of total eight hours and also they received three hours of mealtime.

Q.    And these time sheets are supposed to be signed by the workers, by the aides themselves, right?

A.    Yeah, yeah.

Q.    Why did you start switching from just

Q511WAND                    Wang - By Ms. Yau

MR. BRENLLA:  Before you go on, I just have a question.  Are you saying Exhibit——let me make sure I'm clear.  Exhibit Q was a document produced by GreatCare?

THE WITNESS:  Yes.

MR. BRENLLA:  Okay.

(Discussion off the record)

BY MS. YAU:

Q.    Ms. Wang, at your first deposition, you testified that you were previously a defendant in another lawsuit, correct?

A.    I was what?

Q.    At your first deposition, you testified that you were previously a defendant in another lawsuit, didn't you?

A.    Yes.

Q.    Okay.  So I'm going to show you Exhibit R.  If you would pull up R.

A.    Yes.

Q.    No, actually, I'm so sorry.  Let's pull up not R first but let's pull up Exhibit S first.

A.    Okay.

Q.    Okay.  So let's go with Exhibit R. Sorry.  Turning back to R instead of S.

A.    Okay.

Q.    And the Bates stamp number for R is GC 05.01.2026-000009 through 000016.

A.    There's only eight pages.  Where is 00009?

MS. GRAJEK:  This one is 1-8.

MS. YAU:  I'm so sorry.  I misidentified.  Thank you, Kaitlyn.  Sorry. Exhibit R, let me identify it for the record. GC 05.01.2026, page 1-8.

A.    Okay.

Q.    It's a settlement agreement, right?

A.    Yeah.

Q.    And it's a settlement agreement for a case named Qian, Q-I-A-N, v. GreatCare.

A.    Qian.  Yeah.

Q.    Am I correct that this is a settlement agreement for that particular lawsuit?

A.    Correct.  Yeah.

Q.    And you're named personally in that lawsuit, correct?

A.    Correct.

Q.    This is the settlement agreement for the case that you testified about in the last day of the deposition, correct?

Q511WAND                          Wang - By Ms. Yau

A.    Correct.

Q.    The complaint says that it was filed on November 1, 2017.

A.    Filed?  What do you mean?  November?

Q.    It's the second "WHEREAS" paragraph.

A.    Oh, okay.  So which is the lawsuit start?  Filed November 3, 2017, that's what you said?

Q.    That's right.  That's right.

A.    Okay.

Q.    You agree?

A.    If it says that, yes.

Q.    Okay.  And this case was also about GreatCare's failure to pay for 24-hour live-in cases; isn't that right?

A.    That's not right.  That's not the GreatCare failure to pay.  This agreement is nothing wrong with us.  So we just have a good faith to settle.

Q.    I didn't say whether you were liable or you admitted any wrongdoing.  What I'm asking is that the allegation is about the failure to pay for 24-hour live-in cases, correct?

A.    Correct.

Q.    Okay.  And that it is a class action

Q511WAND                          Wang - By Ms. Yau

lawsuit, correct?

A.    This is not class action.  This is only one single person.

Q.    In the caption, it says that Guo Zhen Qian, G-U-O, Z-H-E-N, Q-I-A-N, brought this suit individually and on behalf of all others similarly situated, correct?

A.    This is the wrong lawsuit, because their lawyer misread in, that's why, because this case definitely is not a class action.

Q.    Ms. Wang——

A.    Yeah.

Q.    ——I'm just asking you:  On the caption, that's what it says, right?

A.    Yeah, the correction, yeah; whatever it says, it is.

Q.    So were there any settlement payment to any aide other than the plaintiff that's in the caption?

A.    No.  Only her.

Q.    Isn't it true that it was after this lawsuit was filed that GreatCare started having the live-in aides fill out paper time sheets?

A.    I don't understand what you mean. Fill out the paper time sheet?  What do you mean

fill out paper time sheet?

Q.    You just testified that GreatCare has aides fill out paper time sheets in addition to clocking in and clocking out on the phone, correct?

A.    I still don't understand what you're talking about.  The clock in, clock out, what the—

Q.    Ms. Wang, we could have the court reporter read it back to you.

A.    Okay.

Q.    That you said that you have—you, as in GreatCare, have the aides filled out paper time sheets; am I correct?

A.    If this person clock in, clock out, they might don't have a time sheet.

Q.    I'm not talking about this person. I'm talking about the practice.

A.    I don't recall.

Q.    You don't recall what you just said in the deposition?

A.    What do you mean, I don't recall what I said?  According—which one?  You said time sheet, and you said clock in, clock out.  I don't understand what you mean.

Q511WAND                    Wang - By Ms. Yau

Q.    All right.  Let me ask it this way.
You said earlier that you have the live-in aides
fill out paper time sheets after GreatCare
started using the telephone clocking in system;
am I right?

A.    Yeah, yeah.

Q.    Okay.  And you only had live-in aides
fill out those paper time sheets; am I correct?

A.    No.  And if we don't——if the aides not
clock in, clock out, they have to fill out time
sheet.  Otherwise, how could I——how could we
verify how many hours they worked?

