**STATE OF NEW YORK**
**DEPARTMENT OF HEALTH**

**REQUEST:** October 31, 2024

███████████████

**AGENCY:** MAP
**FH #:** 8874053Z

---

In the Matter of the Appeal of

███████████████████

from a determination by the New York City
Department of Social Services

:

: **DECISION**
**AFTER**
: **FAIR**
**HEARING**

:

:

---

## JURISDICTION

Pursuant to Section 22 of the New York State Social Services Law (hereinafter Social Services Law) and Part 358 of Title 18 NYCRR, (hereinafter Regulations), a fair hearing was held on January 2, 2025, in New York City, before an Administrative Law Judge. The following persons appeared at the hearing:

<u>For the Appellant</u>

████████████████████

<u>For the Social Services Agency</u>
W. Faton, Fair Hearing Representative (by telephone)

## ISSUE

Was the Plan's October 30, 2024, determination to deny the request for an increase in the Appellant's Personal Care Services (PCS) authorization from 24-hour live-in personal care services to 24-hour split-shift personal care services, correct?

## FINDINGS OF FACT

An opportunity to be heard having been afforded to all interested parties and evidence having been taken and due deliberation having been had, it is hereby found that:

1. The Appellant, age ███, has been in receipt of Medical Assistance benefits through a health care plan operated by Anthem (Empire) HealthPlus (Plan).

2. The Appellant has been in receipt of 24-hour live-in Personal Care Services (PCS).

FH# 8874053Z

3.    The Appellant has been diagnosed with ████████████████████ ████████████████████████.

4.    The Appellant lives alone.

5.    On September 27, 2024, a request was made to increase the Appellant's PCS authorization to 24-hour split-shift care.

6.    On September 16, 2024, a nurse assessor completed a Comprehensive Community Health Assessment of the Appellant's personal care needs. The assessment, also referred to as the UAS, reflects the Appellant requires the following levels of assistance with tasks:

| Activity | Level of Assistance |
|---|---|
| Meal preparation | Total Dependence |
| Ordinary housework | Total Dependence |
| Managing finances | Extensive Assistance |
| Managing medications | Maximal Assistance |
| Phone use | Limited Assistance |
| Stairs | Total Dependence |
| Shopping | Total Dependence |
| Transportation | Total Dependence |
| Bathing | Total Dependence |
| Personal hygiene | Extensive Assistance |
| Dressing upper body | Extensive Assistance |
| Dressing lower body | Total Dependence |
| Walking | Activity Did Not Occur |
| Locomotion | Maximal Assistance |
| Transfer toilet | Total Dependence |
| Toilet use | Total Dependence |
| Bed mobility | Extensive Assistance |
| Eating | Independent, Set Up Help Only |
| Primary mode of Locomotion indoors | Wheelchair, scooter crutch, pushing wheelchair |
| Change in ADL status as compared to 90 days ago, or since last assessment if less than 90 days ago: | No Change |

Overall self-sufficiency has changed significantly as compared to status 90 days ago, or since last assessment if less

FH# 8874053Z

than 90 days:                              No Change
Comments:

Member is a non-ambulatory wheelchair dependent ███ who transfers out of bed via ████████. Member is able to self-wheel short distance due to ███████ ████████. Nursing staff administers medication daily per MD order. Member unable to fully bend and requires total assistance with lower body dressing and care. Facility staff manages meal prep, housekeeping and launders clothing. At times requires assistance with feeding due to ███████████ █. Requires assistance with upper body dressing and personal hygiene due ████████████████████████████████████ ███████████. Due to functional status member requires assistance with ADLS an IADLS.

Comments:

███████████████████████████████████████████. Nursing staff manages █████████████████████████.

7.      By Initial Adverse Determination Notice dated October 2, 2024, the Plan determined to deny the request for an increase in the Appellant's PCS authorization from 24-hour live-in personal care services to 24-hour split-shift care as not medically necessary.

8.      On October 30, 2024, a request was made for an internal Plan appeal of the Initial Adverse Determination Notice dated October 2, 2024.

9.      By Final Adverse Determination Notice dated October 30, 2024, the Plan determined to uphold its determination to deny the request for an increase in the Appellant's personal care services authorization, stating in part:

Anthem Blue Cross and Blue Shield HP decided to deny this service because the *Service is not medically necessary.*

- The request for Home Care / Personal Care Level 2 Personal Care Services Increase to 24 Hour(s) per Day (Split Shift) was denied because you do not meet the criteria.

