# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

HEI LI, *et al.*,

Plaintiffs,

No. 24-cv-7401 (LTS)(KHP)

-against-

GREATCARE, INC., CENTERLIGHT HEALTHCARE, INC., and SENIOR WHOLE HEALTH OF NEW YORK, INC.,

Defendants.

---

**DECLARATION OF BARBARA WANG IN SUPPORT OF GREATCARE, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS**

I, BARBARA WANG, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct based upon my personal knowledge, except where statements are made upon information and belief, which I believe to be true:

## I. INTRODUCTION AND QUALIFICATIONS

1. I am Barbara Wang. I am the Administrator of GreatCare, Inc. ("GreatCare"), the defendant in this action. I have held this role at all times relevant to the events described in this Declaration. I submit this Declaration in opposition to the motion for sanctions filed by Plaintiffs on May 8, 2026 (ECF 210, 213-215).

2. I have personal knowledge of GreatCare's business operations, its records and records-management practices, its personnel, and the matters at issue in the above-captioned federal action.

3. I am the principal authorized to speak for GreatCare regarding its recordkeeping, operations, and litigation conduct, and I make this Declaration in that capacity. Where this Declaration references matters outside my personal knowledge, I so indicate, and I describe the basis for my information and belief.

## II. GREATCARE'S BUSINESS STRUCTURE AND MY ROLE

4. GreatCare is a licensed home-care services agency ("LHCSA") organized and operating under the laws of the State of New York. GreatCare has continuously held a New York State Department of Health LHCSA license at all times relevant to this action. GreatCare's business consists of dispatching home-care aides to render personal-care and home-health services to elderly and disabled individuals in their homes, principally in the New York City metropolitan area.

5. During the relevant period, GreatCare provided services to its clients principally through contractual arrangements with managed long-term care plans ("MLTCs"), including Senior Whole Health of New York, Inc. ("SWHNY") and CenterLight Healthcare, Inc. ("CenterLight"), both of which are defendants in this action. The MLTCs authorize specific hours of home-care services for their enrollees; GreatCare staffs the authorized hours with its home-care aides and bills the MLTC for those services.

6. GreatCare also acts in certain instances as a fiscal intermediary under the New York State Consumer Directed Personal Assistance Program ("CDPAP"), administered pursuant to N.Y. Soc. Serv. L. § 365-f. In CDPAP cases, the consumer (or the consumer's designated representative) — not GreatCare — selects, trains, and supervises the caregiver, who frequently is a family member of the consumer. GreatCare's role is administrative.

7. GreatCare's personnel structure consisted of: (a) home-care aides, who are W-2 employees of GreatCare and who render the personal-care and home-health services; (b) office

coordinators, who handle scheduling, paperwork processing, and day-to-day communications with aides and patients; (c) supervisory registered nurses, who conduct in-home patient visits and supervisory visits as required by 10 N.Y.C.R.R. § 766.6; and (d) administrative and executive personnel, including myself. My day-to-day responsibilities include supervision of the coordinators, negotiation and administration of GreatCare's contracts with the MLTCs, oversight of GreatCare's records-management practices, and operational decisions concerning the agency.

## III. RECORDS RETENTION PRACTICES AT GREATCARE

8. Prior to the commencement of this federal action, GreatCare maintained, in the ordinary course of business, two principal categories of records: (a) aide-side records — including aide time-sheet and assignment records, aide personnel files (employment applications, training, and supervisory documentation), and aide payroll records — which document the work, compensation, and qualifications of GreatCare's home-care aides; and (b) patient-side records — including patient care plans, patient intake forms, and nursing supervisory visit records — which document the home-care services rendered to GreatCare's clients. Fax communications with the MLTCs were preserved in a single physical fax binder kept at GreatCare's office. Records were principally maintained in paper form during the relevant period, with a transition to electronic storage in more recent years.

9. My understanding of GreatCare's records-retention obligations during the relevant period was governed by 10 N.Y.C.R.R. § 766.6(b), which requires a licensed home-care services agency to retain patient service records for six years from the conclusion of services. I understood and applied a minimum six-year retention practice. I understood that a separate three-year retention requirement applied to records of complaints handled under the agency's complaint procedure pursuant to 10 N.Y.C.R.R. § 766.12.