Q.    This lawsuit was brought in
November 2017.  Did the practice of having the
GreatCare aides fill out paper time sheets
happen after 2017?

A.    I don't recall.

Q.    Isn't it true that after the first
lawsuit, GreatCare had its aides start signing
live-in agreements?

A.    I think so.  I think so.  I think at
the beginning——I don't know.  I don't recall.
So whatever document I have is——I have it.  The
date listed there.  I don't recall when I start
to sign the living time sheet or, you know, I

don't recall.

Q.    Ms. Wang, I'm talking about the live-in agreements now.

A.    Yeah.

Q.    So maybe we should take a look at Exhibit T.  Exhibit T is Bates stamped——

A.    Okay.

Q.    ——GC 07.28.2025-006366 through 6370.

A.    Yeah.

Q.    Would you please bring that up.

A.    Yeah.  Yes.  That's the home care worker agreement for live-in case.

Q.    That's right.  So on the first page, on 6366, is a live-in agreement signed by plaintiff U-M-U, Z-H-E-N, Z-H-A-N-G, dated January 2018, isn't it?

A.    Yeah.

Q.    Isn't it true that Ms. Zhang actually started working for GreatCare in 2014?

A.    I don't recall.

Q.    Okay.  Would the New York State home care registry page for Ms. Zhang help refresh your recollection?

A.    What is it?

Q.    Did you just testify that you don't

Q511WAND                         Wang - By Ms. Yau

documents, I didn't shred it.

Q.    Ms. Wang, I understand that.  If you had shredded it, you couldn't have produced them to us.  So I'm asking you, have you ever shredded any documents that are relevant to this case before or after this litigation has commenced?

A.    Again, I tell you one more time.  Whatever I have, I produced to you.  I never shredded.

Q.    Have you ever shredded any patient files?

A.    If the patient file older than six years, yes, we shred it.

Q.    Have you ever deleted patient files?

A.    What delete?  I didn't—we—we don't put in the—how do you say—electronic, and we have like a—what's called like a folder.

Q.    Are you testifying that patient files is always in paper format?

A.    You mean now or you mean before?  How long ago?  If you talking about now, we have electronic files, and if you talk of before, it's all paper.

Q.    Okay.  So I'm asking you, have you

ever deleted or destroyed any patient files?

A.    If the patient older than six years, yes.  We don't need to keep it.

Q.    When is the last time you shredded patient files?

A.    I don't recall.  Whatever is reached to six years and then we just shred it.

Q.    How often do you shred patient files?

A.    Whenever we available or we are not busy, we do that.

Q.    Do you always shred or destroy patient files as soon as it becomes six years?

A.    That I don't recall.  I——I'm not really remember, you know, but of course, and when we have the——whatever patient file and over six years and we are available, and then we just shred it.  It's not what exactly time or exactly date, and whenever we available.

Q.    Is it your testimony that you do not keep patient files that are more than six years old?

A.    Yeah.  Most likely if, you know——

Q.    What about other files?

A.    Other files?  What do you mean?
Patient files?  Aides files?

Q.   We're going to talk about aides files in a little bit.

A.   Yeah, same thing.

Q.   We're going to talk about aides files in a little bit.

Talking about anything other than patient files and aides files, do you destroy any of those files that are more than six years old?

MR. MUNIZ:  I'm just going to object and ask for clarification as to what other files because I don't know if she understands what other files you're talking about.  I don't understand what other files you're talking about.

Q.   Files that shares communications with insurance companies.

A.   Again, we keep like six years.

Q.   Have you ever shredded, deleted, or destroyed any aides files?

A.   Within six years, we definitely not shredded or deleted.

Q.   And is it your testimony that you do not keep aides files that are more than six years old?

A.    For——by law, yes.  We don't need to keep more than six years.

Q.    Have you ever shredded, deleted, or destroyed any emails?

A.    If the email is garbage, it's not something that legally need to keep it, of course.

Q.    And how do you make that decision?

A.    How do I make decision?  It's like, I know what is important, what is legally you have to keep it.

Q.    Besides emails, what other documents have you destroyed?

A.    What?  That question is too wide, and give me an example what document you are referring to.

Q.    The documents you keep.  You know better than I do.

A.    I still don't understand.  Whatever related file with patient, with aides, and then during the six years, and we are not going to shred it.

Q.    So would it be correct to say that generally, GreatCare does not retain any documents that are more than six years old?

Q511WAND                    Wang - By Ms. Yau

A.    Legally?  Yes.  We don't need to keep more than six years.

Q.    This case was filed in 2024, as you said earlier, so does this mean that you don't have any documents relating to—actually, does this mean that you don't have any documents from before 2018?

A.    I don't understand what you mean. What document?  Which one?  What document?

MR. MUNIZ:  I'm sorry.  As it relates to the 14 plaintiffs.

MS. YAU:  First let me ask the general question.

Q.    This case was filed in 2024.

A.    Yeah.

Q.    Does this mean that you don't have any documents from before 2018, any documents?

A.    I'm not sure.  If I provided to you—if I have it, I give it to you.  If I shred it, I don't have it.  If it's over six years.

Q.    This case was filed in 2024.  Does this mean that you don't have any documents relating to this case from before 2018?