FH# 8874053Z

This decision was based on:

- o The appeal for an increase in your PCA hours remains denied. The member has a past medical history ███████████ with no loss of motor function noted. It is not medically necessary to increase your hours to a 24-hour split-shift. You recently underwent a follow-up clinical assessment utilizing the Department of Health's Uniform Assessment System Tool (UAS) that reviewed your physical functioning since your prior assessment to determine if there are any changes in your ability to perform physical functions such as bed mobility (moving around the bed),bathing, personal hygiene (cleaning yourself), dressing upper and lower body, walking, eating, meal preparation, ordinary housework and medication management. Your memory is OK. There is a report of ███████████████████████. Based on the appeal review, this member was reassessed and the authorized hours were adjusted accordingly. The personal care hours are currently authorized in the amount, duration and scope necessary to meet this member's personal care needs. Hours beyond those currently authorized would be for safety monitoring, which is not a covered benefit under the personal care services program. Your PCA hours will remain at a 24 hour live-in. This decision is based on a review of the UAS for New York and the Plan's Tasking Tool.

10.    On October 31, 2024, the Appellant requested this fair hearing.

## APPLICABLE LAW

Social Services Law §365-a provides that "the amount, nature and manner of providing medical assistance for needy persons shall be determined by the public welfare official with the advice of a physician and in accordance with the local medical plan, this title, and the regulations of the department."

Social Services Law §365-a(2) provides that "'standard coverage' shall mean payment of part or all of the cost of medically necessary medical, dental and remedial care, services and supplies, as authorized in this title or the regulations of the department, which are necessary to prevent, diagnose, correct or cure conditions in the person that cause acute suffering, endanger life, result in illness or infirmity, interfere with such person's capacity for normal activity, or threaten some significant handicap and which are furnished an eligible person in accordance with this title and the regulations of the department."

Pursuant to Social Services Law § 365-a(2)(e), standard coverage includes personal care services:

(i) personal care services, including personal emergency response services, shared aide and an individual aide, subject to the provisions of subparagraphs (ii), (iii), and (iv) of this paragraph, furnished to an individual who is not an inpatient or resident of a hospital, nursing facility, intermediate care facility for the mentally retarded, or institution for mental disease, as determined to meet the recipient's needs for assistance when cost

FH# 8874053Z

effective and appropriate, and when prescribed by a physician, in accordance with the recipient's plan of treatment and provided by individuals who are qualified to provide such services, who are supervised by a registered nurse and who are not members of the recipient's family, and furnished in the recipient's home or other location;

(ii)  the commissioner is authorized to adopt standards, pursuant to emergency regulation, for the provision and management of services available under this paragraph for individuals whose need for such services exceeds a specified level to be determined by the commissioner;

(iii)  the commissioner shall provide assistance to persons receiving services under this paragraph who are transitioning to receiving care from a managed long term care plan certified pursuant to section forty-four hundred three-f of the public health law, consistent with subdivision thirty-one of section three hundred sixty-four-j of this title;

(iv)  personal care services available pursuant to this paragraph shall not exceed eight hours per week for individuals whose needs are limited to nutritional and environmental support functions;

Section 505.14(a) of Title 18 of the New York Codes, Rules and Regulations provides definitions and the scope of services of personal care services.

(1) Personal care services means assistance with nutritional and environmental support functions and personal care functions. . . . Such services must be medically necessary for maintaining an individual's health and safety in his or her own home . . . .

(3) Personal care services, as defined in this section, can be provided only if the services are medically necessary and the social services district reasonably expects that the patient's health and safety in the home can be maintained by the provision of such services, as determined in accordance with this section.

(5) Personal care services shall include the following two levels of care, and be provided in accordance with the following standards:

(i) Level I shall be limited to the performance of nutritional and environmental support functions.

(a) Nutritional and environmental support functions include assistance with the following:

(1) making and changing beds;

(2) dusting and vacuuming the rooms which the patient uses;

(3) light cleaning of the kitchen, bedroom and bathroom;

(4) dishwashing;

(5) listing needed supplies;

(6) shopping for the patient if no other arrangements are possible;

(7) patient's laundering, including necessary ironing and mending;

(8) payment of bills and other essential errands; and

(9) preparing meals, including simple modified diets.

(b) The authorization for Level I services shall not exceed eight hours per week.

(ii) Level II shall include the performance of nutritional and environmental support functions . . . and personal care functions.