10. The actual disposition of GreatCare's records during the relevant period differed materially as between the two categories described in paragraph 8. (a) Aide-side records have, in practice, been retained well beyond the regulatory six-year minimum. GreatCare's aide time-sheet records, aide personnel files (including 2015 caregiver application materials), and aide payroll records exist on a continuous basis from 2015 forward — more than ten years as of the date of this Declaration. I have not, in my capacity as Administrator, ever directed the destruction of any aide-side record. (b) Patient-side records that are in paper form and that had reached six years from the conclusion of services were disposed of in the ordinary course, typically by shredding, when office staff had time available to do so. But for the paper records that were shredded, we had saved them digitally first, prior to shredding, and those digital copies of the patient-side records are now available in GreatCare's HHAeXchange portal. The disposition of patient-side paper records was not conducted on a fixed annual schedule and was not triggered by litigation, regulatory inquiry, or other external events. Patient-side records within the six-year window were retained. Certain patient-side records older than six years may, as a practical matter, have survived the rolling disposition practice and remain in GreatCare's possession. If Plaintiffs identify any specific patient-side record(s) they wish to review, GreatCare is willing to search for and produce any such surviving record(s) still in its possession, notwithstanding GreatCare's view that older patient-side records are outside the scope of Plaintiffs' Requests for Production in this action and are not substantively relevant to the wage-and-hour claims at issue.

11. GreatCare was served with the Complaint in this action on October 18, 2024. Upon service of the Complaint, I understood from GreatCare's counsel, Jose Muniz, Esq., that records relating to the named Plaintiffs needed to be preserved, and I directed that records

relating to the named Plaintiffs — including the aide-side records of the named Plaintiffs' work assignments, time sheets, and payroll — be preserved. No aide-side record relating to any named Plaintiff has been destroyed by GreatCare from October 18, 2024 to the present. On March 10, 2025, Plaintiffs served on GreatCare their First Set of Requests for Production of Documents and Electronically Stored Information (filed in this action at ECF 65-1). The relevant time period applicable to the Requests was "from January 1, 2015 through the present" (Instruction 14). The Requests sought 49 enumerated categories of documents directed principally at aide-side records concerning the named Plaintiffs. I understood that none of the Requests sought GreatCare's internal patient clinical files as a category. Three of the Requests touched on patient-related material in limited respects: (a) Request 12 sought "any and all documents concerning the rights, responsibilities, duties, and/or work activities of Plaintiffs," with care plans for the care episodes to which Plaintiffs were assigned named as one example of such documents (Request 12(e)); (b) Request 13 sought adverse determination notices and appeals filed for episodes of care to which Plaintiffs were assigned, documents typically maintained by the Managed Long Term Care plans (Senior Whole Health of New York, Inc. and CenterLight Healthcare, Inc.) and the State; and (c) Request 28 sought communications between GreatCare and any MLTC concerning patients to whom Plaintiffs were assigned to provide care. I understood Requests 12(e), 13, and 28 to seek (respectively) care plans defining Plaintiffs' authorized scope of work, MLTC administrative authorization documents, and GreatCare-MLTC correspondence — not GreatCare's internal patient clinical files. I did not, at that time, issue a formal company-wide written litigation hold suspending the ordinary rolling six-year disposition practice as to patient-side records of non-Plaintiff care recipients or as to patient-side records of episodes of care that occurred before January 1, 2015, because I understood Plaintiffs' Requests not to seek GreatCare's internal

patient clinical files as a category. To the extent that patient-side records of non-Plaintiff care recipients reached the six-year retention mark after October 18, 2024 and were disposed of pursuant to the rolling disposition practice described in paragraph 10, that disposition reflected (a) my good-faith reliance on the six-year regulatory minimum under 10 N.Y.C.R.R. § 766.6(b) and (b) my understanding that Plaintiffs' Requests did not seek GreatCare's internal patient clinical files as a category, and was not undertaken with the intent of depriving Plaintiffs of evidence. I made decisions regarding record retention and disposition based on the age of the records and in a good-faith belief that those decisions were consistent with any applicable legal requirements. I did not selectively decide that certain records should be retained or destroyed based on the content of, or information contained, in the records. I made record-retention-and-disposition decisions without assessing whether any particular records could or might help or undermine: (a) GreatCare's defenses in potential litigation; or (b) any claims that could be asserted against GreatCare in potential litigation.

12. Following the engagement of Balance Law Firm on April 29, 2026, GreatCare implemented a written litigation hold suspending all routine records disposition — patient-side and aide-side alike — pending further direction. No GreatCare records of any category have been destroyed pursuant to the prior rolling six-year disposition practice since the entry of the written litigation hold.

13. I am aware that at my May 1, 2026 deposition the colloquy at Tr. 184:21–186:17 addressed GreatCare's records disposition. My initial response at Tr. 184:21 — "Whatever I have, I produced to you. I never shredded." — was a colloquial response made before I had been asked specifically about the disposition of patient-side records older than six years. In the immediately following testimony, I distinguished between patient-side and aide-side records.

With respect to patient-side records, I testified that "[i]f the patient file older than six years, yes, we shred it." (Tr. 184:28.) With respect to aide-side records, I testified that "[w]ithin six years, we definitely not shredded or deleted." (Tr. 186.) That testimony is consistent with the description set forth in paragraphs 8 through 12 above: aide-side records have, in practice, been retained from 2015 forward, well beyond the regulatory minimum, and patient-side records older than six years were disposed of in the ordinary course consistent with 10 N.Y.C.R.R. § 766.6(b). The accurate description of GreatCare's records-retention practice is set forth in paragraphs 8 through 12 above.