A.    Again, I told you, within six years, it's legally I have to keep it.  If I do give it

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q511WAND                        Wang - By Ms. Yau

to you before six years employee, I have it, I give it to you.  That means I didn't shred, no. That means I have a copy, whatever things I provided to you.  But doesn't means I need to keep like six years.  If I have, I give it to you.  If I don't have it, I cannot give it to you.

Q.    So this means that you have shredded documents——

MR. BRENLLA:  Objection to form.

MR. MUNIZ:  Objection.

MS. GRAJEK:  Join.

A.    I think you go around again and again and again.

MR. MUNIZ:  Hold on.  She answered it. She said that she kept it for six years; after the six years, she shredded it.  So if you're talking about stuff prior to 2018, based upon what she's already testified to, the likelihood is——and you can ask her directly——she shredded it.  And whatever after 2018, 2019, 2020, I imagine hasn't been shredded, yet.

BY MS. YAU:

Q.    On December 1, 2025, did you travel out of the state?

Q511WAND                    Wang - By Ms. Yau

A.    December what?

Q.    December 1, 2025.

A.    What state?  What did you say?

MR. MUNIZ:  I'm just going to object as to relevancy to this case, her travel plans. I don't understand why that's relevant.

A.    What do you mean?

Q.    December 1st of last year.

A.    Uh-huh.

Q.    Did you travel out of state?

A.    No, I don't think so.  When?  I don't remember.  I don't think so.  Why are you asking me this question?  I don't understand.  You mean last year, 2025?

Q.    That's right.

A.    I really don't remember.  Where did I go?

Q.    Do you remember that we had to reschedule a settlement conference because your attorney said that you were traveling out of state?

A.    Well, I——I don't think I traveled out of state.  I don't remember I traveled out of state.  I went to——oh, 2025?  Just the past like a few months, right?

Q.   That's right.

A.   No, no, I didn't travel out of state. I traveled somewhere else, not out of state.

Q.   Where did you travel to?

A.   Florida.  Florida, yeah.

Q.   Okay.  And that was on or around December 1, 2025?

A.   Oh, I don't remember.  I don't remember that—to be frank with you, I don't remember what exactly date.

Q.   Okay.  What was the purpose of the trip?

A.   What is the purpose of the trip? That's my personal issue.  That's just because I have a cough and I couldn't recover; I just want to go to warm place to recover my cough.

Q.   Would it be fair to say that it was for a personal reason?

A.   Because of my health.

As you already know, I've been coughing so long.

Q.   So I want to be clear that you're testifying that you asked your counsel to reschedule a settlement conference—

MR. MUNIZ:  I'm going to object as to

things happens, and you know these days I'm dealing with a lawsuit, a lot of things, if nothing related.  If I'm not using their services, out of my mind.

Q.    Did you have to pay ArcherHall for anything?

A.    Why I have to pay them if I don't use their service?

Q.    Okay.  You submitted an affidavit from someone from a vendor named Randy Liu, or I believe he used his Chinese version of the name. Did you hire him to collect documents?

A.    No.

Q.    What did you hire him to do?

A.    I didn't hire them, and Mr. Muniz office hired them to——to check.

Q.    Did Mr. Liu collect documents from you?

A.    Yeah.

Q.    When he collected documents from you, did he describe to you the protocol he was going to follow to collect these documents?

A.    Because the lawyer gave her——gave him the instruction according to your required, and he just follow the required documents to check

Q511WAND                        Wang - By Ms. Yau

the documents.  The keywords was given to them.

Q.    So you're testifying that other than
the search terms that we gave GreatCare, Mr. Liu
did not——

A.    Not to GreatCare.  We gave it to our
lawyer.

Q.    Your lawyer represents GreatCare,
doesn't he?

A.    Yeah.

Q.    So you are testifying that Mr. Liu
collected documents according to our search
terms, correct?

A.    I think so.

Q.    And are you testifying that Mr. Liu
did not conduct any other kind of collection of
documents?

A.    I don't understand what you're talking
about.

Q.    Where did he collect the documents
from?  Where did Mr. Liu collect the documents
from?

A.    Where?

Q.    Yes, where?

A.    You mean the location?

Q.    Yes.

A.    In Muniz's office.

Q.    What electronic devices did he collect documents from?

A.    I bring my laptops and he just opened up and logged in and then collected.

Q.    Did he collect only your laptop?

A.    What do you mean my laptop?  I have all the password user name provided, log in to my employees' emails, my emails.  I don't need to provide too many computers, right?

Q.    So you're testifying that he searched only your laptop?

MR. BRENLLA:  Objection.

A.    I don't understand, my laptop.  And the email, you can log in anywhere, any computer, if you have a user name and password. What do you mean my laptop?

Q.    I'm simply restating what you testified.  You testified that you brought your laptop to Mr. Liu to collect documents; am I correct?

A.    Yeah.

Q.    So he searched only your laptop, didn't he?

MR. BRENLLA:  Objection.

Q511WAND                        Wang - By Ms. Yau

MS. GRAJEK:  Objection.

A.    Okay.  He searched my laptop because I installed——how to say——the Yahoo installed, my laptop Outlook, which is easy letting to search. That's the things.  And then he can log into any computer for other emails, my employees' emails, or my company emails.