(a) Personal care functions include assistance with the following:

(1) bathing of the patient in the bed, the tub or in the shower;

(2) dressing;

(3) grooming, including care of hair, shaving and ordinary care of nails, teeth and mouth;

(4) toileting; this may include assisting the patient on and off the bedpan, commode or toilet;

(5) walking, beyond that provided by durable medical equipment, within the home and outside the home;

(6) transferring from bed to chair or wheelchair;

(7) turning and positioning;

(8) preparing of meals in accordance with modified diets, including low sugar, low fat, low salt and low residue diets;

(9) feeding;

(10) administration of medication by the patient, including prompting the patient as to time, identifying the medication for the

patient, bringing the medication and any necessary supplies or equipment to the patient, opening the container for the patient, positioning the patient for medication and administration, disposing of used supplies and materials and storing the medication properly;

(11) providing routine skin care;

(12) using medical supplies and equipment such as walkers and wheelchairs; and

(13) changing of simple dressings.

\* \* \*

(iii) The personal care aide may perform nutritional and environmental support functions and personal care functions for the recipient and may also assist the recipient to perform such tasks themselves. Assistance may include supervision and cueing to help the recipient perform a nutritional and environmental support function or personal care function if the recipient could not perform the task without such assistance. Supervision and cueing are not standalone personal care services and may not be authorized, paid for or reimbursed except for providing assistance with nutritional and environmental support functions or personal care functions.

Managed Long Term Care (MLTC) Policy 16.07 provides additional guidance on the appropriate use of task-based assessment tools:

Task-based assessment tools cannot be used to establish inflexible or "one size fits all" limits on the amount of time that may be authorized for an IADL or ADL or the frequency at which such tasks can be performed. Plans must conduct individualized assessments of each enrollee's need for assistance with IADLs and ADLs. This means that plans must permit the assessments of time, as well as frequency, for completion of a task to deviate from the time, frequency, or other guidelines set forth in the tool whenever necessary to accommodate the enrollee's individualized need for assistance.

When an enrollee requires safety monitoring, supervision or cognitive prompting to assure the safe completion of one or more IADLs or ADLs, the task-based assessment tool must reflect sufficient time for such safety monitoring, supervision or cognitive prompting for the performance of those particular IADLs or ADLs. Safety monitoring, supervision and cognitive prompting are not, by themselves, independent or "stand-alone" IADLs, ADLs, or tasks. Ideally, all time that is necessary for the performance of any needed safety monitoring,

Section 505.14(b) of the Regulations provides that when a social services district receives

FH# 8874053Z

a request for personal care services, it must determine whether the individual is eligible for Medical Assistance. The initial authorization for personal care services shall be based on:

- a physician's order from the patient's physician based on the patient's current medical status as determined by a medical examination;

- a social assessment, completed by the social services district which must include a discussion with the patient to determine perception of his/her circumstances and preferences; an evaluation of the potential contribution of informal caregivers, such as family and friends, to the patient's care; and consideration of the number and kind of informal caregivers available to the patient, ability and motivation of informal caregivers to assist in care, extent of informal caregivers' potential involvement, availability of informal caregivers for future assistance, and acceptability to the patient of the informal caregivers' involvement in his/her care. When live-in 24-hour personal care services is indicated, the social assessment shall evaluate whether the patient's home has adequate sleeping accommodations for a personal care aide.

- a nursing assessment completed by a nurse from a certified home health agency or by a nurse employed by the local social services department or by a nurse employed by a voluntary or proprietary agency under contract with the local social services department. The nursing assessment must be completed within 5 working days of the request and must include the following:

  o a review and interpretation of the physician's order;

  o the primary diagnosis code;

  o an evaluation of the functions and tasks required by the patient;

  o the degree of assistance required for each function and task;

  o an evaluation whether adaptive or specialized equipment or supplies including, but not limited to, bedside commodes, urinals, walkers and wheelchairs, can meet the patient's need for assistance with personal care functions, and whether such equipment or supplies can be provided safely and cost-effectively.

  o the development of a plan of care in collaboration with the patient or his/her representative; and

  o recommendations for authorization of services.

- an assessment of the patient's appropriateness for hospice services and an assessment of the appropriateness and cost effectiveness of using adaptive or specialized medical equipment or supplies covered by the Medicaid Program including, but not limited to, bedside commodes, urinals, walkers, wheelchairs and insulin pens.

FH# 8874053Z

Where there is a disagreement between the physician's order and the social, nursing and other required assessments, or there is a question about the level and amount of services to be provided, or if the case involves the provision of continuous personal care services or live-in 24-hour personal care services, an independent medical review of the case must be completed by the local professional director, by a physician designated by the local professional director, or by a physician under contract with the local social services department to review personal care services cases. The individual performing the independent medical review is responsible to make a final determination, generally within seven business days, as to the amount and duration of services to be authorized. 18 NYCRR 505.14(b)(4)(i).