## IV. THE OFF-SITE STORAGE UNIT

14. GreatCare formerly maintained an off-site storage unit in which certain older records were kept. The storage unit was discontinued before the commencement of this action. At the time of discontinuation, the contents of the storage unit were either returned to GreatCare's office for continued retention or, with respect to records that had exceeded the six-year retention period, disposed of pursuant to the rolling disposition practice described in Section III above.

15. Since the engagement of Balance Law Firm, I have confirmed that GreatCare does not currently maintain any off-site storage facility containing original records. All records currently in GreatCare's possession or under its control are physically located at GreatCare's office, with electronic records additionally accessible through the HHAeXchange electronic visit verification system and through GreatCare's email accounts.

16. I am aware that on or about August 4, 2025, in a meeting with Plaintiffs' counsel, I made statements that have been characterized as a refusal to search "the storage unit." My statements on that occasion reflected the fact that GreatCare did not, by that date, have any active

off-site storage facility to search. I did not, on that occasion or thereafter, intend to refuse to search records in GreatCare's possession.

## V. INVENTORY OF SURVIVING RECORDS BY CARE RECIPIENT

17. I have undertaken, in cooperation with Balance Law Firm, an inventory of GreatCare records by care recipient with respect to the individuals to whom Plaintiffs provided services during the relevant period as set forth in Plaintiffs' Amended Complaint and in Plaintiffs' counsel's Huang Declaration (ECF 214).

18. For care recipients whose services occurred within the six-year retention period running back from October 18, 2024 (the date of service of the federal Complaint) — and, as to records of services within Plaintiffs' alleged statute-of-limitations period generally — GreatCare retains some combination of the following records, varying by recipient: patient care plans and intake records; nursing supervisory visit records and assessments; aide time sheets; aide assignment records; and fax communications preserved in the fax binder.

19. I am also aware that the MLTCs — SWHNY and CenterLight — maintain their own records of authorizations, plans of care, and aide visit verifications for the care recipients to whom GreatCare's aides were assigned. Records that may be unavailable from GreatCare may be available in whole or in part from the MLTCs' records, including electronic visit verification records maintained in HHAeXchange.

20. GreatCare has used the same payroll service provider throughout the relevant period (2015-present). GreatCare's preservation of aide payroll records dating to 2015 — more than ten years — substantially exceeds the six-year regulatory minimum under 10 N.Y.C.R.R. § 766.6(b). At year-end 2018 and the beginning of 2019, GreatCare's payroll data was migrated from an older to a newer payroll system. For pay periods on or after that migration, GreatCare can produce responsive printed paystubs in their full format. For pay periods before the

migration, full paystubs are not available in printed form, but responsive payroll data in Excel-spreadsheet form is available and has been produced.

## VI. THE FIVE NURSING VISIT RECORD SETS PRODUCED IN THIS ACTION

21. Plaintiffs' May 8, 2026 sanctions motion (ECF 210, 213-215) identifies five sets of exhibits that Plaintiffs characterize as nursing visit records relevant to this action. As Ms. Chen explains in her separately filed declaration, each of those five exhibits is composed of two distinct parts: (a) a GreatCare nursing supervisory visit record, prepared by a GreatCare supervisory nurse; and (b) a Uniform Assessment System – New York Comprehensive Community Health Assessment Report ("UAS-NY"), prepared by a registered nurse employed by a Managed Long Term Care plan. The UAS-NY portions of the five exhibits are not GreatCare records; they are clinical patient assessments performed by registered nurses employed by Managed Long Term Care plans (such as Senior Whole Health of New York, Inc. and CenterLight Healthcare, Inc.) and came into this action through document production made by those plans, not by GreatCare. The GreatCare portions of the five exhibits are GreatCare nursing supervisory visit records. As Ms. Chen attests in her declaration, she personally authored four of those five GreatCare records, including the bottom-of-page Living-In compliance notations Plaintiffs challenge, in her own handwriting and in the ordinary course of her work for GreatCare in the days following each supervisory visit.

22. The GreatCare nursing supervisory visit record included in the fifth exhibit (the document filed at ECF 214-13) bears a signature on page 1 that is not Ms. Chen's. That GreatCare record is nevertheless a GreatCare nursing supervisory visit record, prepared by a GreatCare supervisory nurse. The identity of the GreatCare supervisory nurse who performed that supervisory visit and authored that record cannot presently be determined from GreatCare's

records or from corporate memory. The record was created in the ordinary course of GreatCare's licensed home-care services business by a registered professional nurse performing the in-home supervisory visit contemplated by 10 N.Y.C.R.R. Part 766; the record has been retained in GreatCare's files since its creation; and the record was produced to Plaintiffs in this action in the same form in which it has been maintained. The absence of present-day identification of the authoring nurse — after the passage of time and the turnover of supervisory nursing staff that is ordinary in the licensed home-care services industry — does not bear on the authenticity of the record as a business record of GreatCare made in the ordinary course of business at or near the time of the supervisory visit to which it pertains. GreatCare will supplement this declaration pursuant to Fed. R. Civ. P. 26(e) if the identity of the authoring nurse can be determined before trial.