Q.    Did he collect any other devices to search for documents?

A.    What other devices?

Q.    Other people's laptops, your telephone.

A.    My telephone?  Why search my telephone?

Q.    The question is:  Did he collect any other devices?  It's yes or no.

A.    Again, again, he only searched something according to you requested.

Q.    The question I asked only required yes or no answer.

A.    Oh.

Q.    Did he only search your laptop?

MR. BRENLLA:  Objection.

A.    I don't understand what you mean, and he searched according to the email password I

Q511WAND                    Wang - By Ms. Yau

provided to him.

Q.   Ms. Wang, this is important.  Are you refusing to answer the question?

A.   I'm not refusing to answer it.  I just tell you, and I provide user name and a password, and he just searched the documents.

Q.   And I would like to know from what devices.

A.   I'm not sure, and, you know, I open the computer for him to look, and whether he using other devices, I don't know.

MR. MUNIZ:  And if I may, Karen, just to clarify the record, because I don't think my client is getting it totally, there was a list of emails that were requested to be searched or at least investigated, and he did that as well.  It wasn't just her laptop.  It was like eight or ten, I forget how many emails you guys wanted to know about.  He went through all of that and he submitted it, and I provided it, his affidavit as to the work that he did.  So I just wanted to make sure that was clear.

BY MS. YAU:

Q.   Ms. Wang, did you provide to Mr. Liu any computers other than your own laptop?

Q511WAND                    Wang - By Ms. Yau

A.    Me?  I don't have many computers.  I just bring my laptop.  And then whether they're using my laptop or a computer, that's his choice.

Q.    Did you provide to Mr. Liu any laptop from anyone else besides your own laptop?

A.    Why I have to provide other people's laptop?

Q.    The question I asked——

A.    No, no.

Q.    Okay.  Thank you.

So Mr. Liu did not search your phone, did he?

A.    What is the point he search my phone?

Q.    Again, the question is just yes or no.

A.    No.

Q.    Did he search any other GreatCare employee's laptop?

A.    My employee doesn't have a laptop.

Q.    Did he search any other GreatCare employee's computers?

A.    Computers?  He search all the emails. The computers is a blank computer.  They don't have anything there.  Again, I told you, he searched in front of Mr. Muniz.

Q511WAND                    Wang - By Ms. Yau

Q.   When he searched your laptop, what email accounts did he search in?

A.   Yahoo email, greatcareny.com email, and all other, my employee email.

Q.   What did he collect?

A.   He collect whatever keyword information, the search terms that you required.

Q.   You testified that he searched for information that you're not exactly sure what they were; am I correct?

MR. MUNIZ:  Objection.

A.   I don't understand what you mean, and I'm not a computer guy, and the lawyer told him what to search and then he just followed the lawyer's instruction.  I——I'm just the client and, you know, I don't understand you.

Q.   Okay.  GreatCare has shared with plaintiff's counsel that GreatCare stored some records in a separate storage unit away from GreatCare's offices, correct?

A.   Not now.

Q.   I'm not just speaking about now.  I'm speaking about any time between 2015 and 2025.

A.   What?  What——

Q.   Did you keep records in a separate

Q511WAND                     Wang - By Ms. Yau

storage unit away from GreatCare's office?

A.    No.  We keep it in our office, current office.

Q.    Are you testifying about now or are you testifying about any point between the period of 2015 and 2025?

A.    You said 20——it used to be, but not now, and all the documents are in our office.

Q.    When did you store documents in that separate storage unit when GreatCare did store those documents there?

A.    I don't recall.

Q.    Did you stop using the storage unit before this lawsuit started?

A.    I don't recall.

Q.    Did you stop using the storage unit after this lawsuit started?

A.    Same question.  I don't recall.

Q.    Did you stop using the storage unit before the pandemic?

A.    I don't recall.

Q.    The pandemic was a very significant event, right?

A.    Yeah.

Q.    You asked me earlier if I remember

what I did in 2014.  I remember what I did before and after the pandemic.

A.    Okay.  I'm glad you remember.

Q.    Let me ask you again:  Did you stop using the storage unit before the pandemic or after?

A.    Again, I don't recall.

MS. GRAJEK:  Objection.

Q.    Has anyone conducted a search of the records in the storage unit for responsive documents to this case?

A.    What did you ask me?

Q.    Has anyone conducted a search of records that are relevant to this case in the storage unit?

A.    No.

Q.    Why not?

A.    We have it in our office, the records, whatever I produced to you, in our office.

Q.    Are you testifying that every record that you have stored in that separate storage unit is a duplicate of what you store in the GreatCare office?

A.    What do you mean duplicated?

Q.    You said you didn't need to search the

Q511WAND                         Wang - By Ms. Yau

separate storage unit and you said that the reason is because you keep it in the GreatCare office, correct?

A.    I still don't understand what you're talking about.  You said whatever document I produced, it is in my office, it's not in storage.

Q.    Obviously we're not talking about documents that have been produced; we're talking about documents that have not been produced.