Section 505.14(b)(4) of the Regulations outlines requirements about the duration of the authorization period:

(v) The duration of the authorization period shall be based on the individual's needs as reflected in the required assessments and documented in the plan of care. In determining the duration of the authorization period, the following shall be considered:

(a) the individual's prognosis and/or potential for recovery; and

(b) the expected length of any informal caregivers' participation in caregiving; and

(c) the projected length of time alternative services will be available to meet a part of the individual's needs.

(vii) No authorization for personal care services shall exceed 12 months from the date of the most recent independent assessment or practitioner order, whichever is earlier.

Section 505.14(a) of Title 18 of the New York Codes, Rules and Regulations provides definitions for continuous and live-in 24-hour personal care services:

(2) Continuous personal care services means the provision of uninterrupted care, by more than one personal care aide, for more than 16 hours in a calendar day for a patient who, because of the patient's medical condition, needs assistance during such calendar day with toileting, walking, transferring, turning and positioning, or feeding and needs assistance with such frequency that a live-in 24-hour personal care aide would be unlikely to obtain, on a regular basis, five hours daily of uninterrupted sleep during the aide's eight hour period of sleep.

(4) Live-in 24-hour personal care services means the provision of care by one personal care aide for a patient who, because of the patient's medical condition, needs assistance during a calendar day with toileting, walking, transferring, turning and positioning, or feeding and whose need for assistance is sufficiently infrequent that a live-in 24-hour personal care aide would be likely to obtain, on a regular basis, five hours daily of

FH# 8874053Z

uninterrupted sleep during the aide's eight hour period of sleep.

Regulations at 505.14(b)(4) explain the process that plans must follow when authorizing or reauthorizing continuous or live-in 24-hour personal care services:

(i) An independent medical review of the case shall be completed by the local professional director, a physician designated by the local professional director or a physician under contract with the local social services department to review personal care services cases when:

(c) the case involves the provision of continuous personal care services or live-in 24-hour personal care services . . . . Documentation for such cases is subject to the following requirements:

(1) The social assessment shall demonstrate that all alternative arrangements for meeting the patient's medical needs have been explored and are infeasible including, but not limited to, the provision of personal care services in combination with other formal services or in combination with voluntary contributions of informal caregivers. In cases involving live-in 24-hour personal care services, the social assessment shall also evaluate whether the patient's home has sleeping accommodations for a personal care aide. When the patient's home has no sleeping accommodations for a personal care aide, continuous personal care services must be authorized for the patient; however, should the patient's circumstances change and sleeping accommodations for a personal care aide become available in the patient's home, the district must promptly review the case. If a reduction of the patient's continuous personal care services to live-in 24-hour personal care services is appropriate, the district must send the patient a timely and adequate notice of the proposed reduction.

(2) The nursing assessment shall document the following:

(i) whether the physician's order has documented a medical condition that causes the patient to need frequent assistance during a calendar day with toileting, walking, transferring, turning and positioning, or feeding;

(ii) the specific personal care functions with which the patient needs frequent assistance during a calendar day;

(iii) the frequency at which the patient needs assistance with these personal care functions during a calendar day;

(iv) whether the patient needs similar assistance with these

FH# 8874053Z

personal care functions during the patient's waking and sleeping hours and, if not, why not; and

(v) whether, were live-in 24-hour personal care services to be authorized, the personal care aide would be likely to obtain, on a regular basis, five hours daily of uninterrupted sleep during the aide's eight-hour period of sleep.

(ii) The local professional director, or designee, must review the physician's order and the social and nursing assessments in accordance with the standards for services set forth in subdivision (a) of this section, and is responsible for the final determination of the amount and duration of services to be authorized.

(iii) When determining whether continuous personal care services or live-in 24-hour personal care services should be authorized, the local professional director, or designee, must consider the information in the social and nursing assessments.

(iv) The local professional director or designee may consult with the patient's treating physician and may conduct an additional assessment of the patient in the home. The final determination must be made with reasonable promptness, generally not to exceed seven business days after receipt of the physician's order and the completed social and nursing assessments, except in unusual circumstances including, but not limited to, the need to resolve any outstanding questions regarding the amount or duration of services to be authorized.

Regulations at 505.14(b)(5)(iv)(d) further explain the process that plans must follow when authorizing or reauthorizing continuous or live-in 24-hour personal care services:

The social services district may not authorize or reauthorize personal care services based upon a task-based assessment when the applicant or recipient of personal care services has been determined by the social services district or the State to be in need of 24-hour personal care, including continuous personal care services, live-in 24-hour personal care services or the equivalent provided by formal services or informal caregivers.