## VII. PRESERVATION TRIGGERS AND TIMING

23. I am aware that, in 2017, an action styled *Guo Zhen Qian v. GreatCare Inc.*, Index No. 656750/2017, was filed in the Supreme Court of the State of New York, New York County. That action has since been dismissed. At the conclusion of that matter, GreatCare instituted a forward-looking practice of retaining live-in case records going forward — that is, records of live-in shifts generated from the resolution of the *Qian* cases onward were retained. The post-*Qian*-case practice change did not require, and did not include, retroactive retrieval or reconstruction of records that had reached the six-year retention mark before that lawsuit was resolved.

24. In approximately early 2023, certain of the individuals who are named Plaintiffs in this action filed wage claims with the New York State Department of Labor ("NYSDOL"). I understood the NYSDOL claims to be administrative proceedings; I cooperated with the NYSDOL administrative process, including by submitting GreatCare's position and supporting

materials. I did not understand the NYSDOL administrative claims to give rise to a separate records-preservation obligation distinct from GreatCare's ongoing six-year retention practice under 10 N.Y.C.R.R. § 766.6(b).

25. GreatCare was served with the federal Complaint in this action on October 18, 2024. Upon service, as I have described in paragraph 11, I directed that records relating to the named Plaintiffs be preserved. I did not at that time formally suspend the ordinary six-year rolling disposition practice as to records of non-Plaintiff care recipients.

26. I understood the six-year retention period under 10 N.Y.C.R.R. § 766.6(b) to be measured from the conclusion of services to the care recipient. The references in my deposition testimony to "August 18, 2019" as a reference date for surviving records were calculated by reference to the date of Plaintiffs' Amended Complaint (August 18, 2025) less six years; that calculation reflected my understanding of the regulatory minimum, not a deliberately selected preservation cutoff.

## VIII. TIME-SHEET PRACTICES AT GREATCARE

27. During the relevant period, GreatCare's home-care aides performing twenty-four hour "live-in" shifts were responsible for completing their own paper time sheets reflecting the hours they worked, the hours allotted for sleep (eight hours, with five hours uninterrupted), and the hours allotted for meals (three hours total). This is the structure recognized under New York Labor Law and the supporting regulations governing live-in home-care work.

28. GreatCare's practice was for aides personally to obtain blank time sheets from GreatCare's office coordinators at the time of each new aide assignment, to complete the time sheets themselves in their own handwriting, and to return the completed time sheets to GreatCare's office. Before any insurance authorization for an aide assignment was confirmed

with the MLTC, GreatCare's coordinators contacted the aide to confirm the aide's willingness to accept the assignment.

29. GreatCare also used the electronic visit verification system required by New York State for participating home-care agencies — the HHAeXchange ("HHAX") telephone-based clock-in/clock-out system. The HHAX system records each aide's arrival and departure at the patient's home. GreatCare also maintained paper time sheets in two parallel tracks. First, paper time sheets were distributed to aides for use when the HHAX phone-based clock-in/clock-out system was unavailable or unsuccessful, so that the aide could record the day's hours contemporaneously by hand. Second, paper time sheets were maintained for GreatCare's internal recordkeeping purposes — including documentation of the sleep and meal periods of the live-in shift that are not captured by the HHAX clock-in/clock-out system. Both tracks of paper time-sheet records were completed by the aides themselves and returned to GreatCare's office for processing.

30. The distribution and collection of paper time sheets at GreatCare was divided between two distinct functions during the relevant period. GreatCare's office coordinators — including, during the relevant period, Ms. OuYang Pei Zhen and Ms. Zhu Yuan — distributed blank time sheets to aides at the time of each new aide assignment. GreatCare's coordinators did not receive completed time sheets back from aides, did not review completed time sheets for completeness, and did not process time sheets for payroll. The receipt, review, and payroll processing of completed time sheets was the responsibility of GreatCare's human-resources personnel. It was not GreatCare's policy or practice for any GreatCare personnel — coordinators or human-resources personnel — to pre-fill time sheets, to provide aides with template time sheets containing pre-completed hours, or to instruct aides to copy from completed forms.