A.    Everything in my office.

Q.    Everything in your office what?  Could you elaborate.

A.    The patient files, the aides files, in my office.

Q.    So what are the records that were stored in the storage unit?

A.    Nothing need to store in the storage place because everything──and, you know, we can save in HHA Exchange right now.

Q.    Earlier you testified about a binder that has communications with the insurance companies about the changes in the patients' conditions, like hospitalizations.

A.    Yeah.

Q511WAND                    Wang - By Ms. Yau

Q.    So does each patient have a patient file?

A.    Patient have a, yeah, single patient file, yeah.

Q.    If an aide works a schedule that is different from the authorization from the insurance company, GreatCare needs a new authorization in order to pay for that aide, correct?

A.    I don't understand.  What do you mean? You said the aides not working for authorization?

Q.    You testified earlier this morning that you had to follow the insurance company's authorizations.

A.    Correct.

Q.    And you testified this morning if the aide end up working, say, two hours out of a 24-hour live-in shift, you would have to put in different codes for the billing, correct?

A.    Correct.

Q.    So if an aide works a schedule that is different from the authorization for a 24-hour live-in shift, doesn't GreatCare need a new authorization, to pay the aide?

A.    What do you mean the aides work for different than authorization?  What do you mean?  That means the aides not follow up instruction to work?

Q.    Let me ask you this:  Again, you have testified you have to follow the authorizations from the insurance companies, right?

A.    Right.

Q.    Okay.  So do those authorizations go into the patient file?

A.    No.  We don't put it in patient file.  We load it in HHA Exchange.

Q.    Do your requests for new authorizations go into the patient file?

A.    Again, if you said a patient file, it's a folder.  We don't put authorization in the patient folder.  And we load it in HHA Exchange.  If we get authorization, if we're changing the service, of course we need to request it, we send communication and then we getting authorization paper, we load it in the system.

Q.    Do requests for new authorizations go into this patient binder?

A.    No.

Q511WAND                        Wang - By Ms. Yau

the communication.

Q.    Which you had just testified is separate from the patient files.

A.    Yes.

Q.    I'm also going to represent to you, Ms. Wang, that Greatcare produced no patient files for another Greatcare patient, and this one is named ██████ , ██████████████ ████████████████████ , and I'm also going to represent to you that Ms. ████ —do you remember her, actually?

A.    I remember her because I was always talking to her son.  Her son live in New Jersey.

Q.    Okay.

A.    A very nice person, yeah.

Q.    I'm going to represent to you that Ms. ████ received services from Ms. Ruan, one of the GreatCare's aides and one of the plaintiffs in this case, until March 17, 2019; am I correct?

A.    I don't remember.

Q.    I'm sorry.  Sorry.  Ms. Wang, I'm just simply going to represent to you, okay—

A.    Okay.

Q.    —that she was a patient that is

Q511WAND                    Wang - By Ms. Yau

receiving services from Ms. Ruan until 2019.

A.   If it says so, yeah, I—that's the truth and that's the truth.  I didn't check the information.  I don't recall exactly date.

Q.   Okay.  I will represent to you that this information is from HHA Exchange.

A.   Okay.

Q.   Now would you agree that 2019 is within six years of 2025?

A.   Yes, and from amended complaint and up to—back to six years, it is.

Q.   So why didn't Greatcare produce any files for Ms. ███████?

A.   If you don't remember your amended complaint and from August 18, 2025, and back to six years, and you know what is exactly date that—that we shouldn't produce something that is not within six years, right?

Q.   That is not correct.  The request for document production clearly said that the relevant period is beyond that.  The relevant period is from 2015.

A.   Oh.

Q.   Ms. Wang—

A.   2015, yeah.

Q.    So—

A.    No, no, not 2015.  So the amended—as I told you, so after six years and we don't need to keep the file, and then the amended complaint is August 18, 2025, right?  And, you know, if this service ended on March 2019, which is already past the six years.

Q.    Didn't your counsel ask you to keep all relevant documents relating to this litigation on document preservation?

A.    These documents actually is—how do you say—it's a labor, and what I'm understanding is whatever you write, you wrote in the complaint led us to provide the record, and we provided according to required, and also, especially if you said you don't have it and you already sent subpoena to whatever place, get all the records.

Q.    I want to be clear, Ms. Wang.  Are you testifying that you have destroyed Ms. ██████ ██████s patient files?

A.    I don't recall, but I don't have it, and if I don't provide it to you, that means I don't have it.

Q.    Why don't you have it?

A.    What do you mean why?  If I don't have it, I don't have it.  Why I don't have it, that seems like a——I don't know how to answer this question.  If I have it, I have it, I provided to you.  If I don't have it, I don't need to provide to you.  I can't.

Q.    So did you shred it?

A.    I don't recall, but I don't have it.

Q.    Were they lost?

A.    I don't know.

Q.    Shortly before Ms. MeiMei Zhao's deposition, you had an accident and you injured yourself, correct?

A.    Correct.

Q.    What happened?

A.    My injury?

Q.    Yes.

A.    You mean February 11th?

Q.    Yes.

A.    Okay.  In the morning, and because as you told me on February 9th and you said, okay, I better come over earlier, that's why I left home earlier in the morning, because at the time is on, you know, in front of my door is ice, is very light ice, I couldn't see very clearly.  I

picture.  You saw the picture I attached to my affidavit, right?  And that the ambulance came. And I asked my doctor——my daughter to take picture for me and then just in case if you don't believe it, and I show you that's a fact. And also, I went to hospital and then the doctor take an x-ray from me and then take CT for me and get all the report.