General Information System message GIS 12 MA/026 was issued in connection with the case of *Strouchler v. Shah*, to clarify the instances in which an individual may be eligible for person care services. Of particular relevance it states:

1. The fact that a person's needs are predictable does not preclude the receipt of [continuous] care if the person has a documented medical need for the tasks to be performed with a frequency that would not allow a live-in aide to perform them and still obtain an uninterrupted five hours of sleep.

2. The need for turning and positioning and/or the need for diaper changes, by themselves, neither preclude nor justify the receipt of [continuous] care. In order to

FH# 8874053Z

receive [continuous] care, the person must have a documented medical need for those tasks to be performed so frequently that a live-in aide cannot provide them and still obtain an uninterrupted five hours of sleep.

3. A person with a documented medical need for turning and positioning may, if otherwise appropriate, qualify for either [continuous] or live-in [24-hour] care depending on the frequency at which turning and positioning is required at night, regardless of whether the person has a nighttime need for transferring.

MLTC Policy 16.07: Guidance on Task-based Assessment Tools for Personal Care Services and Consumer Directed Personal Assistance Services, issued November 17, 2016, clarified that Plans may not use task-based assessment tools to authorize or reauthorize services for enrollees who need continuous services, live-in 24-hour services, or the equivalent provided by formal services or informal caregivers. This is in accordance with *Mayer v. Wing*, 922 F. Supp. 902 (S.D.N.Y., 1996). The Policy provides, in relevant part:

Plans cannot use task-based assessment tools to authorize or reauthorize services for enrollees who need . . . continuous services, live-in 24-hour services, or the equivalent provided by formal services or informal caregivers. *The reason for this is that task-based assessment tools generally quantify the amount of time that is determined necessary for the completion of particular IADLs or ADLs and the frequency of that assistance, rather than reflect assistance that may be needed on a more continuous or "as needed" basis, such as might occur when an enrollee's medical condition causes the enrollee to have frequent or recurring needs for assistance during the day or night.* A task-based assessment tool may thus be suitable for use for enrollees who are not eligible for [continuous or live-in] 24-hour services but is inappropriate for enrollees who are eligible for [continuous or live-in] 24-hour care.

(emphasis in original).

Regulations at 18 NYCRR 505.14(b)(2)(v) provide that an independent medical review of a proposed plan of care shall be obtained before a social services district or MMCO may authorize more than 12 hours of personal care services or consumer directed personal assistance separately or in combination per day on average ("high needs cases"). The review shall result in a recommendation made to the social services district or MMCO, as described below:

(a) The independent medical review must be performed by an independent panel of medical professionals, or other clinicians, employed by or under contract with an entity designated by the Department of Health (the "independent review panel") and shall be coordinated by a physician (the "lead physician") who shall be selected from the independent review panel. The lead physician may not be the same person who performed the initial medical examination a signed the individual's practitioner order.

(b) The lead physician must review the independent assessment, the practitioner order, any other assessment or review conducted by the social services district or MMCO,

FH# 8874053Z

including any plan of care created.

(c) The lead physician may evaluate the individual, or review an evaluation performed by another medical professional on the independent review panel. The medical professional may not have performed the initial medical examination or signed the individual's practitioner order.

(d) The lead physician and panel members may consult with or interview other members of the independent review panel, the ordering practitioner, the individual's treating or primary care physician, and other individuals who the lead physician deems important and who are available to assist the panel's review and recommendation.

(e) The lead physician and panel members may request additional information or documentation, including medical records, case notes, and any other material the lead physician deems important to assist the panel's review and recommendation.

(f) After review, the independent review panel shall produce a report, signed by the lead physician, providing a recommendation on the reasonableness and appropriateness of the proposed plan of care to maintain the individual's health and safety in his or her own home, in accordance with the standards and scope of services set forth in this section. The report may suggest modifications to the plan of care, including the level, frequency, and duration of services and whether additional, alternative, or fewer services would facilitate the provision of medically necessary care. The report may not, however, recommend a specific amount or change in amount of services.

22 OHIP/ADM-01 and MLTC Policy 22.01 provide that on or after May 16, 2022, anyone seeking personal care services and/or consumer directed personal assistance services for the first time or seeking initial MLTC plan eligibility must be referred to the New York Independent Accessor Program (NYIAP) for their Community Health Assessment (CHA) and Clinical Appointment. Beginning May 16, 2022, the NYIAP will conduct all initial assessments for adults (18 and over), including fee for service (FFS) Medicaid recipients and Medicaid Managed Care (MMC)/Health and Recovery Plan (HARP)/Special Needs Plan (SNP) enrollees as well as MLTC plans including Partial Capitation plans and Medicaid Advantage Plus plans. This guidance does not apply to Programs of All-Inclusive Care for Elderly (PACE). The CHA and Clinical Appointment completed by the NYIAP will assess for personal care services and/or consumer directed personal assistance services needs and, where applicable, MLTC plan eligibility. The LDSS (or MMCO) will no longer conduct a separate CHA to authorize these services.