31. It was not GreatCare's policy or practice to require aides to sign weeks or months of time sheets in a single batch, to threaten aides with loss of employment if they did not sign time sheets, or to coerce aides into recording hours that did not reflect what they actually worked. I never instructed any GreatCare personnel — coordinators or human-resources personnel — to engage in any such practices and am not aware of anybody else at GreatCare who instructed any GreatCare personnel to engage in such practices.

32. I am informed that Plaintiffs' counsel deposed two GreatCare coordinators in this action — Ms. OuYang Pei Zhen and Ms. Zhu Yuan — and one GreatCare Intake Specialist, Ms. Mei Mei Zhao. To the best of my knowledge, the deposition testimony of those individuals is consistent with GreatCare's policies and practices as I have described them in paragraphs 27 through 31 above.

33. At my May 1, 2026 deposition, in response to questioning about the consistency of meal and sleep times recorded across multiple time sheets for the same aide, I testified that "whatever they write" reflects the aide's own handwriting and recordkeeping (e.g., Tr. 235:23-25, 236:21-22), and that the contemporaneous time sheets are reliable records of the hours actually worked (Tr. 237:19-20). I stand by that testimony.

34. The completed time sheets — including those of the named Plaintiffs — record the thirteen-hour live-in structure recognized under New York Labor Law: eight hours of sleep (with five uninterrupted), three hours of meals, and thirteen hours of working time within each twenty-four-hour period. Where an aide experienced interruptions during sleep or meal periods, the time-sheet entries reflect those interruptions and the corresponding adjustments.

## IX. PREPARATION OF NYSDOL DECLARATION LETTERS

35. In approximately early 2023, certain of the named Plaintiffs filed wage claims with NYSDOL. In response, GreatCare submitted to NYSDOL its position and supporting

materials in the underlying administrative proceedings, including a small number of letters signed by the care recipients to whom the Plaintiffs had provided services. The purpose of those letters was to address the factual allegations made by the claimants concerning the hours and nature of the live-in services that GreatCare's aides provided to the care recipients. The letters were prepared in early 2023 in response to the NYSDOL administrative claims, before the filing of this federal action.

36. GreatCare's Intake Specialist, Mei Mei Zhao, drafted the declaration letters with input from the care recipients (or, in CDPAP cases, the consumer who was the statutory employer of the caregiver). For each letter, Ms. Zhao confirmed the factual content directly with the patient or the patient's family members before drafting. The patients then sent a representative to pick up the letters from GreatCare's office, signed them at home, and returned them to GreatCare's office.

37. In total, three declaration letters were prepared and submitted to NYSDOL. They collectively addressed the wage claims of seven named Plaintiffs as follows:

38. (a) A letter signed by Patient [redacted] addressed the wage claim of Plaintiff Hei Li, who had provided live-in services to Mr. [redacted]. (b) A letter signed by Patient [redacted] addressed the wage claims of Plaintiffs Li Hui, Li Zhan Jin, and Ruan Hui Xiu, who had provided live-in services to Mr. [redacted]. (c) A letter signed by Patient [redacted] addressed the wage claims of Plaintiffs Zheng Bi Yu, Xiao Mei Zhen, and Xiao Jian Rong, who had provided personal-assistance services to Ms. [redacted]. Plaintiffs Zheng, Xiao Mei Zhen, and Xiao Jian Rong were related to Ms. [redacted] and worked as her caregivers under the CDPAP program described in Section II, paragraph 6 above; Ms. [redacted] was the statutory employer of those caregivers under N.Y. Soc. Serv. L. § 365-f.

39. The letters were prepared in English. The signers and their family members were native Chinese speakers, as were the named Plaintiffs themselves. The Intake Specialist Mei Mei Zhao, who is fluent in both English and Chinese, orally summarized the content of each letter for the signer in Chinese before signature was obtained.

## X. THE [redacted] DECLARATION LETTER AND SIGNATURE

40. The declaration letter identified by Plaintiffs as Exhibit CC at my May 1, 2026 deposition (Bates GC 03.01.2025-234) is the letter described in paragraph 38(a) above — the letter relating to GreatCare's services to Patient [redacted], signed by Mr. [redacted] in connection with the NYSDOL administrative proceeding concerning Plaintiff Hei Li's wage claim. Mr. [redacted] personally signed the letter in his capacity as the patient/care recipient confirming the factual content of the letter concerning the home-care services GreatCare's aides provided to him.

41. The principal and operative signature on the declaration letter is the patient's own signature. To the best of my knowledge, that signature is genuinely Mr. [redacted]'s signature. Its authenticity can be verified by comparison to specimens of Mr. [redacted]'s signature on other GreatCare records that he signed during the relevant period, including Patient RN Visit records bearing his signature. A specimen of Mr. [redacted]'s signature on a Patient RN Visit record will be produced as supporting documentation.

42. The declaration letter also bears a separate signature in a field designated "family witness." That signature is supplementary to, and not a substitute for, the patient's own signature in the patient field; the operative confirmation of the factual content of the letter is the patient's own signed confirmation. The spelling of any name appearing in the "family witness" field does not, in any event, affect the validity of Patient [redacted]'s own signed confirmation of the letter's content.