Q.    Besides the rib fracture, what other injuries did you suffer?

MR. BRENLLA:  Objection to relevance.

A.    The doctor——I'm not a medical doctor. The all report from the hospital.  There is a record.  I submit it already.  You can read.

Q.    So the hospital records you would be able to share would show all of the injuries you suffered from the accident, correct?

A.    Yeah, I shared it all.

Q.    Okay.  After your injury——

A.    Yeah.

Q.    ——what kind of activities were you able to do?

A.    I can walk a little bit, but I have to ask somebody to hold me.  And then I all most time is bedridden, and also, I couldn't go to

A.    I can, using my phone.

Q.    Okay.  Were you able to engage in a Teams meeting?

A.    I don't engage Teams meeting.  You mean—I did Teams meeting with the lawyer.  I lied on the bed.

Q.    Right.

A.    Yeah.

Q.    Were you able to do that?

A.    Have to be very short time and it cannot be long because—actually, I—in the middle of the meeting, I have very painful and I was screaming, so that's why, and then they take a very short time to have a little meeting with me.

Q.    You say you were bedridden.  When were you able to get out of bed?

A.    I think a few weeks, two or three weeks.

Q.    Two or three weeks.

A.    Yeah.

Q.    After February—

A.    The end of March or something?  I don't know.  Middle March?  And the thing is that the painful still happens and I couldn't

Q511WAND                    Wang - By Ms. Yau

talk, and I couldn't talk much because it's hurt really a lot and I took a pain medication, and a very serious pain medication.

Q. And you're no longer on it, though.

A. Not now.

Q. Okay. After the two or three weeks when you were able to get out of bed, were you able to go back to normal activity?

A. No. I haven't go to my office since the first——the first time that I go to office is like 17th; April 17th is the first date. As I——my doctor said, asked me to start on 20th or 21. I don't know. I forgot. But 17th, I, you know, came to my office for just a, you know, like a half an hour, one hour, no more than one hour, and I left.

Q. Between the time you were able to get out of bed and between the time you were actually able to go to the GreatCare offices, did you do any work?

A. I do work, a little work; not too much.

Q. How long does it take you to travel to GreatCare's office from your home?

A. How long?

Q511WAND                   Wang - By Ms. Yau

Q.    Mm-hmm.

A.    It's normally——we are in 34th Street, so depending on the traffic, I normally pick up——the traffic is not bad, and it's take about an hour to get there.

Q.    Okay.  You said you're no longer on painkillers.  When did you stop taking them?

A.    I forgot, and I——I took a like serious pain medication, and then gradually I take like a Tylenol, and I stopped like——I don't know. I——if I——even now, if I still have a pain, I still can take it, but I refuse not——I just decided not to take it.

Q.    I understand that you're leaving New York State For a trip in the middle of May.

A.    Yeah.

Q.    That's correct?

A.    Correct.

Q.    When did you plan this trip?

A.    Oh, almost one year ago.

Q.    And where will you be going?

A.    Going to visit my mom.

Q.    I'm sorry?  Where?

A.    Visit my mom, in China.

Q.    In China.

A.    Yeah.

Q.    And how long will you be away?

A.    Only two weeks.  I come back 31st or June 1st.  I don't remember.  I have to check.

Q.    Is Benjamin R-A-J-O-T-T-E of Maiden Lane Law Group still GreatCare's attorney?

A.    No more.  I already terminated service with him I think——when?  I don't have a phone. And I think couple days.  The date that they spoke to you in the evening, I terminated.

Q.    Why did you terminate his services?

MR. BRENLLA:  Objection.

MR. MUNIZ:  Objection.

Q.    You don't have to tell me about your conversation with your counsel, including Mr. Rajotte.  What I want to know is the reason you hired him as Mr. Muniz's co-counsel, and then fired him I believe just two or three days later.

A.    Yeah.  And of course——

MR. BRENLLA:  Same objection.

MR. MUNIZ:  Same objection.

A.    ——I have right to hire people and then fire people.

MR. MUNIZ:  That's covered by

attorney-client privilege.

MS. YAU:  All right.

BY MS. YAU:

Q.    Okay.  Ms. Wang, we already discussed this.  GreatCare gives paper time sheets to the aides to keep track of their work hours and sleep and meal breaks, correct?

A.    Correct.

Q.    Were they trained on how to fill out these time sheets?

A.    That's for sure.

Q.    Was the training verbal or written?

A.    Of course verbal, because we gave them like a translated version, ask them to see where they put name and address and what that means. They read it.  Yeah.  They read it.  They read Chinese.

Q.    Who trained them?

A.    Whomever gave them time sheet.  HR. And would tell them, and give them, and they just let them read, do you understand what you're going to write.  And at the deposition, Ms. Ruan already deposed, we deposed Ms. Ruan, and she said and we gave her time sheet and then she understand; we explained something to her,

Q511WAND                    Wang - By Ms. Yau

A.    Yeah.

Q.    And each time sheet in that range from 4100 to 4129——that's approximately 30 of them——says Ms. Li took three meal breaks at exactly the same time each day, doesn't it?