When the NYIAP conducts an initial assessment, for those newly in receipt of a proposed plan of care that calls for more than 12 hours per day, on average, of personal care services or consumer directed personal assistance, the local agency must refer the case to the NYIAP's Independent Review Panel (IRP) for an additional independent medical review and must consider the recommendation of the IRP when finalizing the plan of care (POC). 18 NYCRR 505.14(b)(2)(v) and 505.28(d)(5). However, recipients who were authorized to

FH# 8874053Z

receive more than 12 hours of services per day on average prior to and as of May 16, 2022, may continue to receive services without the need for IRP review upon reassessment.

Unless the service recipient's authorization later falls below more than 12 hours on average, the recipient will not need to receive another IRP review to continue to have services reauthorized at more than 12 hours per day on average. If the recipient's authorization is ever reduced below 12 hours per day on average, the recipient may need another IRP review if the local agency later proposes to authorize more than 12 hours per day on average.

Regulations define the high need threshold as more than 12 hours a day, on average, of personal care services and/or consumer directed personal assistance. To determine the average, the local agency may add up the total number of hours it intends to authorize over the course of a week for which services are needed, and then divide by 7. Using this method, a high-needs case is any case where the local agency would authorize more than 84 hours in a given week. Hours covered by voluntary informal assistance or other services or programs do not count towards the high needs threshold and should not be included in the calculation.

Note that the requirement to perform an IRP review does not apply to service authorizations pursuant to a fair hearing or other order by a court of competent jurisdiction. 18 NYCRR 505.14(4)(vi) and 505.28(e)(4).

When the requirement to perform an IRP review is triggered, the local agency must call the NYIAP Operations Support Unit (OSU). NYIAP will provide a designated, secure URL for the local agency to submit the IRP Request Form and include in the referral to the IRP all records and documents used to develop the POC.

The IRP is comprised of a panel of at least two clinicians, including a lead physician (MD or DO). It is charged with reviewing the most recent NYIAP Community Health Assessment (CHA) and Physician's Order (PO), the POC developed by the local agency, and any additional documents or records that may be necessary to make a recommendation about whether the proposed POC is adequate and reasonable to ensure the individual's health and safety in the home or other appropriate community-based setting.

This additional medical review is expected to primarily be a review of the noted records, although the panel may determine that they need to speak to or evaluate the individual, either in person or through a telehealth modality, or speak to the individual's primary care practitioner and/or designated representative. The independent medical professional who conducted the IPP medical exam may not be on the independent review panel for that case. In addition, the IRP Recommendation must be signed by the lead physician.

The recommendation may suggest alternative services and supports or other changes to the POC but cannot specify the number of hours or the changes that must be made. The IRP Review Panel Report and Recommendation Form for High Needs Cases will be uploaded to the Uniform Assessment System-New York (UAS-NY).

FH# 8874053Z

The local agency is expected to review and consider the recommendation prior to finalizing the POC and authorizing services. NYIAP's OSU will notify the local agency of the availability of an IRP recommendation by phone or email and the local agency will retrieve the IRP recommendation report from the UAS-NY by downloading the PDF. The recommendation should be considered before finalizing the POC, which should include any amendments with which the local agency agrees. The local agency should document why it is not making recommended changes in the case file if it decides to implement the previously proposed POC or makes some, but not all, recommended changes.

In the event the IRP review would impair the local agency's ability to authorize services pursuant to an immediate needs review, the local agency must authorize the proposed POC on a temporary basis to meet the 12-calendar-day deadline, pending review of the IRP recommendation. 18 NYCRR §505.14(b)(4)(vi) and 505.28(e)(4). Services of more than 12 hours per day on average may be provided under a temporary plan of care due to the immediate need. Upon receipt of the IRP recommendation, the local agency will finalize the POC and issue an initial determination notice.

An IRP review is not required if:

- The individual is already in receipt of more than 12 hours a day, on average, of personal care services or consumer directed personal assistance as of May 16, 2022, unless they are subsequently authorized for fewer than 12 hours a day, on average, then later breach the high needs level again,

- The individual has had an IRP review and services are maintained at this higher level of care through subsequent proposed POCs regardless of whether proposed by the local agency or an MMCO, or

- The individual's authorized hours are more than 12 per day, on average, and they are then raised to additional hours (e.g., from 16 hours to 24 hours).