## XI. MR. QINGMING LIU'S EMAIL SEARCH ENGAGEMENT

43. In late March 2026, Mr. Qingming Liu was engaged to assist GreatCare with a search of its email accounts using search terms provided by Plaintiffs' counsel. The engagement was arranged through Mr. Muniz's office, not by me directly. Mr. Q. Liu was retained on or about March 25-26, 2026.

44. The scope of Mr. Liu's work, as I understood it, was to search GreatCare's email accounts using search terms provided by Plaintiffs' counsel, to identify communications responsive to Plaintiffs' discovery requests.

45. To enable Mr. Q. Liu's search, I provided Mr. Q. Liu with login credentials — user names and passwords — for multiple email accounts, including the GreatCare work email accounts of other GreatCare personnel listed in the affidavit signed by Mr. Q. Liu signed (filed as Exhibit A to ECF 190 on April 6, 2026). GreatCare does not maintain a generic "company email account" separate from the individual GreatCare-employee email accounts at greatcareny.com. The credentials, once provided, would have permitted Mr. Q. Liu to log into any of those email accounts from any computer.

46. Mr. Q. Liu performed his work over three days at Mr. Muniz's office, as recorded in his affidavit filed as Exhibit A to ECF 190 on April 6, 2026. I provided my laptop for Mr. Q. Liu's use during portions of the work because I had Outlook configured locally on that laptop for ease of searching. I am not a technical specialist in electronic discovery search methods, and I did not personally observe or supervise Mr. Liu's search methodology; I provided the credentials and access.

47. I am informed and believe that the affidavit filed as Exhibit A to ECF 190 on April 6, 2026 submitted by Mr. Q. Liu in this action was drafted at the office of Mr. Muniz by a paralegal and was reviewed and approved by Mr. Muniz prior to filing. I received a copy of the

draft affidavit before it was filed. On my review of the draft, I overlooked the technical discrepancy between the affidavit's description of Mr. Q. Liu's methodology (referring to "possession of" "devices") and the actual methodology by which Mr. Q. Liu conducted the search (logging into multiple email accounts using credentials I had provided). The technical methodology actually used is set forth in paragraphs 45 and 46 above and is further addressed in Mr. Q. Liu's separately filed declaration.

48. At my May 1, 2026 deposition, Plaintiffs' counsel asked whether Mr. Liu "collect[ed] only your laptop" and whether he "searched only your laptop." (Tr. 215:18; 216:18.) I answered that I "bring my laptops" and that Mr. Liu "searched my laptop" (Tr. 215:11; 216:3) because that was the physical computer I made available; I did not bring or provide computers belonging to other GreatCare personnel. (Tr. 218:11-13.) I separately testified, however, that I had provided credentials for multiple email accounts, including my own, GreatCare employees', and GreatCare's company email, and that those accounts could be logged into from any computer with the credentials. (Tr. 215:21-25; 216:7-10.) My references to "my laptop" in the deposition addressed the physical device made available at Mr. Muniz's office; they did not — and were not intended to — characterize the email-account scope of Mr. Q. Liu's search.

## XII. THE FEBRUARY 8, 2026 LETTER TO THE COURT

49. I am informed that Plaintiffs' motion challenges representations made in a February 8, 2026 letter filed by GreatCare's counsel, Jose Muniz, Esq. (ECF 165). Mr. Muniz drafted and filed that letter. My role in connection with that letter was limited to providing him with factual information about GreatCare's recordkeeping practices and operations in response to his questions.

50. In response to Mr. Muniz's inquiry about GreatCare's fax communications with the MLTCs, I informed him that GreatCare maintains its incoming and outgoing fax

communications in a physical binder kept at its office. That fax binder is, and at all relevant times has been, physically present at GreatCare's office. The binder contains fax communications dating back at least six years and has not been destroyed. I separately testified to the existence of the fax binder at my May 1, 2026 deposition (Tr. 34-36).

51. In response to Mr. Muniz's questions about retention obligations, I conveyed my understanding of two distinct retention requirements applicable to a licensed home-care services agency. First, patient service records (including plans of care, nursing visit records, and aide assignment records) are required to be retained for six years under 10 N.Y.C.R.R. § 766.6(b). Second, records of complaints handled under the agency's complaint procedure are required to be retained for three years under 10 N.Y.C.R.R. § 766.12. To my knowledge, GreatCare has adhered to both the six-year retention period for patient service records and the three-year retention period for complaint records.

52. In response to Mr. Muniz's questions about the email search, I provided him with information regarding the email accounts I had authorized for search by Mr. Q. Liu (whose work is addressed in Section XI above). I provided Mr. Muniz with my understanding that GreatCare's email communications with the MLTCs consisted predominantly of administrative and public-notice communications rather than patient-specific service records, with patient-specific communications passing principally by fax (as preserved in the fax binder described in paragraph 50).