A.    Whatever they write, that's what they write, and, yeah.

Q.    And they say that Ms. Li took meal breaks at 8:30 to 9:00 and then noon to 1, and then 7 to 8 p.m., correct?

A.    Whatever it said is correct.  If they write.

Q.    Okay.

MR. BRENLLA:  Objection.  Not all of them have that same time.

Q.    So first of all, that would be two and a half hours of meal breaks, not three hours, correct?

A.    That I don't know.  They have——they are allowed to have three hours meal.  If they take hours——for example, like, if they want to take——finish, like, two hours——or, no, not two hours, like a half an hour to finish a meal or they choose to take one hour, that's up to them, but they're allowed to them to take

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

one-hour break.

Q.   The time sheet also says that Ms. Li starts work at 8 a.m. for every worksheet shift, correct?

A.   Yeah.

Q.   And then she immediately took a breakfast break at 8:30 a.m., correct?

A.   Whatever it says.  That's their writing.  We are not control what they write. The only thing that we know is the total hours they working is 13 hours.  That's it.

Q.   Ms. Li's time sheet also indicates that she takes meals consistently at 9 a.m., 1 p.m., and 6 p.m.; am I correct?

A.   Whatever it says is correct, and that's their handwriting.

Q.   It also consistently says that her sleep break was the same time each day, from 10 p.m. to 6 a.m. every single day; is that right?

MR. BRENLLA:  Objection.

A.   That's what they write, but the—look like their working hours is 13 hours they worked, and then the rest time, they put like their week or whatever, they do whatever they

Q511WAND                    Wang - By Ms. Yau

want.

Q.    Ms. Wang——

A.    Yeah.

Q.    ——didn't you question the fact that she could have had her meals at exactly the same time every day for a period of over three months?

A.    The thing is, whether——what time they sleep, what time they take a meal, they make the decision and we are not there, we don't know. That's their time sheet.  They write their own time sheet.

Q.    So Ms. Wang, you would agree that you don't actually know exactly the work hours they work.

A.    Of course I know.  The 13 hours they work.

Q.    Didn't you just testify you're not there?

A.    I'm not there because their handwriting, the time sheet shows how many hours they work.

Q.    If the time sheets were reliable.

A.    They write time sheets.  Of course the time sheets are reliable.  And also, they work

Q511WAND                    Wang - By Ms. Yau

Okay.  What's happening?

Q.   On 4130, the form started to be typed instead of handwritten, correct?

A.   Yes.  That's not what we type.  That's the whatever home health aide gave it to us and then we just keep it.  They will be able to type.  That's no problem.  As long as they have their signature.  And also, right now, everybody were using like the e-time sheet and we send them link, and they just ask patient and theirself to sign.  It's allowable.

Q.   You are testifying that it's the aides who type up these time sheets?

A.   I don't know who type out for them, but definitely not us.

Q.   Okay.  Let's go to now Exhibit W.

A.   Okay.

Q.   Which is the first one you were looking at.

A.   Okay.

Q.   The Bates stamp number is GC 7.28.2025-4096 through 4099.  And they have patient name which is Chin, Sau King, correct?

A.   Yeah.

Q.   And she's also Ms. Li's patient,

Q511WAND                      Wang - By Ms. Yau

correct?

A.    Ms. Li's patient.  Yeah.  They work several days of this patient, they work several days of other patient.  It's normal, yeah.

Q.    Mm-hmm.  Would you also agree that the date——besides the dates and the names, the time sheets for Mr. and Mrs. ███ and Ms. ███ are nearly identical?

A.    What do you mean, nearly identical? What do you mean about that?

Q.    That they have their meals at exactly the same time each day.

A.    Again, this is the home health aide fill out the time sheet, so whether——what time they take a meal, they control.  We don't.

Q.    Ms. Wang, the question is not who takes control.  The question here is:  The document says that they take the meal breaks at exactly the same time each day.

A.    Okay.

Q.    Correct?

A.    You asked me.  I feel this question you should ask the aides.  And I don't——I don't——I can't answer you this question.  The thing is, whatever they write and we check out

the hours is correct, we process, that's it.  So why we have to bother what time they eat?  Because I wasn't there.  How can I answer the question?  Can I ask you, if I'm not at your home, do I know when you are taking lunch, you are taking breakfast?  I can't, right?

Q.    Right.  And you wouldn't know when they took the meals.

A.    Yeah.

Q.    And you wouldn't know when they slept, correct?

A.    Yes, unless they write in the document.

Q.    So Ms. Wang, did it not raise any concern for you that the information for both of Ms. Li's patients are almost exactly identical?

A.     This is a different date.  They're working with a different patient.  If they write, that's the truth.  And we can't control.  If Li says——if Li wrote that's the time they start eating, that's the time.  How could I say, identify this is the truth or not, which is, I wasn't there, and Li have a right——

Q.    Ms. Wang, let's take a look at Exhibit X.

Q511WAND                    Wang - By Ms. Yau

A.    Uh-huh.  X?

Q.    Yes.  X as in Xerox.

Exhibit X is Bates stamped GC 7.28.2025-4567 through GC 7.28.2025-4636.