Additionally, 18 NYCRR 358-5.9(a) provides, in relevant part, that at a fair hearing concerning the denial of an application for or the adequacy of medical assistance, the appellant must establish that the agency's denial of assistance or benefits was not correct or that the appellant is eligible for a greater amount of assistance or benefits. Except, where otherwise established by law or regulation, in fair hearings concerning the discontinuance, reduction or suspension of medical assistance, the social services agency must establish that its actions were correct.

When the patient's home has no sleeping accommodations for a personal care aide, continuous personal care services must be authorized for the patient; however, should the patient's circumstances change and sleeping accommodations for a personal care aide become available in the patient's home, the district must promptly review the case.

18 NYCRR §505.14(b)(4):

FH# 8874053Z

The initial authorization process shall include additional requirements for authorization of services in certain case situations:

(i) An independent medical review of the case shall be completed by the local professional director, a physician designated by the local professional director or a physician under contract with the local social services department to review personal care services cases when:

(a) there is disagreement between the physician's order and the social, nursing and other required assessments; or

(b) there is question about the level and amount of services to be provided; or

(c) the case involves the provision of continuous personal care services or live-in 24-hour personal care services as defined in paragraphs (a)(2) and (4), respectively, of this section. Documentation for such cases is subject to the following requirements:

(1) The social assessment shall demonstrate that all alternative arrangements for meeting the patient's medical needs have been explored and are infeasible including, but not limited to, the provision of personal care services in combination with other formal services or in combination with voluntary contributions of informal caregivers. In cases involving live-in 24-hour personal care services, the social assessment shall also evaluate whether the patient's home has sleeping accommodations for a personal care aide. When the patient's home has no sleeping accommodations for a personal care aide, continuous personal care services must be authorized for the patient; however, should the patient's circumstances change and sleeping accommodations for a personal care aide become available in the patient's home, the district must promptly review the case. If a reduction of the patient's continuous personal care services to live-in 24-hour personal care services is appropriate, the district must send the patient a timely and adequate notice of the proposed reduction.

**DISCUSSION**

The Plan's October 30, 2024, determination to deny the request for an increase in the Appellant's PCS authorization from 24-hour live-in care to 24-hour split-shift care was correct.

The following facts are undisputed: the Appellant, ████, lives alone and is in receipt of 24-hour live-in Personal Care Services. The Appellant has been diagnosed with ████████ ████████████████████████████. On September 27, 2024, a request was made to increase the Appellant's PCS authorization to 24-Hour split-shift care. By Initial Adverse Determination Notice dated October 2, 2024, the Plan determined to deny the request for an increase in the Appellant's PCS authorization from 24-hour live-in care to 24-hour split-shift care. On October 30, 2024, a request was made for an internal Plan appeal of the Initial Adverse Determination Notice dated October 2, 2024. By Final Adverse Determination Notice dated October 30, 2024, the Plan determined to uphold its determination to deny the request for an increase in the Appellant's PCS authorization as not medically necessary.

FH# 8874053Z

Thereafter, on October 31, 2024, the Appellant requested this fair hearing.

It is the Plan's position that split-shift care is not medically necessary, as the Appellant does not have nighttime needs occurring with such frequency that an aide would not be able to obtain five hours of uninterrupted sleep during an eight-hour period. In support of its position, the Plan entered documents into evidence including, among other things, the UAS report conducted on September 16, 2024, a previous UAS report conducted on July 23, 2024, and the Notice at issue.

In response, the Appellant argued that they require 24-hour split-shift care as opposed to 24-hour live-in care because they live in a studio apartment with only one bed and there is no other adequate sleeping arrangement for an aide. Therefore, the Appellant asserted, an aide would be unable to obtain five hours of uninterrupted sleep. The Appellant testified that they are █████████████ ; however, the Appellant further testified they do not require ███████ at night.

18 NYCRR 505.14(a)(2) provides a definition of "Continuous Personal Care Services" ("Split-Shift Care") as follows: Continuous personal care services means the provision of uninterrupted care, by more than one personal care aide, for more than 16 hours in a calendar day for a patient who, because of the patient's medical condition, needs assistance during such calendar day with toileting, walking, transferring, turning and positioning, or feeding and needs assistance with such frequency that a live-in 24 hour personal care aide would be unlikely to obtain, on a regular basis, five hours daily of uninterrupted sleep during the aide's eight hour period of sleep.

Managed Long Term Care Policy 15.09, issued on December 30, 2015, states, in relevant part, "…Further, the social assessment in live-in 24-hour personal care services and consumer directed personal assistance cases would have to evaluate whether the individual's home has sleeping accommodations for an aide. If not, continuous personal care services or consumer directed personal assistance must be authorized; however, should the individual's circumstances change and sleeping accommodations for an aide become available in the individual's home, the case must be promptly reviewed. If a reduction of the continuous services to live-in 24-hour services is appropriate, timely and adequate notice of the proposed reduction must be sent to the individual."