53. I did not draft the February 8, 2026 letter. To the best of my recollection, I did not review the letter line by line before Mr. Muniz filed it; I authorized Mr. Muniz to make the filing based on my belief that the underlying facts I had communicated to him were accurately reflected therein.

## XIII. MY RIB FRACTURE AND RECOVERY

54. On February 11, 2026, I fell on ice outside my home and sustained a rib fracture, along with related injuries. I was diagnosed and treated at the hospital. Hospital records and a physician's certificate documenting the diagnosis are part of the record in this action; they were attached as Exhibit A to my prior affidavit filed on April 2, 2026 (ECF 188).

55. Following the fall, I was prescribed bedrest. I was bedridden for most of the period between February 11 and the end of March 2026.

56. I returned to GreatCare's office on April 17, 2026 for a brief period, on my doctor's direction, before returning fully thereafter. Between February 11 and April 17, my engagement with GreatCare's operations was limited to such communications as my physical condition permitted.

57. I am aware that certain filings made by Mr. Muniz during my recovery period referred to my injury as a "back fracture." The actual medical diagnosis was a rib fracture. The reference to a "back fracture" in counsel's filings reflected a miscommunication between counsel and me concerning the precise medical terminology; the hospital records themselves, attached to the April 2, 2026 affidavit, contain the accurate diagnosis.

58. At my May 1, 2026 deposition, I testified that during the recovery period I was able to use my telephone for limited communications and was able to participate in brief virtual meetings with my counsel by Teams. (Tr. 222:25-223:9.) I also testified that those meetings had to be very short because my pain was severe during the recovery. (Tr. 223:5-9.) The testimony that I was able to make telephone calls during recovery did not, and was not intended to, convey that I was capable of supervising complex legal and discovery matters, reviewing extensive document collections, or performing my ordinary operational duties at GreatCare during the recovery period.

## XIV. DECEMBER 2025 SETTLEMENT CONFERENCE

59. I was unable to attend the settlement conference set for December 1, 2025. My actual reason for absence was as follows: prior to December 1, my husband had traveled to China to attend a family event — his mother's 100th-birthday celebration — and was scheduled to be out of the country on the date of the conference. During my husband's absence, I traveled with our child to Texarkana, Texas to stay with our son. I departed New York (LaGuardia Airport) for Texarkana, Texas on November 29, 2025, on American Airlines Flight 1987, and returned from Texarkana to New York (LaGuardia Airport) on December 7, 2025, on American Airlines Flight 4066. Outbound and return travel were booked through Expedia. Copies of the booking confirmations are attached hereto as Exhibit 1.

60. I communicated to Mr. Muniz that I was unable to attend the December 1, 2025 conference due to a personal-family matter requiring travel. I authorized him to convey the substance of that to opposing counsel and to the Court.

61. I am aware that at my May 1, 2026 deposition I gave different testimony concerning the December 2025 trip. I testified at deposition that I had traveled to "Florida" for a personal trip "because I have a cough and I couldn't recover; I just want to go to warm place to recover my cough." (Tr. 201:4, 14-20.) That testimony was mistaken as to both destination and reason. My actual travel was to Texarkana, Texas, as set forth in paragraph 59 above and as confirmed by the contemporaneous Expedia booking records attached as Exhibit 1. The deposition testimony was given in error, against the background of: (i) my ongoing recovery from the February 2026 rib fracture, (ii) the unanticipated nature of the questioning, and (iii) my prior limited review of contemporaneous travel records. I have corrected the inaccurate testimony pursuant to Federal Rule of Civil Procedure 30(e); the errata sheet is being served on all parties contemporaneously with the filing of this Declaration.

## XV. COUNSEL SUBSTITUTIONS

62. I cooperated with GreatCare's various attorneys during the periods of their representation of GreatCare. I responded to their questions, made GreatCare personnel available for consultation, and provided documents and information as requested.

63. I selected counsel for GreatCare at various times in an effort to secure appropriate representation for GreatCare. I did not change counsel for the purpose of delaying these proceedings.

## XVI. COMMUNICATIONS WITH PLAINTIFFS' COUNSEL

64. On August 4, 2025, I attended an in-person meet-and-confer meeting at the offices of the National Center for Law and Economic Justice, where Plaintiffs' counsel maintains their offices, for the purpose of delivering and reviewing additional documents responsive to Plaintiffs' document requests. Mr. Muniz attended that meeting with me. The Court had previously suggested that records review take place at GreatCare's office. The August 4 meeting was held at Plaintiffs' counsel's offices, and I brought to the meeting a USB drive containing additional patient and aide files. During the meeting, I walked Plaintiffs' counsel through the contents of the USB drive and the available records and answered questions about GreatCare's recordkeeping and document collection.