A.    Okay.

Q.    And these are time sheets for Ms. Lin.

A.    Yeah.

Q.    And I want to spell the name of the aide Ms. Lin for the record.  It's Z as in zebra, H-U, H-U-A-N, L-I, L-I-N.

A.    Yeah.

Q.    So——

A.    Yeah.

Q.    ——in this Bates stamp range, in Exhibit X, these are the time sheets for Ms. ███ the patient, from November 15, 2019, through March 12, 2021, correct?

A.    12 when?  To 12——

Q.    The first date is November 15, 2019, right?

A.    Okay, yeah.

Q.    And then the last time sheet is March 12, 2021; am I correct?

A.    The last one.  Let me go all the way down.

Q511WAND                    Wang - By Ms. Yau

Okay.  March 12, 2021, yeah.

Q.    Okay.  So you agree with that——

A.    Yeah.

Q.    ——range, date range.

A.    Yeah.

Q.    Okay.  From the pages 4567 through 4582, they were filled in by hand, correct?

A.    Whatever it has, it shows like, you know, they fill out——they fill out, they signed, that's the time sheet.  That's a fact.

Q.    From 4583.  Take a look at 4583.

If you need help, let me know.

A.    I'm looking for the number.

Okay.  Just tell me, what is it?

Q.    On page 4584, it begins——these time sheets are now typed, correct?

A.    Yeah, if it's not typed, it's not typed, yeah.

Q.    From 4584 until the end of the document, they are now typed.

A.    Yeah.

Q.    Correct?

A.    Correct.

Q.    Okay.  Who typed them?

A.    I don't know.  So the aides supposed

to know.  We just gave them time sheet and then they just returned to us the time sheet.

Q.    Are you testifying that the time sheets were not typed up by GreatCare?

A.    At that time, no.

Q.    What do you mean by at that time?  At some time you did?

A.    No.  Because for right now, if we are—if the aides couldn't punch in, punch out, we send the link.  If the link already have a finished, prefilled-out time schedule for the aides to sign, it's state required, can be electronic signature.

Q.    I understand that.  But at the time when Ms. Lin was working, they were paper time sheets, correct?

A.    Yeah, those are paper time sheets.

Q.    And these pages indicated they were typewritten, and are you testifying that GreatCare did not type them for these workers—for Ms. Lin?

A.    Not what I'm aware of it.

Q.    Okay.  Now between 4584 and the end, which is page 4637—

A.    Which is up to the last page?

Q.    That's correct.

A.    I can't scroll there.  It's too hard.

Okay.  Yeah.

Q.    I will represent to you that they cover the dates March 6, 2020, through March 5, 2021.

A.    Yeah.

Q.    Okay.  That's about one year, right?

A.    Yeah.

Q.    They were all typed.

A.    Yeah.

Q.    Do you have an explanation why the time sheets are exactly the same throughout this one year?

A.    I don't know.  You'd really have to check with the aides.  See, the aides write the same time, use the same handwriting and the same time, you should ask them, because for—again, the time sheet is not we supposed to fill out. It's—this is the home health aide's time sheet.

MR. MUNIZ:  Karen, if I may, at 6:08 it's going to be eight hours so I'm going to request that—the judge did say seven hours.  As a courtesy, we're extending to eight.  After 6:08, I'm going to tell my client that's the end

of the deposition.

Q.    Ms. Wang——

THE WITNESS:  Let them finish.

MR. MUNIZ:  No, because finishing could be at 10:00 tonight.

MS. YAU:  Mr. Muniz, we're well aware that the Court ordered seven hours we can take of Ms. Wang.  We are keeping very good track of the time we have used.  I don't think we have used seven hours of testimony yet, given the breaks that we have had, but I can also represent to you that we will not be ending at 10 p.m.

BY MS. YAU:

Q.    Ms. Wang, isn't it true that the typewritten time sheets that GreatCare produced that we just reviewed were actually typed out by GreatCare?

A.    I'm not aware of it.

Q.    Isn't it true that GreatCare had the plaintiffs sign the time sheets after GreatCare filled it out?

A.    I'm not aware.  This is——we just give them blank time sheet and then they, you know, bring back to us.

Q511WAND                        Wang - By Ms. Yau

Q.    Isn't it true that GreatCare told the aides what times to fill in on the handwritten time sheet?

A.    Never.  They fill out theirself.

Q.    Isn't it true that GreatCare made the plaintiffs in this case sign several weeks, even months, of paper time sheets at once?

A.    I'm not aware of it.  I don't think so.

Q.    You supervise all the staff at GreatCare, right?

A.    Yeah.

Q.    Is it customary that you're not aware of what's happening in your office?

A.    The thing is, I'm aware the aides hand the time sheet every week.

Q.    Isn't it true that GreatCare asked the aides to sign the time sheets weeks, even months——

A.    I'm——

Q.    ——after the work was already completed?

A.    If the week——for example, if this week already completed, then they have to hand up this time sheet to us.