Here, the Appellant testified they do not have nighttime needs occurring with such frequency that an aide would be unable to obtain five hours of uninterrupted sleep. Rather, the Appellant's reason for requesting split-shift care is that they have been authorized for 24-hour live-in care, but they reside in a studio apartment with only one bed and no sofa as it had to be removed to accommodate the Appellant's bed. Accordingly, there is nowhere for their aide to sleep. The Plan did not contest the Appellant's testimony as to their living arrangements and rested on the undisputed fact that the Appellant does not have nighttime needs occurring with such frequency that an aide would be unable to obtain five hours of uninterrupted sleep. The

18

FH# 8874053Z

Appellant's testimony regarding their living arrangement was considered and found credible in that it was consistent, forthright, and uncontested by the Plan. Based on the foregoing, the evidence on this record supports a finding that 24-hour split shift care should have been authorized as the Plan did find the Appellant in need of 24-hour live-in care, but the Appellant's apartment is unable to accommodate sleeping arrangements for a live-in aide. In accordance with Managed Long Term Care Policy 15.09, as cited above, "the social assessment in live-in 24-hour personal care services and consumer directed personal assistance cases would have to evaluate whether the individual's home has sleeping accommodations for an aide. If not, continuous personal care services or consumer directed personal assistance must be authorized." The evidence on this record establishes that the Plan was aware that the Appellant is living alone in a studio apartment with a bed requiring a ▮▮▮▮▮▮ for bed mobility. The Plan representative's testimony indicated a screen and couch would be sufficient to accommodate a live-in aide for sleeping purposes. As this is not able to be accommodated in the Appellant's apartment based on there being no sofa or partition in the apartment, the Plan must authorize continuous care (24-hour split shift). Accordingly, the Plan's determination is reversed.

## **DECISION AND ORDER**

The Plan's October 30, 2024, determination to deny the request for an increase in the Appellant's PCS authorization from live-in 24-hour personal care services to 24-Hour split shift PCS was not correct and is reversed.

1.      The Plan is directed to immediately authorize Personal Care Services to the Appellant in the amount of 24-hour split-shift care.

As required by 18 NYCRR 358-6.4, the Plan must comply immediately with the directives set forth above.

DATED:   Albany, New York
            01/21/2025

NEW YORK STATE
DEPARTMENT OF HEALTH
By

*Kimberly Stecker*

Commissioner's Designee

# Assistance Information

Important notice enclosed.  If you need help reading the notice, call 1-800-342-3334.

Aviso importante adjunto: si necesita ayuda para leer este aviso, marque el 1-800-342-3334.

গুরুত্বপূর্ণ নোটিস সংযুক্ত। আপনার যদি নোটিসটি পড়তে সাহায্যের প্রয়োজন হয়, তাহলে কল করুন 1-800-342-3334  নম্বরে।

إخطار  هام مرفق. إذا احتجت إلى المساعدة في قراءة الإخطار يرجى الاتصال بالرقم 3334-342-800-1.

內附重要通告。如需幫助閱讀此通告，請撥打1-800-342-3334。

Un avis important est joint à ce document.  Si vous avez besoin d'aide pour la lecture de l'avis, appelez le 1-800-342-3334.

Avi enpòtan enkli.  Si w bezwen èd pou w li avi a, rele 1-800-342-3334.

중요한 공지사항이 포함되어 있습니다. 이 공지사항을 읽는데 도움이 필요하시면, 1-800-342-3334로  전화하세요.

Содержит важную информацию.  Если при чтении этого извещения у Вас возникнут трудности, позвоните по телефону 1-800-342-3334.

Kèm theo là thông báo quan trọng.  Nếu quý vị cần giúp đọc thông báo này, hãy gọi 1-800-342-3334.

באייגעלייגט א וויכטיקע מעלדונג. אויב איר דאַרפֿט הילף בײַם לייענען די מעלדונג, קלינגט אָן 3334-342-800-1.

Avviso importante incluso.  Se ha bisogno di aiuto per leggere l'avviso, contatti il numero 1-800-342-3334.

Ważna informacja w załączeniu.  Jeśli potrzebujesz pomocy w przeczytaniu tej informacji, zadzwoń pod numer 1-800-342-3334.

اہم نوٹس منسلک ہے۔  اگر آپ کو نوٹس پڑھنے میں مدد چاہیے تو 1-800-342-3334  پر کال کریں۔

**www.otda.ny.gov**

XL206B (11/22)