65. At or near the conclusion of the August 4, 2025 meeting, an attorney for Plaintiffs, Ms. Carmela Huang, made a statement to me, in substance, to the following effect: "Barbara, you are not at fault. I know you dispatched aides according to insurance authorization. This is all the insurance company's fault. You did what you should do. Now we need you to find evidence that the insurance company controlled you." I am restating that statement to the best of my recollection, and not by way of verbatim quotation. I understood Ms. Huang to be telling me that Plaintiffs did not blame me or GreatCare for the matters at issue in this action and that

Plaintiffs were focused on developing their claims against the managed long-term care defendants.

66. On February 2, 2026, an attorney for Plaintiffs, Ms. Carmela Huang, made a separate statement to me, in substance, to the following effect: "Barbara, you know SWH has filed a cross-claim. Instead of fighting SWH and us simultaneously, you should join forces with us against the insurance company. If you testify that the plaintiffs worked overtime, I can settle with you." I am restating that statement to the best of my recollection, and not by way of verbatim quotation. I understood Ms. Huang to be offering to settle Plaintiffs' wage claims against GreatCare on terms favorable to GreatCare if I would provide testimony that the named Plaintiffs had worked overtime. I did not accept that proposal and GreatCare has continued to defend this action through counsel.

67. I describe the statements set forth in paragraphs 65 and 66 above to provide the Court with a complete account of the communications I have had with Plaintiffs' counsel concerning the subject matter of Plaintiffs' present motion. I have no contemporaneous notes or recordings of either statement; I have set them out in this Declaration to the best of my present recollection.

## XVII. CLARIFICATIONS TO MAY 1, 2026 DEPOSITION TESTIMONY

68. I have addressed certain May 1, 2026 deposition exchanges above. I also note the following additional clarifications, none of which is intended as a denial of what I literally said, but each of which provides necessary context.

69. Records disposition (Tr. 184:21–186:17; 198:1-22). My initial response at Tr. 184:21 — "Whatever I have, I produced to you. I never shredded." — was a colloquial response made before I had been asked specifically about the disposition of patient-side records older than six years. In the immediately following testimony at Tr. 184:28 through Tr. 186, I distinguished

between (a) aide-side records, which are not shredded or deleted within the six-year window and which in practice have been retained from 2015 forward, and (b) patient-side records, which are disposed of in the ordinary course when they reach the six-year mark consistent with 10 N.Y.C.R.R. § 766.6(b). The accurate description of GreatCare's actual retention practices — including the substantial over-retention of aide-side records dating to 2015 and the willingness of GreatCare to produce any surviving patient-side records older than six years that Plaintiffs identify — is set forth in Section III above.

70. Mr. Q. Liu's search (Tr. 215-218). My references in the deposition to "my laptop" referred to the physical computer I made available to Mr. Q. Liu at Mr. Muniz's office; they did not characterize the email-account scope of Mr. Q. Liu's search. The accurate description of Mr. Q. Liu's engagement is set forth in Section XI above.

71. December 2025 travel (Tr. 200-201). My testimony at Tr. 201:1-4 (Florida) and Tr. 201:14-20 (cough/warm place) was mistaken as set forth and corrected in Section XIV above. My actual travel was to Texarkana, Texas; the reason was the family circumstances described in Section XIV. The testimony has been corrected pursuant to Federal Rule of Civil Procedure 30(e).

**XVIII. VERIFICATION**

72. I declare under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on this 22nd day of May, 2026.

**BARBARA WANG**

# Receipt

Exhibit 1 Expedia Booking Confirmation

Expedia itinerary: 73287325909296

Purchase date: Oct 28, 2025

## Booking details

### One way flight

New York (LGA) to Texarkana (TXK)

American Airlines 1987

Depart: Nov 29, 2025

Arrive: Nov 29, 2025

**Traveler 1: Adult**

BARBARA WANG

Ticket Number: 0017321047917

**Traveler 2: Child**

Ticket Number: 0017321047919

## Payment details

**Flight price**

Traveler 1: Adult

Taxes and fees

Traveler 2: Child

Taxes and fees

**Other**

Price Drop Protection

CS 扫描全能王
3亿人都在用的扫描App

Expedia

# Receipt

Expedia itinerary: 73312398110695

Purchase date: Nov 28, 2025

## Booking details

### One way flight

Texarkana (TXK) to New York (LGA)

American Airlines 4066

Depart: Dec 7, 2025

Arrive: Dec 7, 2025

**Traveler 1: Adult**

BARBARA WANG

Ticket Number: 0017322781729

## Payment details

**Flight price**

Traveler 1: Adult

Taxes and fees

**Other**

Price Drop Protection

## Total

Paid

CS 扫描全能王
3亿人都在用的扫描App