**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HEI LI, ZHU H.L. LIN, LI CHEN, MEI F. CHEN, XIU F. CHEN, HUI HE, HUI LI, ZHAN J. LI, HUI X. RUAN, JIAN R. XIAO, MEI Z. XIAO, MU Z. ZHANG, BI Y. ZHENG, and XIU X. ZHU,<br><br>Plaintiffs,<br><br>-against-<br><br>GREATCARE, INC., CENTERLIGHT HEALTHCARE, INC., and SENIOR WHOLE HEALTH OF NEW YORK, INC.,<br><br>Defendants. | Case No. 1:24-cv-07401 (LTS) (KHP) |

**DEFENDANT GREATCARE, INC.'S RESPONSE TO PLAINTIFFS' LOCAL CIVIL RULE 56.1 STATEMENT OF MATERIAL FACTS AND STATEMENT OF ADDITIONAL MATERIAL FACTS**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56.1(b)–(d), Defendant GreatCare, Inc. ("GreatCare") submits this response to Plaintiffs' Statement of Material Facts (ECF 258) in opposition to Plaintiffs' motion for partial summary judgment (ECF 255). GreatCare's Statement of Additional Material Facts, submitted pursuant to Local Civil Rule 56.1(b), follows as Part II and is numbered separately. "Liu Decl." and "Chen Tzu Wei Decl." refer to the declarations of B. Robert Liu and Chen Tzu Wei submitted with this response, and "Wang SJ Decl." and "Zhao SJ Decl." to those of Barbara Wang and Mei Mei Zhao. "Wang May 22 Decl." and "Zhao May 22 Decl." refer to the earlier, separate declarations of Ms. Wang and Ms. Zhao filed on May 22, 2026 in opposition to Plaintiffs' motion for sanctions (ECF 228-2 and 228-1, respectively).

**PRELIMINARY STATEMENT AND GENERAL RESPONSES**

**1.** Each response below is made solely for purposes of the pending motions for summary judgment and without waiving any objection to the admissibility at trial of the material cited by Plaintiffs. Where a paragraph is admitted, GreatCare admits the fact stated and not any characterization, inference or legal conclusion embedded in it.

**2.** A number of Plaintiffs' paragraphs state legal conclusions rather than facts — among them the assertions that Plaintiffs were "employed by" GreatCare in the case of the three consumer-directed personal assistance program Plaintiffs, that particular hours were "compensable," and that a Plaintiff "could not" obtain sleep or meal periods within the meaning of the governing regulations. Legal conclusions in a Rule 56.1 statement are not deemed admitted, *Flores Moreno v. Ramos*, No. 17 CV 9439-LTS-KNF, 2021 WL 637563 (S.D.N.Y. Feb. 17, 2021) (ECF 94 at 6 n.5), and GreatCare objects to each such paragraph on that ground while responding to its factual content.

**3.** Friedman Declaration Exhibit 59, on which paragraphs 43 through 63 rest, is the spreadsheet Plaintiffs prepared pursuant to the Court's August 6, 2026 Order (ECF 242), re-captioned as a summary of missing payroll and time records. It is a summary prepared by Plaintiffs' counsel, not a business record, and GreatCare responds to it as such (Schedule of Objections, item 2). The Court addressed that spreadsheet and the records underlying it in *Li v. GreatCare, Inc.*, No. 24-CV-7401 (LTS)(KHP), 2026 WL 2593180, at *8–9 (S.D.N.Y. Sept. 1, 2026) (ECF 274 at 18–21) (the "9/1/26 Order"). Where GreatCare admits a paragraph among paragraphs 43 through 63, it admits only what Exhibit 59 marks; it does not admit that hours worked or pay in the marked weeks are unknown, because Plaintiffs' own Exhibits 134 through 147 supply visit-level payroll data for those weeks.

**4.** Paragraphs 64 through 69 cite "Friedman Decl., Ex. 64 (Workman Decl. ¶ 20)" and its sub-paragraphs. Exhibit 64 as filed contains no paragraph 20; the text cited appears in the declaration of Scott Workman, an employee of Plaintiffs' counsel (ECF 257 ¶ 3), at ECF 257 (the "Workman Declaration"). GreatCare objects to the Workman Declaration under Fed. R. Civ. P. 56(c)(2). If it is offered as expert analysis, it may not be considered: Plaintiffs disclosed no expert by the March 30, 2026 deadline fixed at ECF 118, and they have not shown that the failure was substantially justified or harmless. Fed. R. Civ. P. 26(a)(2), 37(c)(1). If it is offered as lay testimony, it may not be considered because it rests on counsel's instructions — including the instruction to "count 24 work hours for each 24-hour live-in shift," ECF 257 ¶ 12(c) — rather than on the declarant's perception, and it is not a summary of voluminous records within Fed. R. Evid. 1006. Fed. R. Evid. 701(a), (c), 1006. GreatCare responds to those paragraphs on the assumption that the citation is to ECF 257, without waiving these objections.

**5.** Plaintiffs' Exhibits 31 (Declaration of Xiu X. Zhu) and 100 (Declaration of Hui X. Ruan) are the only two of the fourteen Plaintiff declarations filed without an interpreter's certification on the face of the exhibit, although each declarant testified at her deposition through an interpreter. GreatCare objects to the weight of both under Fed. R. Civ. P. 56(c)(4) and Fed. R. Evid. 604. The interpreter declarations later filed for both declarations (ECF 268-1 for Exhibit 31; ECF 268-2 for Exhibit 100) were each executed by Way P. Moy, who attended Ms. Ruan's deposition as a "check interpreter" and whom she identified under oath as one of her lawyers. Ruan Dep. (Dec. 17, 2025) 2:22–23, 72:3–4, 73:6–8 (Liu Decl. Ex. 28); see also id. at 69:5–7, 70:11–17, 82:24–83:15; ECF 248-13 at 8 (Mr. Moy's certification of interpretation of Ms. Ruan's interrogatory responses). Paragraphs 14, 103, 104, 105, 115, 119, 179, 186, 222 and 238 rest on those exhibits, and paragraphs 119 and 222 rest on Exhibit 100 alone.

**6.** Several paragraphs cite only "Id." to the evidence cited in a preceding paragraph. GreatCare has responded to each on the basis of the evidence so incorporated; where that evidence does not support the paragraph, GreatCare says so.

**7.** Plaintiffs' employment-date paragraphs (1 through 14) state dates "approximately." GreatCare admits each such paragraph to the extent its own records show the dates stated and identifies, where the cited evidence shows otherwise, what the evidence shows.

**8.** Where a response admits a paragraph without dispute and goes on to supply further record material — whether or not introduced by the words "GreatCare notes" — the paragraph is admitted as stated, and the further material is supplied for completeness under Local Civil Rule 56.1(b); it is not offered to controvert the admitted fact.

**9.** GreatCare does not rely in this response, and does not rely in its Statement of Additional Material Facts, on the contents of any completed Living-In Time Sheet, care-recipient declaration letter, or nurse-visit record for the truth of what it records, other than time sheets a Plaintiff herself adopted at her deposition, which are cited as her own statements under Fed. R. Evid. 801(d)(2)(A). *See* 9/1/26 Order, 2026 WL 2593180, at *10 (ECF 274 at 23–24). The declarations submitted by GreatCare take the same approach: Ms. Chen Tzu Wei makes no statement about any completed "Home Health Aide Living-In Time Sheet," any declaration letter signed by a patient or a patient's family member, or any nurse-visit record or other clinical record, Chen Tzu Wei Decl. ¶ 34; Barbara Wang identifies the blank Living-In Time Sheet form and GreatCare's practice of giving blank sheets to each aide, and denies creating, altering, backdating or fabricating any such record, Wang SJ Decl. ¶¶ 23–24; and the Liu Declaration attaches the

Plaintiff-adopted sheets for the stated purpose only and offers no business-records foundation for them, Liu Decl. ¶ 21.

## RESPONSES TO PLAINTIFFS' NUMBERED PARAGRAPHS

**1.** *Plaintiff Hei Li was employed by GreatCare from approximately June 17, 2017 until approximately December 29, 2022. Friedman Decl., Ex. 1 (HHAX EVV Rec. for Hei Li); Ex. 2 (Hei Li App., GC 000733, 000736); Ex. 3 (Hei Li Dep. 15:3-9).*

**Response:** Admitted in part and disputed in part. Admitted that GreatCare records show a hire date of June 17, 2017 and a final visit on December 29, 2022. Disputed that the period was live-in work: live-in shifts ended February 28, 2021. *See* Friedman Decl. Ex. 1 (HHAX EVV Recs. for Hei Li) rows dated 3/17/2022-12/29/2022; Friedman Decl. Ex. 134 (HHAX Payroll Recs. for Hei Li) (181 live-in rows, 6/17/2017-2/28/2021).

**2.** *Plaintiff Zhu H.L. Lin was employed by GreatCare from approximately March 13, 2015 until approximately March 8, 2021. See, e.g., Friedman Decl., Ex. 4 (HHAX EVV Rec. for Lin); Ex. 5 (Lin Decl. ¶ 7).*

**Response:** Admitted.

**3.** *Plaintiff Li Chen was employed by GreatCare from approximately January 2, 2015 until approximately May 18, 2020. Friedman Decl., Ex. 6 (L. Chen Decl. ¶ 32); Ex. 7 (HHAX EVV Rec. for L. Chen).*

**Response:** Admitted in part and disputed in part. Admitted that Ms. Chen's first EVV-recorded visit was January 2, 2015, Friedman Decl. Ex. 7, and that her last billed and paid visit was March 12, 2020; GreatCare's payroll record for her begins July 1, 2014. Friedman Decl. Ex. 136 (495 rows, 7/1/2014–3/12/2020). Disputed that she worked for GreatCare until approximately May

18, 2020: every Exhibit 7 row after March 12, 2020, through May 18, 2020, is marked "Not Billed" and carries no clock-in or clock-out time, and Exhibit 136 records no paid visit after March 12, 2020. Disputed that she worked live-in shifts throughout: her live-in work ended May 3, 2016. *See* Friedman Decl. Ex. 136 (HHAX Payroll Recs. for L. Chen) (185 live-in rows, 1/2/2015-5/3/2016, all RateType Daily); Friedman Decl. Ex. 7 (HHAX EVV Recs. for L. Chen).

**4.** *Plaintiff Mei F. Chen was employed by GreatCare from approximately March 6, 2016 until approximately January 4, 2019. Friedman Decl., Ex. 8 (HHAX EVV Rec. for M. Chen); Ex. 9 (M. Chen App., GC 002911, 002914).*

**Response:** Admitted.

**5.** *Plaintiff Xiu F. Chen was employed by GreatCare from approximately February 19, 2016 until approximately October 31, 2024. Friedman Decl., Ex. 10 (HHAX EVV Rec. for X. Chen); Ex. 11 (X. Chen App., GC 000685, 000687).*

**Response:** Admitted in part and disputed in part. Admitted that GreatCare's records show a hire date of February 19, 2016 for Xiu F. Chen. Friedman Decl. Ex. 11 at GC 05.23.2025-000685; Ex. 61 (paystub, "Hire Date 02/19/2016"). The material cited does not support the remainder of the assertion. Exhibit 10, filed as the EVV record for Xiu F. Chen, contains no record for her: every row on PDF pages 2–4 names the caregiver "Chen Mei Fang" and duplicates Exhibit 8 line for line, including the closing rows of January 2–4, 2019. Friedman Decl. Ex. 10 (PDF pp. 2–4), compared with Ex. 8. Nothing cited supports an October 31, 2024 end date. GreatCare notes that Plaintiffs' uncited Exhibit 137, the HHAeXchange payroll record for Ms. Chen, ends with a visit on October 25, 2024. Friedman Decl. Ex. 137.

**6.** *Plaintiff Hui He was employed by GreatCare from approximately July 2, 2016 until approximately July 11, 2020. Friedman Decl., Ex. 12 (HHAX EVV Rec. for He); Ex. 13 (He App., GC 003366, 003369).*

**Response:** Admitted.

**7.** *Plaintiff Hui Li was employed by GreatCare from approximately July 18, 2015 until approximately April 6, 2023. Friedman Decl., Ex. 14 (HHAX EVV Rec. for Hui Li); Ex. 15 (Hui Li Dep. 77:25-78:9).*

**Response:** Admitted in part and disputed in part. Admitted that GreatCare's records reflect a hire date of July 18, 2015 for Hui Li and that her last billed and paid visit was April 6, 2023. Friedman Decl. Ex. 14; Ex. 140 (VisitID 873559136). Disputed to the extent the paragraph implies continuous employment or live-in work through that date: her last live-in shift was October 26, 2018; between November 27, 2018 and February 3, 2023 the EVV exhibit Plaintiffs cite contains no entry; and her only 2023 visits — February 3, March 30 and April 6 — were hourly visits of ten to twelve hours. Friedman Decl. Ex. 140 (553 live-in rows, 9/2/2015–10/26/2018; 2023 rows "Hourly"); Ex. 14. Ms. Li testified that she stopped working for the couple she served "at the end of 2018." Friedman Decl. Ex. 15 (Hui Li Dep.) 77:14–24, 78:3–9.

**8.** *Plaintiff Zhan J. Li was employed by GreatCare from approximately September 24, 2016 until approximately March 7, 2021. Friedman Decl., Ex. 16 (HHAX EVV Rec. for Z. Li); Ex. 17 (Z. Li App., GC 004137, 004140); Ex. 18 (Z. Li Dep. 11:4-6).*

**Response:** Admitted.

**9.** *Plaintiff Hui X. Ruan was employed by GreatCare from approximately March 29, 2015 until approximately August 27, 2023. Friedman Decl., Ex. 19 (HHAX EVV Rec. for Ruan); Ex. 20 (Ruan App., GC 009815, 009819); Ex. 21 (Ruan Dep. (Dec. 17, 2025) 47:11-12, 50:16-21).*

**Response:** Admitted. GreatCare's records reflect a hire date of March 29, 2015 for Hui X. Ruan and a last billed visit on August 27, 2023. Friedman Decl. Ex. 20 at GC 009815; Ex. 19 (last billed row 8/27/2023). GreatCare notes that the deposition testimony cited supports only the start date (Ex. 21 (Ruan Dep. (Dec. 17, 2025)) 47:11–12) and that the passage at 50:16–21 does not address the end of her employment.

**10.** *Plaintiff Jian R. Xiao was employed by GreatCare from approximately November 10, 2020 until approximately August 20, 2023. Friedman Decl., Ex. 22 (EVV Recs. for J. Xiao); Ex. 23 (J. Xiao App., GC 000923, 000925).*

**Response:** Admitted in part and disputed in part. Admitted that Ms. Xiao's first shift was November 10, 2020 and that her last billed and paid shift was August 15, 2023; the only later entry, dated August 20, 2023, is marked "Not Billed" and carries no clock-in or clock-out time. Friedman Decl. Ex. 22 (VisitIDs 913335879, 913335884); Ex. 143. Disputed as a legal conclusion and otherwise disputed in part: every shift in Friedman Decl. Ex. 22 is CDPAP consumer-directed work (under Extended MLTC and, in August 2023, Hamaspik), for which GreatCare acted as fiscal intermediary within the parameters set by the plan; whether GreatCare was her employer for purposes of the FLSA and the NYLL is the economic-reality question addressed in Point IV of GreatCare's accompanying memorandum of law. *See* Friedman Decl. Ex. 22 (EVV Recs. for J. Xiao) (437 of 437 rows "PA-LivingIn" under a CDPAP payer: 429 "Extended Managed long term care CDPAP," 8 "Hamaspik, Inc. CDPAP" (8/1–8/20/2023)).

**11.** *Plaintiff Mei Z. Xiao was employed by GreatCare from approximately May 2, 2018 until approximately November 3, 2020, from approximately September 1, 2021 until approximately May 6, 2022, and from approximately May 3, 2023 until approximately August 18, 2023. Friedman Decl., Ex. 24 (HHAX EVV Rec. for M. Xiao).*

**Response:** Admitted in part and disputed in part. Admitted that the three periods match Friedman Decl. Ex. 24. Disputed as a legal conclusion and otherwise disputed in part: all 507 shifts are CDPAP consumer-directed work (Extended MLTC; Hamaspik in August 2023), for which GreatCare acted as fiscal intermediary within the parameters set by the plan; whether GreatCare was her employer for purposes of the FLSA and the NYLL is the economic-reality question addressed in Point IV of GreatCare's accompanying memorandum of law. *See* Friedman Decl. Ex. 24 (507 of 507 rows "PA-LivingIn": 498 Extended, 9 "Hamaspik, Inc. CDPAP" (8/2–8/18/2023); gaps 11/3/2020-9/1/2021 and 5/6/2022-5/3/2023).

**12.** *Plaintiff Mu Z. Zhang has been employed by GreatCare from approximately January 4, 2015 to the present. Friedman Decl., Ex. 25 (Zhang App., GC 001011, 001016); Ex. 26 (HHAX EVV Rec. for Zhang); Ex. 27 (Zhang Decl. ¶ 6).*

**Response:** Admitted in part and disputed in part. Admitted that Ms. Zhang remains employed by GreatCare, and that her first recorded live-in shift was January 1, 2015. Disputed that her employment began "approximately January 4, 2015." The page Plaintiffs cite records "Date of Hire 9/21/2014" and "Orientation Date 8/22/2014" (Friedman Decl. Ex. 25 at GC 05.23.2025-001011); Plaintiffs' own payroll exhibit for Ms. Zhang begins with a paid eight-hour hourly visit on September 21, 2014 (Ex. 145, VisitID 96812657); and Ms. Wang testified that the New York State Home Care Registry shows a September 21, 2014 start (Wang 30(b)(6) Dep. (May 1, 2026) 168:13–171:17 (ECF 252-3)). GreatCare further notes that Ms. Zhang's live-in shifts ended March

18, 2021, and that her employment since that date has been hourly work. Friedman Decl. Ex. 26 (rows coded "PCA -LivingIn" under AlphaCare through 12/27/2017, then 24-hour T1020 per-diem rows under SWHNY from 1/1/2018, the last billed on 3/18/2021; hourly T1019 rows from 4/1/2021).

**13.** *Plaintiff Bi Y. Zheng was employed by GreatCare from approximately October 18, 2018 until approximately August 20, 2021. Friedman Decl., Ex. 28 (HHAX EVV Rec. for Zheng); Ex. 29 (Zheng App., GC 001079, 001081).*

**Response:** Admitted in part and disputed in part. Admitted that GreatCare's records reflect a hire date of October 18, 2018 for Bi Y. Zheng and that the 440 visits in Friedman Decl. Ex. 28 run from October 18, 2018 to August 20, 2021. Friedman Decl. Ex. 29 at GC 001079; Ex. 28. Disputed that Ms. Zheng was employed by GreatCare as an agency aide. Every one of the 440 rows in Exhibit 28 is coded "PA-LivingIn" under "Extended Managed long term care CDPAP": consumer-directed personal assistance under N.Y. Soc. Serv. Law § 365-f, for which GreatCare acted as fiscal intermediary and under which the consumer or her representative is responsible for recruiting, hiring, training and supervising the personal assistant, Wang SJ Decl. ¶ 30; the plan's care-management records for the consumer answer "Yes" to "Member is willing and able to interview, train, and supervise CDPAS personal assistants" and name GreatCare as the fiscal intermediary. Friedman Decl. Ex. 28 (440 of 440 rows); Ex. 146; Ex. 101 at GC 005638–005641 ("CDPAP 24 HRS LIVE-IN," T1020 modifier U6, "WITH (GREAT CARE)"); Ex. 103-2 at GSD-ExtendedMLTC 00001460, 001496. *See infra* Statement of Additional Material Facts § I.

**14.** *Plaintiff Xiu X. Zhu was employed by GreatCare from approximately September 9, 2017 until approximately February 12, 2021. Friedman Decl., Ex. 30 (HHAX EVV Rec. for Zhu); Ex. 31 (Zhu Decl. ¶ 7).*

**Response:** Admitted.

**15.** *Defendant GreatCare, Inc. ("GreatCare") is a licensed home care services agency ("LHCSA") that maintains its principal offices at 110 West 34th Street, Suite 1207, New York, New York. GC Answer, ECF No. 187 ¶ 50; Friedman Decl., Ex. 32 (SWHNY-GC Home Health Services Agree. ("HHSA"), SWHNY 000243).*

**Response:** Admitted.

**16.** *Defendant CenterLight Healthcare, Inc. ("CenterLight") is a managed long-term care plan ("MLTC") whose office is located at 136-65 37th Avenue, Flushing, NY 11354. Friedman Decl., Ex. 33 (NYSDOH-CL 2022-2026 Cont., CenterLight 000154).*

**Response:** Admitted. GreatCare notes that the cited contract is a PACE Managed Long Term Care contract effective January 1, 2022. *See* Friedman Decl. Ex. 33 at CenterLight 000154 (CONTRACT TERM: FROM January 1, 2022 TO December 31, 2026).

**17.** *Defendant Senior Whole Health of New York, Inc. ("SWHNY") is a managed long-term care plan ("MLTC") whose office is located at Trinity Center, 111 Broadway, Suite 1505, New York, NY 10006. Friedman Decl., Ex. 34 (NYSDOH/SWHNY Con., SWHNY 000001).*

**Response:** Admitted.

**18.** *Under their contracts with the NYSDOH and per state Medicaid regulations, the MLTC Defendants were required to assess their members for the appropriate level of home care services at least every six months. Id., Article V § J ¶¶ 6(b), 7, 9(c)(vii) & (x), SWHNY 000041-000043); 18 NYCRR §§ 505.14, 505.28; Friedman Decl., Ex. 35 (Plaintiffs' First Set of Requests for Admission to CL ("CL Adms.") Nos. 24, 25, 28 (deemed admitted))[1]; Ex. 36 (NYSDOH/CL*

[1] Plaintiffs' RFAs to CenterLight were deemed admitted on January 5, 2026. ECF Nos. 131, 146.

*Cons., Art. III(B), CL 000389); Ex. 37 (Ding Decl. ¶¶ 4-5); see, e.g., Ex. 38 (CL Ass. Recs. for P.C., CenterLight Confid. 003181, 003225).*

**Response:** Objection; the paragraph states a legal conclusion, not a fact, and no response is required. *Flores Moreno*, ECF 94 at 6 n.5. To the extent a response is required: Admitted that SWHNY's contract with the Department of Health required a comprehensive reassessment of each member "at least once every six (6) months." Friedman Decl. Ex. 34, Art. V § J ¶ 7, SWHNY 000042. The material cited does not support the assertion as to CenterLight. The provision cited, Article III(B) of the CenterLight contract, is captioned "Continuation of Enrollment" and provides for annual recertification under 42 C.F.R. § 460.160(b); it does not impose a six-month assessment cycle. Friedman Decl. Ex. 36, Art. III(B), CenterLight 000389. The Requests for Admission cited (Nos. 24, 25, 28) concern aide-supervision documents and the identity of nurse assessors and say nothing about frequency, and the Ding declaration paragraphs cited describe visits rather than any six-month cycle. Friedman Decl. Ex. 35, Nos. 24, 25, 28; Ex. 37 ¶¶ 4–5. SWHNY's Rule 30(b)(6) witness testified that reassessment frequency "might be six months, might be a year, it is all depending on that member's needs." Friedman Decl. Ex. 40 (Glapa Dep. (Feb. 26, 2026)) 44:4–7.

**19.** *CenterLight and SWHNY relied on their periodic assessments to create plans of care and to authorize services. 42 C.F.R. §§ 460.104, 460.106; Friedman Decl., Ex. 39 (2018 CL/GC Agree. § 1.13, CL 000042); Ex. 35 (CL Adms., Nos. 21, 22); Ex. 32 (SWHNY-GC HHSA §§ 2.4-2.5, SWHNY 000247, § 1.24, SWHNY 000246, §§ 3.3-3.4, SWHNY 000247); Ex. 40 (Glapa Dep. (Feb. 26, 2026) 43:20-44:9, 107:2-7).*

**Response:** Admitted. GreatCare notes that it had no role in those assessments or authorizations. *See* Wang SJ Decl. ¶ 8; Friedman Decl. Ex. 37 (Ding Decl.) ¶¶ 3-4.

**20.** *GreatCare received members' care plans from CenterLight by fax. Friedman Decl., Ex. 41 (Wang Dep. (Jan. 7, 2026) 146:2-11).*

**Response:** Admitted. GreatCare notes that the witness testified CenterLight faxed "only authorization" (Friedman Decl. Ex. 41, 146:5-8). *See* Friedman Decl. Ex. 41 (Wang Dep.) 146:5-8.

**21.** *SWHNY gave GreatCare a copy of each care plan, held meetings with GreatCare by phone about the care plan, and sent a copy of the care plan to each member. Friedman Decl., Ex. 40 (Glapa Dep. (Feb. 26, 2026) 43:8-16, 44:10-24).*

**Response:** Admitted.

**22.** *SWHNY also entered each plan of care into the Homecare Software Solutions, LLC d/b/a HHAeXchange ("HHAX") portal and shared it with GreatCare. Friedman Decl., Ex. 42 (Glapa Dep. (Jan. 26, 2026) 240:14-241:7); Ex. 40 (Glapa Dep. (Feb. 26, 2026) 43:11-16); see, e.g., Ex. 43 (HHAX Plan of Care ("POC") for X.Y.W., GC 002118).*

**Response:** Admitted. GreatCare notes that what it received was a "different view for the provider," not SWHNY's own record. *See* Friedman Decl. Ex. 42 (Glapa 30(b)(6) Dep.) 240:14-17, 241:2-7.

**23.** *GreatCare's nurses directed its home health aides on how to implement the plans of care developed by SWHNY. Friedman Decl., Ex. 44 (Wang Dep. (May 15, 2026) 48:5-16, 133:23-134:7).*

**Response:** Admitted.

**24.** *For the assessments, the MLTC Defendants' nurses, or a nurse provided by a contracted agency retained by the MLTC Defendants, evaluated each care recipient's activities of*

*daily living, including bathing, personal hygiene, dressing, eating, bed mobility, toilet transfers and use, locomotion, and managing stairs, and instrumental activities of daily living, including meal preparation, housework, shopping, managing medications, managing finances, telephone use, and transportation. See, e.g., Friedman Decl., Ex. 45 (SWHNY Ass. Recs. for S.M.C.D., SWHNY 001886-001939);*[2] *Ex. 35 (CL Adms., Nos. 27-28); Ex. 37 (Ding Decl. ¶¶ 3, 4).*

**Response:** Admitted. GreatCare notes that the plans' nurses, not GreatCare, conducted those assessments. See Friedman Decl. Ex. 45 at SWHNY001916–001917; Friedman Decl. Ex. 37 (Ding Decl.) ¶¶ 3-4; Wang SJ Decl. ¶ 8.

**25.** *CenterLight's documents accurately reflected the nighttime activities of the subject member. Friedman Decl., Ex. 35 (CL Adms., No. 23).*

**Response:** Admitted in part and disputed in part. Disputed as phrased. The admission reaches only documents entitled "Personal Care Assessment," Friedman Decl. Ex. 35 (CL Adms.) No. 23, and, as a deemed Rule 36 admission, binds only CenterLight and is not evidence against GreatCare. Schedule of Objections, item 7.

**26.** *GreatCare kept patient files containing its own nurses' assessments and nursing notes that a GreatCare's nurse prepared during home visits to the care recipient member, as well as the member's medical orders from the treating physician. Friedman Decl., Ex. 51 (Wang Dep. (May 1, 2026) 86:9-17; 73:12-19, 146:2-11; 208:13-17).*

---

[2] See also Ex. 46 (SWHNY Ass. Recs. for S.K.C.-1, SWHNY 001945-002003); Ex. 47 (SWHNY Ass. Recs. for P.C.P., SWHNY 001820-001845); Ex. 48 (SWHNY Ass. Recs. for K.W.P., SWHNY 003842-003854); Ex. 49 (SWHNY Ass. Recs. for X.Y.W., SWHNY 005321-005342); Ex. 50 (SWHNY Ass. Recs. for X.J.L., SWHNY 001630-001683).

**Response:** Admitted. GreatCare notes only that the citation to Wang Dep. 146:2–11 concerns HHAeXchange activity codes, not patient files; the remaining pinpoint citations (86:9–17, 73:12–19, 208:13–17) support the paragraph. Friedman Decl. Ex. 51.

**27.** *Plaintiffs electronically verified their work shifts by using an electronic visit verification ("EVV") system that required Plaintiffs to call a dedicated telephone number using their care recipients' telephones and clock in and out their shifts by entering in their assigned ID number and GreatCare's ID number. Friedman Decl., Ex. 52 (GC Duty Code List, GSD002640-002641); Ex. 51 (Wang Dep. (May 1, 2026) 138:9-22); see, e.g., Ex. 53 (Lin Dep. 57:3-9); Ex. 54 (X. Chen Dep. 38:12-39:15); Ex. 55 (M. Xiao Dep. 80:14-22).*

**Response:** Admitted.

**28.** *At the end of every shift, Plaintiffs were also required to enter codes that were assigned to them that corresponded to specific work duties. Friedman Decl., Ex. 52 (GC Duty Code List, GSD002640-002641); see, e.g., Ex. 53 (Lin Dep. 57:6-20); Ex. 56 (Zhang Dep. 67:4-16).*

**Response:** Admitted.

**29.** *There was no code provided to Plaintiffs to report lack of adequate sleep. Friedman Decl., Ex. 52 (GC Duty Code List, GSD002640-002641); see, e.g., Ex. 55 (M. Xiao Dep. 82:17-24).*

**Response:** Admitted in part and disputed in part. Admitted that the duty-code list at Friedman Decl. Ex. 52 contains no code for reporting a lack of sleep and admitted that, before April 2023, GreatCare did not use HHAeXchange codes 801 and 802 in its operations. (Wang SJ Decl. ¶ 21) Disputed that no means of reporting a lack of adequate sleep was provided to Plaintiffs.

GreatCare's Living-In Time Sheet — completed copies of which, from GreatCare's production for Plaintiff Zhan J. Li, Plaintiffs themselves filed — asks in print whether the aide received five consecutive uninterrupted hours of sleep and adequate sleeping facilities and requires her to itemize any interruption, Friedman Decl. Ex. 60 at GC03.01.2025-000458, -000459; the Caregivers Agreement signed by nine Plaintiffs (ten agreements; AMF ¶¶ 29–32, 295) provides that if a bona fide sleep period is not received "it is critical that the Caregiver report this on his/her timesheet," (Liu Decl. Ex. 2(a) — Caregivers Agreement, GC 08.04.2025 008018; Chen Tzu Wei Decl. ¶¶ 13, 17, 19); an aide on a live-in case who did not receive her sleep or meal periods could report it in writing on that sheet, and could report it, or any question about her hours or pay, by telephone to GreatCare's office, Wang SJ Decl. ¶ 22; GreatCare's home care workers reach its office by telephone, and a worker who has a problem during her work contacts GreatCare rather than the plan, Zhao SJ Decl. ¶¶ 12, 15; and aides were told to call the company if they did not get enough sleep, Ouyang Dep. (Feb. 9, 2026) 20:7–21:3 (Liu Decl. Ex. 30). GreatCare further notes that the deposition testimony cited concerns a code for meals, not sleep. Friedman Decl. Ex. 55 (M. Xiao Dep.) 82:17–21.

**30.** *When the telephone system did not function properly, or Plaintiffs made an error in entering information, Plaintiffs were sometimes required to submit paper timesheets. Friedman Decl., Ex. 57 (Y. Zhu Dep. 40:4-13, 76:9-14).*

**Response:** Admitted. GreatCare notes that telephonic clock-in and clock-out was the required method and that paper time sheets were used only as a backup. *See* Friedman Decl. Ex. 57 (Y. Zhu Dep.) 40:6–13; Friedman Decl. Ex. 6 (L. Chen Decl.) ¶ 36.

**31.** *Failures of the telephone system occurred seldomly. See, e.g., Friedman Decl., Ex. 28 (HHAX EVV Recs. for Zheng).*

**Response:** Admitted.

**32.** *Plaintiffs' EVV information was recorded on the HHAX platform, which is a New York State Department of Health ("NYSDOH") and New York Office of Medicaid Inspector General ("OMIG") approved provider of EVV services. See N.Y. State Dep't of Health, Electronic Visit Verification: Request for Information (RFI) Summary of Responses and Path for Implementing EVV, app. § 3.1.13 (2020).*[3]

**Response:** Admitted.

**33.** *Failures of GreatCare's telephone system were also recorded in HHAX as incomplete clock-in and clock-out entries that were adjusted and then billed. See, e.g., Friedman Decl., Exs. 12, 28 (HHAX EVV Recs. for He, visit date Nov. 9, 2016; and Zheng, visit date July 22, 2020).*

**Response:** Admitted. GreatCare notes that both cited adjustments increased the recorded time to a full 24-hour shift and were billed as such. *See* Friedman Decl. Ex. 12 row 11/9/2016 (EVV in 11:15 adjusted to 8:00); Friedman Decl. Ex. 28 row 7/22/2020 (EVV in 8:29 adjusted to 8:30, 24:00:00 Billed).

**34.** *Case notes entered by GreatCare into HHAX also show that when an aide worked beyond her regularly scheduled hours, GreatCare did not rely on its phone clock-in/clock-out system to capture the additional time; instead, GreatCare staff instructed the aide when to "clock out" based on her location at the patient's home, and any additional pay required the aide to separately call in and submit a paper "duty sheet" for after-the-fact authorization. Friedman Decl., Ex. 58 (GC HHAX Patient Notes, 43918332).*

[3] https://www.health.ny.gov/health_care/medicaid/redesign/evv/repository/docs/sum_resp_path_implement.pdf.

**Response:** Disputed. The material cited does not support the assertion as stated. The only source cited is a single HHAeXchange patient note, which reads in full: "aide call to informed tomorrow patient have an early appointment and she will start shift at 8 am. She ask if she clock out when she still at md appt. I explain to clock out when she is at patient home and also to request a note form md for possible overtime." Friedman Decl. Ex. 58 (GC HHAX Patient Notes), PatientNoteID 43918332 (Dec. 15, 2020) (errors in original). The note records an aide who telephoned with a scheduling question being told to use the clock-out system at the patient's home. It does not refer to a paper "duty sheet" or to any instruction not to rely on the telephone system. The same exhibit records GreatCare requesting overtime authorization from the plan after an aide's medical-appointment escort: "We would like to request for 3.5Hrs Overtime on 8/29/23 due to medical appointment. Yesterday, the aide worked a total of 9.5 hours." Id., PatientNoteID 100002466 (Aug. 30, 2023); *see also* PatientNoteIDs 92085237 (Apr. 6, 2023) and 146345025 (Aug. 6, 2025).

**35.** *GreatCare did not produce EVV records from GreatCare's telephone clocking-in and clocking-out system. Friedman Decl. ¶ 61.*

**Response:** Admitted that GreatCare did not produce clock-in and clock-out data from its telephone-based EVV system. GreatCare notes that the same data was produced natively by HHAeXchange in response to Plaintiffs' subpoena and that Plaintiffs used it to reconstruct every shift at issue. Friedman Decl. ¶¶ 3, 67, 141; Exs. 1, 4, 7, 8, 10, 12, 14, 16, 19, 22, 24, 26, 28, 30, 134–147.

**36.** *GreatCare did not provide EVV data from HHAX or any other source. Instead, GreatCare produced only paper timesheets for some Plaintiffs for some time periods. Id.;*

*Friedman Decl., Ex. 59 (Summ. of Missing Pay. and Time Recs.); see also Ex. 60 (Sample Live-In Timesheets, GC 000458-000459, 000476-000477).*

**Response:** Admitted in part and disputed in part. Admitted that GreatCare did not itself produce HHAeXchange EVV data, which HHAeXchange produced natively in response to Plaintiffs' subpoena. Friedman Decl. ¶¶ 61, 67. Disputed that GreatCare "produced only paper timesheets." Plaintiffs' own paragraphs 39 through 41 and their Exhibits 59, 61, 62 and 63 describe GreatCare's production of paystubs, payroll registers, billing-versus-payroll reports and check registers, and Exhibit 59's "Missing Payroll Documents" column presupposes that payroll documents were produced for the weeks it does not mark. See ¶¶ 39–41 above; Friedman Decl. ¶¶ 62, 64–66; Exs. 59, 61–63.

**37.** *None of the paper timesheets produced by GreatCare were signed by Plaintiffs' care recipients. Id.*

**Response:** Admitted in part and disputed in part. Admitted that the live-in timesheet form bears only the aide's signature. Disputed that any cited material establishes what every produced timesheet does or does not bear. *See* Friedman Decl. Ex. 60 (Sample Live-In Timesheets) at GC03.01.2025-000458 (certification block) (visual).

**38.** *The paper timesheets produced by GreatCare all indicate meal and sleep breaks that Plaintiffs did not actually receive. Id.; see, e.g., Friedman Decl., Ex. 18 (Z. Li Dep. 60:10-61:6).*

**Response:** Disputed. Zhan J. Li's testimony about her own sheets does not address what "all" produced timesheets show. Ms. Li admits she signed the sheets, Friedman Decl. Ex. 18 (Z. Li Dep.) 60:8-9, 60:14, each of which certifies above her signature that "the above hours are accurate and complete," Friedman Decl. Ex. 60 (Sample Live-In Timesheets) at GC 000458; her

testimony that a colleague filled in the figures and that actual meal and sleep time differed, Ex. 18 at 60:14–61:6, is uncorroborated by any contemporaneous record. Another Plaintiff, Hui X. Ruan, testified that she filled in her live-in sheets herself, "if I did this and I am sure I did this," and that GreatCare never told her "to falsify or lie on anything that [she] had to sign." Ruan Dep. (Jan. 12, 2026) 78:17–79:23 (ECF 214-19); AMF ¶ 108. Ms. Li herself testified that she filled in the timesheet marked at her deposition as Defendant's Exhibit 4. Friedman Decl. Ex. 18 (Z. Li Dep.) 65:5–7.

**39.** *GreatCare produced paystubs and payroll registers that for each pay period that was produced reflect the aide's pay rate, hours paid, number of live-in shifts, gross wages, deductions, taxes, and net pay. See Ex. 61 (Sample Paystub and Payroll Register, GC 003060, 003070, 003215–003216).*

**Response:** Admitted.

**40.** *GreatCare also produced spreadsheets that show, for each pay period that was produced, the aide's pay rate, hours paid, and pay amount versus the "billed rate" to the MLTC ("billing vs. payroll reports"). See Friedman Decl. Ex. 62 (Sample Billing vs. Payroll Report).*

**Response:** Admitted.

**41.** *For Plaintiffs Zhu H.L. Lin, Li Chen, Mei F. Chen, Xiu F. Chen, Hui Li, Hui X. Ruan, Mu Z. Zhang, and Xiu X. Zhu, GreatCare also produced check register spreadsheets that show, for time periods produced, total amounts paid, but not rate of pay, or number of live-in or hourly shifts performed, and do not distinguish between hourly work and live-in shifts; the check register spreadsheets also omit large periods of time. See, e.g., Friedman Decl. Ex. 63 (Sample Check Register).*

**Response:** Admitted in part and disputed in part. Admitted that GreatCare produced check-register spreadsheets for the Plaintiffs named, that the rows are not labelled by shift type, and that the sample register spans March 10, 2016 to September 28, 2018 with internal gaps, the longest of which is 42 days (May 18 to June 29, 2017). Friedman Decl. Ex. 63 (PDF p. 2). The sample register is Xiu F. Chen's (Friedman Decl. ¶ 63), and its longest gap corresponds to a break in her work: the HHAeXchange records show no billed visit by her from April 24 through June 8, 2017. HHAX EVV Records (HHAX Subpoena Prod., June 30, 2025, file 1.1). Disputed that the registers do not disclose the rate of pay or distinguish live-in from hourly weeks. The Hours column of the register carries the number of live-in shifts on live-in weeks (for example, "6 $858.00," six shifts at $143.00) and the number of hours on hourly weeks (for example, "39 $546.00," thirty-nine hours at $14.00); each row also states the pay period, gross, taxes and net. Of the 85 rows in the sample register, 27 are live-in weeks and 33 are thirty-nine-hour hourly weeks. Friedman Decl. Ex. 63 (PDF p. 2).

**42.** *Information sufficient to reconstruct the precise hours worked by Plaintiffs and their weekly total pay was obtained by serving a subpoena on HHAX. Friedman Decl. ¶ 67.*

**Response:** Admitted.

**43.** *GreatCare produced no timesheets for Plaintiff Hei Li and produced a payroll register, paystubs, and billing vs. payroll reports that omitted approximately two work weeks that Ms. Li worked 24-hour, "live-in" shifts. Friedman Decl. Ex. 59 (Summ. of Missing Pay. and Time Recs.).*

**Response:** Admitted in part and disputed in part. Admitted that Exhibit 59 marks two pay periods as lacking payroll records. GreatCare disputes the underlying premise that records are

missing rather than simply not located by Plaintiffs. *See* Friedman Decl. Ex. 59 (Hei Li, 2 "Missing Payroll" rows); Friedman Decl. Ex. 134 (HHAX Payroll Recs. for Hei Li) (260 rows).

**44.** *For Plaintiff Zhu H.L. Lin, GreatCare produced paper timesheets only for November 16, 2019 through March 12, 2021, omitting approximately 169 work weeks that Ms. Lin worked 24-hour, "live-in" shifts. Friedman Decl. Ex. 59 (Summ. of Missing Pay. and Time Recs.).*

**Response:** Admitted in part and disputed in part. Admitted that GreatCare produced paper Living-In Time Sheets for Zhu H.L. Lin only for the weeks of November 16, 2019 through March 12, 2021 and that Friedman Decl. Ex. 59 marks 169 pay periods for Ms. Lin, from the week beginning May 29, 2016 through the week beginning November 3, 2019, as lacking a time record. Disputed to the extent the paragraph implies that the hours worked in those weeks are unrecorded. Friedman Decl. Ex. 135, filed by Plaintiffs the same day, is the HHAeXchange payroll record for Ms. Lin and contains 829 visit-level rows from March 13, 2015 through March 19, 2021, with service code, visit time, rate type, rate and pay amount for each visit, and only two gaps longer than thirty-one days, one of which (November 3, 2015 to February 29, 2016) precedes her first live-in shift. Friedman Decl. Ex. 135.

**45.** *GreatCare also produced paystubs and billing vs. payroll reports that omitted approximately 115 work weeks that Ms. Lin worked 24-hour, "live-in" shifts. Id.*

**Response:** Admitted in part and disputed in part. Admitted that Exhibit 59 so states. Disputed that Exhibit 59 — Plaintiffs' counsel's summary (Schedule of Objections, item 2) — establishes the assertion, and disputed that pay records for the weeks it marks are absent from the record: the visit-level pay data in Exhibit 135 covers the weeks it identifies. *See* Friedman Decl. Ex. 59 (Lin, 115 "Missing Payroll" rows, 5/29/2016-9/23/2018); Friedman Decl. Ex. 135.

**46.** *GreatCare produced no timesheets or payroll records for Li Chen. Id.*

**Response:** Disputed. The material cited does not support the assertion as stated. Exhibit 59, the only source cited, marks 48 weeks for Li Chen as lacking a time record and a payroll record, all of them between May 3, 2015 and May 1, 2016; it does not mark her remaining employment, which ran from January 2015 to May 2020, and by the summary's own method (Friedman Decl. ¶ 62) an unmarked week is one for which a produced record was found. Friedman Decl. Ex. 59 (Li Chen rows). Plaintiffs' Exhibit 136 contains 495 visit-level payroll rows for Ms. Chen from July 1, 2014 to March 12, 2020, including all 185 of her live-in shifts, with pay rate, rate type and amount. Friedman Decl. Ex. 136.

**47.** *GreatCare produced no timesheets for Xiu F. Chen and produced a payroll register, paystubs, and billing vs. payroll reports that omitted approximately three work weeks that Ms. Chen worked 24-hour, "live-in" shifts. Id.*

**Response:** Admitted in part and disputed in part. Admitted that GreatCare produced no paper Living-In Time Sheets for Xiu F. Chen, and that Friedman Decl. Ex. 59 marks three pay periods for her (June 4, 2017; March 21, 2021; March 28, 2021) as lacking payroll documents. Disputed as to the work weeks the summary attributes to Ms. Chen. Exhibit 59 states that its rows were built from "Plaintiffs' HHAX EVV Records" (Friedman Decl. ¶ 62), but the EVV exhibit Plaintiffs filed for Ms. Chen, Exhibit 10, contains no record for Xiu F. Chen: every row on it is for "Chen Mei Fang," a different Plaintiff, and it spans March 6, 2016 to January 4, 2019 rather than the August 2016 to March 2021 period the summary assigns to Ms. Chen. Friedman Decl. Ex. 10 (ECF 263-10). Disputed further that the absence of paper time sheets reflects a failure to keep records of hours: Ms. Chen testified that GreatCare never required her to submit a weekly time sheet and that she "rarely had to sign any forms," X. F. Chen Dep. (Jan. 28, 2026) 57:2–58:14,

64:6–10 (ECF 252-16), and Friedman Decl. Ex. 137 supplies 1,279 visit-level payroll rows for her from February 19, 2016 through October 25, 2024.

**48.** *GreatCare produced no timesheets for Mei F. Chen and produced a payroll register that omitted approximately three work weeks that Ms. Chen worked 24-hour, "live-in" shifts. Id.*

**Response:** Admitted in part and disputed in part. Admitted that Exhibit 59 so states. Disputed that Exhibit 59 — Plaintiffs' counsel's summary (Schedule of Objections, item 2) — establishes the assertion, and disputed that pay records for the weeks it marks are absent from the record: Exhibit 138 supplies visit-level pay data for all of Ms. Chen's live-in shifts, including the three weeks flagged. *See* Friedman Decl. Ex. 138 (HHAX Payroll Recs. for M. Chen) (126 rows: 117 live-in rows paid at a daily rate of $130 or $143, one live-in row at $0, and eight hourly rows).

**49.** *GreatCare produced no timesheets or payroll records for Hui He. Id.*

**Response:** Disputed. The material cited does not support the assertion as stated. Exhibit 59 marks 54 weeks for Hui He, in four discontinuous blocks between September 4, 2016 and December 15, 2019; it does not mark the balance of her employment, which ran from July 2, 2016 to July 11, 2020, and by the summary's own method (Friedman Decl. ¶ 62) an unmarked week is one for which a produced record was found. Friedman Decl. Ex. 59 (Hui He rows). Plaintiffs' Exhibit 139 contains 776 visit-level payroll rows for Ms. He from July 2, 2016 to July 11, 2020, including all 207 live-in rows (on 177 dates; mutual-case dates carry two rows at $65 each). Friedman Decl. Ex. 139.

**50.** *GreatCare produced no timesheets for Hui Li and produced a payroll register that omitted approximately 36 work weeks that Ms. Li worked 24-hour, "live-in" shifts. Id.*

**Response:** Admitted in part and disputed in part. Admitted that Exhibit 59 so states. Disputed that Exhibit 59 — Plaintiffs' counsel's summary (Schedule of Objections, item 2) — establishes the assertion, and disputed that pay records for the weeks it marks are absent from the record: Exhibit 140, Ms. Li's HHAeXchange payroll record, runs through her last live-in shift on October 26, 2018, after the last week Exhibit 59 marks. *See* Friedman Decl. Ex. 59 (Hui Li rows end 10/21/2018); Friedman Decl. Ex. 15 (Hui Li Dep.) 78:3-9; Friedman Decl. Ex. 140 (last live-in 10/26/2018).

**51.** *For Plaintiff Zhan J. Li, GreatCare produced paper timesheets only for late 2019 through early 2021, omitting approximately 165 work weeks. Id.*

**Response:** Admitted in part and disputed in part. Admitted that Exhibit 59 marks approximately 165 weeks for Zhan J. Li as lacking a time record. Disputed that paper time sheets were produced for the whole of "late 2019 through early 2021": Exhibit 59 itself marks time records as missing for the weeks beginning December 29, 2019, September 6 and 13, 2020, and every week from December 20, 2020 through February 7, 2021, all within that window. Friedman Decl. Ex. 59 (Zhan J. Li rows). Plaintiffs' Exhibit 141 contains 596 visit-level payroll rows for Ms. Li from September 24, 2016 to March 7, 2021, including 539 live-in rows on 486 dates (538 of them paid). Friedman Decl. Ex. 141.

**52.** *GreatCare also produced a payroll register, paystubs, and billing vs. payroll reports that omitted approximately two work weeks that Ms. Li worked 24-hour, "live-in" shifts. Id.*

**Response:** Admitted in part and disputed in part. Admitted that Exhibit 59 marks two pay periods, both in the week of and the week after Ms. Li's hire. Disputed that Exhibit 59 — Plaintiffs' counsel's summary (Schedule of Objections, item 2) — establishes the assertion, and

disputed that pay records for the weeks it marks are absent from the record: Exhibit 141, Ms. Li's HHAeXchange payroll record, begins with her hire. *See* Friedman Decl. Ex. 17 (Z. Li App.) at GC 004137 ("Hire Date: 09/24/2016"); Friedman Decl. Ex. 141 (HHAX Payroll Recs. for Z. Li).

**53.** *For Plaintiff Hui X. Ruan, GreatCare produced paper timesheets only for November 8, 2019 through December 5, 2021, omitting approximately 156 work weeks. Id.*

**Response:** Admitted in part and disputed in part. Admitted that Exhibit 59 so states. Disputed that Exhibit 59 — Plaintiffs' counsel's summary (Schedule of Objections, item 2) — establishes the assertion, and disputed that pay records for the weeks it marks are absent from the record: the weeks it identifies are documented visit by visit in Exhibit 142. *See* Friedman Decl. Ex. 142 (HHAX Payroll Recs. for Ruan) (count, 855 rows, 3/29/2015-8/27/2023).

**54.** *GreatCare also produced a payroll register, paystubs, and billing vs. payroll reports that omitted approximately 72 work weeks that Ms. Ruan worked 24-hour, "live-in" shifts. Id.*

**Response:** Admitted in part and disputed in part. Admitted that Exhibit 59 so states. Disputed that Exhibit 59 — Plaintiffs' counsel's summary (Schedule of Objections, item 2) — establishes the assertion, and disputed that pay records for the weeks it marks are absent from the record: Exhibit 142 covers them. *See* Friedman Decl. Ex. 59 (Ruan, 72 "Missing Payroll" rows, 9/4/2016-2/11/2018); Friedman Decl. Ex. 142.

**55.** *For Plaintiff Jian R. Xiao, GreatCare produced paper timesheets omitting approximately six work weeks. Id.*

**Response:** Admitted in part and disputed in part. Admitted that Exhibit 59 marks six weeks. Disputed that Exhibit 59 — Plaintiffs' counsel's summary (Schedule of Objections, item 2)

— establishes the assertion, and disputed that pay records for the weeks it marks are absent from the record: Exhibit 143 shows no gap of more than 31 days in Jian R. Xiao's record, and every row of Exhibit 22 is a CDPAP shift. *See* Friedman Decl. Ex. 143 (HHAX Payroll Recs. for J. Xiao) (count, 433 rows, no gap over 31 days); Friedman Decl. Ex. 22 (all rows "PA-LivingIn" under a CDPAP payer).

**56.** *GreatCare also produced paystubs that omitted approximately one work week that Ms. Xiao worked 24-hour, "live-in" shifts. Id.*

**Response:** Admitted in part and disputed in part. Admitted that Exhibit 59 marks one pay period, the week of the August 20, 2023 entry. Disputed that Exhibit 59 — Plaintiffs' counsel's summary (Schedule of Objections, item 2) — establishes the assertion, and disputed that pay records for the weeks it marks are absent from the record: the only Exhibit 22 entry in that week is an August 20, 2023 visit marked "Not Billed," with no clock-in or clock-out time (VisitID 913335884), and Exhibit 143 records pay for every shift through the last billed one, August 15, 2023 (VisitID 913335879). See Friedman Decl. Ex. 59 (1 "Missing Payroll" row, 8/20/2023); Friedman Decl. Ex. 143 (HHAX Payroll Recs. for J. Xiao); Friedman Decl. Ex. 22 (VisitID 913335884).

**57.** *For Plaintiff Mei Z. Xiao, GreatCare produced paper timesheets only for January 2020 through May 2023, omitting approximately 87 work weeks. Id.*

**Response:** Admitted in part and disputed in part. Admitted that Exhibit 59 marks approximately 87 weeks for Mei Z. Xiao as lacking a time record. Disputed that paper time sheets were produced for the whole of "January 2020 through May 2023": Exhibit 59 marks time records as missing for the weeks beginning April 24 and May 1, 2022 and for every week from May 21 through August 13, 2023. Friedman Decl. Ex. 59 (Mei Z. Xiao rows). Plaintiffs' Exhibit 144

contains 504 visit-level payroll rows for Ms. Xiao from May 2, 2018 to August 18, 2023, every one of them coded as consumer-directed ("PA-LivingIn"). Friedman Decl. Ex. 144; Ex. 24.

**58.** *GreatCare also produced a payroll register and paystubs that omitted approximately 15 work weeks that Ms. Xiao worked 24-hour, "live-in" shifts. Id.*

**Response:** Disputed. The material cited does not support the assertion. Exhibit 59, the only source cited, contains no mark in its "Missing Payroll Documents" column for Mei Z. Xiao: across all 1,581 rows, her 87 marks are all in the "Missing Time Records" column, and no row supports a fifteen-week payroll omission. Friedman Decl. Ex. 59 (Mei Z. Xiao rows, columns C and D). Plaintiffs' Exhibit 144 supplies 504 visit-level payroll rows for her. Friedman Decl. Ex. 144.

**59.** *For Plaintiff Mu Z. Zhang, GreatCare produced paper timesheets only for January 3, 2020 through March 19, 2021, omitting approximately 120 work weeks. Id.*

**Response:** Admitted in part and disputed in part. Admitted that Exhibit 59 marks 120 weeks between September 2017 and December 2019. Disputed that Exhibit 59 — Plaintiffs' counsel's summary (Schedule of Objections, item 2) — establishes the assertion, and disputed that pay records for the weeks it marks are absent from the record: Exhibit 145 documents all 1,751 of Ms. Zhang's visits and pay from 2014 to 2025. *See* Friedman Decl. Ex. 145 (HHAX Payroll Recs. for Zhang) (count, 1,751 rows, 2 gaps over 31 days).

**60.** *GreatCare also produced paystubs and billing vs. payroll reports that omitted approximately 56 work weeks that Ms. Zhang worked 24-hour, "live-in" shifts. Id.*

**Response:** Admitted in part and disputed in part. Admitted that Exhibit 59 so states. Disputed that Exhibit 59 — Plaintiffs' counsel's summary (Schedule of Objections, item 2) —

establishes the assertion, and disputed that pay records for the weeks it marks are absent from the record: Exhibit 145 covers them. *See* Friedman Decl. Ex. 59 (Zhang, 56 "Missing Payroll" rows, 9/10/2017-9/30/2018); Friedman Decl. Ex. 145.

**61.** *For Plaintiff Bi Y. Zheng, GreatCare produced full payroll records but no timesheets. Id.*

**Response:** Admitted.

**62.** *For Plaintiff Xiu X. Zhu, GreatCare produced paper timesheets only for December 6, 2019 through February 12, 2021, omitting approximately 110 work weeks. Id.*

**Response:** Admitted in part and disputed in part. Admitted that Exhibit 59 marks approximately 110 weeks for Xiu X. Zhu as lacking a time record. Disputed that paper time sheets were produced for the whole of "December 6, 2019 through February 12, 2021": Exhibit 59 marks time records as missing for the pay periods beginning November 1 and November 8, 2020, inside that window. Friedman Decl. Ex. 59 (Xiu X. Zhu rows). Plaintiffs' Exhibit 147 contains 500 visit-level payroll rows for Ms. Zhu from September 9, 2017 to February 11, 2021, her entire employment, with a single gap longer than thirty-one days (33 days in January 2018). Friedman Decl. Ex. 147.

**63.** *GreatCare also produced paystubs and billing vs. payroll reports that omitted approximately 48 work weeks that Ms. Zhu worked 24-hour, "live-in" shifts. Id.*

**Response:** Admitted in part and disputed in part. Admitted that Exhibit 59 so states. Disputed that Exhibit 59 — Plaintiffs' counsel's summary (Schedule of Objections, item 2) — establishes the assertion, and disputed that pay records for the weeks it marks are absent from the

record: Exhibit 147 covers them. *See* Friedman Decl. Ex. 59 (Zhu, 48 "Missing Payroll" rows, 9/24/2017-9/23/2018); Friedman Decl. Ex. 147 (count, 500 rows).

**64.** *When Plaintiffs worked a 24-hour, "live-in" shift, they were paid for only 13 hours. Friedman Decl., Ex. 64 (Workman Decl. ¶ 20(a)); see also Exs. 134-147 (HHAX Payroll Recs. for Plaintiffs).*

**Response:** Admitted in part and disputed in part. Admitted that for each 24-hour "live-in" shift GreatCare paid Plaintiffs on a thirteen-hour basis: through January 5, 2018 as a per diem equal to thirteen times the then-applicable hourly rate, and from January 6, 2018 as 780 minutes (13.00 hours) at the applicable hourly rate. Friedman Decl. Exs. 134–147 (HHAX Payroll Recs.); *see, e.g.*, Ex. 137, VisitIDs 218901238 (1/5/2018, "Daily," $182) and 218901239 (1/6/2018, "Hourly," 780 RegularHours at $14, $182). Disputed only insofar as the paragraph implies that twenty-four hours of each live-in shift were hours worked. That premise is not drawn from the records; Plaintiffs' damages declarant states that "Plaintiffs' counsel instructed me that I should count 24 work hours for each 24-hour live-in shift." ECF 257 ¶ 12(c); *see also id.* ¶ 12(e). The thirteen-hour unit was set by the payers: CenterLight's Change in Aide Authorization for member P.C. checks "Live In" and authorizes 13.00 hours from 8:00 a.m. to 8:00 a.m. for each of seven days, (Liu Decl. Ex. 21 — GC03.01.2025-000014; Wang SJ Decl. ¶ 25), and the SWHNY fee schedule provides that the T1020 live-in per diem "is standardized to 13 hours of service (1 unit = 13 hours) Maximum 1 unit/24 hours," Friedman Decl. Ex. 32 at SWHNY 000217; see also id. at SWHNY 000233, 000237, 000240. GreatCare further notes that the cited paragraph 20(a) does not appear in Exhibit 64 as filed; the text appears at ECF 257 ¶ 20(a).

**65.** *None of the Plaintiffs were compensated at or above the basic state minimum wage rate for all 24-hours of their "live-in" shifts. Id. at ¶ 20(b).*

**Response:** Objection; the paragraph states a legal conclusion, not a fact, and no response is required. *Flores Moreno*, ECF 94 at 6 n.5. To the extent a response is required: Disputed. The assertion assumes that all twenty-four hours of a live-in shift are compensable hours worked; Plaintiffs' damages declarant states that "Plaintiffs' counsel instructed me that I should count 24 work hours for each 24-hour live-in shift." ECF 257 ¶ 12(c). GreatCare paid each live-in shift on a thirteen-hour basis at the hourly rate recorded on the payroll record for that shift. *See* Response to ¶ 64; Friedman Decl. Exs. 134–147. GreatCare notes that Exhibit 64 as filed contains no paragraph 20; the text cited appears at ECF 257 ¶ 20(b), which refers to the "New York State minimum wage rate."

**66.** *None of the Plaintiffs were compensated at the Wage Parity Act's minimum rate of home care aide total compensation for all 24-hours of their "live-in" shifts. Id. at ¶ 20(c).*

**Response:** Objection; the paragraph states a legal conclusion, not a fact, and no response is required. *Flores Moreno*, ECF 94 at 6 n.5. To the extent a response is required: Disputed. The assertion assumes that all twenty-four hours of a live-in shift are compensable. ECF 257 ¶ 12(c). GreatCare's payroll register, which Plaintiffs filed, carries a dedicated "WP M - Wage Parity" earnings line computed on the hours paid—for example, $3.56 per hour on 78 hours, six live-in shifts at thirteen hours—together with "WPS M - Sick Pay - WP" and "WPV M - Vac Pay - WP" lines. Friedman Decl. Ex. 61 at GC 003215–003216 (PDF pp. 4–5). GreatCare notes that Exhibit 64 as filed contains no paragraph 20; the text cited appears at ECF 257 ¶ 20(c).

**67.** *GreatCare produced no evidence that Plaintiffs received any benefits to meet the benefit portion of the minimum rate of home care aide total compensation required by the Wage Parity Act. Friedman Decl. ¶ 69.*

**Response:** Disputed. The material cited does not support the assertion. The payroll register Plaintiffs filed as Exhibit 61 carries a "WP M - Wage Parity" earnings line on multiple check dates—for example $3.56 per hour on 78 hours ($278.04)—together with "WPS M - Sick Pay - WP" and "WPV M - Vac Pay - WP" lines. Friedman Decl. Ex. 61 at GC 003215–003216 (PDF pp. 4–5). Whether those amounts satisfied the statutory minimum is a separate question; that GreatCare produced no evidence of benefits is not what the record shows.

**68.** *As a general matter, Plaintiffs did not receive one additional hour's pay at the basic minimum hourly wage rate whenever they worked a 24-hour, "live-in" shift or any other shift where their spread of hours exceeded 10 hours. Friedman Decl., Ex. 64 (Workman Decl ¶ 20(d).*

**Response:** Admitted in part and disputed in part. Admitted that, apart from the pay week of January 5 through 11, 2019, in which GreatCare paid spread-of-hours compensation to eight Plaintiffs, GreatCare's paystubs record no spread-of-hours payment, the "Spread of Hours" line appearing at 0.00. (Liu Decl. Ex. 10 — paystubs, GC 08.04.2025 010237, 011379; Wang SJ Decl. ¶ 15). Disputed as to shifts other than 24-hour live-in shifts: the source cited is limited to live-in shifts "where their spread of hours exceeded 10 hours," ECF 257 ¶ 20(d), and addresses no other shift. GreatCare further notes that the cited paragraph 20(d) does not appear in Exhibit 64 as filed; the text appears at ECF 257 ¶ 20(d).

**69.** *As a general matter, Plaintiffs never received any overtime pay when they worked more than 40 hours per week. Id. at ¶ 20(e).*

**Response:** Disputed. The material cited does not support the assertion as stated. Exhibit 64 as filed contains no paragraph 20; the source text, at ECF 257 ¶ 20(e), is limited to overtime "at one and one-half times the regular rate," a qualification the paragraph omits. The payroll records Plaintiffs filed carry overtime fields: the OTPayRate field is populated on every row, and overtime

premiums were paid on hourly visits in April–June 2015 at $13.13, one and one-half times the then minimum wage. Friedman Decl. Exs. 134–147; Ex. 135 (Lin), e.g., VisitIDs 111686782, 113777227. Every workweek in which those records show a Plaintiff over forty hours when each live-in day is counted as thirteen hours and her hourly visits are added falls between January 2015 and December 2017, and counting the paid VisitID 0 rows coded "HHA-HR" brings twenty more weeks over forty, three of them since October 2021 (AMF ¶ 312); whether a premium was owed for any such week, at what rate, and within which limitations period are addressed in Point VI.B of GreatCare's accompanying memorandum of law. GreatCare's HHAeXchange notes record GreatCare requesting overtime authorization from the plans on aides' behalf. Friedman Decl. Ex. 58, PatientNoteIDs 92085237 (Apr. 6, 2023), 100002466 (Aug. 30, 2023), 146345025 (Aug. 6, 2025).

**70.** *Plaintiffs did not obtain five hours of continuous uninterrupted sleep and three hours of completely duty-free meal breaks per shift. See, e.g., Friedman Decl., Ex. 56 (Zhang Dep. 93:7–24); Ex. 27 (Zhang Decl. ¶ 25); Ex. 54 (Xiu F. Chen Dep. 59:22–60:7); Ex. 84 (Xiu F. Chen Decl. ¶¶ 21–22); see infra ¶¶ 72–240.*

**Response:** Objection; the paragraph states a legal conclusion, not a fact, and no response is required. *Flores Moreno*, ECF 94 at 6 n.5. To the extent a response is required: Admitted that Ms. Zhang and Xiu F. Chen so aver as to themselves. Friedman Decl. Ex. 27 ¶ 25; Ex. 84 ¶¶ 21–22. The material cited does not support the assertion as to the other twelve Plaintiffs or as to meal breaks: the deposition passages cited address sleep only, in the care of one member each, and Ms. Zhang's testimony describes variation between nights—two to three wakings "would be considered a good day"—rather than a uniform experience. Friedman Decl. Ex. 56

(Zhang Dep.) 93:7–24; Ex. 54 (Xiu F. Chen Dep.) 59:22–60:7. GreatCare responds to the member-specific paragraphs individually below.

**71.** *Whenever Plaintiffs worked a 24-hour, "live-in" shift, Plaintiffs had care duties that prevented Plaintiffs from obtaining adequate sleep and meal breaks. Id.*

**Response:** Objection; the paragraph states a legal conclusion, not a fact, and no response is required. *Flores Moreno*, ECF 94 at 6 n.5. To the extent a response is required: Disputed. The cited testimony describes variation from night to night rather than a duty that "prevented" sleep on every shift; the same witness distinguished nights with two to three wakings, which "would be considered a good day," from nights with four to five. Friedman Decl. Ex. 56 (Zhang Dep.) 93:20–23. Two witnesses' accounts of their own care recipients are cited for a proposition about fourteen Plaintiffs, many care recipients and every shift over nine years. GreatCare's Living-In Time Sheet asked each aide on each shift whether she received five consecutive uninterrupted hours of sleep and three one-hour meal periods. Friedman Decl. Ex. 60 at GC03.01.2025-000458, -000459.

**72.** *P.C. was a "patient" of GreatCare and member of CenterLight, who authorized Mr. C. for 24-hour "live-in" services from no later than August 1, 2015 through February 28, 2021. Friedman Decl. Ex. 65 (CL Auth. Recs. for P.C., CenterLight Confid. 002450-002485); Ex. 1 (HHAX EVV Rec. for Hei Li).*

**Response:** Admitted in part and disputed in part. Admitted that CenterLight authorized live-in personal care for Mr. C. through GreatCare (Thu-Sun) and non-party Astra (Mon-Wed); disputed that the cited exhibit shows any authorization before January 1, 2018. *See* Friedman Decl. Ex. 65 at CenterLight Confid. 002450 (PDF p. 54) and 002475 (PDF p. 79) ("PCW Schedule: Mon/Tue/Wed").

**73.** *During that period, Mr. C. received 24-hour, "live-in" care services from Plaintiff Hei Li three days per week. However, for nearly the entire time during the relevant period, only one day per week was through GreatCare. The other two days that Ms. Li provided services to Mr. C. were through another, non-defendant home care services agency. Friedman Decl., Ex. 66 (Hei Li Decl. ¶¶ 8-9); Ex. 35 (CL Adms. No. 44); see, e.g., Ex. 65 (CL Auth. Recs., CenterLight Confid. 002450, 002475); Ex. 38 (CL Ass. Recs. for P.C., CenterLight Confid. 003630, CenterLight001114).*

**Response:** Admitted in part and disputed in part. Admitted that Hei Li provided live-in services to Mr. C. through GreatCare on one day per week for most of the relevant period, and on other days through a non-party agency. Friedman Decl. Ex. 1 (168 of 182 GreatCare live-in rows on Sundays). The material cited does not support the two-day and three-day figures. CenterLight's authorization records allocate four live-in days per week (Thursday through Sunday) to GreatCare and three (Monday through Wednesday) to the non-party agency, Friedman Decl. Ex. 65 at CenterLight Confid. 002475; Ms. Li's declaration states that GreatCare had three of the seven days and the other agency four, Friedman Decl. Ex. 66 ¶¶ 8, 12, 23; and CenterLight's own record lists GreatCare's aide at "7 day/ 24 hr live-ing." Friedman Decl. Ex. 38 at CenterLight 001114. Ms. Li testified that at the other agency she worked three days a week for the same member on the same terms. Hei Li Dep. (Oct. 9, 2025) 73:18, 97:4 (Liu Decl. Ex. 27). CenterLight's Change in Aide Authorization for this member records the same four-day and three-day allocation as of April 2017: "Effective 4/17/17 Preferred will cover Mon - Wed Eff. 4/20/17 - Great Care will cover Thurs. - Sun," with each day entered at "13.00" hours, 08:00AM to 08:00AM, under "Live In." Friedman Decl. Ex. 114 at CenterLight Confid. 003317; *see infra* Statement of Additional Material Facts ¶ 22.

**74.** *Through GreatCare, Ms. Li provided 24-hour, "live-in" care services to Mr. C. over 182 "live-in" shifts. Friedman Decl., Ex. 1 (HHAX EVV Rec. for Hei Li).*

**Response:** Admitted in part and disputed in part. Admitted that Friedman Decl. Ex. 1 records 182 live-in shifts for Hei Li between June 17, 2017 and February 28, 2021; disputed that they were continuous, since 154 were isolated single Sundays and no run exceeded two days. *See* Friedman Decl. Ex. 1, all 182 live-in rows (PDF pp. 2-5); counted by day-of-week and consecutive-date run from the Visit Date column.

**75.** *CenterLight, through its nurse Qi Ding, assessed Mr. C. on a near-monthly basis, conducting both semi-annual assessments and interim visits. See, e.g., Friedman Decl., Ex. 38 (CL Ass. Recs., CenterLight Confid. 003326, 003336, 003346, 003356).*

**Response:** Admitted.

**76.** *Nurse Ding repeatedly and consistently documented that Mr. C. had left-side weakness and ambulated with an unsteady gait and poor balance. See, e.g., id. at 003099, 003335;*[4] *Friedman Decl., Ex. 35 (CL Adms. Nos. 35-36).*

**Response:** Admitted that Nurse Ding recorded left-sided weakness, an unsteady gait and poor balance. Friedman Decl. Ex. 38 at CenterLight Confid. 003335. GreatCare notes that the page cited as CenterLight Confid. 003099 does not appear in Exhibit 38 as filed, and that the same note records the member as "able to transfer, toilet and ambulate with cane with one person supervision and assist" and "no fall, injury, reported." Friedman Decl. Ex. 38 at CenterLight Confid. 003335.

[4] See also id. at 004041, 004043, 004160, 004163, 004495, 004500.

**77.** *As a result of his left-side hemiplegia, poor balance, and unsteady gait, Nurse Ding identified Mr. C. as at high risk for falls. Friedman Decl., Ex. 38 (CL Ass. Recs., CenterLight Confid. 003194, 003238, 003272); Ex. 35 (CL Adms. No. 37).*

**Response:** Admitted. GreatCare notes that the same fall-risk assessments record no falls in the preceding three months and the notes report no falls or injuries throughout. *See* Friedman Decl. Ex. 38 at CenterLight Confid. 003194 (PDF p. 49); e.g. 003376 (PDF p. 74) ("No fall, injury, reported. Continue pcw living services.").

**78.** *Across assessments and visits, Nurse Ding repeatedly documented that Mr. C. walked with a cane and required the assistance or supervision of another person to ambulate, and required supervision to transfer and to stand up from a seated position. See, e.g., Friedman Decl., Ex. 38 (CL Ass. Recs., CenterLight Confid. 003335, 003345).*[5]

**Response:** Admitted in part and disputed in part. Admitted that the notes record ambulation with a cane and one-person supervision; disputed that the cited pages record a need for supervision to stand from a seated position. *See* Friedman Decl. Ex. 38 at CenterLight Confid. 003345 (PDF p. 71).

**79.** *Nurse Ding repeatedly and consistently documented that Mr. C. suffered intermittent dizziness, especially at night when changing positions. See, e.g., id. at 003115, 003132.*[6]

**Response:** Admitted that the notes record intermittent dizziness on change of position, including at night. Friedman Decl. Ex. 38 at CenterLight Confid. 003205, 003386. GreatCare notes

---

[5] See also id. at 003205, 003213, 003249, 003258, 003283, 003335, 003345, 003376, 003386, 003412, 003458, 003468, 003484, 003580, 003603, 003685, 003703, 003757, 003779, 003796, 003845, 003863, 003903, 003930, 004021, 004027, 004109.

[6] See also id. at 003160, 003205, 003283, 003386, 003396, 003448, 003468, 003478, 003521, 003531, 003560, 003603, 003613, 003642, 003677.

that the two pages cited in the text (003115 and 003132) do not appear in Exhibit 38 as filed, and that each such entry adds that the dizziness was "relieved well with resting" and that the nurse's instruction was to the member, to change position slowly. *Id.* at 003205 ("Intermittent dizziness still noted, especially during the night when change position such as sitting to standing, relieved well with resting"); 003386.

**80.** *Mr. C. did not sleep well at night and was often awake throughout the night. Friedman Decl., Ex. 3 (Hei Li Dep. 100:10-20); Ex. 66 (Hei Li Decl. ¶ 17, 19); Ex. 38 (CL Ass. Recs., CenterLight Confid. 003205, 003249).*[7]

**Response:** Admitted in part and disputed in part. Admitted that Plaintiff so testified; disputed that the records support "often awake throughout the night" — CenterLight's notes record only "sometimes not sleeping well, waking up 2-3 times to urinate" and reaffirmed live-in service. *See* Friedman Decl. Ex. 38 at CenterLight Confid. 003205 (PDF p. 51) and 003376 (PDF p. 74).

**81.** *Throughout the night, Mr. C. continuously drank soft drinks, ate multiple meals, and repeatedly asked Plaintiff Hei Li to cook for him. Friedman Decl., Ex. 66 (Hei Li Decl. ¶¶ 33, 35); Ex. 3 (Hei Li Dep. 102:12-18); Ex. 67 (W.Y. Letter); Ex. 38 (CL Ass. Recs., CenterLight Confid. 003180, 003468, 003488, 003531, 003613, 003800); Ex. 35 (CL Adms. No. 40).*

**Response:** GreatCare objects to Plaintiffs' reliance on Exhibit 67 to support this paragraph. Exhibit 67 is an unsworn letter from Wang Ying, a non-party residing in China; it is not a declaration or affidavit made on personal knowledge under oath or under 28 U.S.C. § 1746, it is unauthenticated, and no custodian or other witness has been produced to identify it or show its personal-knowledge basis. Fed. R. Civ. P. 56(c)(4); Fed. R. Evid. 602, 901. Its English text is an

[7] See also id. at 003376, 003426, 003498, 003613.

uncertified translation from Chinese, with no translator identified and no affidavit attesting to the translation's accuracy, so even the letter's content cannot be relied upon in this form. Its statements, offered by Plaintiffs for their truth, are also hearsay as to GreatCare, and no exception applies because the letter's author is not a party or a party's agent. Fed. R. Evid. 802; *see Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 129–30 (2d Cir. 2004) (hearsay statements in a letter offered on summary judgment are properly disregarded unless within an exception, and even a letter that might qualify must still be properly authenticated). Accordingly, the Court cannot consider Exhibit 67 as support for Plaintiffs' motion. Fed. R. Civ. P. 56(c)(2). Disputed, in any event, on the remaining cited material: the only deposition testimony cited, Friedman Decl. Ex. 3 (Hei Li Dep.) 102:12–18, is not Ms. Li's account of the nights: she was reciting a visiting nurse's instruction to the member, as the transcript states at 102:20–22 ("To answer what Nurse Ding [ph] instructed as to how to take care of the patient"). The declaration paragraphs cited describe one additional meal "almost every night" and soda consumption "every day," not "multiple meals" or drinking "throughout the night." Friedman Decl. Ex. 66 ¶¶ 33, 35. CenterLight's assessment records state that the member "sometime" ate during the night. Friedman Decl. Ex. 38 at CenterLight Confid. 003468, 003800.

**82.** *Mr. C. repeatedly got up to use the bathroom throughout the night, and could not control his urination or bowel movements. Friedman Decl., Ex. 35 (CL Adms. Nos. 32-33); Ex. 3 (Hei Li Dep. 65:2-6, 102:12-16); Ex. 66 (Hei Li Decl. ¶ 35); Ex. 67 (W.Y. Letter); Ex. 38 (CL Ass. Recs., CenterLight Confid. 003185, 003205, 003215, 003224, 003376).*

**Response:** GreatCare objects to Plaintiffs' reliance on Exhibit 67 to support this paragraph and incorporates by reference the objections to Exhibit 67 stated in its response to Paragraph 81, above; the Court cannot consider Exhibit 67 on this motion for the same reasons.

Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, 802, 901. Admitted in part and disputed in part. Admitted that the records show the member woke two to three times a night to urinate; disputed that he could not control urination or bowels — Friedman Decl. Ex. 38 records occasional urinary incontinence and "bowel function normal." *See* Friedman Decl. Ex. 38 at CenterLight Confid. 003652 (PDF p. 137); 003426 (PDF p. 84) ("BM daily"); 003376 (PDF p. 74) ("limit fluids after evening meal").

**83.** *Nurse Ding repeatedly documented that Mr. C. had benign prostatic hyperplasia and woke and got out of bed two to three times each night to urinate. Friedman Decl., Ex. 35 (CL Adms. Nos. 32-33); Ex. 38 (CL Ass. Recs., CenterLight Confid. 003160, 003180, 003205, 003224, 003249, 003376, 003386, 003396, 003498, 003521, 003580, 003603, 003613, 003642, 003652, 003677, 003697).*

**Response:** Admitted in part and disputed in part. Admitted that Nurse Ding repeatedly documented benign prostatic hyperplasia and that the member woke two to three times each night to urinate. Disputed to the extent the paragraph is offered to establish that the member's night-time needs prevented an aide from receiving five uninterrupted hours of sleep: the cited records document the member's condition and do not address any aide's sleep, and CenterLight continued to authorize live-in service after documenting the frequency. *See* Friedman Decl. Ex. 38 at CenterLight Confid. 003160 (PDF p. 42); 003376 (PDF p. 74) ("Continue pcw living services").

**84.** *Beginning in or around March 2021, CenterLight reduced P.C.'s authorized care from 24-hour, "live-in" care to under ten hours per day after assessing that Mr. C.'s wife could take over more of Mr. C.'s care. Friedman Decl., Ex. 68 (Coord. Note, CenterLight Conf. 003135); Ex. 69 (CenterLight Personal Care Aide Authorization Detail, CenterLight Confid. 2470, 2472); Ex. 3 (Hei Li Dep. 112:5-113:6).*

**Response:** Admitted in part and disputed in part. Admitted that, effective March 7, 2021, CenterLight reduced the authorization for Mr. C. from live-in care. Disputed that the reduction was to "under ten hours per day" and that the cited records attribute it to an assessment that the wife could take over care. The coordinator's note reads "reduce PPT's aide service hours from 24 h live-in to 10 hx7 days" and gives as the reason that "PPT has family support at this time"; the authorization detail reads "Aide Services: HHA For 7 Days x 10 Hours. 9am - 7Pm"; and Ms. Li testified that the case "in March 2021 changed to ten hours." Friedman Decl. Ex. 68 at 003135; Ex. 69 at 002470; Ex. 3 (Hei Li Dep.) 112:5–113:6. The same page also assigns GreatCare four of the seven days: "PCW service: 4dx10hr Thu/Fri/Sat/Sun (Great Care)," 40 hours per week, for March 7 through August 31, 2021, and again for September 1 through October 2, 2021. Friedman Decl. Ex. 69 at CenterLight Confid. 002470, 002472. GreatCare's billing from March 7, 2021 shows 10:00 adjusted hours per day. Friedman Decl. Ex. 1 (rows from 3/7/2021).

**85.** *In or about October 2021, Mr. C. disenrolled from CenterLight, and effective November 1, 2021, he enrolled with non-defendant MLTC Centersplan. Friedman Decl., Ex. 70 (CenterLight A&G Appeal Record, CENTERLIGHT 002545); Ex. 1 (HHAX EVV Rec. for Hei Li).*

**Response:** Admitted.

**86.** *Plaintiff Hei Li continued to work as Mr. C.'s home health aide under Centersplan, working six-hour shifts, until early January 2022. Friedman Decl., Ex. 1 (HHAX EVV Rec. for Hei Li)*

**Response:** Admitted in part and disputed in part. Admitted that the Centersplan shifts Ms. Li worked from November 1 to December 28, 2021 were six-hour shifts. Friedman Decl. Ex. 1 (26 billed rows, 11/1/2021–12/28/2021). Disputed that her work for Mr. C. under Centersplan ended in early January 2022. The January 2–4, 2022 rows are marked "Not Billed" with no clock

times, and the same exhibit records five further billed visits, of 5 to 8.75 hours, on March 17, June 2, August 3, December 22 and December 29, 2022. Friedman Decl. Ex. 1. Ms. Li's declaration states that she "stopped working for GreatCare entirely at the end of December 2022." Friedman Decl. Ex. 66 ¶¶ 37–38.

**87.** *Plaintiff Hei Li did not receive five hours of continuous uninterrupted sleep or three-hours of completely duty-free meal breaks when working 24-hour shifts. Friedman Decl., Ex. 3 (Hei Li Dep. 65:19-21); Ex. 66 (Hei Li Decl. ¶¶ 19, 22, 33); Ex. 67 (W.Y. Letter).*

**Response:** GreatCare objects to Plaintiffs' reliance on Exhibit 67 to support this paragraph and incorporates by reference the objections to Exhibit 67 stated in its response to Paragraph 81, above; the Court cannot consider Exhibit 67 on this motion for the same reasons. Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, 802, 901. Disputed: Plaintiff's own declaration states that she slept up to two or three hours per shift and that her routine was the same on the days she worked for non-party True Care. See Friedman Decl. Ex. 66 ¶¶ 19, 23 (PDF pp. 4–5).

**88.** *K.N.W. was a "patient" of GreatCare and a member of CenterLight, who authorized Ms. W. for 24-hour, "live-in" care services. Friedman Decl., Ex. 71 (CL Ass. Recs. for K.N.W., NYSDOH 000969-000991).*

**Response:** Admitted in part and disputed in part. Admitted that the member received 24-hour live-in personal care services through GreatCare. Disputed that the cited exhibit shows a CenterLight authorization: it is a CenterLight PACE assessment, not an authorization, and records that she lived with her daughter. *See* Friedman Decl. Ex. 71 at NYSDOH-000969 (PDF p. 2) and NYSDOH-000991 (PDF p. 24) ("Can the needs be scheduled? ... Yes").

**89.** *During the period covered by the Amended Complaint, Plaintiffs Li Chen and Zhan J. Li each provided 24-hour, "live-in" care services to K.N.W. over a total of 15 shifts. Additionally, Plaintiffs Xiu F. Chen and Plaintiff Lin also each provided one 24-hour, "live-in" care services to Ms. W. Friedman Decl., Ex. 7 (HHAX EVV Recs. for L. Chen); Ex. 16 (HHAX EVV Recs. for Z. Li).*

**Response:** Disputed. The material cited does not support the assertion. Neither cited exhibit identifies any care recipient. Exhibit 7 contains fourteen CenterLight live-in rows for Li Chen (March 18 to May 3, 2016) and Exhibit 16 contains fourteen for Zhan J. Li (September 24 to October 24, 2016, one of them "Not Billed") — fourteen each, not fifteen. Friedman Decl. Exs. 7, 16. No exhibit is cited for the single shifts attributed to Xiu F. Chen and to Ms. Lin. The declarations describe short substitute assignments. Friedman Decl. Ex. 81 ¶ 18; Ex. 6 ¶¶ 47–48.

**90.** *CenterLight conducted an assessment of Ms. W. on June 10, 2016, when Ms. W. was age 88. Friedman Decl., Ex. 71 (CL Ass. Recs. for K.N.W., NYSDOH 000969-000991).*

**Response:** Admitted in part and disputed in part. Admitted that an assessment was performed on June 10, 2016 when the member was 88; disputed that CenterLight conducted it — the report says Palm Beach Health Care Agency, LLC (LHCSA) did, for CenterLight Healthcare PACE. *See* Friedman Decl. Ex. 71 at NYSDOH-000969 and 000991 (PDF pp. 2, 24).

**91.** *CenterLight's assessment recorded a primary diagnosis of Alzheimer's disease along with cancer, diabetes mellitus, and chronic obstructive pulmonary disease; and that her cognitive skills for daily decision-making were severely impaired so that she was disoriented and confused, could not provide consent, and could not speak in sentences. Id. at 000970, 000973-000974.*

**Response:** Admitted.

**92.** *The assessment also recorded that Ms. W. had an unsteady gait exhibited daily and walked with a walker with extensive assistance; that she required maximal assistance for bathing, personal hygiene, upper-body dressing, and toilet transferring, total dependence for lower-body dressing and toilet use, and extensive assistance for walking and locomotion; that she was incontinent of both bladder and bowel with no control present and used pull-up briefs; and that she could not be left alone safely. Id.*[8]

**Response:** Admitted. GreatCare notes that the same page records that the assessor found the member's needs could be scheduled. *See* Friedman Decl. Ex. 71 at NYSDOH-000991 (PDF p. 24).

**93.** *CenterLight conducted another assessment of Ms. W. on December 8, 2016 that further recorded that Ms. W.'s aide changed her diaper four to five times during the daytime and two times during the night. Id. at 001926.*

**Response:** Admitted in part and disputed in part. Admitted that the December 8, 2016 assessment records four to five daytime diaper changes and two at night. Disputed to the extent the paragraph is offered to establish that the member's night-time needs prevented an aide from receiving five uninterrupted hours of sleep: the record quantifies the night-time need as two changes and does not address any aide's sleep. *See* Friedman Decl. Ex. 71 at NYSDOH-001926 (PDF p. 26).

**94.** *None of the Plaintiffs who provided care services to Ms. W. were able to receive five hours of continuous, uninterrupted sleep or three hours of completely duty-free meal breaks when working 24-hour shifts. See, e.g., Friedman Decl., Ex. 6 (L. Chen Decl. ¶ 49); Ex. 81 (Zhan J. Li Decl. ¶ 42).*

[8] See also id. at 000991.

**Response:** Objection; the paragraph states a legal conclusion, not a fact, and no response is required. *Flores Moreno*, ECF 94 at 6 n.5. To the extent a response is required: Admitted that Li Chen avers that she never slept five continuous hours on any 24-hour shift, and that Zhan J. Li avers that she did not receive three hours of duty-free meal breaks on any shift. Friedman Decl. Ex. 6 ¶ 49; Ex. 81 ¶ 42. The material cited does not support the assertion as to this member or as to the other Plaintiffs. Neither declaration mentions K.N.W.; Zhan J. Li's cited paragraph addresses meal breaks only, and her declaration describes six care recipients ("five elderly women and one elderly man") and does not identify any of them as K.N.W.; and no evidence is cited for Xiu F. Chen or Ms. Lin. Friedman Decl. Ex. 6 ¶¶ 24, 27, 49; Ex. 81 ¶¶ 12–40. Li Chen's declaration describes a separate bedroom to which she withdrew to sleep. Ex. 6 ¶¶ 24, 27.

**95.** *S.K.C.-1 was a "patient" of GreatCare and, at varying times, a member of CenterLight and a member of SWHNY, who both authorized Ms. C. for 24-hour, "live-in" care services. Friedman Decl., Ex. 72 (SWHNY Auths. for S.K.C.-1, SWHNY 002548-002549); Exs. 4, 16, 30 (HHAX EVV Recs. for Lin, Z. Li, Zhu).*

**Response:** Admitted in part and disputed in part. Admitted that SWHNY authorized GreatCare for "7Days 24Hrs" from July 1, 2016. Disputed that the cited exhibit supports the assertion as to CenterLight or uses the term "live-in": it contains no CenterLight authorization and does not use that term. *See* Friedman Decl. Ex. 72 at SWHNY002548 (PDF p. 4); the remaining eight letters (SWHNY002533, 002558, 002560, 002565, 002567, 002589, 002617, 002659) authorize only supplies, equipment or PERS.

**96.** *Ms. C. was a member of CenterLight from on or around March 7, 2016 to approximately June 2016 and a member of SWHNY from approximately July 2, 2016 through March 8, 2021. Id.*

**Response:** Admitted in part and disputed in part. Admitted as to the SWHNY period. Disputed as to the start of the CenterLight period: Friedman Decl. Ex. 4 shows the first CenterLight live-in shift on February 29, 2016 rather than March 7, 2016, and the cited Friedman Decl. Ex. 72 contains no CenterLight record. *See* Friedman Decl. Ex. 4 (MCO column: Alphacare, Centerlight, Senior Health Partners, Senior Whole Health, Senior Whole Health (GCI)).

**97.** *During the period covered by the Amended Complaint, Ms. C. received 24-hour, "live-in" care services from Plaintiffs Zhu H.L. Lin, Xiu X. Zhu, Zhan J. Li for over a total of 1,206 shifts. Id.*

**Response:** Admitted in part and disputed in part. Admitted that the cited HHAeXchange tables contain approximately 1,221 billed live-in rows for Zhu H.L. Lin, Xiu X. Zhu and Zhan J. Li under CenterLight and SWHNY, of which 714 are in Friedman Decl. Ex. 4, 495 in Ex. 30 and 12 in Ex. 16. Disputed that any row in those tables identifies this care recipient, and disputed that the figure fairly describes Zhan J. Li's service: her share is twelve shifts between December 20, 2020 and March 7, 2021, consistent with her declaration that she worked one day per week for this member. Friedman Decl. Ex. 16 (12 T1020 rows); Ex. 81 ¶ 36.

**98.** *After Ms. C.'s enrollment with SWHNY, SWHNY sent nurses to conduct comprehensive in-home assessments of Ms. C. on December 13, 2016, May 31, 2017, November 9, 2017, May 17, 2018, November 19, 2018, May 9, 2019, and November 10, 2019. Friedman Decl., Ex. 46 (SWHNY Ass. Recs. for S.K.C.-1, SWHNY 001982, 002009, 002047, 002069, 002125, 002194, 002266, 002325).*

**Response:** Admitted.

**99.** *In each of SWHNY's comprehensive assessments from December 13, 2016 through November 10, 2019, SWHNY recorded that Ms. C.'s primary diagnosis was dementia; that Ms. C. ambulated with an unsteady gait and required extensive to maximal assistance with walking; that Ms. C. had a diagnosis of dizziness and giddiness for which she was receiving active treatment; that Ms. C. required extensive to maximal assistance to transfer on and off the toilet or commode; that Ms. C. was frequently incontinent of urine on a daily basis and wore pads or briefs. See, e.g., Friedman Decl., Ex. 46 (SWHNY Ass. Recs. for S.K.C.-1, SWHNY 001986-001988, 002000, 002070, 002129-002131, 002269-002271).*

**Response:** Admitted in part and disputed in part. Admitted as to dementia, gait, dizziness and toileting assistance; disputed that every assessment recorded daily urinary incontinence — the November 10, 2019 assessment records "Occasionally incontinent - Less than daily." *See* Friedman Decl. Ex. 46 at SWHNY002130 (PDF p. 65); e.g. SWHNY001987 (PDF p. 8) ("Frequently incontinent - Daily, but some control present").

**100.** *At its November 9, 2017 assessment, SWHNY assessed Ms. C. at medium risk for falls. Id. at 002030.*

**Response:** Disputed. The material cited does not support the assertion. The page cited, SWHNY 002030, does not appear in Exhibit 46 as filed, whose Bates numbers run from 002009 to 002047 with nothing between; the November 9, 2017 assessment (SWHNY 002069–002087) records no fall-risk score or category — it records "One fall in last 30 days" and that the member and her daughter were "instructed on pain management and fall prevention," SWHNY 002074, 002075, although it also records that "Daughter reported no fall in the last 90 days," SWHNY

002075 — and the phrase "medium risk" appears nowhere in the exhibit. Friedman Decl. Ex. 46 at SWHNY 002074–002075, 002132.

**101.** *SWHNY's November 10, 2019 comprehensive assessment recorded that Ms. C. had a diagnosis of fecal urgency. Id. at 002143.*

**Response:** Admitted. GreatCare notes that the diagnosis is recorded as "monitored but no active treatment" and appears only in the November 2019 assessment. *See* Friedman Decl. Ex. 46 at SWHNY002143 (PDF p. 76).

**102.** *In its May 19, 2016, December 13, 2016, November 9, 2017, November 19, 2018, May 9, 2019, and November 10, 2019 assessments, SWHNY recorded that Ms. C. could not be left alone safely. Id. at 002003, 002009, 002070, 002146, NYSDOH 000926.*

**Response:** Admitted in part and disputed in part. Admitted that the cited assessments record that the member could not be left alone safely. Disputed as to the November 19, 2018 assessment, for which no page is cited. GreatCare notes that the same pages record that her needs could be scheduled. *See* Friedman Decl. Ex. 46 at SWHNY002003 (PDF p. 22), SWHNY002146 (PDF p. 77), NYSDOH-000926 (PDF p. 137).

**103.** *Because Ms. C. was awake at night, Plaintiffs had to attend to her throughout the night, including repeated assistance to go to the toilet. See, e.g., Friedman Decl., Ex. 53 (Lin Dep. 60:14-22); Ex. 73 (X. Zhu Dep. 34:11-20, 122:11-12, 123:21-24); Ex. 46 (SWHNY Ass. Recs. for S.K.C.-1, Section I, SWHNY002009); Ex. 5 (Lin Decl. ¶¶ 21-23); Ex. 31 (X. Zhu Decl. ¶¶ 15-17).*

**Response:** Admitted in part and disputed in part. Admitted that the December 2016, May 2017, November 2017 and May 2018 assessments record that the member "sleeps a lot during day and is up at night," Friedman Decl. Ex. 46 at SWHNY002009, 002331, 002075, 002201;

disputed as a constant — SWHNY recorded her sleep problems as "Not present" in three of eight assessments (May 2016, May 2019 and November 2019) and, in May 2019, that she "sleeps a lot nowadays." See id. at SWHNY001988–001989, 002131, NYSDOH-000911.

**104.** *None of the Plaintiffs assigned to provide care services to Ms. C. received five hours of continuous uninterrupted sleep on any of their shifts. Friedman Decl., Ex. 53 (Lin Dep. 123:5-6); Ex. 73 (X. Zhu Dep. 34:11-20, 123:21-24); Ex. 31 (X. Zhu Decl. ¶ 18); Ex. 5 (Lin Decl. ¶¶ 22-23).*

**Response:** Admitted in part and disputed in part. Admitted that Xiu X. Zhu so avers. Friedman Decl. Ex. 31 ¶ 18. The material cited does not support the assertion as to Ms. Lin or as to the third aide assigned to this member. Lin Decl. ¶¶ 22–23 concern the member's urination and fall prevention and contain no averment about Ms. Lin's own sleep, and the only other citation for her, Lin Dep. 123:5–6 ("I actually did not have a chance to sleep"), was her answer to a question about whom she contacted when she was not getting meal breaks and gives no account of any shift, ECF 252-13 (Lin Dep.) 122:20–123:10; her declaration states that "[t]he only place I could sleep was on a sofa a few steps from her bed." Friedman Decl. Ex. 5 ¶¶ 22–23, 26. Ms. Zhu testified that she slept "about 4.5 hour" per shift and that "[w]henever she sleep then I take a break." Friedman Decl. Ex. 73 (X. Zhu Dep.) 34:19–20, 122:9–10. No evidence is cited for Zhan J. Li, whose declaration places her with this member one day a week from December 2020 to March 2021. Friedman Decl. Ex. 81 ¶ 36. The HHAX duty sheets for Zhan J. Li, Ms. Lin and Ms. Zhu carry the same patient number, GCI-74251656736. Friedman Decl. Ex. 123 at GC 08.04.2025 009004, 009673, 012479. Ms. Lin's and Zhan J. Li's complaints to the Department of Labor give different figures for the member's nights. Ms. Lin reported that the member "goes to the toilet frequently, 10 times a night" and that she "needed to get up 10 times a night (10 pm to 5 am)." Friedman Decl. Ex. 132 at GSD-

000953. For January 1 to March 25, 2021, Zhan J. Li reported that she "had to get up at least 2 to 3 times to address the patient's toileting needs" and "had to get up 3 to 4 times per night, from 9:30pm to 6:30am." *Id.* at GSD-000945.

**105.** *None of the Plaintiffs assigned to provide care services to Ms. C. received three hours of duty-free meal breaks when working 24-hour shifts. Friedman Decl., Ex. 5 (Lin Decl. ¶ 30); Ex. 31 (X. Zhu Decl. ¶ 19); Ex. 81 (Zhan J. Li Decl. ¶ 42); Ex. 73 (X. Zhu Dep. 121:17-20).*

**Response:** Admitted in part and disputed in part. Admitted that the cited declarations so state. Friedman Decl. Ex. 5 ¶ 30; Ex. 31 ¶ 19; Ex. 81 ¶ 42. Disputed that the deposition testimony cited supports the paragraph. Asked whether she needed to call the office to report at mealtimes, Ms. Zhu testified: "No need to call. There is no set time for meal. I was able to eat. While she was eating, I work … but she non [*sic*] stop me eating," and added, "Whenever she sleep then I take a break." Friedman Decl. Ex. 73 (X. Zhu Dep.) 121:13–20, 122:9–10. Zhan J. Li's declaration quantifies the time she in fact spent eating. Ex. 81 ¶ 39 ("I was able to eat for 20 to 30 minutes").

**106.** *S.M.C.D. was a "patient" of GreatCare and, at varying times, a member of non-defendant MLTC Senior Health Partners ("SHP") and Defendant SWHNY, who both authorized Ms. C. for 24-hour, "live-in" care services. Friedman Decl., Ex. 74-A (SHP Recs. for S.M.C.D., GSD-SHPHF001837-001838, 001847-001848); see, e.g., Ex. 75 (SWHNY Care Plan for S.M.C.D., SWHNY 001937-1940).*

**Response:** Admitted.

**107.** *Ms. C.D. was enrolled with non-defendant MLTC SHP until November 1, 2016 when she became a member of Defendant SWHNY. Friedman Decl., Ex. 74-A (SHP Recs. for*

*S.M.C.D., GSD-SHPHF001837-001838, 001847-001848); see, e.g., Ex. 75 (SWHNY Care Plan for S.M.C.D., SWHNY 001937); Exs. 16, 21 (HHAX EVV Recs. for Z. Li, Ruan).*

**Response:** Admitted that the member was enrolled with Senior Health Partners and became a member of SWHNY effective November 1, 2016. Friedman Decl. Ex. 74-A at GSD-SHPHF001837, 001847; Ex. 75 at SWHNY 001937, 001940. GreatCare notes that the exhibit cited as "Ex. 21 (HHAX EVV Recs. for … Ruan)" is a four-page excerpt of Ms. Ruan's deposition; her EVV record is Exhibit 19.

**108.** *During the period covered by the Amended Complaint, Plaintiffs Zhan J. Li and Hui X. Ruan each provided 24-hour, "live-in" services to Ms. C.D. for a total of 49 shifts. Id.*

**Response:** Disputed. The material cited does not support the assertion. The paragraph cites only the evidence cited in ¶ 107; of that evidence, Exhibit 21 is a deposition excerpt containing no shift data, and the EVV tables in Exhibits 16 and 19 name no care recipient. Friedman Decl. Ex. 21; Exs. 16, 19. Ms. Ruan's EVV record shows eleven Senior Health Partners live-in rows between April 8 and September 26, 2015 and forty-one SWHNY live-in rows between August 13, 2016 and August 4, 2019, without identifying the member; Exhibit 16 contains no Senior Health Partners rows, and its SWHNY live-in rows are predominantly mutual-modifier rows (T1020 U2). Friedman Decl. Ex. 19; Ex. 16. No cited exhibit yields a figure of 49 shifts.

**109.** *SHP assessed Ms. C.D. in April 2015, and SWHNY conducted an assessment of her on October 17, 2016, April 23, 2017, October 16, 2018, and April 2, 2019. Friedman Decl., Ex. 74-A (SHP Recs. for S.M.C.D., GSD-SHPHF001998-2019); Ex. 45 (SWHNY Ass. Recs. for S.M.C.D., SWHNY 001898-001918, NYSDOH 000732-000753, 000799-000820, 001701-001723).*

**Response:** Admitted. GreatCare notes that Friedman Decl. Ex. 45 also contains SWHNY assessments on October 9, 2017 and April 3, 2018 that the paragraph omits, and the cited

SHP bates range runs past the end of Friedman Decl. Ex. 74-A into uncited Friedman Decl. Ex. 74-B. *See* Friedman Decl. Ex. 45, assessments at NYSDOH-001679 (10/09/2017) and NYSDOH-000754 (04/03/2018) (PDF pp. 75, 48).

**110.** *SHP recorded that Ms. C.D. was moderately impaired in cognition; that she was frequently incontinent of urine and occasionally incontinent of bowel, with her incontinence care provided by her aide; that she ambulated indoors only with an assistive device and used a wheelchair outdoors; and that she required dependent, extensive assistance with her activities of daily living. Friedman Decl., Ex. 74-A (SHP Recs. for S.M.C.D., GSD-SHPHF001834, 001999, 002002-002003).*

**Response:** Admitted. GreatCare notes that the same pages record maximal ADL assistance and total aide task time of 56.55 hours per week. *See* Friedman Decl. Ex. 74-A at GSD-SHPHF001834 (PDF p. 2) and GSD-SHPHF001998-002003 (PDF pp. 7-12) (visual).

**111.** *SWHNY recorded that Ms. C.D.'s primary diagnosis was dementia. See, e.g., Friedman Decl., Ex. 45 (SWHNY Ass. Recs. for S.M.C.D., SWHNY 001913, 001915, 001937).*[9]

**Response:** Admitted.

**112.** *SWHNY recorded that Ms. C.D. had an unsteady gait; used a wheelchair; and required maximal assistance with bathing, dressing, walking, transferring, toileting, and eating. See, e.g., Friedman Decl., Ex. 45 (SWHNY Ass. Recs for S.M.C.D., SWHNY 001901-001903, 001939).*[10]

---

[9] See also id. at NYSDOH 000815, 000817, 001701, 001718.

[10] See also id. at NYSDOH 000736, 000758, 000803.

**Response:** Admitted. *See* Friedman Decl. Ex. 45 at SWHNY001939 (PDF p. 25); Friedman Decl. Ex. 74-A at GSD-SHPHF002000 (PDF p. 9) (visual) ("Son's family lives upstairs").

**113.** *Ms. C.D. was frequently incontinent of urine and occasionally incontinent of bowel; she rarely controlled her bowels; and her aide changed her pull-ups approximately six times per day. See, e.g., Friedman Decl., Ex. 45 (SWHNY Ass. Recs. for S.M.C.D., SWHNY 001903, NYSDOH 000804, 001684).*

**Response:** Admitted. GreatCare notes that the records place the six pull-up changes across the full day and record "some control" of the bladder. *See* Friedman Decl. Ex. 45 at NYSDOH-000804 (PDF p. 58).

**114.** *Ms. C.D.'s assessors recorded that Ms. C.D. could not be left alone safely. Ex. 45 (SWHNY Ass. Recs. for S.M.C.D., NYSDOH 000753, 000798, 000820, 001723, 001745).*

**Response:** Admitted. GreatCare notes that the same Sign/Finalize pages record that the member's needs could be scheduled in four of the five assessments cited. *See* Friedman Decl. Ex. 45 at NYSDOH-000753, 000798, 001723, 001745 (PDF pp. 47, 52, 101, 103).

**115.** *The Plaintiffs assigned to provide care services to Ms. C.D. never received five hours of continuous uninterrupted sleep or three hours of completely duty-free meal breaks when working 24-hour shifts. Ex. 100 (Ruan Decl. ¶ 21); Ex. 81 (Zhan J. Li Decl. ¶¶ 41, 42).*

**Response:** Objection; the paragraph states a legal conclusion, not a fact, and no response is required. *Flores Moreno*, ECF 94 at 6 n.5. To the extent a response is required: Admitted that Ms. Ruan and Zhan J. Li each aver, in general terms, that they did not receive five hours of uninterrupted sleep or three hours of duty-free meal breaks on any 24-hour shift. Friedman

Decl. Ex. 100 ¶ 21; Ex. 81 ¶¶ 41–42. The material cited does not support the assertion as to this member: neither declaration mentions S.M.C.D.; Ms. Ruan's declaration describes four unnamed care recipients identified by redacted address, and Zhan J. Li's declaration describes six (Ex. 81 ¶ 12), none identified as S.M.C.D. Friedman Decl. Ex. 100 ¶¶ 12–20; Ex. 81 ¶¶ 12–40. Each declaration also describes the sleeping accommodation provided and the sleep and meal time taken: Ms. Ruan "had a separate bedroom" at one placement and a bed "in the kitchen" at another, and slept "approximately one or two hours at a time"; Zhan J. Li states that "[d]uring each mealtime, I was able to eat for 20 to 30 minutes." Friedman Decl. Ex. 100 ¶¶ 13, 14, 16, 17, 20; Ex. 81 ¶¶ 17, 20, 26, 39, 40.

**116.** *X.J.L. was a "patient" of GreatCare and member of SWHNY, who authorized Ms. L. for 24-hour, "live-in" care services. Friedman Decl., Ex. 76 (SWHNY Care Plan for X.J.L., SWHNY 003643-003644).*

**Response:** Admitted in part and disputed in part. Admitted that X.J.L. was a member of SWHNY and that SWHNY authorized GreatCare to provide "PCS Level II Live in" service under T1020 for the period April 1 through September 30, 2022. Friedman Decl. Ex. 76 at SWHNY 003644. Disputed because the material cited does not support the assertion beyond that period: Exhibit 76 contains no authorization for 2023, when ¶ 117 places Ms. Ruan's five live-in shifts for this member. *Id.*

**117.** *Between April 11, 2023 and May 9, 2023, Plaintiff Hui X. Ruan worked 5 "live-in" shifts providing 24-hour care services to X.J.L., a member of SWH. Friedman Decl., Ex. 19 (HHAX EVV Rec. for Ruan).*

**Response:** Admitted. Friedman Decl. Ex. 19 records five 24-hour shifts on April 11, 18, 25 and May 2 and 9, 2023. GreatCare notes that they were five isolated Tuesdays interleaved

with six-hour hourly visits for the same member. *See* Friedman Decl. Ex. 19 (2023 rows: T1020 on 4/11, 4/18, 4/25, 5/2, 5/9; T1019:U1 hourly visits on 4/20, 4/23, 4/30 and weekends).

**118.** *SWHNY conducted an assessment of Ms. L. on March 11, 2023, which recorded that Ms. L., then age [REDACTED], had cognitive skills for daily decision-making that were severely impaired; had short-term and procedural memory problems, could not recognize family members or her aides, and was not self-directing; carried a primary diagnosis of Alzheimer's disease, along with coronary heart disease and anxiety; required maximal assistance with bathing, extensive assistance with lower-body dressing and toilet use, limited assistance with personal hygiene and upper-body dressing, and supervision or cueing with walking, locomotion, transferring, bed mobility, and eating; was totally dependent on others for meal preparation, housework, finances, shopping, and transportation; used a cane indoors and a wheelchair outdoors; was incontinent of bladder and wore pull-ups (including at night) that the aide changed on a toileting schedule established every 2-3 hours; and that she wandered daily, including indoor wandering at night. Friedman Decl., Ex. 50 (SWHNY Ass. Recs. for X.J.L., SWHNY 001634-001656).*

**Response:** Admitted. GreatCare notes that the same assessment records that the member needed only supervision or cueing for walking, locomotion, transferring, bed mobility and eating. *See* Friedman Decl. Ex. 50 at SWHNY001638 (PDF p. 7) (ADL grid), SWHNY001646 (PDF p. 15) ("A wheelchair is used outdoors only.") and SWHNY001647 (PDF p. 16) ("Scheduled toileting program: Not ordered AND did not occur").

**119.** *When providing 24-hour care services to Ms. L., Ms. Ruan was not able to obtain five hours of continuous, uninterrupted sleep or three completely duty-free hours of meal breaks. Friedman Decl., Ex. 100 (Ruan Decl. ¶ 21).*

**Response:** Objection; the paragraph states a legal conclusion, not a fact, and no response is required. *Flores Moreno*, ECF 94 at 6 n.5. To the extent a response is required: Admitted that Ms. Ruan avers, in general terms, that she did not receive five hours of uninterrupted sleep or three hours of duty-free meal breaks with any of her live-in care recipients. Friedman Decl. Ex. 100 ¶ 21. The material cited does not support the assertion as to Ms. L.: the cited sentence names no member, the declaration describes four long-term care recipients by redacted address, and Ms. Ruan's service to this member consisted of five separate Tuesdays between April 11 and May 9, 2023. Friedman Decl. Ex. 100 ¶¶ 12–20; Ex. 19 (five T1020 rows, 4/11/2023–5/9/2023). The declaration describes the sleeping accommodations at each placement and states that Ms. Ruan slept "approximately one or two hours at a time." Ex. 100 ¶¶ 13–20.

**120.** *SWHNY did not independently monitor or verify whether the aide received the legally required sleep and meal breaks and instead relied exclusively on GreatCare to come forward and report a sleep problem. Friedman Decl., Ex. 40 (Glapa Dep. (Feb. 26, 2026) 10:21-19:4).*

**Response:** Objection; the paragraph states a legal conclusion, not a fact, and no response is required. *Flores Moreno*, ECF 94 at 6 n.5. To the extent a response is required: Admitted that SWHNY's Rule 30(b)(6) witness testified that SWHNY "provide[s] the authorization" and does "not manage the aide," and that it followed medical necessity unless told that an aide was not getting sleep. Friedman Decl. Ex. 40 (Glapa Dep. (Feb. 26, 2026)) 10:21–19:4. Disputed that SWHNY relied "exclusively" on GreatCare or did not independently monitor. The same witness testified that SWHNY's UAS assessments contain questions "to ask about the living quarters, the onus of the five-hour time"; that a report could come from the aide directly; that concerns from "the patient or the patient's family" are addressed "through our member touch

point"; and that SWHNY would re-trigger an assessment. *Id.* 11:6–16, 13:12–24, 14:12–18. The cited testimony does not address meal breaks.

**121.** *K.W.P. and P.C.P. were "patients" of GreatCare and members of SWHNY and SWHNY's predecessor organization Alphacare, who authorized Ms. and Mr. P. for 24-hour, "live-in" care services. Friedman Decl., Ex. 14, 16, 19 (HHAX EVV Recs. for Plaintiffs Hui Li, Z. Li, Ruan).*

**Response:** Admitted that K.W.P. and P.C.P. were members of AlphaCare and then of SWHNY and that GreatCare provided services to them. GreatCare notes that the exhibits cited are EVV visit tables, which record billed visits, and that they contain no authorization; the plan-level authorization documents for these members are cited elsewhere. *See* Friedman Decl. Exs. 47, 77, 78, 80.

**122.** *During the period covered by the Amended Complaint, Plaintiffs Hui Li, Zhan J. Li, and Hui X. Ruan each provided 24-hour, "live-in" services to K.W.P. and/or her husband P.C.P. over a total of 967 shifts. Id.*

**Response:** Admitted in part and disputed in part. Admitted that the cited tables contain roughly 1,019 AlphaCare and SWHNY live-in rows for these three aides; disputed that they can be attributed to these members or reconciled with the 49 shifts ¶ 108 assigns Ruan to a different member. *See* Friedman Decl. Ex. 14 (68 T1020U2 rows) and Friedman Decl. Ex. 16 (228 T1020U2 rows); Friedman Decl. Ex. 19 (41 Senior Whole Health live-in rows).

**123.** *K.W.P. was a member of non-defendant AlphaCare MLTC until approximately December 31, 2017 when AlphaCare merged into SWHNY and AlphaCare ceased to exist. See*

*Magellan Health, Inc., Magellan Health Closes on Acquisition of SWHNY (Oct. 31, 2017);*[11] *see, e.g., Friedman Decl., Ex. 77 (AlphaCare Service Plan Recs. for K.W.P.); Ex. 78 (SWHNY Care Plan for K.W.P., SWHNY 004237); Ex. 14, 16, 18 (HHAX EVV Recs. for Hui Li, Z. Li, Ruan).*

**Response:** Admitted that K.W.P. was a member of AlphaCare and became a member of SWHNY effective January 1, 2018. Friedman Decl. Ex. 77 at SWHNY 003748 (last AlphaCare plan, "10/02/2017 - Present"); Ex. 78 at SWHNY 004237 (SWHNY care plan, effective Jan. 1, 2018); Exs. 14, 16, 19 (MCO column). GreatCare notes that the exhibit cited as "Ex. 18 (HHAX EVV Recs. for … Ruan)" is the Zhan J. Li deposition excerpt, Ms. Ruan's EVV record being Exhibit 19, and that the corporate-merger statement is supported only by a press release cited by URL, which is not in the record.

**124.** *AlphaCare sent a registered nurse to conduct assessments of K.W.P. and issued Person-Centered Service Plans effective July 2, 2014; January 26, 2015; April 26, 2016; September 20, 2016; February 22, 2017; March 27, 2017; and October 2, 2017. Friedman Decl., Ex. 77 (AlphaCare Service Plan Recs. for K.W.P., SWHNY 003748, 003753, 003758, 003762, 003766, 003769, 003774).*

**Response:** Admitted.

**125.** *AlphaCare recorded that Ms. P. had generalized muscle weakness, difficulty walking, and depended on a wheelchair. See, e.g, Friedman Decl., Ex. 77 (AlphaCare Service Plan Recs. for K.W.P., SWHNY 003749, 003754, 003759, 003763, 003767, 003770).*

**Response:** Admitted in part and disputed in part. Admitted as to the four later plans. Disputed as to the two earliest cited plans, which record only wheelchair dependence; the other two

[11] https://magellanhealth.mediaroom.com/2017-10-31-Magellan-Health-Closes-on-Acquisition-of-Senior-Whole-Health.

diagnoses carry a September 20, 2016 onset date. *See* Friedman Decl. Ex. 77 at SWHNY003749 (PDF p. 3); SWHNY003767 (PDF p. 21), SWHNY003770 (PDF p. 24) (wheelchair only).

**126.** *Beginning with the plan effective September 20, 2016, AlphaCare recorded that Ms. P. had Alzheimer's disease, both early-onset and unspecified, and unspecified dementia. Friedman Decl., Ex. 77 (AlphaCare Service Plan Recs. for K.W.P., SWHNY 003749, 003754, 003759, 003763).*

**Response:** Admitted.

**127.** *AlphaCare's plans reflected the progression of Ms. P.'s dementia: it identified "dementia or delirium" as an open care-management issue beginning September 20, 2016, added impaired communication on February 22, 2017 and cognitive loss on March 27, 2017. Friedman Decl., Ex. 77 (AlphaCare Service Plan Recs. for K.W.P., SWHNY 003765 (Sept. 20, 2016), 003761 (Feb. 22, 2017), 003756 (Mar. 27, 2017)).*

**Response:** Disputed. The material cited does not support the assertion as stated. On the pages cited, the "Dementia or Delirium" issue is marked "Status: Closed" with a start date of September 20, 2016; the "Communication is impaired" issue is marked "Closed" with a start date of March 10, 2017; and the "Cognitive loss" issue is marked "Open" with a start date of September 30, 2017. Friedman Decl. Ex. 77 at SWHNY 003765, 003761, 003756. The dates the paragraph recites are the effective dates of the plans, not the issue start dates the same tables record.

**128.** *AlphaCare recorded that Ms. P. had urinary incontinence, and its later plans also identified bowel conditions as an open care-management issue. Friedman Decl., Ex. 77 (AlphaCare Service Plan Recs. for K.W.P., 003749, 003751, 003756, 003759, 003761, 003763, 003765, 003776).*

**Response:** Admitted in part and disputed in part. Admitted that AlphaCare recorded urinary incontinence for Ms. P., listed as an open issue with the comment "Frequently incontinent" and a diagnosis of unspecified urinary incontinence. Friedman Decl. Ex. 77 at SWHNY 003751. Disputed that AlphaCare identified bowel conditions as an open issue: on each cited page where it appears, "Bowel Conditions" is marked "Status: Closed" with a start date of March 10, 2017. Friedman Decl. Ex. 77 at SWHNY 003756, 003761.

**129.** *Across its plans, AlphaCare recorded that Ms. P. required assistance with activities of daily living, including bathing, personal hygiene, dressing, transferring, locomotion, turning and positioning, and incontinence care. Friedman Decl., Ex. 77 (AlphaCare Service Plan Recs. for K.W.P., SWHNY 003750, 003776).*

**Response:** Admitted.

**130.** *SWHNY sent a registered nurse to conduct comprehensive in-home assessments of Ms. P. on March 28, 2018, September 11, 2018, March 4, 2019, and September 4, 2019. Friedman Decl., Ex. 48 (SWHNY Ass. Recs. for K.W.P., SWHNY 003686, 003842, 003989, 004072).*

**Response:** Admitted.

**131.** *SWHNY's assessments of Ms. P. recorded a primary diagnosis of Alzheimer's disease, or dementia, and noted that Ms. P. was very forgetful, easily confused, and was unable to make decisions about her daily activities or to direct her own care. See, e.g., Friedman Decl., Ex. 48 (SWHNY Ass. Recs. for K.W.P., SWHNY 003687, 003691, 003847, 003994).*

**Response:** Admitted. GreatCare notes that SWHNY's assessments record that the husband lived with her in a mutual case and, in March 2019, that "Spouse is able to provide help as

needed. Spouse:, is member's primary resource." See Friedman Decl. Ex. 48 at SWHNY003687 (Sept. 11, 2018) (PDF p. 4); SWHNY003665 (Mar. 4, 2019) (PDF p. 2).

**132.** *SWHNY recorded that K.W.P.'s mobility deteriorated over the assessment period: at the March 28, 2018 assessment, she required extensive assistance with walking and transfers, and by the September 11, 2018 assessment and thereafter, she was bed-bound and totally dependent for locomotion. Friedman Decl., Ex. 48 (SWHNY Ass. Recs. for K.W.P., SWHNY 003690 (Sept. 11, 2018), 003846 (Mar. 4, 2019), 003993 (Sept. 4, 2019), 004076 (Mar. 28, 2018)).*

**Response:** Admitted. *See* Friedman Decl. Ex. 48 at SWHNY003690 (PDF p. 6) and SWHNY003854 (PDF p. 15) (03/04/2019 assessment).

**133.** *SWHNY recorded that Ms. P. required total or maximal assistance, or total dependence, with activities of daily living, including bathing and toileting, and that she needed to be repositioned every two hours to avoid pressure ulcers. Friedman Decl., Ex. 48 (SWHNY Ass. Recs. for K.W.P., 003690-003691, 003846-003847, 003993-003994).*

**Response:** Admitted. GreatCare notes that the same assessment's structured fields record that no turning/repositioning or scheduled toileting program was ordered or occurred. *See* Friedman Decl. Ex. 48 at SWHNY003854 (PDF p. 15).

**134.** *SWHNY's March 28, 2018 assessment also noted that Ms. P.'s aides had established Ms. P. on scheduling toileting every two hours, although Ms. P. often refused to cooperate. Friedman Decl., Ex. 48 (SWHNY Ass. Recs. for K.W.P., SWHNY 004077).*

**Response:** Admitted. Friedman Decl. Ex. 48 at SWHNY 004077. The same page records the member's bladder continence as "Incontinent – No control present" and bowel continence as "Occasionally incontinent – Less than daily." *Id.*

**135.** *SWHNY recorded that Ms. P. was incontinent with no control over her bladder present at every assessment, that her bowel incontinence progressed to no control present by September 4, 2019, and that she wore diapers and underpads. Friedman Decl., Ex. 48 (SWHNY Ass. Recs. for K.W.P., SWHNY 003691, 003847, 003994, 004077).*

**Response:** Admitted. GreatCare notes that bowel incontinence reached "no control present" only at the September 2019 assessment. *See* Friedman Decl. Ex. 48 at SWHNY003994 (PDF p. 19) and SWHNY004077 (PDF p. 23); Friedman Decl. Ex. 82 (Hui Li Decl.) ¶ 5.

**136.** *K.W.P. lived with her spouse, P.C.P., in a studio apartment. Friedman Decl., Ex. 48 (SWHNY Ass. Recs. for K.W.P., SWHNY 003665, 003842).*

**Response:** Admitted. GreatCare notes that the same page records that the room was clean and safe, that there had been no fall, ER visit or hospitalization in 90 days, that the spouse was the member's primary resource, and that the service was "7Dx13H, Live in from Great Care." *See* Friedman Decl. Ex. 48 at SWHNY003665 (PDF p. 2); same "7Dx13H, Live in from Great Care" at SWHNY003843 (PDF p. 10).

**137.** *Mr. P. was authorized for six hours of home care services per day from his own, separate aide until May 1, 2017, when he began sharing an aide with his wife; effective August 18, 2017, Mr. P. was authorized for mutual, "live-in" care with his wife, which SWHNY continued. Friedman Decl., Ex. 80 (AlphaCare Service Plans for P.C.P., SWHNY 004817, 004820); Ex. 47 (SWHNY Ass. Recs. for P.C.P., SWHNY 004803, 005004).*

**Response:** Admitted. GreatCare notes that SWHNY's plan of care allocates Mr. P. six hours per day of the mutual placement ("7D6HRS PCA/WK from Great Care, total 7D24HRS LIVE IN PCA/WK"). Ex. 47 at SWHNY 004803.

**138.** *As recipients of mutual, "live-in" care, Ms. and Mr. P. received care services from a single aide who was required to care for both spouses at the same time. Friedman Decl., Ex. 79 (SWHNY Provider Notice re Mutual Auth. Process, SWHNY 000690-000691).*

**Response:** Admitted in part and disputed in part. Admitted that a single aide served both spouses under the mutual authorization. The material cited does not support the assertion for the period at issue: Exhibit 79 is a SWHNY provider notice dated June 1, 2023 announcing that SWHNY "will be launching a new process for Mutual Services authorizations" effective that date; it names neither member and post-dates the last shift either Plaintiff worked for this couple. Friedman Decl. Ex. 79 at SWHNY 000690.

**139.** *AlphaCare sent a registered nurse to conduct assessments of Mr. P. and issued Person-Centered Service Plans effective July 2, 2014; January 26, 2015; January 31, 2017; March 27, 2017; and October 2, 2017. Friedman Decl., Ex. 80 (AlphaCare Service Plans for P.C.P., SWHNY 004814-004830).*

**Response:** Admitted.

**140.** *AlphaCare recorded that Mr. P. had abnormalities of gait and mobility, and generalized muscle weakness. Friedman Decl., Ex. 80 (AlphaCare Service Plans for P.C.P., SWHNY 004815).*

**Response:** Admitted. GreatCare notes that both diagnoses carry an October 2, 2017 onset date and appear only in the last of AlphaCare's five plans. *See* Friedman Decl. Ex. 80 at SWHNY004815 (PDF p. 3); SWHNY004817 (PDF p. 5) ("Home Health Aide - Live In Two Client 08/18/2017").

**141.** *AlphaCare recorded that Mr. P. had urinary incontinence and an overactive bladder, and its later plans also identified bowel conditions as an open care-management issue. Friedman Decl., Ex. 80 (AlphaCare Service Plans for P.C.P., SWHNY 004815-004816, 004820).*

**Response:** Admitted in part and disputed in part. Admitted that AlphaCare recorded urinary incontinence and an overactive bladder for Mr. P. Friedman Decl. Ex. 80 at SWHNY 004815–004816. Disputed that its plans identified bowel conditions as an open issue: the cited page records "Bowel Conditions Closed 03/11/2017." Friedman Decl. Ex. 80 at SWHNY 004820; *see also* Ex. 47 at SWHNY 004779, 005099 (bowel "Continent - Complete control").

**142.** *AlphaCare identified cognitive loss (beginning with its January 26, 2015 plan) and impaired communication (beginning with its January 31, 2017 plan) as open care-management issues. Friedman Decl., Ex. 80 (AlphaCare Service Plans for P.C.P., SWHNY 004819, 004822, 004826).*

**Response:** Disputed. The material cited does not support the assertion as stated. On each of the three pages cited, the "Cognitive loss" issue is marked "Closed" with a start date of November 16, 2016, and no impaired-communication issue appears; where that issue does appear in the exhibit, at SWHNY 004820 and 004823, it is marked "Closed" with a start date of March 11, 2017. Friedman Decl. Ex. 80 at SWHNY 004819, 004822, 004826, 004820, 004823. The dates the paragraph recites are plan effective dates, not issue start dates.

**143.** *Across its plans, AlphaCare consistently recorded that Mr. P. required assistance with activities of daily living. Friedman Decl., Ex. 80 (AlphaCare Service Plans for P.C.P., SWHNY 004816-004817, 004822-004823).*

**Response:** Admitted. GreatCare notes that the same plans mark the ADL care-management issue "Closed" since October 6, 2014 and set a goal of a daily outdoor walk. *See* Friedman Decl. Ex. 80 at SWHNY004822 (PDF p. 10); SWHNY004817 (PDF p. 5).

**144.** *SWHNY sent a registered nurse to conduct comprehensive in-home assessments of Mr. P. on March 28, 2018, September 11, 2018, March 4, 2019, September 4, 2019, and September 10, 2021. Friedman Decl., Ex. 47 (SWHNY Ass. Recs. for P.C.P., SWHNY 004683, 004775, 004831, 004980, 005094).*

**Response:** Admitted. GreatCare notes that Friedman Decl. Ex. 47 also contains a September 14, 2022 assessment, conducted for SWHNY by Five Borough Home Care Inc., which the paragraph omits. *See* Friedman Decl. Ex. 47 at SWHNY001822-001845 (PDF pp. 4-27) (visual).

**145.** *SWHNY recorded that Mr. P. ambulated with a cane and had an unsteady gait exhibited daily, and that his need for assistance with walking worsened from supervision in 2018 to extensive assistance by September 2021. Friedman Decl., Ex. 47 (SWHNY Ass. Recs. for P.C.P., SWHNY 004779, 005098-005099).*

**Response:** Admitted. GreatCare notes that the same page's narrative describes the dizziness and unsteady gait as "occasional," and in 2018 he needed only supervision or cueing to walk. *See* Friedman Decl. Ex. 47 at SWHNY004778-004779 (PDF pp. 32-33).

**146.** *SWHNY recorded that Mr. P. needed increasing assistance with activities of daily living, ranging from extensive assistance with bathing in 2018 to maximal assistance with bathing and extensive assistance with dressing, toileting, and ambulation by September 2021. Friedman Decl., Ex. 47 (SWHNY Ass. Recs. for P.C.P., SWHNY 004778, 005097-005098).*

**Response:** Admitted. GreatCare notes that the increased assistance is recorded as of September 2021, after both Plaintiffs had stopped serving this couple. *See* Friedman Decl. Ex. 47 at SWHNY004778 (PDF p. 32) and SWHNY005098 (PDF p. 47); Friedman Decl. Ex. 82 ¶ 5; Friedman Decl. Ex. 81 ¶ 34.

**147.** *SWHNY recorded that Mr. P. was occasionally incontinent both of urine and bowel, and that he wore pull-ups. Friedman Decl., Ex. 47 (SWHNY Ass. Recs. for P.C.P., SWHNY 004779, 004797, 005099).*

**Response:** Admitted in part and disputed in part. Admitted that SWHNY recorded Mr. P. as occasionally incontinent of urine ("less than daily") and as using pull-ups. Friedman Decl. Ex. 47 at SWHNY 004779, 004797. Disputed that SWHNY recorded him as incontinent of bowel: each cited page records bowel continence as "Continent - Complete control," as does every other bowel-continence entry in the exhibit. Friedman Decl. Ex. 47 at SWHNY 004779, 004797, 005099.

**148.** *Because the Ps both required extensive assistance, the Plaintiffs who provided services to the couple worked around the clock and did not receive five hours of uninterrupted sleep or three hours of duty-free meal breaks on their 24-hour shifts. See, e.g., Friedman Decl., Ex. 18 (Z. Li Dep. 85:14-21, 61:3-6); Ex. 15 (Hui Li Dep. 5:13-15, 59:3-8); Ex. 81 (Zhan J. Li Decl. ¶¶ 30-32, 35); Ex. 82 (Hui Li Decl. ¶¶ 7-10,).*

**Response:** Objection; the paragraph states a legal conclusion, not a fact, and no response is required. *Flores Moreno*, ECF 94 at 6 n.5. To the extent a response is required: Admitted that Zhan J. Li avers that she did not receive three hours of duty-free meal breaks while serving this couple. Friedman Decl. Ex. 81 ¶ 35. The material cited does not support the remainder of the assertion. Hui Li's declaration paragraphs cited (¶¶ 7–10) describe the authorization, the

wife's diaper changes and the husband's separate aide, and contain no averment about sleep or meals. Friedman Decl. Ex. 82 ¶¶ 7–10. The deposition testimony cited is general or concerns rest rather than any sleep period at this placement: Hui Li testified that she sued "because I worked 24 hours and I could not sleep," and that at the couple's home she "could not rest" because of meal preparation, while confirming that a separate aide was assigned to the husband. Friedman Decl. Ex. 15 at 5:13–15, 59:3–11. Zhan J. Li's cited testimony concerns her time sheets and live-in work generally and does not refer to this couple. Ex. 18 at 61:2–6, 85:9–21. Zhan J. Li's declaration places the night-time need at about two bathroom assists for the wife and states that the husband "could walk and use the bathroom on his own." Friedman Decl. Ex. 81 ¶ 31. SWHNY assessed Mr. P. at "Supervision - Oversight/cueing" for walking, locomotion and transfers, and its plan of care allocated him six hours per day of the mutual placement. Friedman Decl. Ex. 47 at SWHNY 004779, 004803.

**149.** *X.Y.W. was a "patient" of GreatCare and a member of SWHNY and SWHNY's predecessor Alphacare, who authorized Ms. W. for 24-hour, "live-in" care services. Friedman Decl., Ex. 83 (AlphaCare Service Plans for X.Y.W., SWHNY 005408-005432); see, e.g., Ex. 49 (SWHNY Ass. Recs. for X.Y.W., SWHNY 005350).*

**Response:** Admitted. GreatCare notes that the same page records the member as alert, oriented, self-directing and needing help getting up only one to two times a night. *See* Friedman Decl. Ex. 49 at SWHNY005350 (PDF p. 27).

**150.** *From approximately January 1, 2018 until the time she passed away in or around [REDACTED], Ms. W. was a member of SWHNY. See, e.g., Friedman Decl., Ex. 10 (HHAX EVV Recs. for X. Chen); Ex. 26 (HHAX EVV Recs. for Zhang).*

**Response:** Admitted in part and disputed in part. Admitted that Ms. W. was a member of SWHNY from January 1, 2018. Friedman Decl. Ex. 26 (SWHNY live-in rows from 1/1/2018, following the last AlphaCare row on 12/27/2017). The material cited does not otherwise support the assertion: Exhibit 10, filed as Xiu F. Chen's EVV record, contains no record for Xiu F. Chen and nothing bearing on this member's plan enrollment. Friedman Decl. Ex. 10 (PDF pp. 2–4). Disputed that the member passed away on or about March 22, 2021. Paragraph 150 cites only Exhibits 10 and 26 — two HHAX EVV timekeeping exports — neither of which addresses the member's death. The GreatCare patient note that Plaintiffs themselves cite at Paragraph 281 for this same date, Friedman Decl. Ex. 58 (PatientNoteID 48662389), records that the member's "[l]ast day of PCA was on 3/22/21" and that she "was expired on 3/28/21" at the hospital, related to COVID-19.

**151.** *During the period covered by the Amended Complaint, Plaintiffs Li Chen, Xiu F. Chen, Hui He, and Mu Z. Zhang each provided 24-hour, "live-in" care services to X.Y.W. over a total of 1,047 shifts. Friedman Decl., Ex. 7, 10, 12, 26 (HHAX EVV Recs. for L. Chen, X. Chen, He, and Zhang).*

**Response:** Admitted in part and disputed in part. Admitted that the four cited tables contain, in the aggregate, approximately 1,153 AlphaCare and SWHNY live-in rows: 171 for Li Chen (Ex. 7, January 2, 2015 to February 14, 2016), 981 for Ms. Zhang (Ex. 26), one for Hui He (Ex. 12, a single T1020 shift on December 21, 2018), and none for Xiu F. Chen. Friedman Decl. Exs. 7, 26, 12, 10. Disputed that each of the four named Plaintiffs provided live-in care to this member over those shifts: Exhibit 12 records one such shift for Hui He, and Exhibit 10 records none for Xiu F. Chen and names a different caregiver. Friedman Decl. Ex. 12; Ex. 10. GreatCare

notes that SWHNY's assessment records Xiu F. Chen as present at a visit to this member, Friedman Decl. Ex. 49, but no cited shift record attributes any shift to her.

**152.** *Prior to their employment with GreatCare, Plaintiffs Li Chen and Mu Z. Zhang had already been providing 24-hour, "live-in" services to Ms. W. when Ms. W. was receiving services through another agency called Amazing. Ex. 56 (Zhang Dep. 23:2-3, 46:19-24); Ex. 6 (L. Chen Decl. ¶¶ 10, 32); Ex. 27 (Zhang Decl. ¶¶ 5,6).*

**Response:** Admitted. GreatCare notes that the same exhibits show the aides moved with the patient from Amazing to GreatCare — Ms. Zhang testified that she "actually brought that patient over to Great Care" after the patient "discussed with the aide workers together" — kept the identical schedule and 13-hour pay they had at Amazing, and that Zhang already recovered two payments from Amazing for this work. See Friedman Decl. Ex. 56, 46:14-16 and 46:19-24; Friedman Decl. Ex. 6 (L. Chen Decl.) ¶¶ 32, 33, 40 (PDF pp. 6–7); Friedman Decl. Ex. 27 (Zhang Decl.) ¶¶ 6, 8, 9 (PDF pp. 2–3).

**153.** *AlphaCare issued Person Centered Service Plans for Ms. W. on December 2, 2014, August 9, 2016, January 25, 2017, and August 1, 2017. These service plans recorded incontinence, cognitive loss, impaired communication, difficulty walking, and abnormalities of gait and mobility, and the need for assistance with activities of daily living as care-management issues. To assist with Ms. W.'s care, AlphaCare authorized live-in personal care aide services and a monthly supply of incontinence supplies, including underpads, diapers, and liners. Friedman Decl., Ex. 83 (AlphaCare Service Plans for X.Y.W., SWHNY 005429-005432 (Dec. 2, 2014), 005425-005428 (Aug. 9, 2016), 005417-005420 (Jan. 25, 2017), 005408-005411 (Aug. 1, 2017)).*

**Response:** Admitted. GreatCare notes that in the earlier plan copies several of those issues are marked "Closed," and AlphaCare, not GreatCare, selected the live-in per-diem model.

*See* Friedman Decl. Ex. 83 at SWHNY005432 (PDF p. 26) and SWHNY005427-005428 (PDF pp. 21-22).

**154.** *SWHNY conducted comprehensive in-home assessments of Ms. W. on July 27, 2018, January 28, 2019, July 8, 2019, and January 10, 2020. Friedman Decl., Ex. 49 (SWHNY Ass. Recs. for X.Y.W., SWHNY 005297, 005321, 005375, 005446).*

**Response:** Admitted.

**155.** *On July 27, 2018, SWHNY conducted a comprehensive assessment of Ms. W. that recorded an unsteady gait, a history of falls, weakness, and chronic pain; that she required assistance with activities of daily living including walking, locomotion, toilet transferring, and bed mobility; and that she had a cardiorespiratory condition marked by shortness of breath. Id. at 005375-005401.*

**Response:** Admitted. GreatCare notes that the same assessment records the member alert, oriented and self-directing, continent of bowel and bladder with no diapers or pads used at home, and dyspnea absent at rest. *See* Friedman Decl. Ex. 49 at SWHNY005399 (PDF p. 52), SWHNY005381 (PDF p. 34) and SWHNY005302 (PDF p. 3) (01/10/2020 assessment).

**156.** *The assessment concluded that Ms. W. could not be left alone safely and recommended continuing 24-hour live-in personal care services seven days a week. Friedman Id. at 005398.*

**Response:** Admitted. GreatCare notes that the same page records that the needs can be scheduled, and SWHNY's next three assessments record that Ms. W. could be left alone safely. *See* Friedman Decl. Ex. 49 at SWHNY005342 (PDF p. 26), 005467 (PDF p. 83), 005318 (PDF p. 4); "Can the needs be scheduled? ... Yes" at SWHNY005398 (PDF p. 51).

**157.** *On January 28, 2019, SWHNY conducted a comprehensive assessment of X.Y.W. that recorded that she had a history of multiple falls; including a head injury from a fall in her home at night; that she reported dizziness when getting up from a seated or lying position; and that she had poor balance and an unsteady gait and walked only short distances with a quad cane and aide assistance. Id. at 005321-005373.*

**Response:** Admitted that the January 28, 2019 assessment so records. Friedman Decl. Ex. 49 at SWHNY 005350. GreatCare notes that the same assessment records "No falls in the past 90 days," codes the Sleep Problems item as "Not present," and records that the member "receives 24 hour live in PCS services x 7 days/week from Great Care"; and that of the range cited (005321–005373), only SWHNY 005321–005342 and 005350 appear in the exhibit. *Id.* at SWHNY 005327, 005350.

**158.** *The assessment also recorded that Ms. W. needed assistance getting up one to two times at night to urinate and that a bedside commode was in place. Id. at 005326, 005350.*

**Response:** Admitted.

**159.** *On July 8, 2019, SWHNY conducted a comprehensive assessment of Ms. W. that recorded that Ms. W. had an unsteady gait; ambulated with a quad cane indoors and a rollator outdoors; needed human assistance on uneven surfaces; had general weakness; was forgetful with mild cognitive impairment; and that she reported dizziness. Id. at 005439-005467.*

**Response:** Admitted.

**160.** *The assessment also recorded that she urinated twice at night and required the aide's assistance for toilet transfers. Id. at 005439, 005451.*

**Response:** Admitted.

**161.** *On January 10, 2020, SWHNY conducted a comprehensive assessment of X.Y.W. that recorded Ms. W. urinated twice at night and required the aide's assistance for toilet transfers. Id. at 005302, 005444.*

**Response:** Admitted. GreatCare notes that the same assessment records that Ms. W. could be left alone safely and that her needs could be scheduled. *See* Friedman Decl. Ex. 49 at SWHNY005318 (PDF p. 4).

**162.** *The Plaintiffs who provided long-term care services to Ms. W. all reported that Ms. W. called on them several times each night to ask for their assistance with toileting and other needs. Friedman Decl., Ex. 6 (Li Chen Decl. ¶¶ 25-26); Ex. 56 (Zhang Dep. 93:7-24, 88:2-13); Ex. 27 (Zhang Decl. ¶¶ 11, 24); Ex. 54 (Xiu F. Chen. Dep. 59:11-16); Ex. 84 (X. Chen. Decl. ¶¶ 18-19).*

**Response:** Disputed. The material cited does not support the assertion as stated. Paragraph 151 names four Plaintiffs who served Ms. W.—Li Chen, Xiu F. Chen, Hui He and Mu Z. Zhang—and no evidence is cited from Hui He. The accounts cited for the other three vary: "[e]very one to two hours" (Friedman Decl. Ex. 6 ¶ 26); "every two hours" (Ex. 27 ¶ 24); "two to three times every two to three hours" (Ex. 84 ¶ 18); "two, three times … Sometimes three times" (Ex. 54 at 59:14–16); and "two to three times … Sometimes … four to five times" (Ex. 56 at 93:20–23). The complaints the same three Plaintiffs filed with the Department of Labor, each describing a single female patient over ninety, report that the patient used the commode "2 to 3 times on average each night" (Li Chen and Mu Z. Zhang, whose complaints also state that the aide needed to get up "at least 3 times" and "every 2 hours," respectively) and "2-3 times a night" (Xiu F. Chen). Friedman Decl. Ex. 132 at GSD-000891, GSD-000915, GSD-000929. In SWHNY's care-management calls of September 4, October 1, November 5 and December 3, 2018, the care manager recorded that

"PCA Zhang, Muzhen" denied that the member had experienced incontinence in the prior three days; calls earlier in 2018 record that the member was "occasionally bladder incontinent." Friedman Decl. Ex. 126 at SWHNY 001853–001858, 001875, 001877. SWHNY's nurse recorded that Ms. W. needed assistance getting up one to two times a night, with a bedside commode in place. Friedman Decl. Ex. 49 at SWHNY 005326, 005350.

**163.** *None of the Plaintiffs who provided care services to Ms. W. were able to obtain five hours of continuous, uninterrupted sleep per shift; instead Plaintiffs never slept more than three hours per shift. Friedman Decl., Ex. 6 (L. Chen Decl. ¶ 27; see also ¶¶ 25-26); Ex. 56 (Zhang Dep. 88:2-13, 93:7-24); Ex. 27 (Zhang Decl. ¶¶ 11, 23-25); Ex. 54 (X. Chen Dep. 59:22-60:7); Ex. 84 (X. Chen Decl. ¶¶ 17-19).*

**Response:** Objection; the paragraph states a legal conclusion, not a fact, and no response is required. *Flores Moreno*, ECF 94 at 6 n.5. To the extent a response is required: Admitted that Li Chen avers that she never slept more than three continuous hours and that Ms. Zhang testified to two to three hours. Friedman Decl. Ex. 6 ¶ 27; Ex. 56 at 88:6–7. The material cited does not support the assertion as to the other Plaintiffs: no evidence is cited from Hui He; Xiu F. Chen's declaration gives no hours figure and describes a night-time window from midnight or 1:00 a.m. to 8:00 or 10:00 a.m. with two to three interruptions, Friedman Decl. Ex. 84 ¶¶ 17–19; and Ms. Zhang's declaration paragraphs cited give no figure. Ex. 27 ¶¶ 23–25. Ms. Zhang testified that she slept at the member's home, that she signed an agreement requiring written notice of any sleep shortfall and did not give it, and that she raised the subject only with a nurse; Xiu F. Chen testified that she did not raise it at all. Friedman Decl. Ex. 56 at 88:14–19, 96:18–19, 97:2–25; Ex. 54 at 59:17–18, 60:4–7.

**164.** *Additionally, none of the Plaintiffs received three hours of completely duty-free meal breaks during their shifts with Ms. W.; instead, the Plaintiffs rushed their meals, usually taking between 10 and 15 minutes to eat and typically eating at Ms. W.'s side so that they could continue to monitor Ms. W.'s safety while they ate. Friedman Decl., Ex. 6 (Li Chen Decl. ¶¶ 30-31); Friedman Decl., Ex. 56 (Zhang Dep. 91:13-92:5, 96:12-14); Ex. 27 (Zhang Decl. ¶ 25); Friedman Decl., Ex. 84 (Xiu F. Chen Decl. ¶¶ 22-23).*

**Response:** Admitted in part and disputed in part. Admitted that the declarants state that they ate quickly at the member's side. Disputed that no meal time was available. Ms. Zhang testified: "I did have the time to eat, however, sometimes when I was hurrying through it or I just had two bites then the patient said I have to go to the bathroom and I have to get up right away … so in other words I was on call so we could not get three hours of mealtime." Friedman Decl. Ex. 56 (Zhang Dep.) 91:21–92:5. Her declaration states that while the member watched television she "would go out to buy groceries and clean the apartment," and that the member's lunch often ran from 2 p.m. until around 5 p.m. because "she would eat, watch television, nap, and talk"; she adds: "The entire time, I had to stay by her side to make sure that she didn't slip out of her chair. Also, she wanted me to be there to listen to her talk." Friedman Decl. Ex. 27 ¶¶ 17, 19–20. Xiu F. Chen states that she "was usually done eating in 10-15 minutes," that with cooking her meals "took no more than 30 minutes in total," and that she left the home to buy the member's newspaper. Friedman Decl. Ex. 84 ¶¶ 11, 22–23.

**165.** *D.C. was a "patient" of GreatCare and a member of non-defendant MLTC Aetna authorized for 24-hour, "live-in" care. Friedman Decl., Ex. 12 (HHAX EVV Rec. For He).*

**Response:** Admitted in part and disputed in part. Admitted that GreatCare served an Aetna household on a 24-hour live-in per diem basis under a mutual authorization. Friedman Decl.

Ex. 93 at AET LIANG 0001008 ("S5126 - 24 hour live-in aide - 7DX24H (MUTUAL)"). The material cited does not support the assertion as stated: the only exhibit cited, Ms. He's EVV export, contains no authorization, and its client-name column is redacted in every row, so it neither identifies D.C. nor shows what Aetna authorized. Every Aetna live-in row in it is coded "PCA-LivingInMutual"—one aide serving two members of one household. Friedman Decl. Ex. 12 (71 rows across 36 dates, 7/5/2016–10/18/2016).

**166.** *During the period covered by the Amended Complaint, Plaintiff Hui He worked 18 "live-in" shifts providing care services to D.C. Id.*

**Response:** Admitted in part and disputed in part. Admitted that Ms. He's EVV record shows 36 twenty-four-hour "PCA-LivingInMutual" days under Aetna between July 5 and October 18, 2016. Friedman Decl. Ex. 12 (71 rows, 36 distinct dates). Disputed that eighteen of them can be attributed to D.C. from the cited exhibit, whose client-name column is redacted in every row; the same 36 days are the only possible source for both this paragraph's eighteen shifts and ¶ 197's seventeen. Friedman Decl. Ex. 12; Ex. 93 at AET LIANG 0001008.

**167.** *Aetna conducted assessments of Mr. C. on March 3, 2016 and September 7, 2016. Friedman Decl., Ex. 85 (Aetna Ass. Recs. for D.C., AET D.C. 0000010-0000029, 0000030-0000049).*

**Response:** Admitted in part and disputed in part. Admitted that comprehensive community health assessments of Mr. C. dated March 3, 2016 and September 7, 2016 appear in the exhibit. Friedman Decl. Ex. 85 at AET CHEN 0000010–0000049. Disputed that Aetna conducted them: each form states "Organization which conducted this assessment: XINCON HOME HEALTH CARE SERVICES, INC. - New York (1669L001) (LHCSA); Organization for which this assessment is being performed: Aetna Better Health." *Id.* at AET 0000010.

**168.** *The assessments recorded that Mr. C. exhibited an unsteady gait daily, that he ambulated indoors with a cane, and that he required assistance with activities of daily living, including toilet transferring. Id. at 0000013-0000015, 0000033-0000035.*

**Response:** Admitted. GreatCare notes that the same pages record that Mr. C. was fully continent, independent for toilet use and bed mobility, cognitively independent, and left his home daily. *See* Friedman Decl. Ex. 85 at AET 0000010 (cognition), 0000013 (toilet use, bed mobility), 0000014 (continence, activity level), 0000015 ("No fall in last 90 days").

**169.** *Plaintiff Hui He did not receive five hours of continuous, uninterrupted sleep or three hours of completely duty-free meal breaks on any of her 24-hour shifts when providing care to Mr. C. Friedman Decl., Ex. 86 (He Decl. ¶¶ 15-16).*

**Response:** Disputed. The material cited does not support the assertion. Ms. He's declaration does not mention Mr. C.; it states that she "primarily cared for two 24-hour live-in care recipients," describes Mr. L. and an unnamed elderly woman, and offers only a general closing sentence for other recipients. Friedman Decl. Ex. 86 ¶¶ 4, 9–16. The cited paragraph also states that "[a]t most, I was able to take approximately half an hour to eat my own meal," and Ms. He testified that she could "take an hour or so to have a break for yourself, to have lunch." Ex. 86 ¶ 16; Friedman Decl. Ex. 92 (He Dep.) 65:18–24. Aetna's assessments of Mr. C. record a man living with his spouse who walked with a cane and went out daily. Friedman Decl. Ex. 85 at AET 0000010, 0000013–0000015.

**170.** *S.K.C.-2 was a "patient" of GreatCare and a member of non-defendant MLTC Elderplan, who authorized Ms. C. for 24-hour, "live-in" care services. Friedman Decl., Ex. 87 (ElderPlan Auth. Services Notice for S.K.C.-2, ELDERPLAN000204).*

**Response:** Admitted in part and disputed in part. Admitted that S.K.C.-2 was a member of ElderPlan and that ElderPlan authorized live-in personal care worker services from GreatCare. Friedman Decl. Ex. 87 at ELDERPLAN 000204. Disputed that the cited notice authorized 24-hour care in the sense the paragraph implies: the notice authorizes "Personal Care Worker (PCW): 91 live-in total hrs/wk"—thirteen hours per day—and ElderPlan's tasking tool for the same member computes 6.05 task hours per day and 42.33 per week. Friedman Decl. Ex. 87 at ELDERPLAN 000204; Ex. 88 at ELDERPLAN 000205.

**171.** *During the period covered by the Amended Complaint, Plaintiffs Hui He and Hui X. Ruan each provided 24-hour, "live-in" services to S.K.C.-2 for a total of 198 shifts. Friedman Decl., Ex. 12, 19 (HHAX EVV Rec. For He and Ruan).*

**Response:** Admitted in part and disputed in part. Admitted that the two cited EVV exhibits contain 200 ElderPlan live-in rows between them: ten for Ms. He (September 1 to October 15, 2016) and 190 for Ms. Ruan (September 6, 2016 to July 15, 2018). Friedman Decl. Ex. 12; Ex. 19. Disputed that 198 of them were shifts for S.K.C.-2 by these two Plaintiffs: neither exhibit names the member, and ElderPlan's own assessment records identify two other GreatCare aides serving this member ("Tenzan, Dolker--PCW from Great care INC"; "Xiao Ling Zhu--PCW") and record Ms. He at the August 18, 2016 assessment as a personal care worker "from Amazing Home Care," a different agency. Friedman Decl. Ex. 88 at ELDERPLAN 000100, 000128, 000206; NYSDOH 000380.

**172.** *ElderPlan assessed Ms. C. on August 18, 2016, February 25, 2017, August 9, 2017, and February 19, 2018. Friedman Decl., Ex. 88 (ElderPlan Ass. Recs. for S.K.C.-2, ELDERPLAN000099, 000128, 000206; NYSDOH 000380).*

**Response:** Admitted.

**173.** *ElderPlan recorded that Ms. C.'s diagnoses included Parkinson's disease, functional urinary incontinence, abnormalities of gait and mobility, osteoarthritis, osteoporosis, congestive heart failure, and short-term memory problems; ElderPlan's care-management records further reflected dementia and mild cognitive impairment. Id. at 000099, 000118, 000146, 000224, 000247.*

**Response:** Admitted in part and disputed in part. Admitted that ElderPlan recorded the diagnoses listed. Friedman Decl. Ex. 88 at ELDERPLAN 000099, 000118, 000146, 000224, 000247. Disputed that ElderPlan's records reflected dementia or mild cognitive impairment: one of the pages cited codes "Alzheimer's disease: Not present" and "Other Dementia: Not present," as does the corresponding NYSDOH page, and the only cognitive entry in the exhibit is "Short-term memory" as a trigger item. Friedman Decl. Ex. 88 at ELDERPLAN 000247; NYSDOH 000385; ELDERPLAN 000099.

**174.** *Ms. C. ambulated only with a rollator and the assistance of her aide. Id. at 000103; NYSDOH 000390, 000391.*

**Response:** Admitted that ElderPlan recorded that Ms. C. ambulated "with assist of PCW and rollator." Friedman Decl. Ex. 88 at NYSDOH 000385. GreatCare notes that the pages cited (ELDERPLAN 000103; NYSDOH 000390–000391) are an ADL performance page and walking-test pages that do not contain that finding, and that the same records list a bedside commode among the member's equipment ("Use Commode at Night (Yes/No): Yes"). *Id.* at ELDERPLAN 000205.

**175.** *Ms. C. required extensive-to-maximal assistance with the activities of daily living, including walking, transferring, toileting, dressing, and eating. Id. at 000103, NYSDOH 000385, 000390, 000391.*

**Response:** Admitted. GreatCare notes that ElderPlan's Tasking Tool converted the same needs into 6.05 task hours per day and 42.33 per week. *See* Friedman Decl. Ex. 88 at ELDERPLAN000205 (PDF p. 11).

**176.** *ElderPlan also recorded that Ms. C. was frequently incontinent of urine, used a commode, and wore pull-ups, liners, and underpads. Id. at 000099, 000118, 000146, 000224, 000228, NYSDOH 000385.*

**Response:** Admitted. GreatCare notes that the same records show a bedside commode in use at night. *See* Friedman Decl. Ex. 88 at ELDERPLAN000205 (PDF p. 11).

**177.** *ElderPlan's records reflect a complaint that a prior aide was unwilling to get up at night to assist her with toileting. Friedman Decl., Ex. 89 (ElderPlan Member Notes for S.K.C.-2, ELDERPLAN000039-000040).*

**Response:** Admitted in part and disputed in part. GreatCare objects under Fed. R. Evid. 802 and 805 to the daughter's statements recorded in the plan's note, to the extent offered for their truth. Admitted that the note exists; disputed as to any relevance to Plaintiffs — the complained-of aide served Mondays and Tuesdays and was replaced on May 22, 2017, while Ms. Ruan's shifts for this member were Wednesdays and Thursdays. *See* Friedman Decl. Ex. 89 at ELDERPLAN000039-000040; Friedman Decl. Ex. 19 (Ruan's 190 Elder Plan rows: 85 Wed, 84 Thu, 9 Sat, 8 Sun, 2 Tue, 2 Fri; May 2017 shifts 5/3, 5/4, 5/10, 5/11, 5/17, 5/18, 5/24, 5/25, 5/31).

**178.** *In its August 18, 2016, February 25, 2017, and August 9, 2017 assessments, ElderPlan recorded that Ms. C. could not be left alone safely. Friedman Decl., Ex. 88 (ElderPlan Ass. Recs. for S.K.C.-2, ELDERPLAN000119, 000147, 000225; NYSDOH 000444, 001363, 001453).*

**Response:** Admitted. GreatCare notes that each cited page also answers "Can the needs be scheduled? Yes." *See* Friedman Decl. Ex. 88 at ELDERPLAN000119, 000147, 000225; NYSDOH 000444, 001363, 001453.

**179.** *Neither of the Plaintiffs assigned to provide care services to Ms. C. received five hours of continuous uninterrupted sleep or three hours of completely duty-free meal breaks when working 24-hour shifts. Friedman Decl., Ex. 86 (He Decl. ¶¶ 14-15); Ex. 100 (Ruan Decl. ¶ 21).*

**Response:** Disputed. The material cited does not support the assertion. Neither declaration mentions S.K.C.-2. Ms. He's cited paragraphs describe an unnamed woman whose husband slept in the bedroom, whereas ElderPlan's records show this member living with a daughter who provided care two days a week; Ms. Ruan's cited paragraph is a general statement about "any of my 24-hour live-in care recipients," and her declaration describes four unnamed recipients, none identifiable as this member. Friedman Decl. Ex. 86 ¶¶ 14–15; Ex. 100 ¶¶ 12–21; Ex. 88 at ELDERPLAN 000205. Each declarant describes a sleeping accommodation (Ex. 86 ¶ 15; Ex. 100 ¶ 14, "Although I had a separate bedroom"), and ElderPlan's tasking tool computed 6.05 task hours per day with a commode at night. Friedman Decl. Ex. 88 at ELDERPLAN 000205.

**180.** *S.C. was a "patient" of GreatCare and member of non-defendant MLTC Aetna, who authorized Ms. C. for 24-hour, "live-in" services. Friedman Decl., Ex. 90 (Aetna Ass. Recs. for S.C., AET S.C. 0000825, 000847).*

**Response:** Admitted in part and disputed in part. Admitted that S.C. was a member of Aetna and that Aetna's assessments record "24hrs PCA live-in service" and "PCA from Greatcare Home Care, PCA live in." Friedman Decl. Ex. 90 at AET 0000803, 0000824. The material cited does not otherwise support the assertion: Exhibit 90 is an assessment set containing no

authorization document, and the assessments were conducted by contracted licensed agencies for Aetna. *Id.*

**181.** *During the period covered by the Amended Complaint, Plaintiffs Zhan J. Li, and Hui X. Ruan each provided 24-hour, "live-in" services to S.C. for a total of 319 shifts. Friedman Decl., Exs. 16, 19 (HHAX EVV Recs. for Z. Li and Ruan).*

**Response:** Admitted in part and disputed in part. Admitted that the two cited exhibits contain 321 twenty-four-hour Aetna rows between them (92 in Ex. 16, June 3, 2017 to August 16, 2018; 229 in Ex. 19, June 14, 2019 to January 16, 2022). Friedman Decl. Exs. 16, 19. Disputed as to the figure of 319 and as to attribution to S.C., whose name is redacted from every row. *Id.*

**182.** *Aetna Better Health sent a registered nurse to conduct comprehensive assessments of Ms. C. on January 30, 2017, July 26, 2017, January 10, 2018, July 13, 2018, January 12, 2019, July 14, 2019, and January 19, 2020. Friedman Decl., Ex. 90 (Aetna Ass. Recs. for S.C., AET S.C. 0000803, 0000824, 0000846, 0000868, 0000889, 0000910, 0000932).*

**Response:** Admitted in part and disputed in part. Admitted that comprehensive assessments of Ms. C. dated January 30, 2017, July 26, 2017, January 10, 2018, July 13, 2018, January 12, 2019, July 14, 2019 and January 19, 2020 appear in the exhibit. Friedman Decl. Ex. 90. Disputed that Aetna conducted them: the forms name Xincon Home Health Care Services, Inc. and Longevity Health Services, LLC, contracted licensed agencies, as the conducting organizations, performed for Aetna Better Health. *Id.* at AET 0000824. GreatCare notes that the Bates numbers cited do not correspond to the dates in the order listed.

**183.** *Across its assessments, Aetna recorded that Ms. C.'s primary diagnosis was dementia, and that her cognitive skills for daily decision-making were moderately to severely impaired. Id. at 0000825, 0000829; 0000847, 0000851, 0000869, 0000873.*

**Response:** Admitted.

**184.** *Aetna recorded that Ms. C. was non-ambulatory, that her primary mode of locomotion indoors was a wheelchair, and that she could not stand or walk on her own; required extensive-to-maximal assistance with the activities of daily living, including two-person assistance for bathing and maximal assistance for toileting, and total dependence for meal preparation, housework, medications, and other instrumental activities; was incontinent of urine and wore pull-ups, diapers, and underpads. Id. at 0000871-872, 0000937.*

**Response:** Admitted. GreatCare notes that the same assessments record the member stable and safe at home with no falls or hospitalizations. *See* Friedman Decl. Ex. 90 at AET 0000824 (PDF p. 7).

**185.** *Aetna recorded that Ms. C. had a diagnosis of insomnia, experienced visual hallucinations and delusions, was prescribed a bedtime sleep medication and a bedtime antipsychotic, and that she could not be left alone safely. Id. at 0000820, 0000823, 0000825, 0000842, 0000845, 0000847, 0000882, 0000906, 0000909, 0000947.*

**Response:** Admitted in part and disputed in part. Admitted that Aetna recorded insomnia under active treatment, hallucinations and delusions, bedtime Ambien, and that the member could not be left alone; disputed that any antipsychotic was prescribed at bedtime — quetiapine is recorded "QD (Daily)." *See* Friedman Decl. Ex. 90 at AET 0000947 (PDF p. 27); 0000823 (PDF p. 6, "Can the needs be scheduled? ... Yes").

**186.** *Neither of the Plaintiffs assigned to provide care services to Ms. C. received five hours of continuous uninterrupted sleep or three hours of completely duty-free meal breaks when working 24-hour shifts. Friedman Decl., Ex. 81 (Zhan J. Li Decl. ¶¶ 41-42); Ex. 100 (Ruan Decl. ¶ 21)*

**Response:** Disputed. The material cited does not support the assertion. Neither declaration mentions Ms. C.: Zhan J. Li's cited paragraphs refer to "any of my 24-hour shifts at GreatCare," and her declaration describes six recipients, none identified as this member; Ms. Ruan's cited paragraph names no recipient. Friedman Decl. Ex. 81 ¶¶ 13–42; Ex. 100 ¶ 21. Zhan J. Li's declaration describes meal breaks of "at most 25 to 30 minutes," "about 10 to 15 minutes" and "20 to 30 minutes," and a bed "placed right across from" the member's bed. Friedman Decl. Ex. 81 ¶¶ 17, 26, 35, 39. Aetna recorded this member's insomnia as treated with a bedtime medication and the member as "stable and safe in home." Friedman Decl. Ex. 90 at AET 0000824, 0000947.

**187.** *Y.L. was a "patient" of GreatCare and member of non-defendant MLTC Fidelis, who authorized Mr. L. for 24-hour, "live-in" services. See Friedman Decl., Ex. 91 (Fidelis Ass. Recs. for Y.L., NYSDOH 000821, 000841); Ex. 12 (HHAX EVV Recs. for He).*

**Response:** Admitted in part and disputed in part. Admitted that Mr. L. was a member of Fidelis and received 24-hour live-in personal care through GreatCare. The material cited does not otherwise support the assertion: Exhibit 91 is a single assessment dated April 28, 2017, not an authorization, and the same page records that the plan's task tool "CALULATES 7DX9HRS." Friedman Decl. Ex. 91 at NYSDOH 000821, 000841.

**188.** *During the period covered by the Amended Complaint, Plaintiff Hui He provided 24-hour, care services to Mr. L. over a total of 130 "live-in" shifts. Friedman Decl., Ex. 12 (HHAX EVV Rec. For He).*

**Response:** Admitted.

**189.** *On April 28, 2017, Fidelis conducted an assessment of Mr. L., then age 86, that recorded he was bedbound, that his cognitive skills for daily decision-making were severely impaired, and that he had short-term, procedural, and situational memory problems. Friedman Decl., Ex. 91 (Fidelis Ass. Rec of Y.L., NYSDOH 000822, 000825, 000830, 000839).*

**Response:** Admitted. GreatCare notes that the same assessment records that the member lived "[w]ith spouse/partner only"; that his first informal helper was his spouse, who lived with him and gave him help with both ADLs and IADLs, with 16 hours of informal help from family, friends and neighbors in the prior three days; and that the assessor's comment at sign-off reads "CURRENT PCA SERVICES 7DX24HRS TTT CALULATES 7DX9HRS." Friedman Decl. Ex. 91 at NYSDOH 000821, 000833–000834, 000841.

**190.** *The April 28, 2017 assessment recorded that Mr. L. required total dependence (full performance by others) for bathing, upper- and lower-body dressing, locomotion, and toilet transferring and toilet use; that walking did not occur during the entire assessment period; and that he required maximal assistance with personal hygiene, bed mobility, and eating, with his primary mode of locomotion indoors recorded as bed-bound. Id. at 000824-000825.*

**Response:** Admitted. GreatCare notes that the same assessment records the co-resident wife providing ADL help and sixteen hours of informal care in three days. *See* Friedman Decl. Ex. 91 at NYSDOH 000833 (PDF p. 14, Helper 1 = Spouse), 000834 (PDF p. 15, "16"), 000841 (PDF p. 22).

**191.** *The April 28, 2017 assessment also recorded that Mr. L. was incontinent of both bladder and bowel with no control present and wore diapers/briefs, with diagnoses including full incontinence of feces and other specified urinary incontinence. Id. 000825, 000831, 000838.*

**Response:** Admitted.

**192.** *The April 28, 2017 assessment also flagged that Mr. L.'s conditions made his cognitive, ADL, mood, or behavior patterns unstable; that his wife (the informal helper who lived with him) was unable to continue in caring activities; that family reported feeling overwhelmed by his illness; and that the aide was instructed to keep the bed side rails up, change diapers frequently to prevent skin breakdown, and reposition him every two hours. Id. at 000827, 000833-000834.*

**Response:** Admitted. GreatCare notes that the same assessment codes "Turning/repositioning program: Not ordered AND did not occur" and "Scheduled toileting program: Not ordered AND did not occur." *See* Friedman Decl. Ex. 91 at NYSDOH 000832 (PDF p. 13); 000826 (PDF p. 7, Sleep Problems); 000835 (PDF p. 16, "TRAZODONE 50 … BED (Bedtime)").

**193.** *Plaintiff Hui He's responsibilities for Mr. L. included: feeding him milk every around the clock, changing his diaper approximately every two hours, using the toilet whenever he needed, and turning and repositioning his body in bed approximately every two hours to prevent bedsores and skin breakdown. Friedman Decl., Ex. 92 (He Dep. 49:15-17, 51:19-22, 64:18-65:13, 77:10-14); Ex. 86 (He Decl. ¶¶ 11, 12).*

**Response:** Admitted in part and disputed in part. Admitted that Ms. He so testified and averred. Friedman Decl. Ex. 92 (He Dep.) 77:12–14; Ex. 86 ¶¶ 11–12. Disputed to the extent the paragraph attributes to the cited testimony matters it does not contain: the passages at 49:15–17 and 51:19–22 are general answers about all of her patients and do not mention this member, milk, or the

toilet, and the Fidelis assessment records that the member was bedbound, doubly incontinent, and "does not use [the toilet]." Friedman Decl. Ex. 91 at NYSDOH 000832. Ms. He testified that she did not tell GreatCare about the night-time demands she describes. Ex. 92 at 78:2–8.

**194.** *Because Mr. L. was confined to his bed and had to be turned and have his diapers changed every two hours throughout the night, Ms. He could not sleep for five uninterrupted hours; as she explained, had she slept for five hours the patient "would be all wet with . . . urine," which "would not be acceptable." Friedman Decl., Ex. 92 (He Dep. 77:10-14, 148:23-149:3, 150:8-14); Ex. 86 (He Decl. ¶¶ 11, 12).*

**Response:** Admitted in part and disputed in part. Admitted that the care recipient was bedbound and doubly incontinent, wore diapers, was totally dependent on others for toilet use and locomotion, and was under the care of a visiting palliative and hospice physician, Friedman Decl. Ex. 91 (Fidelis Community Health Assessment, Apr. 28, 2017) §§ F, J; and admitted that Ms. He so testified. Disputed that Ms. He "could not sleep for five uninterrupted hours" on any particular shift, a conclusion the paragraph draws from Ms. He's retrospective generalization rather than from any shift-level evidence. Ms. He testified that she never raised the subject with anyone at GreatCare: "Q. Did you speak to anyone about it? A. No." He Dep. (Jan. 15, 2026) 152:13–19; *see also id.* 78:2–14 (ECF 252-12).

**195.** *Plaintiff Hui He did not have enough time to rest and did not receive three hours of completely duty-free meal breaks during her shifts; she was able to stop to eat only after feeding the care recipient, and for no more than approximately a half hour to an hour before resuming work. Friedman Decl., Ex. 92 (He Dep. 64:18-65:24, 77:4-5); Ex. 86 (He Decl. ¶ 16).*

**Response:** Admitted in part and disputed in part. Admitted that Ms. He testified that she did not receive three full hours of duty-free meal breaks. Disputed that she had "no more than

approximately a half hour to an hour" to eat. The cited deposition passage is: "there is a time, of course, that you can take an hour or so to have a break for yourself, to have lunch." Friedman Decl. Ex. 92 (He Dep.) 65:18–24; *see also id.* 64:12–14. The shorter figure is imported from Ms. He's declaration (Ex. 86 ¶ 16), which also describes meal periods taken. Ex. 86 ¶¶ 5, 7.

**196.** *M.Q.L. was a "patient" of GreatCare and a member of non-defendant MLTC Aetna, who authorized Ms. L. for 24-hour, "live-in" services. Friedman Decl., Ex. 93 (Aetna Serv. Auths. for M.Q.L., AET M.Q.L. 0001004, 0001006, 0001008).*

**Response:** Admitted. GreatCare notes that Aetna's authorization, "24 hour live-in aide - 7DX24H (MUTUAL)" at one unit per day from June 1, 2016, was terminated as of October 17, 2016 and covered two consumers in one household. *See* Friedman Decl. Ex. 93 at AET LIANG 0001008 (PDF p. 4); Friedman Decl. Ex. 94 at NYSDOH 000488 ("Others Present at Assessment: Husband (Mutual Case): and aide").

**197.** *During the period covered by the Amended Complaint, Plaintiff Hui He worked 17 "live-in" shifts providing care services to M.Q.L. Friedman Decl., Ex. 12 (HHAX EVV Rec. for He).*

**Response:** Admitted in part and disputed in part. Admitted that Ms. He's EVV record shows 36 twenty-four-hour mutual live-in days under Aetna between July 5 and October 18, 2016, matching the period of Aetna's mutual authorization. Friedman Decl. Ex. 12; Ex. 93 at AET 0001008. Disputed that seventeen of them can be attributed to Ms. L. from the cited exhibit, whose client-name column is redacted; the same 36 days are the only source for both this paragraph and ¶ 166, and each was a mutual shift serving two members of one household. Friedman Decl. Ex. 12.

**198.** *Aetna conducted assessments of Ms. L. on March 3, 2016 and September 7, 2016. Friedman Decl., Ex. 94 (Aetna Ass. Recs. for M.Q.L., NYSDOH 000488, 001521).*

**Response:** Admitted in part and disputed in part. Admitted that assessments of Ms. L. dated March 3, 2016 and September 7, 2016 appear in the exhibit. Friedman Decl. Ex. 94 at NYSDOH 000488, 001521. Disputed that Aetna conducted them: each form names Xincon Home Health Care Services, Inc. as the conducting organization. *Id.* The same page records "Others Present at Assessment: Husband (Mutual Case): and aide." *Id.* at NYSDOH 000488.

**199.** *The assessments recorded that Ms. L. lived with her spouse only; that she was cognitively impaired, with daily decision-making moderately impaired and short-term, procedural, and situational memory problems and periods of confusion; had a diagnosis of dementia; and that she used a wheelchair, with an unsteady gait. Id. at 000488-000489, 000492-000493, 000496.*

**Response:** Admitted.

**200.** *The assessments also recorded that Ms. L. required extensive assistance for bathing, personal hygiene, upper- and lower-body dressing, locomotion, and toilet transferring and toilet use, and maximal assistance for walking; that she was occasionally incontinent of bladder and wore pads or briefs; that she was restrained by bed rails "for fall precaution"; and that she could not be left alone safely. Id. at 000490-000494, 000496-000500, 000503, 000505-000506, 000508, 001521-001527, 001529-001533, 001535, 001537-001538, 001540.*

**Response:** Admitted. GreatCare notes that both assessments code sleep problems on one of the last three days, answer that the needs can be scheduled, and record occasional (less than daily) bladder incontinence. *See* Friedman Decl. Ex. 94 at NYSDOH 000493, 001526; 000508 (PDF p. 22) and 001540 (PDF p. 42), Sign/Finalize.

**201.** *Whenever Ms. He worked a "live-in" shift providing care to Ms. L., Ms. He was not able to obtain five hours of continuous, uninterrupted sleep or three hours of completely duty-free meal breaks. Friedman Decl., Ex. 86 (He Decl. ¶ 16).*

**Response:** Objection; the paragraph states a legal conclusion, not a fact, and no response is required. *Flores Moreno*, ECF 94 at 6 n.5. To the extent a response is required: Admitted that Ms. He avers, in general terms, that she did not receive five hours of uninterrupted sleep or three hours of duty-free meal breaks on any of her 24-hour shifts. Friedman Decl. Ex. 86 ¶ 16. The material cited does not support the assertion as to Ms. L.: the declaration does not mention her, states that Ms. He "primarily cared for two 24-hour live-in care recipients," and describes Mr. L. and an unnamed woman. Friedman Decl. Ex. 86 ¶¶ 4, 9–15. The cited paragraph also states that "[a]t most, I was able to take approximately half an hour to eat my own meal," and Ms. He testified that she could take "an hour or so" for lunch. Ex. 86 ¶ 16; Friedman Decl. Ex. 92 (He Dep.) 65:18–24. Ms. L. was one of two members of a mutual household served by a single aide. Friedman Decl. Ex. 93 at AET 0001008; Ex. 94 at NYSDOH 000493, 000508.

**202.** *K.L. was a "patient" of GreatCare and a member of non-defendant MLTC Integra, who authorized Ms. L. for 24-hour, "live-in" care services. Friedman Decl., Ex. 95 (Integra Ass. Recs. for K.L., NYSDOH 000225-000226, 000331, 001364; Ex. 8 (HHAX EVV Rec. for M. Chen).*

**Response:** Admitted in part and disputed in part. Admitted that K.L. was a member of Integra and that Integra's 2016–2017 assessments record that she "has currently PCW 7 D X 24 Hrs service from Greatcare" and "receives 24 hours live-in service." Friedman Decl. Ex. 95 at NYSDOH 001364, 000331, 000335; Ex. 8 (Integra rows coded "PCA-LivingIn"). The material cited does not otherwise support the assertion: Exhibit 95 contains no authorization document, and at the cited page NYSDOH 000225 the words "receives 24 hours lives-in service" describe the

member's co-resident granddaughter, not the member. Friedman Decl. Ex. 95 at NYSDOH 000225, 000356. The same assessment records that the member's daughter lives upstairs and that the daughter and son "can provide help as needed." *Id.* at NYSDOH 000225.

**203.** *During the period covered by the Amended Complaint, Plaintiff Mei F. Chen provided 24-hour, "live-in" care to Ms. L. over 100 "live-in" shifts. Id.*

**Response:** Admitted in part and disputed in part. Admitted that GreatCare's EVV shows 118 live-in shifts by Ms. Chen under INTEGRA between March 6, 2016 and April 17, 2017; note that all of them precede the limitations period. *See* Friedman Decl. Ex. 8 (118 INTEGRA "PCA-LivingIn" rows, 3/6/2016-4/17/2017); Friedman Decl. Ex. 96 ¶¶ 11-12.

**204.** *Integra conducted assessments on Ms. L. on February 1, 2016, February 19, 2016, August 12, 2016, and February 15, 2017. Friedman Decl., Ex. 95 (Integra Ass. Recs. for K.L., NYSDOH 000224, 000330, 000356, 001364).*

**Response:** Admitted in part and disputed in part. Admitted that assessments of Ms. L. dated February 1, 2016, February 19, 2016, August 12, 2016 and February 15, 2017 appear in the exhibit. Friedman Decl. Ex. 95 at NYSDOH 000224, 000356, 001364, 000330. Disputed that Integra conducted the February 1, 2016 assessment: the form names Astra Home Care, Inc., a licensed agency, as the conducting organization, performed for Integra. *Id.* at NYSDOH 000224. GreatCare notes that the Bates numbers cited do not correspond to the dates in the order listed.

**205.** *In each of the assessments, Ms. L.'s primary diagnosis was recorded as dementia. Id. at 000229, 000336, 000361, 001370.*

**Response:** Admitted.

**206.** *Each assessment additionally recorded that Ms. L. had impaired cognitive skills for daily decision-making, recorded as moderately impaired in the February 1, 2016, August 12, 2016, and February 15, 2017 assessments, and as severely impaired in the February 19, 2016 assessment, and that she had a short-term memory problem. Id. at 000225, 000331, 000357, 001365.*

**Response:** Admitted.

**207.** *Ms. L. required maximal assistance with bathing, personal hygiene, dressing, and walking as Ms. L. exhibited an unsteady gait and was unable to walk on her own. Id. at 000228-000229, 000334, 000360, 000362, 000366, 001368, 001370.*

**Response:** Admitted. GreatCare notes that the same assessments record a daughter in the building visiting daily and a son available to help. *See* Friedman Decl. Ex. 95 at NYSDOH 000225 (PDF p. 3); 000331 (PDF p. 9).

**208.** *Ms. L. was frequently incontinent of both bladder and bowel on a daily basis and wore incontinence briefs. Id. at 000229, 000336, 000361, 001369.*

**Response:** Admitted.

**209.** *At the February 15, 2017 assessment, the assessor instructed that a toileting routine be instituted every two hours to reduce the occurrence of Ms. L.'s incontinence. Id. at 000336.*

**Response:** Admitted in part and disputed in part. Admitted that the February 15, 2017 assessor instructed a two-hourly toileting routine; disputed that the record shows such a routine was performed overnight. *See* Friedman Decl. Ex. 95 at NYSDOH 000336 (PDF p. 12), 000331 (PDF p. 9).

**210.** *The February 1, 2016 and February 19, 2016 assessments recorded that, as reported by Ms. L.'s personal care aide and son, Ms. L. could not clean herself after a bowel movement. Id. at 000229, 000361.*

**Response:** Admitted.

**211.** *Each of the assessments recorded that Ms. L. required maximal assistance to use the toilet and to clean herself after incontinent episodes. Id. at 000228, 000335, 000360, 001368.*

**Response:** Admitted.

**212.** *The February 1, 2016 and August 12, 2016 assessments recorded that Ms. L. could not be left alone safely. Id. at 000244, 001388.*

**Response:** Admitted. GreatCare notes that both cited pages also answer "Can the needs be scheduled? Yes," and the member was never alone in the apartment. *See* Friedman Decl. Ex. 95 at NYSDOH 000244 (PDF p. 7), 001388 (PDF p. 24), 001365 (PDF p. 20).

**213.** *Ms. L. needed toileting multiple times during the night, and Plaintiff Mei F. Chen had to help her each time and make sure that she did not fall. Friedman Decl., Ex. 96 (Mei F. Chen Decl. ¶ 14).*

**Response:** Disputed. Admitted that Ms. Chen avers three to four night-time toileting episodes; disputed as to any implication of continuous duty — the same paragraph records that the member rose even when she did not need the toilet and sometimes used a bedside commode. *See* Friedman Decl. Ex. 96 ¶¶ 11, 12, 14, 17.

**214.** *When providing care to Ms. L., Plaintiff Mei F. Chen never received five hours of continuous, uninterrupted sleep or three hours of completely duty-free meal breaks when working 24-hour shifts. Id. at ¶¶ 15-16.*

**Response:** Disputed. Admitted that Ms. Chen so avers; disputed as to legal effect — she concedes meal time, a sleeping accommodation, and disclosure of the 13-hour structure at hire, and all of her live-in shifts ended April 17, 2017. *See* Friedman Decl. Ex. 96 ¶¶ 10, 12, 16, 17; Friedman Decl. Ex. 8 (last live-in shift 4/17/2017).

**215.** *D.T.K. was a "patient" of GreatCare and a member of non-defendant MLTC Empire BlueCross BlueShield ("Empire"), who authorized Ms. T. for 24-hour, "live-in" care services. See Friedman Decl., Ex. 97 (Empire Plans for D.T.K., DTK000082).*

**Response:** Admitted in part and disputed in part. Admitted that D.T.K. was a member of Empire and that Empire's person-centered service plans elected "PCW 7d x live-in" for September 1, 2017 through April 30, 2018 and "7 days x live-in" for the two following plan periods. Friedman Decl. Ex. 97 at DTK 000082, 000088. The material cited does not otherwise support the assertion: the cited document is a service plan rather than an authorization, and it does not use the phrase "24-hour." *Id.*

**216.** *During the period covered by the Amended Complaint, Plaintiff Hui X. Ruan provided 24-hour, "live-in" services to Ms. T. over 34 shifts. Friedman Decl., Ex. 19 (HHAX EVV Rec. for Ruan).*

**Response:** Admitted in part and disputed in part. Admitted that Ms. Ruan's EVV record shows 34 live-in shifts, on 34 distinct dates from July 22, 2018 to March 17, 2019, within the period of Empire's service plans. Friedman Decl. Ex. 19. GreatCare notes that those 34 rows are billed under "Amerigroup," that the fourteen rows labelled "Empire Blue Cross blue shield" in the same exhibit are hourly rows from December 2022 to March 2023, that the client name is redacted in every row, and that Empire's records place the member in a nursing home by March 29, 2019. Friedman Decl. Ex. 19; Ex. 98.

**217.** *Empire's nurse assessed Ms. T. on August 21, 2018 and February 24, 2019. Friedman Decl., Ex. 98 (Empire/Anthem Ass. Recs. for D.T.K., DTK000072-000077, 000113-000119).*

**Response:** Admitted.

**218.** *Empire's assessments recorded that Ms. T. did not have a normal gait, required an assistive device and hands-on assistance to ambulate, and was at risk of falls. Id. at 000075, 000117.*

**Response:** Admitted.

**219.** *Empire's assessments further recorded that Ms. T. needed assistance with bathing, dressing, grooming, toileting, transferring, walking, and meal preparation. Id. at 000074.*

**Response:** Admitted. GreatCare notes that the same form records that the member directed her own care and that her sons could stay with her. *See* Friedman Decl. Ex. 98 at DTK000072 (PDF p. 2), DTK000076 (PDF p. 6).

**220.** *Empire's records also recorded that Ms. T. was incontinent and wore diapers, and that she woke approximately twice per night for toileting and changing. Friedman Decl., Ex. 99 (Empire/Anthem Prog. Notes for D.T.K., DTK000028-000029, 000048).*

**Response:** Admitted in part and disputed in part. GreatCare objects under Fed. R. Evid. 802 and 805 to the son's statement recorded in the care manager's note, to the extent offered for its truth. Admitted that Empire's records state that Ms. T. was incontinent and wore diapers, and that a care manager recorded, from a telephone call with the member's son on or about February 21, 2019, that she woke about twice a night. Friedman Decl. Ex. 99 at DTK 000028–000029 (son's call at DTK 000029). An earlier care-management contact note records "nighttime toileting needs" and

"Bowel & bladder incontinent" without stating any frequency. Id. at DTK 000048. Disputed to the extent the paragraph presents the twice-nightly figure as Empire's clinical finding: Empire's nurse answered item 29, "NIGHT TIME NEEDS," "NO" on both the August 21, 2018 and the February 24, 2019 assessments — the second three days after the son's call — on a form defining that item to include "toileting, turns, redirection, medications, diaper changes, transfer to BSC/toilet." Friedman Decl. Ex. 98 at DTK 000076, 000118.

**221.** *Empire assessed that Ms. T. was not safe to be left alone. Friedman Decl., Ex. 98 (Empire/Anthem Ass. Recs. for D.T.K., DTK000075).*

**Response:** Admitted. GreatCare notes that the same assessment answers "NIGHT TIME NEEDS: NO" and records no night-time cognitive or behavioral changes. *See* Friedman Decl. Ex. 98 at DTK000074-000076 (PDF pp. 4-6).

**222.** *While assigned to provide care services to Ms. T., Ms. Ruan never received five hours of continuous uninterrupted sleep or three hours of completely duty-free meal breaks when working 24-hour shifts. Friedman Decl., Ex. 100 (Ruan Decl., ¶ 21).*

**Response:** Disputed. The material cited does not support the assertion. The cited paragraph of Ms. Ruan's declaration is a general statement about "any of my 24-hour live-in care recipients"; the declaration describes four recipients, none identifiable as D.T.K., and states that at one placement "I had a separate bedroom." Friedman Decl. Ex. 100 ¶¶ 12–21. Empire's nurse recorded "NIGHT TIME NEEDS: NO" for this member on both assessments within the period of Ms. Ruan's 34 shifts. Friedman Decl. Ex. 98 at DTK 000076, 000118; Ex. 19 (34 live-in rows, 7/22/2018–3/17/2019).

**223.** *S.Y.Y. was a "patient" of GreatCare and a member of non-defendant MLTCs Extended and Hamaspik, who authorized Ms. Y. for 24-hour, "live-in" care services. See Friedman Decl., Ex. 101 (Extended Auth. Recs. for S.Y.Y., GC 005635); Ex. 102 (HHAX Note for S.Y.Y., GC 010739).*

**Response:** Admitted in part and disputed in part. Admitted that S.Y.Y. was a member of Extended MLTC and that GreatCare provided services in connection with her care. Disputed that either plan authorized "24-hour, 'live-in' care services" from GreatCare as an agency and disputed that the cited exhibits show any Hamaspik authorization. Every authorization in Friedman Decl. Ex. 101 is a CDPAP authorization — consumer-directed personal assistance under N.Y. Soc. Serv. Law § 365-f, in which the consumer or her designated representative selects, trains and supervises the personal assistant and GreatCare acts as fiscal intermediary: "CDPAP 24 HRS LIVE-IN," procedure code T1020, modifier U6, "WITH (GREAT CARE)." Friedman Decl. Ex. 101 at GC 005638–005641. The page cited, GC 005635, is a request to "increase CDPAP services from 35 HRS per week to LIVE-IN." *Id.* at GC 005635. Exhibit 101 contains no Hamaspik document, and the cited page of Exhibit 102 (GC 010739) is a note that the member would transfer to Hamaspik. Extended's utilization-management unit reviewed the arrangement as a "HIGH UTILIZATION CASE REVIEW/CDPAS 24 HR LIVE IN" and approved a "1 NIGHT OBSERVATIONAL STUDY 8PM - 8AM," to be performed by "EXTENDED AT HOME" and authorized for March 1 through March 9, 2020. Friedman Decl. Ex. 103-1 at GSD-ExtendedMLTC 00001152–00001153. Extended's member care associate, noting "MCA RECEIVED PAWC FROM GREATCARE," recorded the personal assistants as "PA: ZHENG, BIYU - FRIEND" and "PA: XIAO, MEIZHEN - FRIEND" on August 14, 2020, and "PA: XIAO, JIANRONG - FRIEND

EFF 11/10/2020" on December 16, 2020. *Id.* at GSD-ExtendedMLTC 00001157–00001158. *See infra* Statement of Additional Material Facts § I.

**224.** *During the period covered by the Amended Complaint, Plaintiffs Jian R. Xiao, Mei Z. Xiao, and Bi Y. Zheng each provided 24-hour, "live-in" care services to S.Y.Y. over a total of 1,384 shifts. Friedman Decl., Ex. 22, 24, 28 (HHAX Recs. for J. Xiao, M. Xiao, Zheng).*

**Response:** Admitted in part and disputed in part. Admitted that GreatCare's records show 1,384 twenty-four-hour shifts by these three Plaintiffs; disputed that they were agency aide shifts — every row is coded "PA-LivingIn" under a CDPAP payer, with GreatCare as fiscal intermediary. *See* Friedman Decl. Ex. 22, 24, 28 (every row "PA-LivingIn" under a CDPAP payer); Friedman Decl. Ex. 103-2 at GSD-ExtendedMLTC00001460 (PDF p. 1), 001496 (PDF p. 12), PDF pp. 7, 46; Friedman Decl. Ex. 103-1 at 001408 (PDF p. 55).

**225.** *Extended assessed and monitored Ms. Y. throughout her enrollment. See Friedman Decl., Ex. 103 (Extended Ass. Recs. for S.Y.Y., GSD-Extended 001132-001170).*

**Response:** Admitted. GreatCare notes that the same monitoring forms answer "Yes" to "Member is willing and able to interview, train, and supervise CDPAS personal assistants" and list GreatCare under "Name of fiscal intermediary/LHCSA." *See* Friedman Decl. Ex. 103-2 at GSD-ExtendedMLTC00001460, 001496, 001501, 001506, 001517 (PDF pp. 1, 12, 14, 16, 19); Friedman Decl. Ex. 103-1 at 001408, 001412, 001417 (PDF pp. 55, 57, 59).

**226.** *Extended's nurses repeatedly documented that Ms. Y. suffered from dementia, and that she was forgetful and cognitively impaired. See, e.g., Id. at 001366, 001399.*[12]

[12] See also id. at 001403, 001407, 001411, 001416, 001421, 001427, 001432, 001442, 001448, 001459, 001464.

**Response:** Admitted in part and disputed in part. Admitted that Extended recorded forgetfulness due to unspecified dementia. Disputed to the extent the paragraph asserts cognitive impairment beyond that: the 2018 entries record the member "A&OX3, FORGETFUL." See Friedman Decl. Ex. 103-1 at GSD-ExtendedMLTC00001358, 001362, 001366 (PDF pp. 41-43).

**227.** *Extended assessed Ms. Y. as at high risk for falls. Id. at 001479, 001603.*

**Response:** Admitted.

**228.** *Extended recorded that Ms. Y. used an assistive device, a cane and a walker, when ambulating. Id. at 001479, 001603, 001708.*[13]

**Response:** Admitted.

**229.** *Extended recorded that Ms. Y. had an unsteady gait and required hands-on human assistance for safe ambulation. Id. at 001481, 001604, 001708.*[14]

**Response:** Admitted.

**230.** *Extended repeatedly recorded that Ms. Y. had nocturia and got up during the night to use the bathroom; some assessments noted that she required assistance to get to the toilet, with several assessments specifying that the assistance was provided by her live-in personal assistant. See, e.g., Id. at 001366, 001407.*[15]

**Response:** Admitted. GreatCare notes that both cited entries are "Sleep Pattern" entries recording that the member slept eight hours, and seventeen or more later entries record "7-8 hours." *See* Friedman Decl. Ex. 103-1 at GSD-ExtendedMLTC00001366 (PDF p. 43), 001399 (PDF p. 50,

[13] See also id. at NYSDOH 000313, 000450, 001394.

[14] See also id. at 001479, 001603; NYSDOH 000313, 000450, 001394.

[15] See also id. at 001411, 001416, 001428, 001432, 001448, 001453, 001459, 001464, 001469, 001474, 001485, 001490, 001495, 001500, 001505, 001516, 001522, 001528, 001532, 001538, 001548, 001566, 001588, 001593, 001599, 001609, 001721.

"8H, SLE[E]P GOOD AFTER EATING GAR[L]IC SOUP."), 001407 (PDF p. 54); Friedman Decl. Ex. 103-2 at 001464, 001469, 001474, 001485, 001490, 001500, 001505, 001511, 001516, 001522, 001528, 001532, 001538, 001548, 001566, 001588, 001593.

**231.** *Extended repeatedly recorded that Ms. Y. suffered from bladder and bowel incontinence, would become incontinent if she did not reach the bathroom in time, and used liners. See, e.g., Id. at 001358, 001362.*[16]

**Response:** Admitted in part and disputed in part. Admitted that Extended recorded stress incontinence managed with liners. Friedman Decl. Ex. 103-1 at GSD-ExtendedMLTC 00001358, 001362. Disputed that the cited pages record bowel incontinence: they record "BM QD. STRESS INCONTINENCE, USES LINERS" and rate the elimination pattern "Fair." Id.; see also Ex. 103-2 at 001464 ("BM daily. Urination Incontinence, Uses Liners"). Bowel incontinence first appears in the August 13, 2020 assessment, which lists "bladder and bowel incontinence" among the diagnoses and marks incontinence "Bladder" and "Bowel," Friedman Decl. Ex. 103-2 at GSD-ExtendedMLTC 00001481, and in a fall-risk form's compound criterion ("Frequent Bladder and/or Bowel incontinence OR Nocturia"), id. at 00001479, 00001603.

**232.** *On March 1, 2020, Extended sent an observer to conduct an in-home overnight observation of Ms. Y. and documented on an Observation Activity Report with a "Night Shift" log running from 8:00 p.m. to 8:00 a.m. Friedman Decl., Ex. 104 (Extended Observation Activity Report for S.Y.Y., GSD-ExtendedMLTC 00001258-00001263).*

**Response:** Admitted.

[16] See also id. at 001366, 001371, 001379, 001390, 001395, 001400, 001404, 001408, 001412, 001417, 001422.

**233.** *According to the Observation Activity Report and EVV, Plaintiff Mei Z. Xiao was providing care for Ms. Y. on that date. Id. at 00001260; Friedman Decl., Ex. 24 (EVV Recs. for M. Xiao).*

**Response:** Admitted.

**234.** *According to the Observation Activity Report, Ms. Y. fell asleep at 9:00 p.m., at 10:00 p.m. woke up "talking to Xiao Meizhen", at 10:30 p.m. was lying awake in her bed, at 11:00 p.m. was awake and "asked Xiao Meizhen (aid) to help her to the commode", at 11:30 "Xiao Meizhen (aid) helped Client back to her bed", at 12:00 a.m. "Client is laying in her bed talking to Xiao Meizhen (aide)", at 12:30 a.m. was awake, slept from 1:00 a.m. until 3:00 a.m., was awake between 3:00 a.m. and 4:00 a.m., woke up again at 5:30 a.m., at 6:00 a.m. was "talking to xiao meizhen (aid)", back asleep at 7:00 a.m., awake again at 7:30 a.m., and back asleep at 8:00 a.m. Friedman Decl., Ex. 104 (Extended Observation Activity Report for S.Y.Y., GSD-ExtendedMLTC 00001260-00001263).*

**Response:** Admitted that the Observation Activity Report contains the entries recited in Paragraph 234. Friedman Decl. Ex. 104 at GSD-ExtendedMLTC 00001260–00001263. GreatCare notes that the same log records that in the twelve hours from 8:00 p.m. to 8:00 a.m. the aide was called upon for physical assistance once (the 11:00 p.m. commode request and the 11:30 p.m. return to bed); records no aide involvement of any kind after the 12:00 a.m. entry and before 6:00 a.m.; and records the client asleep at 9:30 p.m. and at 4:00, 4:30 and 5:00 a.m., entries the paragraph omits. Id. at 00001260–00001262.

**235.** *None of the Plaintiffs who provided care to Ms. Y. received five hours of continuous uninterrupted sleep on any of their 24-hour shifts. Friedman Decl., Ex. 105 (J. Xiao Dep. 59:10-13, 71:9-15); Ex. 106 (J. Xiao Decl. ¶¶ 12, 29); Ex. 55 (M. Xiao Dep. 57:6-11, 73:4-74:11); Ex.*

*107 (M. Xiao Decl. ¶¶ 11, 18, 21-24, 28); Ex. 108 (Zheng Dep. 27:4-28:10); Ex. 109 (Zheng Decl. ¶¶ 24-28, 30).*

**Response:** Disputed. The material cited does not support the assertion as stated. Two of the six citations do not address the aides' sleep: Jian R. Xiao's testimony at 59:10–13 concerns how often the member rose, and the passage at 71:9–15 is an unprompted statement rendered through the interpreter after counsel had said "No further questions," and it describes how often the member rose ("She gets up six, seven times a night"), not whether the aide slept. Friedman Decl. Ex. 105. Ms. Zheng's testimony at 27:4–6 begins "And you would work 13-hour shifts; is that correct? A. Yes," and the "every hour" figure at 28:2–5 followed counsel's statement that the interpreter's rendering "every so often" was wrong. Friedman Decl. Ex. 108 at 27:4–28:10. The three declarations give different figures for the same member ("at least six times"; "at least four or five … as many as eight"; "at least two to three times … as many as four to five times"). Friedman Decl. Ex. 107 ¶ 22; Ex. 106 ¶ 25; Ex. 109 ¶ 27. Ms. Zheng's own accounts also differ from one another: besides her declaration's figures, she told the Department of Labor that she "had to get up at least 3-4 times a night to assist the patient with using the toilet," Friedman Decl. Ex. 132 at GSD-000846, and the deposition passage discussed above gives "every hour," Ex. 108 at 28:2–5. Jian R. Xiao told the Department of Labor that the member "can't walk and uses wheelchair to move around" and "goes to toilet 4 to 5 times a night," Ex. 132 at GSD-000883; Extended's care manager recorded on February 2, 2021, in a call with the member and "PA XIAO, JIANRONG," that "PA SAID MBR WALKS TO BATHROOM," Ex. 103-1 at GSD-ExtendedMLTC 00001159; and Jian R. Xiao's declaration describes bringing the member to her building's lobby "where she could push her walker and get some exercise," Ex. 106 ¶ 19. *See also infra* Statement of Additional Material Facts ¶ 96. Mei Z. Xiao testified that she went to sleep "around 11" and that the arrangement was

"about the same" at the successor agency. Friedman Decl. Ex. 55 at 73:15–16, 74:16–23. Extended's monthly records put the member's sleep at seven to eight hours, and its overnight observation of March 1–2, 2020 recorded one aide assist in twelve hours. Friedman Decl. Ex. 103-2 at GSD-ExtendedMLTC 00001464; Ex. 104 at 00001261–00001262.

**236.** *None of the Plaintiffs who provided care to Ms. Y. received three hours of duty-free meal breaks on any of their 24-hour shifts. Friedman Decl., Ex. 107 (M. Xiao Decl. ¶ 28); Ex. 55 (M. Xiao Dep. 83:14-25); Ex. 106 (J. Xiao Decl. ¶ 29); Ex. 109 (Zheng Decl. ¶¶ 21-22).*

**Response:** Admitted in part and disputed in part. Admitted that the cited declarants so aver. Friedman Decl. Ex. 107 ¶ 28; Ex. 106 ¶ 29; Ex. 109 ¶¶ 21–22. Disputed that the cited deposition testimony supports the paragraph. It begins with the opposite concession: "Q. But during the time that you worked at GreatCare, you did have time to eat; right? A. Yes, I did have time to eat. So my meal time with this elderly, I eat with her in same time." Friedman Decl. Ex. 55 (M. Xiao Dep.) 83:14–19. Ms. Zheng's declaration describes her own pace ("the cooking and eating took no more than 30 minutes") rather than an absence of available time, Ex. 109 ¶ 22, and Mei Z. Xiao's and Ms. Zheng's declarations describe going out for groceries. Ex. 107 ¶¶ 15–16; Ex. 109 ¶ 18.

**237.** *Plaintiffs did not receive assessments for the following care recipients who were all "patients" of GreatCare and were all authorized for 24-hour, "live-in" services: a. H.C., who was a member of SWHNY, and received 24-hour, "live-in" care services from Xiu F. Chen over three shifts; b. X.D., who was a member of non-defendant MLTC Agewell, and received 24-hour, "live-in" care services from Hui X. Ruan over four shifts; c. L.H.L., who was a member of SWHNY, and received 24-hour, "live-in" care services from Hui X. Ruan over one shift; d. J.S.L., who was a member of non-defendant MLTC Agewell, and received 24-hour, "live-in" care services from Hui*

*X. Ruan over four shifts; e. P.L., who was a member of non-defendant MLTC Aetna, and received 24-hour, "live-in" care services from Plaintiff Hui He over two shifts; f. X.Q.L., who was a member of non-defendant MLTC Aetna, and received 24-hour, "live-in" care services from Plaintiff Hui He over two shifts; g. C.H.M., who was a member of CenterLight, and received 24-hour, "live-in" care services from Plaintiff Hui X. Ruan over five shifts; and h. Y.X., who was a member of non-defendant MLTC Aetna, and received 24-hour, "live-in" care services from Plaintiffs Hui X. Ruan and Mu Z. Zhang over seven shifts. Friedman Decl. ¶ 114.*

**Response:** Disputed. The material cited does not support the assertions. Paragraph 114 of the Friedman Declaration reads in its entirety: "Attached hereto as Exhibit 109 is a true and correct copy of the Declaration of Plaintiff Bi Y. Zheng." Paragraph 115 states only that no party or non-party produced assessment records for the eight named care recipients. Friedman Decl. ¶¶ 114–115. No evidence is cited for the assertions that any of the eight was a GreatCare patient, was authorized for 24-hour live-in services, or was served by the named Plaintiff for the number of shifts stated; and Exhibit 10, the only EVV exhibit filed under Xiu F. Chen's name, contains no record for her. Friedman Decl. Ex. 10. GreatCare lacks knowledge sufficient to admit or deny the shift figures as stated and disputes them for want of support.

**238.** *While providing services to these care recipients, none of the Plaintiffs were able to obtain five hours of continuous, uninterrupted sleep or three hours of completely duty-free meal breaks per 24-hour shift. See, e.g., Friedman Decl., Ex. 86 (He Decl. ¶ 16); Ex. 100 (Ruan Decl. ¶ 21).*

**Response:** Objection; the paragraph states a legal conclusion, not a fact, and no response is required. *Flores Moreno*, ECF 94 at 6 n.5. To the extent a response is required: Admitted that Ms. He and Ms. Ruan each aver, in general terms, that they did not receive five hours

of uninterrupted sleep or three hours of duty-free meal breaks on any 24-hour shift. Friedman Decl. Ex. 86 ¶ 16; Ex. 100 ¶ 21. The material cited does not support the assertion as to the eight care recipients listed in ¶ 237: no evidence is cited from Xiu F. Chen or Mu Z. Zhang, who on Plaintiffs' own account served two of them, and neither cited declaration identifies any of the eight. Ms. He's declaration describes two care recipients, naming only one (Mr. L.), and neither is among the eight; Ms. Ruan's describes four unnamed women. Friedman Decl. Ex. 86 ¶¶ 4, 13, 15–16; Ex. 100 ¶¶ 11–21. Each declarant describes the meal time and sleeping accommodation she had. Ex. 86 ¶¶ 15–16; Ex. 100 ¶¶ 14, 20.

**239.** *Plaintiffs also did not receive any assessments for H.S.W., who was a member of CenterLight living in [REDACTED], and received 24-hour, "live-in" care services from Plaintiff Li Chen over three weeks for a total of 12 shifts. Friedman Decl. ¶ 115; Ex. 7 (HHAX EVV Recs. for L. Chen).*

**Response:** Admitted. Li Chen's EVV record shows twelve CenterLight live-in shifts in four weekly three-day blocks from March 18 to April 10, 2016, with two further shifts on May 2–3, 2016, and no assessment records were produced for the member so identified. Friedman Decl. Ex. 7 (14 CenterLight "PCA-LivingIn" rows, 3/18/2016–5/3/2016); Friedman Decl. ¶ 116. GreatCare notes that the statement about assessment records appears at ¶ 116 of the Friedman Declaration, not ¶ 115, and that the client name is redacted on every row of Exhibit 7.

**240.** *Ms. W. was a particularly difficult assignment for Ms. Chen, and Ms. Chen was unable to sleep five continuous hours during her shifts or obtain three completely duty-free meal breaks when providing 24-hour care to Ms. W. Friedman Decl., Ex. 6 (L. Chen Decl. ¶¶ 47, 49).*

**Response:** Objection; the paragraph states a legal conclusion, not a fact, and no response is required. *Flores Moreno*, ECF 94 at 6 n.5. To the extent a response is required:

Admitted that Li Chen describes, at ¶ 47 of her declaration, a difficult assignment of about three weeks in early 2016 involving a care recipient in Flushing. Friedman Decl. Ex. 6 ¶ 47. The material cited does not support the assertion as stated: the declaration does not identify that recipient as H.S.W. and does not mention CenterLight, and ¶ 49 is a general statement about all of Ms. Chen's 24-hour shifts rather than about this assignment. Friedman Decl. Ex. 6 ¶¶ 47–51; Ex. 7. The same declaration states that GreatCare told Ms. Chen she would have five hours of sleep and describes sleeping in blocks of up to three continuous hours. Ex. 6 ¶¶ 27, 41.

**241.** *Both CenterLight and SWHNY had contracts with the New York State Department of Health ("NYSDOH") to provide home health aide services and personal care services in the home. See, e.g., Friedman Decl., Ex. 34 (NYSDOH-SWHNY 2017-2021 Cont., SWHNY 000001-000186); Ex. 36 (NYSDOH-CL 2017-2021 Cont., CenterLight 000381-568).*[17]

**Response:** Admitted. GreatCare notes that Friedman Decl. Ex. 36 is a PACE contract with Comprehensive Care Management Corporation d/b/a CenterLight Health Care, Inc., and that GreatCare is not a party to either. *See* Friedman Decl. Ex. 34 at SWHNY 000001 (PDF p. 2); Friedman Decl. Ex. 36 at CenterLight 000381 (PDF p. 2).

**242.** *NYSDOH permitted CenterLight and SWHNY to deliver the services through contracted providers, allowing them to delegate activities or functions to those providers in a manner consistent with their contracts with the State. See, e.g., Id. at Art. V.B, (CenterLight 000402); Friedman Decl., Ex. 34 (NYSDOH-SWHNY 2017-2021 Cont., Art. V.A, SWHNY 000021; Art. VII.A, SWHNY 000070).*

[17] See also Ex. 110 (NYSDOH-CL 2016 Extension, CenterLight 000554-000568); Ex. 33 (NYSDOH-CL 2022-2026 Cont., CenterLight 000154).

**Response:** Admitted in part and disputed in part. Admitted that each plan could meet its network obligations "either directly or through a network of contracted providers." Friedman Decl. Ex. 34, Art. V.A.4, SWHNY 000021. Disputed that the contracts "allow" delegation generally: the delegation provision, which appears at Article VII.B.3 rather than at the Article VII.A pinpoint cited, provides that the plan "may only delegate" in a manner consistent with the agreement and federal law, and that the plan "shall maintain full responsibility" and "is accountable to the Department for all functions and responsibilities." Friedman Decl. Ex. 34, Art. VII.B.1–3, SWHNY 000071; Ex. 36, Art. V.B.3, CenterLight 000402.

**243.** *When the MLTC Defendants delivered the services by subcontracting with providers, they retained full responsibility over the services and were required to maintain full responsibility for adhering to and otherwise fully complying with all applicable laws, regulations, including compliance with the FLSA, NYLL, and Wage Parity Act. Friedman Decl., Ex. 36 (NYSDOH-CL 2017-2021 Cont., Art. V.B, CenterLight 000402); Ex. 34 (NYSDOH-SWHNY 2017-2021 Cont., Art. VII(B), SWHNY 000071, K-M, SWHNY 000081).*[18]

**Response:** Objection; the paragraph states a legal conclusion, not a fact, and no response is required. *Flores Moreno*, ECF 94 at 6 n.5. To the extent a response is required: Admitted that each plan retained full responsibility for compliance with "all applicable laws and regulations" notwithstanding any subcontract. Friedman Decl. Ex. 36, Art. V.B.1, CenterLight 000402; Ex. 34, Art. VII.B.1, SWHNY 000071. Disputed that the cited clauses refer to the FLSA, the NYLL or the Wage Parity Act; those statutes are addressed in separately captioned sections. Friedman Decl. Ex. 34, Art. VII.K–M, SWHNY 000081; Ex. 36, Art. V.L–M, CenterLight 000409–000410.

[18] See also Ex. 33 (NYSDOH-CL 2022-2026 Cont., Art. V.B, CenterLight 000182-000183).

**244.** *CenterLight and SWHNY were required to develop protocols to establish a verification system to demonstrate their subcontractors' FLSA compliance, including record-keeping methodologies, tracking of aide travel time, hours worked on live-in cases, and appropriate rate reimbursement. Friedman Decl., Ex. 36 (NYSDOH-CL 2017-2021 Cont., Art. V.M, CenterLight 000410); Ex. 34 (NYSDOH-SWHNY 2017-2021 Cont., Art. VII(L), SWHNY 000081).*

**Response:** Admitted in part and disputed in part. Admitted that each plan was required to comply with the Fair Labor Standards Act and to "develop protocols to establish a verification system to demonstrate compliance with requirements," and that those protocols "shall include appropriate record keeping methodologies, tracking of aide travel time, hours worked on live-in cases, and appropriate rate reimbursement." Friedman Decl. Ex. 36, Art. V.M, CenterLight 000410; Ex. 34, Art. VII.L, SWHNY 000081. Disputed that the clause concerns "their subcontractors' FLSA compliance." The word "subcontractor" does not appear in it; the duty runs to "the Contractor," meaning the plan. Where the State meant to reach subcontractors it said so in the immediately preceding clause, which requires the Contractor to obtain annual subcontractor certifications of PHL § 3614-c compliance and provides that "[s]olely collecting the certification or an attestation of compliance is not sufficient." Friedman Decl. Ex. 36, Art. V.L–M, CenterLight 000409–000410; Ex. 34, Art. VII.K–L, SWHNY 000081.

**245.** *SWHNY was further required to develop protocols to establish a verification system to demonstrate compliance with the NYLL, including record-keeping methodologies, and identifying appropriate reimbursement rates. Friedman Decl., Ex. 34 (NYSDOH-SWHNY 2017-2021 Cont., Art. VII(M), SWHNY 000081).*

**Response:** Admitted in part and disputed in part. Admitted that SWHNY had to develop minimum-wage compliance protocols under Labor Law Sec. 652.1; disputed as to the broader characterization as an NYLL "verification system." *See* Friedman Decl. Ex. 34 Art. VII.M, at SWHNY 000081 (PDF p. 82).

**246.** *SWHNY was also required to develop protocols to establish a system to verify that home care aide wages provided by each subcontractor met or exceeded the local wage requirements. Friedman Decl., Ex. 34 (NYSDOH-SWHNY 2017-2021 Cont., Art. VII(K), SWHNY 000081).*

**Response:** Admitted.

**247.** *The MLTC Defendants were required to certify to NYSDOH annually that all home care services provided by them or their subcontractors were in compliance with the Wage Parity Act. Id.; Friedman Decl., Ex. 36 (NYSDOH-CL 2017-2021 Cont., Art. V.L, CenterLight 000409).*

**Response:** Admitted.

**248.** *The MLTC Defendants were required to collect from their LHCSA subcontractors, including GreatCare, sufficient information to verify that their subcontractors were in compliance with the Wage Parity Act. Id. at Art. V.L, 000409; Friedman Decl. Ex. 34 (NYSDOH-SWHNY 2017-2021 Cont., Art. VII(K), SWHNY 000081).*

**Response:** Admitted. GreatCare notes that the collection duty was quarterly and obliged the plans to require subcontractors to supply the information. *See* Friedman Decl. Ex. 34 Art. VII.K, at SWHNY 000081 (PDF p. 82).

**249.** *Neither CenterLight nor SWHNY were permitted to verify the compliance of their LHCSAs by collecting a certification or attestation alone: their contracts with the NYSDOH*

*contract expressly stated that solely collecting the certification or an attestation of compliance was not sufficient. Friedman Decl., Ex. 36 (NYSDOH-CL 2017-2021 Cont., Art. V(L), CenterLight 000409); Ex. 34 (NYSDOH-SWHNY 2017-2021 Cont., Art. VII(K), SWHNY 000081).*

**Response:** Admitted.

**250.** *Under their contracts with the NYSDOH, the MLTC Defendants' failure to fully comply with the home care worker wage parity requirements could "result in non-payment of services rendered." Friedman Decl. Ex. 36 (NYSDOH-CL 2017-2021 Cont., Art. V.L, CenterLight 000410); Ex. 34 (NYSDOH-SWHNY 2017-2021 Cont., Art. VII(K), SWHNY 000081).*

**Response:** Admitted.

**251.** *Throughout the relevant period, CenterLight and SWHNY contracted with GreatCare to provide home care and personal services to their members. See, e.g., Friedman Decl., Ex. 32 (SWHNY-GC HHSA, SWHNY 000243-000281); Ex. 39 (2018 CL/GC Agree., CenterLight 000041-000063).*[19]

**Response:** Admitted in part and disputed in part. Admitted that Senior Whole Health of New York, Inc. contracted with GreatCare, Inc. throughout the relevant period, and that CenterLight Healthcare, Inc. and GreatCare, Inc. entered into a LHCSA Ancillary Agreement dated as of October 1, 2022, (Friedman Decl. Ex. 111, CenterLight 000092–000127; Wang SJ Decl. ¶ 26). Disputed that Friedman Decl. Ex. 39 is a contract between defendant CenterLight Healthcare, Inc. and GreatCare. It is the "Licensed Home Care Services Agency Services Agreement Between CL Healthcare, Inc." and GreatCare Inc., dated as of January 1, 2018; CenterLight Healthcare, Inc. is defined in it as "PLAN" and is "acknowledged as a third-party beneficiary of this Agreement." Friedman Decl. Ex. 39 at CenterLight 000041, 000051.

[19] See also Ex. 111 (2022 LHCSA Ancillary Agreement, CenterLight 000092-000127).

**252.** *The contracts between the MLTC Defendants and GreatCare were drafted by the MLTC Defendants and set out the rates that CenterLight and SWHNY would pay GreatCare for its aides' services. Friedman Decl., Ex. 51 (Wang Dep. (May 1, 2026) 6:2-7:1, 12:19-13:9); Ex. 32 (SWHNY-GC HHSA, 000268-000269); Ex. 39 (2018 CL/GC Agree., CenterLight 000058-000063).*[20]

**Response:** Admitted in part and disputed in part. Admitted that the plans drafted their form agreements and set the rate schedules; disputed as to the implication of imposition — Wang testified rates were negotiable and the contract "a mutual agreement." *See* Friedman Decl. Ex. 51 (Wang Dep. (May 1, 2026)) 13:2-4.

**253.** *The rates were periodically adjusted by CenterLight and SWHNY to account for increases in the New York state minimum wage and Wage Parity total compensation rates. Id.*

**Response:** Admitted that CenterLight and SWHNY periodically adjusted GreatCare's rates to account for increases in the New York State minimum wage and in Wage Parity total compensation. GreatCare notes that SWHNY's amendment effective April 1, 2017 recites that NYLL § 652 and PHL § 3614-c "require Provider to increase wages for most or all of Provider's direct care employees," raises the rates "to include the amount determined by DOH," and provides that "all rate increases are contingent upon Plan's receipt of applicable funds from DOH." Friedman Decl. Ex. 32 (Apr. 1, 2017 amend.) at SWHNY 000217–000218. SWHNY's Amendments 12, 14 and 15 recite that the statutes require SWHNY to increase the base wage rate paid to GreatCare "for the sole purpose of enabling Provider to comply with Statutory Wage Requirements." Id. at SWHNY 000231, 000236, 000239.

[20] See also Ex. 32 (SWHNY-GC HHSA, Amends. 10, 12, 14, 15, SWHNY 000217-000219, 000231-000242); Ex. 39 (2018 CL/GC Agree. Am. 1, CenterLight 000029-000035).

**254.** *The contracts gave the MLTC Defendants the unilateral power to amend their agreements with GreatCare. Friedman Decl., Ex. 39 (2018 CL/GC Agree., § 11, CenterLight 000053); Ex. 111 (2022 LHCSA Ancillary Agreement § 1.2, CenterLight 000108); Ex. 32 (SWHNY-GC HHSA § 11, SWHNY 000259-000260).*

**Response:** Admitted in part and disputed in part. Admitted that each agreement contains an amendment provision. Disputed as phrased: the cited provisions do not give the plans an unqualified unilateral power to amend. Section 11 of the CenterLight agreement bars unilateral rate changes outright, and section 11 of the SWHNY agreement permits unilateral amendment only for legal compliance and lets GreatCare terminate over an adverse reimbursement change. *See* Friedman Decl. Ex. 39 Sec. 11, at CenterLight 000053 (PDF p. 26); id. Sec. 4.1, at CenterLight 000047 (PDF p. 20); Ex. 32 Sec. 11, at SWHNY 000259–000260 (PDF pp. 35–36).

**255.** *SWHNY's contract obligated GreatCare to require its aides to cooperate with, be bound by, and abide by SWHNY's protocols. Id. at § 3.3, 000247.*

**Response:** Admitted in part and disputed in part. Admitted that Sec. 3.3 obligates GreatCare to require "Health Care Practitioners" to abide by SWHNY's protocols; disputed that the section refers to home health aides, who fall outside the Sec. 1.9 definition. *See* Friedman Decl. Ex. 32 Sec. 1.9, at SWHNY 000245 (PDF p. 21).

**256.** *In SWHNY's Agreement with GreatCare, SWHNY reserved the right to approve the participation of any new GreatCare aide. Id. at § 3.14.5, 000251.*

**Response:** Admitted in part and disputed in part. Admitted that Sec. 3.14.5 reserves an approval right over new Health Care Practitioners; disputed that it reaches "any new GreatCare aide" or that the right was ever exercised as to a Plaintiff. *See* Friedman Decl. Ex. 40 (Glapa Dep. (Feb. 26, 2026)) 64:17-21.

**257.** *SWHNY required GreatCare to identify all of its aides by name who would operate under their agreement and to notify SWHNY before adding any new aides. Id. at § 3.14.1, 000250.*

**Response:** Admitted in part and disputed in part. Admitted that the SWHNY agreement requires GreatCare to supply a list and to notify SWHNY of changes to it. Disputed as phrased: section 3.14.1 requires a list of Provider locations and Health Care Practitioners, not of aides, and SWHNY's own designee testified "we don't know who the aides are." *See* Friedman Decl. Ex. 32 Sec. 3.14.1(a), at SWHNY 000250 (PDF p. 26); Friedman Decl. Ex. 40 (Glapa Dep. (Feb. 26, 2026)) 64:16-18.

**258.** *GreatCare routinely notified SWHNY when it sent a substitute aide to cover a shift that the member care recipient's regularly assigned aide was unable to work (for example, because the regular aide called out, was sick, or was on vacation). See, e.g., Friedman Decl., Ex. 58 (GC HHAX Patient Notes, 5431612, 60861195, 16864714, 24176305).*

**Response:** Admitted in part and disputed in part. Admitted that GreatCare recorded substitute coverage in HHAX; disputed that the four cited notes show routine notification to SWHNY — three contain only a schedule entry. *See* Friedman Decl. Ex. 58, notes 5431612, 16864714 and 24176305.

**259.** *SWHNY obligated GreatCare to require its aides, including Plaintiffs, to cooperate with, be bound by, and abide by SWHNY's credentialing process, and SWHNY credentialed each GreatCare aide individually before she could provide home care to its members. Friedman Decl., Ex. 32 (SWHNY-GC HHSA § 3.3, SWHNY 000247, § 3.14.4, SWHNY 000250).*

**Response:** Admitted in part and disputed in part. Admitted that the SWHNY agreement contains a credentialing provision. Disputed as phrased: section 3.14.4 requires credentialing of "Provider and each Health Care Practitioner" by the plan or its designee, and no cited document

shows that SWHNY individually credentialed any Plaintiff. *See* Friedman Decl. Ex. 112 (2025 SWHNY Provider Manual) at SWHNY 000536 (PDF p. 3).

**260.** *SWHNY could also terminate or suspend any GreatCare aide providing services to its members when, among other reasons, it determined that an aide from GreatCare had failed to meet or maintain its credentialing/recredentialing standards or when it determined that an aide's termination was necessary for the health and safety of its member. Id. at § 6.2.1, SWHNY 000256).*

**Response:** Admitted in part and disputed in part. Admitted that Sec. 6.2.1 permits SWHNY to terminate a Health Care Practitioner's participation under the Agreement on those grounds; disputed that this is authority over an aide's employment. *See* Friedman Decl. Ex. 32 Sec. 6.2 preamble, at SWHNY 000256 (PDF p. 32).

**261.** *SWHNY had a department that would investigate complaint filed against aides by its members and employees and could exclude aides from working with its members on the basis of those investigations. Friedman Decl., Ex. 40 (Glapa Dep. (Feb. 26, 2026) 57:10-65:4).*

**Response:** Admitted in part and disputed in part. Admitted that SWHNY had an investigations team for member and employee complaints; disputed as to the exclusion authority — the witness was speculating and said "we don't know who the aides are … those are GreatCare's employees, not ours." *See* Friedman Decl. Ex. 40 (Glapa Dep. (Feb. 26, 2026)) 64:16-18.

**262.** *When a member complained about the care a GreatCare aide provided, SWHNY's grievance process required GreatCare and the aide to participate in SWHNY's investigation of the complaint. Friedman Decl., Ex. 112 (2025 SWHNY Provider Manual, SWHNY 000535-000536); Ex. 32 (SWHNY-GC HHSA § 3.3, SWHNY 000247).*

**Response:** Admitted in part and disputed in part. Admitted that the Provider must participate in grievance investigations; disputed that the manual imposes any duty on the aide, and it is a 2025 document. *See* Friedman Decl. Ex. 112 at SWHNY 000535-000536 (PDF pp. 2-3).

**263.** *CenterLight required GreatCare to ensure that all of its aides who performed work under its agreement with CenterLight were properly licensed or certified and qualified to provide the covered services. Friedman Decl., Ex. 39 (2018 CL/GC Agree. § 3.9, CenterLight 000045).*

**Response:** Admitted. GreatCare notes that the same section provides that GreatCare "shall assume responsibility for supervising, training and compensating such personnel." *See* Friedman Decl. Ex. 39 Sec. 3.9.2, at CenterLight 000045 (PDF p. 18).

**264.** *CenterLight also required that aides who worked with CenterLight members be subject to CenterLight's specialized PACE orientation, member-specific plan of care, and ongoing supervision and competencies conducted by CenterLight. Friedman Decl., Ex. 113 (CL-GC E-mail, GSD GC 002710- 002711).*

**Response:** Disputed. The material cited does not support the assertion. The e-mail concerns CDPAS Personal Assistants and addresses GreatCare as a fiscal intermediary; it says nothing about LHCSA aides, and it is dated May 23, 2023. *See* Friedman Decl. Ex. 113 at GSD GC 002711 (PDF p. 3).

**265.** *When requesting an aide from GreatCare for a member care recipient, CenterLight could specify certain personal characteristics, including the aide's spoken language and gender. Friedman Decl., Ex. 114 (CL Change in Aide Auth. for P.C., CenterLight Confid. 003317).*

**Response:** Admitted.

**266.** *CenterLight could request that an aide no longer render services to its members. Friedman Decl., Ex. 39 (2018 CL/GC Agree. § 3.9.4, CenterLight 000046).*

**Response:** Admitted. GreatCare notes that Sec. 3.9.4 permits such a request on reasonable discretion and prior written notice, and that the right runs to "PLAN or CL" and concerns service to members, not employment. *See* Friedman Decl. Ex. 39 Sec. 13, at CenterLight 000053 (PDF p. 26).

**267.** *GreatCare was required to honor such requests, and neither GreatCare nor the aide had the right to deny or appeal CenterLight's requests. Id.*

**Response:** Admitted in part and disputed in part. Admitted that there is no contractual right of appeal; disputed as to the addition of "deny" and the omission of "subject to applicable law." *See* Friedman Decl. Ex. 39 Sec. 3.9.4, at CenterLight 000046 (PDF p. 19).

**268.** *For each of their members receiving home care services, CenterLight and SWHNY were responsible for authorizing their care. Friedman Decl., Ex. 39 (2018 CL/GC Agree. § 3.1, CenterLight 000043); Ex. 32 (SWHNY-GC HHSA § 1.1, SWHNY 000244); See, e.g., Ex. 65 (CL Auth. Recs. for P.C., CenterLight Confid. 002450-002476); Ex. 115 (SWHNY Auth. Recs. for X.Y.W., GC 002880-002907).*

**Response:** Admitted that CenterLight and SWHNY authorized the home care services their members received, and that GreatCare provided services only as so authorized. Friedman Decl. Ex. 115 at GC 002882–002884 (SWHNY approval notices for "Personal Care Aide Level II - Live in per day ~ T1020," "Provider Name: GREATCARE, INC."); Ex. 65 at CenterLight Confid. 002450–002476. GreatCare notes that the contract provisions cited define "Authorization" as approval for payment and require the agency to render services "only according to an established Plan of Care." Friedman Decl. Ex. 32 § 1.1; Ex. 39 § 3.1.

**269.** *The MLTC Defendants determined the amount and type of home care services for each of their member care recipients. See Answer of Defendant CenterLight Healthcare, Inc., ECF No. 97 ¶¶ 60, 69; Friedman Decl., Ex. 35 (CL Adms., Nos. 21, 22); Ex. 32 (SWHNY-GC HHSA §§ 1.24, 3.3, SWHNY 000246-000247); Ex. 41 (Wang Dep. (Jan. 7, 2026) 149:13-151:2).*

**Response:** Admitted. GreatCare notes that scheduling within the authorization was arranged by the member and GreatCare. *See* Friedman Decl. Ex. 41 (Wang Dep. (Jan. 7, 2026)) 150:17-20.

**270.** *GreatCare was required to schedule its aides, including Plaintiffs, within the parameters set by the MLTC Defendants' authorizations. Friedman Decl., Ex. 39 (2018 CL/GC Agree., §§ 3.1, 3.4.1, CenterLight 000043-000044); Ex. 32 (SWHNY-GC HHSA §§ 1.1, 3.3, SWHNY 000244, 000247); Ex. 41 (Wang Dep. (Jan. 7, 2026) 151:3-9); Ex. 116 (GC Resps. to SWHNY's Interrogatories, Resp. to Interrogatory No. 4) (GreatCare "has not deviated from any MLTC authorization at any time.").*

**Response:** Admitted. GreatCare notes that the same response records that GreatCare never paid an aide below minimum wage and maintained HHAX time and billing records. *See* Friedman Decl. Ex. 116, Resp. to Interrogatory No. 4 (PDF p. 5).

**271.** *The MLTC Defendants' authorizations specified the length of each aide's shift. See, e.g., Friedman Decl., Ex. 65 (CL Auth. Recs. for P.C., CenterLight Confid. 2450-2474); Ex. 115 (SWHNY Auths. for X.Y.W., GC 002880-002907).*

**Response:** Admitted in part and disputed in part. Disputed as phrased. The cited authorizations specify a per-diem service code and days per week, not the length of any aide's shift. *See* Friedman Decl. Ex. 65 (CL Auth. Recs. for P.C.) at CenterLight Confid. 002450 (PDF p. 54).

**272.** *When the MLTC Defendants authorized 24-hour, "live-in" services, GreatCare was permitted to schedule only one aide to work the entire 24-hour shift alone. Friedman Decl., Ex. 35 (CL Adms., No. 46).*

**Response:** Admitted in part and disputed in part. Disputed as to "the MLTC Defendants." The cited request is by its terms limited to CenterLight and is a Rule 36 deemed admission binding only CenterLight. *Schedule of Objections, item 7; see* Friedman Decl. Ex. 35, Request for Admission No. 46 ("when CenterLight authorized 'live-in' services").

**273.** *SWHNY also obligated GreatCare to require its aides, including Plaintiffs, to cooperate with, be bound by, and abide by SWHNY's authorization requirements. Friedman Decl., Ex. 32 (HHSA § 3.3, SWHNY 000247).*

**Response:** Admitted in part and disputed in part. Admitted that Sec. 3.3 obligates GreatCare to require Health Care Practitioners to abide by SWHNY's authorization requirements; disputed that the clause reaches aides. *See* Friedman Decl. Ex. 32 Sec. 1.9, at SWHNY 000245 (PDF p. 21).

**274.** *CenterLight paid GreatCare only for "Covered Services" services that the member care recipient was entitled to under his or her Plan of Care, and CenterLight retained final authority to determine whether such services were reimbursable. Friedman Decl., Ex. 39 (2018 CL/GC Agree. §§ 1.4, 4.1, 4.3, CenterLight 000042, 000047).*

**Response:** Admitted that the agreement defines Covered Services as services a member is entitled to under the Plan of Care and reserves to the plan final authority to determine whether services are reimbursable. Friedman Decl. Ex. 39 §§ 1.4, 4.3. GreatCare notes that the contracting and paying party under the instrument is CL Healthcare, Inc., with CenterLight Healthcare, Inc. a third-party beneficiary having "ultimate responsibility for payment obligations of CL hereunder,"

and that § 4.1 provides for revision of rates by mutual written agreement. Friedman Decl. Ex. 39 § 4.1, CenterLight 000047; *id.* at CenterLight 000041, 000051.

**275.** *Hours worked by GreatCare's aides, including Plaintiffs, that differed from SWHNY's authorizations were generally payable only upon the MLTC Defendants' issuance of a new or additional authorization and the MLTC Defendants had no obligation to pay GreatCare for hours worked by aides outside of their authorizations. Friedman Decl., Ex. 40 (Glapa Dep. (Feb. 26, 2026) 106:12-107:21); Ex. 32 (SWHNY-GC HHSA § 4.3, SWHNY 000251- 000252); see, e.g., Ex. 58 (GC HHAX Patient Notes, 92085237, 100002466, 132722006).*

**Response:** Admitted. GreatCare notes that Sec. 4.3 excepts emergency services and services for which no authorization is required. *See* Friedman Decl. Ex. 40 (Glapa Dep. (Feb. 26, 2026)) 107:17-21.

**276.** *SWHNY would approve hours worked outside the authorization for medical escorts, which occurred when an aide accompanied a member to a medical appointment that ran longer than scheduled, and emergency services. Friedman Decl., Ex. 42 (Glapa Dep. (Jan. 26, 2026) 183:18-184:23); Ex. 40 (Glapa Dep. (Feb. 26, 2026) 129:7-133:21); Ex. 32 (SWHNY-GC HHSA § 4.3, SWHNY 000252); Ex. 58 (GC HHAX Patient Notes, 100002466, 146345025, 92085237).*

**Response:** Admitted. GreatCare notes that SWHNY's designee testified that she knew of no circumstance other than medical escorts in which its utilization-management team approved hours outside the authorization. *See* Friedman Decl. Ex. 42 (Glapa 30(b)(6) Dep. (Jan. 26, 2026)) 184:6-8; 183:2-4.

**277.** *To obtain payment for a medical escort, GreatCare would submit a service request to SWHNY's utilization management team, which reviewed the request and determined whether the additional hours were approved. Friedman Decl., Ex. 42 (Glapa Dep. (Jan. 26, 2026) 183:23-184:8); Ex. 40 (Glapa Dep. (Feb. 26, 2026) 129:7-23); Ex. 58 (GC HHAX Patient Notes, 77851200, 88367927).*

**Response:** Admitted in part and disputed in part. Admitted as to the process. Disputed that note 77851200 supports the paragraph: it concerns a vendor change, not a medical escort. *See* Friedman Decl. Ex. 42 (Glapa 30(b)(6) Dep. (Jan. 26, 2026)) 183:13-17.

**278.** *Per its agreement with GreatCare, SWHNY would also reimburse GreatCare for "emergency services" its aides provided with no requirement that it issue a new authorization. Friedman Decl., Ex. 32 (SWHNY-GC HHSA § 4.3, SWHNY 000251-000252).*

**Response:** Admitted. GreatCare notes that Sec. 4.3 states the point as an exception to SWHNY's disclaimer of liability for unauthorized services. *See* Friedman Decl. Ex. 32 Sec. 4.3, at SWHNY 000252 (PDF p. 28).

**279.** *Authorization from SWHNY was not a guarantee of payment. Friedman Decl., Ex. 32 (SWHNY-GC HHSA § 1.1, SWHNY 000244); Ex. 40 (Glapa Dep. (Feb. 26, 2026) 107:2-7).*

**Response:** Admitted.

**280.** *On [REDACTED], GreatCare requested that SWHNY pay an aide who had accompanied SWHNY's member K.W.P. to the hospital for a full "live-in" shift because the aide had accompanied Ms. P. to the hospital. Friedman Decl., Ex. 117 (GreatCare Fax to SWHNY Case Manager, SWHNY 004516).*

**Response:** Disputed. The fax says "The member has PCA service," never uses "live-in," and states the aide called an ambulance and worked 8:00 a.m. to 8:00 a.m.; it does not say the aide accompanied the member, and it states, "No sure if member is hospitalized or not." *See* Friedman Decl. Ex. 117 at SWHNY 004516 (PDF p. 2).

**281.** *On [REDACTED], Plaintiff Xiu F. Chen worked only two hours that day because her care recipient, X.Y.W., was admitted into the hospital. Friedman Decl., Ex. 10 (HHAX EVV Rec. for X. Chen); Ex. 58 (GC HHAX Patient Note for X.Y.W., 48662389); Ex. 118 (SWHNY Revised Auth. for Member X.Y.W., SWHNY 005616-005617).*

**Response:** Disputed. The material cited does not support the assertion. Exhibit 10 contains no record for Xiu F. Chen, no 2021 entry and no two-hour entry. Friedman Decl. Ex. 10. Exhibit 118 records a one-time two-hour authorization with "No live in care" for March 22, 2021, and the cited patient note records that the member's "[l]ast day of PCA was on 3/22/21" and that she "was expired on 3/28/21" at the hospital, related to COVID-19; neither names an aide. No cited document states that the care recipient was admitted to a hospital on March 22, 2021, the date pleaded — the hospital death Ex. 58 records occurred six days later, on March 28, 2021. Friedman Decl. Ex. 118 at SWHNY 005616–005617; Ex. 58, PatientNoteID 48662389. GreatCare's billing-versus-payroll report for Ms. Chen records her live-in days for this member through March 16, 2021. Friedman Decl. Ex. 62 (PDF pp. 2–5).

**282.** *GreatCare reported the reduced hours to SWHNY, who responded by revising the authorization for that single date, converting Ms. W.'s 24-hour live-in per diem into two hourly units so that payment would match the hours worked. Id.; Ex. 40 (Glapa Dep. (Feb. 26, 2026) 105:2-106:5).*

**Response:** Admitted. GreatCare notes that the revision was billed in fifteen-minute T1019 units and ran to GreatCare, not to the aide. *See* Friedman Decl. Ex. 40 (Glapa Dep. (Feb. 26, 2026)) 105:20-22; 107:17-21.

**283.** *SWHNY also approved and denied requests to authorize its members to receive the medical supplies used by aides, including incontinence products, nonsterile gloves, enteral/nutritional supplements, and durable medical equipment such as commodes and walkers. See, e.g., Friedman Decl., Ex. 119 (SWHNY Approval Notices for S.K.C.-1, SWHNY 002586-002623); Ex. 120 (SWHNY Adverse Determs. for Member S.K.C.-1, SWHNY 002541-002547, 002596-2605).*[21]

**Response:** Admitted in part and disputed in part. Admitted that SWHNY approved and denied member supply requests; disputed that these were "supplies used by aides" — SWHNY denied gloves precisely because caregiver protective equipment is not a covered benefit. *See* Friedman Decl. Ex. 120 at SWHNY 002543 (PDF p. 4).

**284.** *GreatCare billed CenterLight, SWHNY, and the other non-defendant MLTCs for work performed by Plaintiffs. See, e.g., Friedman Decl., Ex. 62 (Sample Billing vs. Payroll Report for Xiu F. Chen); Ex. 123 (HHAX Invoices, GC 008307-008318).*

**Response:** Admitted in part and disputed in part. Admitted that GreatCare billed CenterLight and SWHNY. Disputed that the cited exhibits support the assertion as to any other MLTC: they show no billing to any other MLTC. GreatCare notes that Friedman Decl. Ex. 123 runs to GC 012485, not GC 008318. *See* Friedman Decl. Ex. 62 at PDF p. 5 (Grand Total line).

**285.** *GreatCare's billing was done through, or recorded in, HHAX. Id.*

[21] See also, e.g., Ex. 121 (SWHNY Approval Notices for K.W.P., SWHNY 004266-004269, 004317); Ex. 122 (SWHNY Adverse Determs. for K.W.P., SWHNY 004279-004288).

**Response:** Admitted.

**286.** *Pursuant to their contracts with GreatCare, CenterLight and SWHNY reimbursed GreatCare for 24-hour, "live-in" shifts at a per diem rate that covered only 13 hours per shift. See, e.g., Friedman Decl., Ex. 32 (SWHNY/CG HHSA, Amend. 12, SWHNY 000232-000233); Ex. 39 (2018 CL/GC Agree., Exhibit B, CenterLight 000058); Ex. 40 (Glapa Dep. (Feb. 26, 2026) 85:6-15); Ex. 51 (Wang Dep. (May 1, 2026) 13:18-23, 15:13-19).*

**Response:** Admitted in part and disputed in part. Admitted that the live-in per diem was standardized to 13 hours. Disputed that the per diem "covered only 13 hours per shift" as an hourly measure: the structure is the State's under PHL Sec. 3614-c and 12 NYCRR 142-2.1, and SWHNY's designee testified that the per diem "is not an hourly breakdown by any means." *See* Friedman Decl. Ex. 40 (Glapa Dep. (Feb. 26, 2026)) 85:6–15; Friedman Decl. Ex. 51 (Wang Dep. (May 1, 2026)) 13:22-23; Friedman Decl. Ex. 32 (Amend. 12) at SWHNY 000232 (PDF p. 8).

**287.** *CenterLight and SWHNY reimbursed GreatCare for hourly and split-shift care services in 15-minute increments. Friedman Decl., See, e.g., Ex. 32 (SWH/GC HHSA, Amend. 1, SWHNY 000187); Ex. 39 (2018 CL/GC Agree., 000058).*

**Response:** Admitted.

**288.** *According to SWHNY's corporate representative, GreatCare's responsibility was to be a "passthrough" for the funds flowing from SWHNY to the aides, including the Plaintiffs. Friedman Decl., Ex. 42 (Glapa Dep. (Jan. 26, 2026) 192:4-15).*

**Response:** Admitted in part and disputed in part. Disputed as phrased. The witness said GreatCare was "accountable for" the passthrough of funds and that SWHNY's check was the DOL

wage-parity form; she testified SWHNY does not pay aides. *See* Friedman Decl. Ex. 42 at 183:2-4; Friedman Decl. Ex. 40 (Glapa Dep. (Feb. 26, 2026)) 107:19-21.

**289.** *GreatCare's corporate representative, Barbara Wang, testified that GreatCare's ability to pay its aides was dependent on SWHNY. Friedman Decl., Ex. 44 (Wang Dep. (May 15, 2026) 160:8-161:9).*

**Response:** Admitted. GreatCare notes that Ms. Wang's explanation was that SWHNY's authorization set the hours billed and paid, and she testified GreatCare "still ha[s] to pay minimum wage to the aides." *See* Friedman Decl. Ex. 51 (Wang Dep. (May 1, 2026)) 21:16-21.

**290.** *Ms. Wang testified that GreatCare's ability to pay its aides the legal minimum wage depended on how much SWHNY paid GreatCare. Friedman Decl., Ex. 51 (Wang Dep. (May 1, 2026) 20:4-21:21).*

**Response:** Admitted in part and disputed in part. Admitted that when the question was first put, over objection, Ms. Wang answered "Should be." Friedman Decl. Ex. 51 (Wang Dep. (May 1, 2026)) 21:5–11. Disputed that Ms. Wang testified that GreatCare's ability to pay the legal minimum wage depended on how much SWHNY paid GreatCare. When asked the same question again, she rejected its premise: "my understanding is, we follow the state rule, and then if Senior Whole Health give us the rate, which is not, I feel like, can cover our cost, we still have to pay minimum wage to the aides," and "the only thing, that we can either not take their patient or end up the contract." *Id.* 21:16–24. When asked a third time, she answered, "According to the state requirement. For example, the state requirement said, okay, the beginning of January, you have to pay minimum wage to aides, we have to pay," *id.* 22:14–17, and when asked a fourth time, she testified: "No. I don't understand," *id.* 22:23. *See also* Wang Dep. (May 15, 2026) 226:23–227:5 (ECF 252-4).

**291.** *In an August 9, 2024 email to SWHNY, Ms. Wang wrote that the rate SWHNY offered was "not enough to pay the caregivers['] salaries" and that "[w]ith this rate we won't be able to sustain our operations," and she asked SWHNY to "re-evaluate the contract amount ... that we can continue our business." Friedman Decl., Ex. 124 (Email from Wang to M. Ritchie, SWHNY 001084).*

**Response:** Admitted that Ms. Wang wrote the words quoted in an e-mail dated August 9, 2024. Friedman Decl. Ex. 124 at SWHNY 001084. GreatCare notes that the e-mail is subject-lined "cdpap amendment," opens "I received cdpap amendment today," is addressed to "Michelle," and concerns the consumer-directed program rate rather than the live-in personal care per diem. *Id.*

**292.** *As per its contract with GreatCare, during CenterLight's assessment visits, CenterLight's nurses provided supervision of home health aides and personal care workers. See, e.g., Friedman Decl., Ex. 37 (Ding Decl. ¶¶ 5, 12-14); Ex. 39 (CL/GC Agree., § 3.8.2, CenterLight 000045); Ex. 113 (CL-GC E-mail, GSD GC-002711); Ex. 35 (CL Adms. Nos. 30, 31)1; Ex. 38 (CL Ass. Recs. for P.C., CenterLight Confid. 003466, 003486, 003539); Ex. 66 (Hei Li Decl. ¶¶ 27-29).*

**Response:** Admitted in part and disputed in part. Admitted that CenterLight's nurses provided nursing supervision of aides at assessment visits, and that Ms. Ding so avers. Friedman Decl. Ex. 37 ¶¶ 5, 12–14; Ex. 38 at CenterLight Confid. 003466, 003486, 003539; Ex. 66 ¶¶ 27–29. Disputed that the contract provision cited establishes that duty: § 3.8.2 of the 2018 agreement is an audit-and-verification right; the nursing-supervision provision was added later, as § 2.9 of the First Amendment, and § 3.8.3 provides that the plan's determinations "shall in no way affect LHCSA's responsibilities to provide care in a manner consistent with sound medical judgment." Friedman Decl. Ex. 39 §§ 3.8.2–3.8.3, CenterLight 000045; *id.*, First Amendment § 2.9. GreatCare notes that

Exhibit 113 concerns consumer-directed personal assistants, and that the Requests for Admission cited concern Ms. Ding and Hei Li specifically.

**293.** *One nurse employed by CenterLight was Qi Ding. Friedman Decl., Ex. 37 (Ding Decl. ¶¶ 3, 4); Ex. 35 (CL Adms. Nos. 26-27); see, e.g., Ex. 38 (CL Ass. Recs. for P.C., CenterLight Confid. 003466-003468, 003611-003613).*

**Response:** Admitted.

**294.** *At each assessment, Ms. Ding evaluated CenterLight member P.C.'s activities of daily living and would give the aide present instructions on how to provide care to Mr. C. See, e.g., Friedman Decl., Ex. 38 (CL Ass. Recs. for P.C., CenterLight Confid. 003115-003116, 003118, 003120)[22]; Ex. 37 (Ding Decl. ¶ 12).*

**Response:** Admitted that Ms. Ding evaluated the member's activities of daily living at assessments and instructed the aide present on the member's care, as the assessment records in the footnote show ("Aide instructed in Bathing, Skin Care, Foot Care, Mouth Care, Toileting, Pressure Relief"). Friedman Decl. Ex. 38 at CenterLight Confidential 003466; Ex. 37 ¶ 12. GreatCare notes that the four pages cited in the text (003115, 003116, 003118, 003120) do not appear in Exhibit 38 as filed, and that Ms. Ding states at ¶ 21 of her declaration that she does not recall this member.

**295.** *Ms. Ding would also review the assessment with the aide and explain it carefully. Friedman Decl., Ex. 37 (Ding Decl. ¶ 14).*

**Response:** Admitted.

[22] See also id. at 003123, 003126, 003128, 003131-003133, 003466, 003486, 003539, 003549, 003568, 003578, 003611, 003620, 003630, 003650, 003670, 003695, 003704, 003744, 003759, 003769, 003778, 003797, 003818, 003833, 003843, 003890.

**296.** *Ms. Ding and other nurses sent to assess Mr. C. often instructed Mr. C.'s aides on Mr. C.'s care tasks, including personal care, meal preparation, monitoring and reporting signs of cardiac dysfunction, monitoring hypertension, and diet. See, e.g., Friedman Decl., Ex. 38 (CL Ass. Recs. for P.C., CenterLight Confid. 003466-003468, 003476, 003496).*[23]

**Response:** Admitted in part and disputed in part. Admitted that CenterLight nurses instructed aides on the member's care tasks. Disputed as to the cardiac and hypertension items, which are not on the Bates pages cited in the text. *See* Friedman Decl. Ex. 38 at CenterLight Confidential 003466 (PDF p. 90).

**297.** *Ms. Ding and other nurses also instructed the aides to follow CenterLight's plan of care for Mr. C., reinforcing healthier habits, precautions and infection control. Id. at 003650-003651, 003670-003677;*[24] *Friedman Decl., Ex. 35 (CL Adms. Nos. 30, 31); Ex. 37 (Ding Decl. ¶¶ 12, 14); Ex. 66 (Hei Li Aff. ¶¶ 27-29, 34).*

**Response:** Admitted in part and disputed in part. Admitted that CenterLight's nurses gave the aides clinical instruction. Disputed that the cited records direct the aide to follow a plan of care in those terms; they list teaching topics. *See* Friedman Decl. Ex. 66 (Hei Li Decl.) ¶¶ 23-24.

**298.** *CenterLight required that records relating to the services be retained for at least ten years from the termination of the agreement. Friedman Decl., Ex. 39 (2018 CL/GC Agree., paragraph 7, CenterLight 000082).*

**Response:** Disputed. The material cited does not support the assertion as stated. The page cited, CenterLight 000082, is paragraph 7 of Exhibit D to the agreement, the PACE Program

---

[23] See also id. at 003611-003612, 003630-003631, 003640, 003685-003687, 003714-003716, 003759-003771, 003843-003845; CenterLight 000558-000560, 001932-001935.

[24] See also id. at 003704-003705, 004091-004097; CenterLight 001114-001116, 001663-001665, 001818-001820, 002530-002532.

Addendum, captioned "Audits/Access"; it requires the agency to permit audits by federal authorities and to make books and records available "for a period of ten (10) years from the termination of the applicable PACE" contract, not from termination of the GreatCare agreement, and it is not a general retention requirement imposed by CenterLight. Friedman Decl. Ex. 39 at CenterLight 000082. The NYSDOH standard clauses in the same exhibit provide that "medical records shall be retained for a period of six years after the date of service." *Id.* at CenterLight 000079, ¶ 3.

**299.** *In the member care recipients' homes, SWHNY's nurse assessors "instructed" and "educated" GreatCare's aides, including the Plaintiffs, on how to care for the member. See, e.g., Friedman Decl., Ex. 48 (SWHNY Ass. Recs. for K.W.P., SWHNY 003847, 003849, 003854); Ex. 49 (SWHNY Ass. Recs. for X.Y.W., SWHNY 005382, 005399)*[25]*; Ex. 56 (Zhang Dep. 63:20-64:25).*

**Response:** Admitted in part and disputed in part. Admitted that nurse assessors visiting members' homes recorded instructing and educating the aide present on the member's care, and that the assessment cited from Exhibit 48 was conducted by SWHNY. Friedman Decl. Ex. 48 at SWHNY 003847, 003849, 003854. Disputed that the assessments cited from Exhibits 49 and 46 were SWHNY's: the July 27, 2018 assessment in which SWHNY 005382 and 005399 sit was conducted by Premier Home Health Care Services, Inc., and the November 10, 2019 assessment in which SWHNY 002130 sits was conducted by Five Borough Home Care Inc., each a licensed agency performing the assessment for the plan. Friedman Decl. Ex. 49 at SWHNY 005375; Ex. 46 at SWHNY 002125. Ms. Zhang testified that she did not know which insurer a visiting nurse came from. Friedman Decl. Ex. 56 (Zhang Dep.) 64:15–18.

[25] See also Ex. 47 (SWHNY Ass. Recs. for P.C.P., SWHNY 004688); Ex. 46 (SWHNY Ass. Recs. for S.K.C.-1, SWHNY 002130).

**300.** *On July 27, 2018, SWHNY's nurse "educated" Plaintiff Xiu F. Chen at member care recipient X.Y.W.'s home on caring for skin hygiene and using a "4-legs cane" for Ms. W.'s walking and transferring. On January 28, 2019, SWHNY's nurse "educated" Plaintiff Xiu F. Chen on maintaining Ms. W.'s skin hygiene and using a walking aid. Friedman Decl., Ex. 49 (SWHNY Ass. Recs. for X.Y.W., SWHNY005321 (identifying aide), 005322, 005326, 005328, 005375 (identifying aide), 005380, 005382, 005399, 005400); Ex. 56 (Zhang Dep. 64:2-8).*

**Response:** Admitted in part and disputed in part. Admitted that at the January 28, 2019 assessment, which SWHNY conducted, the nurse recorded educating the aide present, identified as "PCA -chen xiu fang," on skin hygiene and use of a walking aid. Friedman Decl. Ex. 49 at SWHNY 005321–005328. Disputed that SWHNY's nurse conducted the July 27, 2018 assessment: its cover page names Premier Home Health Care Services, Inc. as the organization that conducted it, with SWHNY the organization for which it was performed. Friedman Decl. Ex. 49 at SWHNY 005375. GreatCare notes that the Zhang testimony cited concerns a different Plaintiff and member.

**301.** *On December 13, 2016, SWHNY's nurse "educated" a GreatCare aide in member care recipient S.K.C.-1's home on proper perineal and skin care, and on May 31, 2017, a SWHNY's nurse "educated" a GreatCare aide on maintaining her proper perineal and skin care. Friedman Decl., Ex. 46 (SWHNY Ass. Recs. for S.K.C.-1, SWHNY 002266 (identifying aide), 002270, 002325 (identifying aide), 002329).*

**Response:** Admitted. GreatCare notes that neither aide identified on the cited pages is a Plaintiff. *See* Friedman Decl. Ex. 46 at SWHNY 002266 (PDF p. 97) and SWHNY 002325 (PDF p. 115).

**302.** *On May 9, 2019, SWHNY's nurse "educated" Plaintiff Xiu X. Zhu in Ms. C.'s home on proper and frequent cleaning to prevent skin breakdown. Id. at SWHNY 001982 (identifying aide), 001987.*

**Response:** Admitted.

**303.** *On November 10, 2019, SWHNY's nurse "educated" Plaintiff Zhu H.L. Lin in member care recipient S.K.C.-1's home on how to maintain proper skin hygiene and the prevention of urinary tract infections. Id. at SWHNY 002125 (identifying aide), 002130.*

**Response:** Disputed. The material cited does not support the assertion as stated. The November 10, 2019 assessment records "RN educated caregivers of proper skin hygiene and prevention of UTI," but its cover page names Five Borough Home Care Inc., not SWHNY, as the organization that conducted it, and the aide present is recorded as "Lin, Li," not Plaintiff Zhu H.L. Lin. Friedman Decl. Ex. 46 at SWHNY 002125, 002130.

**304.** *On March 21, 2019, SWHNY's nurse "educated" a GreatCare aide in member care recipient X.J.L. 's home on fall precautions and skin breakdown prevention, on September 21, 2019, on Ms. L.'s medication and diuretic schedule, energy conservation, hand hygiene during flu season, and preventive screenings, and on March 12, 2020 about fall precautions. Friedman Decl., Ex. 50 (SWHNY Ass. Recs. for X.J.L., SWHNY 002794 (identifying aide), 002799, 003034-003035 (identifying aide), 003039, 003041, 003043, 003130 (identifying aide), 003135).*

**Response:** Admitted in part and disputed in part. Admitted that at the March 21, 2019 and March 12, 2020 assessments, which SWHNY conducted, the nurse recorded educating the GreatCare aide present on fall precautions and skin-breakdown prevention. Friedman Decl. Ex. 50 at SWHNY 002794, 002799, 003130, 003135. Disputed that SWHNY's nurse conducted the September 21, 2019 assessment: its cover page names New Millenium NY, Inc., a licensed agency,

as the conducting organization. *Id.* at SWHNY 003034. GreatCare notes that the aides identified on the two SWHNY assessments ("Huang, Su Ying" and "Huang, Yue Chong") are not Plaintiffs.

**305.** *On March 11, 2023, the nurse also taught Ms. L.'s aide to make sure that the window and door were always locked to prevent Ms. L. from wandering outside of her apartment; to establish a toileting schedule for Ms. L.; on strategies that could significantly help to decrease the risk of falls; and to have Ms. L. follow a low salt and low cholesterol diet. Id. at SWHNY 0001630.*

**Response:** Admitted in part and disputed in part. Admitted that the March 11, 2023 assessment records the teaching described. Friedman Decl. Ex. 50 at SWHNY 001630. Disputed that the nurse was SWHNY's: the assessment's cover page names X-Treme Care, LLC, a licensed agency, as the conducting organization. *Id.* GreatCare notes that the aide is not identified.

**306.** *On March 28, 2018, SWHNY's nurse "instructed" an unnamed GreatCare aide in member care recipient K.W.P.'s home on incontinence care, the use of hot compression to relieve pain, and the importance of preventative care, and on September 11, 2018, SWHNY's nurse "educated" and "instructed" a GreatCare aide on how to reposition Ms. P. to avoid pressure on the same area, incontinence care, how to clean and apply lotion to the anal area after toileting, and the use of hot compression to relieve pain. Friedman Decl., Ex. 48 (SWHNY Ass. Recs. for K.W.P., SWHNY 003686 (identifying aide), 003691; 004072 (identifying aide), 004077, 004079, 004095.*

**Response:** Disputed. The material cited does not support the assertion as stated. Both assessments cited — March 28, 2018 (SWHNY 004072) and September 11, 2018 (SWHNY 003686) — were conducted by Premier Home Health Care Services, Inc., with Senior Whole Health of New York the organization for which each was performed; the teaching entries are as

described, but they were not made by SWHNY's nurse. Friedman Decl. Ex. 48 at SWHNY 003686, 004072. The aides recorded as present ("PCA LI,SHU E" and "PCA BaiChung Tao") are not Plaintiffs. *Id.*

**307.** *On September 10, 2018, SWHNY's care manager spoke by phone with Ms. P.'s GreatCare aide and "educated" her on the importance of seeking medical attention for any observed change in the member care recipient's condition, such as eating less or increased lethargy. Friedman Decl., Ex. 125 (SWHNY Case Management ("CM") Notes for K.W.P., SWHNY 001704).*

**Response:** Admitted. GreatCare notes that the aide educated on that call was a substitute not identified as a Plaintiff, that the member's spouse was also educated, and that the call was placed to the spouse. *See* Friedman Decl. Ex. 125 at SWHNY 001704 (PDF p. 3).

**308.** *On March 4, 2019, SWHNY's nurse "educated" Plaintiff Zhan J. Li in member care recipient Ms. P.'s home on how to reposition Ms. P., pain relief, and how to clean and apply fungal cream to anal irritation. Friedman Decl., Ex. 48 (SWHNY Ass. Recs. for K.W.P., SWHNY 003842 (identifying aide), 003847, 003849, 003854).*

**Response:** Admitted. GreatCare notes that the aide is recorded as "PCA: Lai, Zhan Jin." *See* Friedman Decl. Ex. 48 at SWHNY 003847-003854 (PDF pp. 13-15).

**309.** *On September 11, 2018, SWHNY's nurse "educated" member care recipient P.C.P.'s GreatCare home aide on proper skin care and frequent undergarment changes to prevent skin breakdown, and on March 4, 2019, SWHNY's nurse "educated" a GreatCare aide on Mr. P.'s proper skin care and frequent undergarment changes to prevent skin breakdown. Friedman Decl.,*

*Ex. 47 (SWHNY Ass. Recs. for P.C.P., SWHNY 004831 (identifying aide), 004836, 004838, 004980 (identifying aide), 004985, 005004).*

**Response:** Admitted in part and disputed in part. Admitted that at the March 4, 2019 assessment, which SWHNY conducted, the nurse recorded educating the GreatCare aide present on skin care and undergarment changes. Friedman Decl. Ex. 47 at SWHNY 004831. Disputed as to September 11, 2018: that assessment (SWHNY 004980) was conducted by Premier Home Health Care Services, Inc. *Id.* at SWHNY 004980. GreatCare notes that the Bates pages cited are reversed against the two dates, and that the aide identified on both is "PCA LI,SHU E," who is not a Plaintiff.

**310.** *SWHNY's care managers made periodic telephone calls to the member care recipients, during which they confirmed the member's authorized services and reviewed the member's plan of care; on these calls, the care manager sometimes spoke with and educated the member care recipient's aide, including Plaintiffs and other GreatCare aides. See, e.g., Friedman Decl., Ex. 126 (SWHNY CM Notes for X.Y.W., SWHNY 001853, 001854);* [26] *Ex. 125 (SWHNY CM Notes for K.W.P., SWHNY 001704).*

**Response:** Admitted. *See* Friedman Decl. Ex. 126 at SWHNY 001853, 001876-001877 (PDF pp. 3, 16-17).

**311.** *A SWHNY care manager "educated" Plaintiff Mu Z. Zhang on a telephone calls on: a. January 9, 2018, about applying warm compression to member care recipient X.Y.W.'s right knee to promote pain relief, provide scheduled toileting to prevent incontinence, and follow up with the audiologist regarding the member's hearing (Friedman Decl., Ex. 126 (SWHNY CM*

[26] See also id. at 001855, 001857, 001858, 001869, 001870, 001874, 001877, 001878; Ex. 127 (SWHNY CM Notes for X.J.L., SWHNY 001407).

*Notes for X.Y.W., SWHNY 001876, 001877). b. February 7, 2018, about placing Ms. W.'s walker in front of the bedside commode to assist with safe transfers, and on scheduled toileting. Friedman Decl., Id. at SWHNY 001873, 001874, 001875. c. March 6, 2018, about emergency preparedness and scheduled toileting to prevent incontinence. Id. at SWHNY 001870, 001872. d. March 8, 2018, on communicating all of the member's symptoms to her physician, and scheduled toileting to prevent incontinence. Id. at SWHNY 001869). e. July 3, 2018, regarding the member's health care proxy. Id. at SWHNY 001863. f. August 1, 2018, on contacting SWHNY's care management team about any change in the member's health condition. Id. at SWHNY 001858. g. September 4, 2018, on applying warm compression to promote pain relief and on the importance of rest periods before and after activities of daily living, such as meals and bathing Id. at SWHNY 001857. h. November 5, 2018 and December 3, 2018, on pain relief. Id. at SWHNY 001853-001855.*

**Response:** Admitted that a SWHNY care manager recorded educating "PCA Zhang, Muzhen" by telephone on the subjects listed. Friedman Decl. Ex. 126 at SWHNY 001853–001877. GreatCare notes that the January 9, 2018 note records that Ms. Zhang "works on Mon-Weds" for this member, and that the footnote citation to Exhibit 127 concerns a different member and a different aide. *Id.* at SWHNY 001876; Ex. 127.

**312.** *In addition to supervision, SWHNY also provided GreatCare with mandatory trainings for GreatCare to give its aides. Friedman Decl., Ex. 42 (Glapa Dep. (Jan. 26, 2026) 224:16-226:23); Ex. 44 (Wang Dep. (May 15, 2026) 208:9-21); Ex. 128 (SWHNY Training Ltr., SWHNY 001236); Ex. 129 (SWHNY Training Materials, SWHNY 001221-001230); Ex. 130 (SWHNY Training Attestation, SWHNY 001235).*

**Response:** Disputed. The material cited does not support the assertion as stated. SWHNY's Rule 30(b)(6) witness testified that SWHNY imposes no training requirements other

than those passed down from the State and that "we don't employ their aides." Friedman Decl. Ex. 42 (Glapa Dep. (Jan. 26, 2026)) 224:16–226:23. Exhibits 128 through 130 concern a single depression-screening performance-improvement project, in a letter dated January 1, 2025 and an attestation referring to training in December 2024, after every Plaintiff's live-in work had ended. Friedman Decl. Exs. 128–130. Ms. Wang testified that GreatCare provided its aides' training and that SWHNY "sent information, which is required" under state and labor law. Friedman Decl. Ex. 44 (Wang Dep. (May 15, 2026)) 208:9–21. GreatCare's interrogatory response describes its own annual native-language compliance training program. Friedman Decl. Ex. 116, Resp. to Interrog. No. 4.

**313.** *SWHNY periodically audited GreatCare to ensure compliance with all of its contractual obligations. Friedman Decl., Ex. 51 (Wang Dep. (May 1, 2026) 73:3-74:3); Ex. 44 (Wang Dep. (May 15, 2026) 53:10-54:14); Ex. 131 (GC RFA Resp. to SWHNY, Nos. 12, 44).*

**Response:** Admitted in part and disputed in part. Admitted that SWHNY audited GreatCare; disputed as to "periodically" and "all of its contractual obligations" — the witness could recall neither frequency nor date, and described file reviews. *See* Friedman Decl. Ex. 44 (Wang Dep. (May 15, 2026)) 53:2-5.

**314.** *When it audited GreatCare, SWHNY went to GreatCare's office and had GreatCare provide the names of the aides assigned to specific members. Friedman Decl., Ex. 44 (Wang Dep. (May 15, 2026) 52:14-53:5); Ex. 51 (Wang Dep. (May 1, 2026) 74:11-13).*

**Response:** Admitted.

**315.** *In its audits, SWHNY reviewed the files of the aides assigned to its members, which included each aide's physical examination, employment application, employment agreement, New*

*York Department of Labor forms, and performance evaluations. Friedman Decl., Ex. 51 (Wang Dep. (May 1, 2026) 73:7-11); Ex. 44 (Wang Dep. (May 15, 2026) 43:6-15, 52:21-53:9); Ex. 131 (GC RFA Resp. to SWHNY, No. 44).*

**Response:** Admitted in part and disputed in part. Admitted that GreatCare's aide files contained each aide's physical examination, employment application, employment agreement, Department of Labor forms and performance evaluations, and that GreatCare made those files available to SWHNY on audit. Disputed that the cited testimony establishes what SWHNY reviewed: Ms. Wang testified "we just give them the file … I do not know" what SWHNY checked, and the RFA response states only that SWHNY "audit and can request Plaintiffs' aide files." Friedman Decl. Ex. 44 at 53:2–5; Ex. 131, No. 44.

**316.** *SWHNY required GreatCare to maintain all records relating to the aides' services for a minimum of ten years. Friedman Decl., Ex. 32 (SWHNY-GC HHSA § 7.4, SWHNY 000257).*

**Response:** Admitted. GreatCare notes that Sec. 7.4's ten-year minimum applies to records required under the Agreement, and that the same Article provides those records "remain the sole property of Provider." *See* Friedman Decl. Ex. 32 Sec. 7.2, at SWHNY 000257 (PDF p. 33).

**317.** *Plaintiffs filed wage theft complaints against GreatCare with the New York State Department of Labor ("DOL") on or about the following dates: a. Plaintiff Hei Li on or about July 20, 2022; b. Plaintiff Zhu H.L. Lin May 25, 2022; c. Plaintiff Li Chen on or about May 1, 2021; d. Plaintiff Mei F. Chen on or about May 1, 2022; e. Plaintiff Xiu F. Chen on or about August 8, 2022; f. Plaintiff Hui He on or about September 1, 2022; g. Plaintiff Hui Li on or about October 30, 2022; h. Plaintiff Zhan J. Li on or about September 8, 2022; i. Plaintiff Hui X. Ruan on or about May 12, 2022; j. Plaintiffs Jian R. Xiao and Mei Z. Xiao on or about May 18, 2023; k. Plaintiff Mu*

*Z. Zhang on or about September 12, 2023; l. Plaintiff Bi Y. Zheng on or about November 11, 2021; and m. Plaintiff Xiu X. Zhu on or about January 3, 2021. Friedman Decl., Ex. 132 (Plaintiffs' DOL Complaint Forms, GSD-000839-000953).*

**Response:** Admitted in part and disputed in part. Admitted that twelve of the fourteen Plaintiffs executed a New York State Department of Labor complaint form naming GreatCare; that a thirteenth complaint form naming GreatCare, in Hui He's name, appears in the exhibit without its executed certification page; that those forms were filed with the Department; and that the Department opened a matter under Case No. LS11 2022004439 concerning GreatCare in which all fourteen Plaintiffs are named. Friedman Decl. Ex. 132 (GSD-000839–000953); *id.* at GSD 000916 (Department letter of Oct. 22, 2024, Case No. LS11 2022004439). The complaint form in the exhibit for Xiu X. Zhu names a different agency; see the response below to subparagraph (m). Disputed only as to the dates the paragraph assigns to certain filings. The dates are taken from the claimant signature blocks on the LS 223 forms; the "Office Use Only" block on each first page is blank, so the exhibit does not establish the date on which any form was received by the Department. *Id.* Three of the pleaded dates do not match the exhibit, as set out in the responses to subparagraphs (e), (l) and (m); the LS 11 Letters of Representation for Xiu X. Zhu and Xiu F. Chen are dated December 27, 2021 and July 17, 2022. Friedman Decl. Ex. 132; Grajek Decl. Ex. 22 (ECF 252-22) at PDF pp. 80, 88. GreatCare does not contend that the October 22, 2024 letter reflects any determination on the merits of Plaintiffs' claims.

**(a)** Admitted that Hei Li's complaint form is signed and dated July 20, 2022, which is the date the subparagraph pleads, and admitted that the form was filed with the Department. Friedman Decl. Ex. 132. GreatCare notes that the form itself does not record a date of receipt by the Department.

**(b)** Admitted that Zhu H.L. Lin's complaint form is signed and dated May 25, 2022, which is the date the subparagraph pleads, and admitted that the form was filed with the Department. Friedman Decl. Ex. 132. GreatCare notes that the form itself does not record a date of receipt by the Department.

**(c)** Admitted that Li Chen's complaint form is signed and dated May 1, 2021, which is the date the subparagraph pleads, and admitted that the form was filed with the Department. Friedman Decl. Ex. 132. GreatCare notes that the form itself does not record a date of receipt by the Department.

**(d)** Admitted that Mei F. Chen's complaint form is signed and dated May 1, 2022, which is the date the subparagraph pleads, and admitted that the form was filed with the Department. Friedman Decl. Ex. 132. GreatCare notes that the form itself does not record a date of receipt by the Department.

**(e)** Disputed. Xiu F. Chen's complaint form is signed and dated August 3, 2022, not August 8, 2022, and her representative's LS 11 Letter of Representation is dated July 17, 2022. Friedman Decl. Ex. 132 (LS 223, p. 6 of 6, for Xiu F. Chen; GSD-000928). Admitted that the form was filed with the Department.

**(f)** Admitted that Hui He's LS 11 Letter of Representation is signed by her and dated September 1, 2022, and admitted that a complaint form in her name was filed with the Department. Friedman Decl. Ex. 132 at GSD 000855. GreatCare notes that her LS 223 in the exhibit consists of pages 1, 3 and 5 of 6 (GSD-000856–000858) and that no executed "Page 6 of 6" certification for Ms. He appears in the exhibit; she is the only one of the fourteen complainants for whom the executed certification page is absent. *Id.*

**(g)** Admitted that Hui Li's complaint form is signed and dated October 30, 2022, which is the date the subparagraph pleads, and admitted that the form was filed with the Department. Friedman Decl. Ex. 132. GreatCare notes that the form itself does not record a date of receipt by the Department.

**(h)** Admitted that Zhan J. Li's complaint form is signed and dated September 8, 2022, which is the date the subparagraph pleads, and admitted that the form was filed with the Department. Friedman Decl. Ex. 132. GreatCare notes that the form itself does not record a date of receipt by the Department.

**(i)** Admitted that Hui X. Ruan's complaint form is signed and dated May 12, 2022, which is the date the subparagraph pleads, and admitted that the form was filed with the Department. Friedman Decl. Ex. 132. GreatCare notes that the form itself does not record a date of receipt by the Department.

**(j)** Admitted that Jian R. Xiao and Mei Z. Xiao's complaint form is signed and dated May 18, 2023 (both forms), which is the date the subparagraph pleads, and admitted that the form was filed with the Department. Friedman Decl. Ex. 132. GreatCare notes that the form itself does not record a date of receipt by the Department.

**(k)** Admitted that Mu Z. Zhang's complaint form is signed and dated September 12, 2023, which is the date the subparagraph pleads, and admitted that the form was filed with the Department. Friedman Decl. Ex. 132. GreatCare notes that the form itself does not record a date of receipt by the Department.

**(l)** Disputed. Bi Y. Zheng's complaint form is signed and dated November 21, 2022, not November 11, 2021. Friedman Decl. Ex. 132 (LS 223, p. 6 of 6, for Bi Y. Zheng). Admitted that the form was filed with the Department.

**(m)** Disputed. The complaint form in Friedman Decl. Ex. 132 for Xiu X. Zhu is signed and dated January 3, 2022, not January 3, 2021, and it names "Premier," not GreatCare, as the employer; her representative's LS 11 Letter of Representation is dated December 27, 2021. Friedman Decl. Ex. 132 (LS 223 for Xiu X. Zhu; GSD-000931–000936). Admitted that Ms. Zhu is among the fourteen claimants named in the Department's October 22, 2024 letter. *Id.* at GSD 000916.

**318.** *In November 2017, GreatCare and its principal and corporate representative, Barbara Wang, were sued in a New York State Supreme Court class action regarding their failure to pay aides who worked 24-hour shifts for all hours worked; the Parties entered into a settlement agreement resolving those claims in 2023. Friedman Decl., Ex. 133 (Settlement Agreement, GSD 05.01.2026-000001-08)*

**Response:** Admitted in part and disputed in part. Admitted that on November 3, 2017 Guo Zhen Qian, suing "individually and on behalf of all others similarly situated," commenced an action in the Supreme Court of the State of New York, New York County, Index No. 656750/2017, against GreatCare Inc., Jian Peng, "Jane" Zhu and Barbara Wang; that GreatCare's Rule 30(b)(6) designee testified that "the allegation is about the failure to pay for 24-hour live-in cases," Wang 30(b)(6) Dep. (May 1, 2026) 164:22–24 (ECF 252-3), and that the caption pleaded claims on behalf of others similarly situated, *id.* 165:4–16; and that the action was resolved by a settlement agreement executed and filed on December 12, 2023. Friedman Decl. Ex. 133. Disputed only as to scope: no class was moved for or certified; the release runs to Ms. Qian alone, "individually and on

behalf of her children, spouses, agents, heirs, executors," and to no other aide, Friedman Decl. Ex. 133 at pp. 3–4 (Release of Plaintiffs' Claims); the total consideration was $7,500, payable in three installments, of which $3,359.76 was attorney's fees and costs, *id.* at pp. 2–3; Ms. Wang testified that no aide other than Ms. Qian was paid anything, Wang 30(b)(6) Dep. 165:17–20; and the agreement recites that nothing in it "shall be construed, considered, or deemed to be an admission of liability or wrongdoing by any Defendants," Friedman Decl. Ex. 133 at p. 5, ¶ 7. GreatCare objects under Fed. R. Evid. 408 to the settlement agreement being received to prove the validity of Plaintiffs' claims.

**SCHEDULE OF OBJECTIONS UNDER FED. R. CIV. P. 56(c)(2) AND LOCAL CIVIL RULE 56.1(d)**

GreatCare's evidentiary objections to material Plaintiffs cite are stated in the responses identified below and are collected here so that each may be applied once. Each objection is made for purposes of the pending motions only (General Response 1). No hearsay objection is made to the plans' assessment narratives themselves (but *see* item 10 as to statements of family members recorded in the plans' notes); GreatCare asks only that each narrative be read together with the authorization it accompanied (Fed. R. Evid. 106). Translation and execution of Plaintiffs' declarations are addressed in General Response 5 and in GreatCare's memorandum of law.

**1.** Legal conclusions pleaded as facts. Paragraphs 18, 65, 66, 70, 71, 94, 115, 119, 120, 148, 163, 201, 238, 240 and 243 state legal conclusions, not facts; no response is required and none is deemed admitted. Paragraphs 10 and 11 do so in part, in characterizing GreatCare as the Plaintiff's employer. *Flores Moreno v. Ramos*, No. 17 CV 9439-LTS-KNF, 2021 WL 637563 (S.D.N.Y. Feb. 17, 2021) (ECF 94 at 6 n.5). The objection is stated in each of those responses.

**2.** Friedman Declaration Exhibit 59 (the spreadsheet prepared under the Court's August 6, 2026 Order, re-captioned). Plaintiffs' counsel's summary, not a business record and not a Rule 1006 summary of admissible records; it cannot be presented in a form admissible in evidence. Fed. R. Civ. P. 56(c)(2). General Response 3; responses to Paragraphs 36 and 43 through 63.

**3.** Friedman Declaration Exhibit 64 and the Declaration of Scott Workman (ECF 257). Undisclosed expert opinion (Fed. R. Civ. P. 26(a)(2), 37(c)(1)) and, to the extent offered as lay testimony, arithmetic on instructed premises outside Fed. R. Evid. 701 and 1006; Exhibit 64 as filed contains no paragraph 20. General Response 4; responses to Paragraphs 64 through 69.

**4.** Friedman Declaration Exhibits 31 and 100 (the declarations of Xiu X. Zhu and Hui X. Ruan). Filed without the interpreter's certification the other Plaintiff declarations carry, by declarants who testified that they do not read English; the interpreter declarations later filed for both (ECF 268-1, 268-2) were each executed by Way P. Moy, who attended Ms. Ruan's deposition as a "check interpreter" and whom she identified under oath as one of her lawyers. GreatCare objects to the weight of each under Fed. R. Civ. P. 56(c)(4) and Fed. R. Evid. 604. The objection is stated in General Response 5 and applies to Paragraphs 14, 103, 104, 105, 115, 119, 179, 186, 222 and 238.

**5.** Friedman Declaration Exhibit 67 (the "W.Y. Letter"). An unsworn letter of a non-party residing in China, not made on personal knowledge under oath or under 28 U.S.C. § 1746, unauthenticated, hearsay, and in an uncertified translation. Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, 802, 901. Responses to Paragraphs 81, 82 and 87.

**6.** Lack of personal knowledge — Friedman Declaration Exhibit 86 ¶¶ 14–16 and Exhibit 100 ¶ 21. Cited for care recipients the declarations do not mention or address only in general terms. Fed. R. Civ. P. 56(c)(4). Responses to Paragraphs 115, 119, 169, 179, 186, 201, 222 and 238.

**7.** Friedman Declaration Exhibit 35 (Plaintiffs' requests for admission to CenterLight, deemed admitted by the orders of January 5 and 12, 2026 included in the exhibit). A Rule 36 admission, including a deemed admission, binds only the party that made it and is not evidence against a co-defendant. Riberglass, Inc. v. Techni-Glass Indus., Inc., 811 F.2d 565, 566–67 (11th Cir. 1987) (per curiam); Becerra v. Asher, 105 F.3d 1042, 1048 (5th Cir. 1997); 8B Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2264 (3d ed.). Responses to Paragraphs 18, 19, 24, 25, 73, 76, 77, 81, 82, 83, 269, 272, 292, 293 and 297. Where GreatCare admits a fact stated in those paragraphs, it does so on the plan's own records, not on Exhibit 35.

**8.** Friedman Declaration Exhibits 128 through 130 and the materials cited at ECF 256 at 7 n.2 and in Paragraph 123. Exhibit 130 attests to training in December 2024, after every Plaintiff's live-in work for GreatCare had ended; City Council testimony and a press release are not proper record evidence under Fed. R. Civ. P. 56(c)(1)(A). Responses to Paragraphs 123 and 312.

**9.** Records of other entities and of aides who are not Plaintiffs (Paragraphs 299 through 309) and exhibits that do not support the paragraph citing them are addressed in the numbered responses under Fed. R. Civ. P. 56(c)(1)(B); they are not restated here.

**10.** Statements of members' family members recorded in plan notes. The daughter's complaint recorded in Friedman Declaration Exhibit 89 at ELDERPLAN000039–000040 and the

son's report recorded in Exhibit 99 at DTK 000048 are hearsay within hearsay to the extent offered for their truth; the plan's business-record foundation reaches the care manager's entry, not the family member's statement. Fed. R. Evid. 802, 803(6), 805. Responses to Paragraphs 177 and 220.

## PART II — GREATCARE'S STATEMENT OF ADDITIONAL MATERIAL FACTS

### A. The parties and the live-in structure: 13/8/5/3, the plans' per-diem authorizations, and the State's 13-hour billing standard

**1.** On a GreatCare live-in case, the aide lived in the member's home under an arrangement that provided five uninterrupted hours of sleep within an eight-hour sleep period and three hours of meal time, and the member had already been assessed by a registered nurse and approved by the State for 24-hour live-in service before GreatCare received the authorization. Wang Dep. (May 1, 2026) 43:6–15 (testimony of Barbara Wang, GreatCare's Rule 30(b)(6) designee) (ECF 252-3).

**2.** As GreatCare used the terms, a live-in shift differed from a split shift in that the live-in member did not need evening services and had only 13 hours of authorized service, and the live-in arrangement provided the aide a separate bed, at least three hours of meal time and five uninterrupted hours of an eight-hour sleep period. Wang Dep. (May 15, 2026) 84:20–85:19 (ECF 252-4).

**3.** Wang testified that whether a member was authorized for a live-in shift or a split shift was decided by a medical professional's assessment and approved by the State, and not by GreatCare. Wang Dep. (May 15, 2026) 85:23–86:18, 44:20–45:7 (ECF 252-4).

**4.** GreatCare could not convert a live-in authorization into two 12-hour split shifts and could not change the 13-hour billing unit, a "standard setup" that, in Ms. Wang's words, GreatCare "cannot change." Wang Dep. (May 1, 2026) 33:5–13, 43:16–18 (ECF 252-3).

**5.** Under GreatCare's live-in arrangement as its intake specialist Mei Mei Zhao described it, the aide worked 13 hours and then had eight hours of sleeping time, of which five were undisturbed, plus three hours of meal time; both the aide and the member knew that structure; and a 24-hour case in which the aide could not sleep at night was a split shift requiring two different aides who would never be replaced by one. M. Zhao Dep. (Feb. 11, 2026) Tr. 58–61 (ECF 252-7 at PDF p. 17).

**6.** GreatCare coordinator OuYang Pei Zhen testified that a member who needed assistance to toilet three times a night or repositioning at night would not be authorized by the government for a 24-hour live-in aide but for a 12-and-12 split shift, and that she had no authority to set a member's hours. Ouyang Dep. (Feb. 9, 2026) (ECF 252-6) at PDF pp. 53–55, 67.

**7.** Senior Whole Health of New York's Rule 30(b)(6) witness testified that T1020 is "the universal code for live-in care" and that one unit of T1020 equals 13 hours. Glapa Dep. (Jan. 26, 2026) 41:20–24 (ECF 252-9).

**8.** The same witness testified that "[t]he 13 hours is not, it is a CMS standard per diem rate. So it is up to 24 hours, 13 is the maximum, it is a per diem rate, not an hourly rate." Glapa Dep. (Feb. 26, 2026) 84:2–9, 85:5–16 (ECF 252-10).

**9.** The same witness testified that live-in care means an aide who sleeps and resides with the member during the shift, and that a member who wakes at night such that the aide is not getting sufficient sleep "may need a split-shift care to come in so that aide can sleep." Glapa Dep. (Jan. 26, 2026) 41:6–19 (ECF 252-9).

**10.** The Amendment to the Provider Agreement between Senior Whole Health of New York, Inc. and GreatCare, Inc., effective April 1, 2017, defined billing code T1020 as "Personal care services, per diem; per diem is standardized to 13 hours of service (1 unit = 13 hours)

Maximum 1 unit/24 hours; 1 week = 7 units (91hrs)," and directed that the code be used "to bill for live-in services." GC03.01.2025-000002 (Liu Decl. Ex. 22).

**11.** Amendment No. 12 to the SWHNY–GreatCare services agreement, effective December 31, 2017, set the reimbursement for T1020, "PCS Level II Live in," at "$292.12 per diem (which includes 13 hours paid at $18.02 per hour for all worker wage and expense requirements … and $0.34 per hour for FLSA, plus $57.86 per diem for administrative expenses)," and repeated that the "[p]er diem is standardized to 13 hours of service (1 unit = 13 hours) Maximum 1 unit/24 hours; 1 week = 7 units (91 hrs)." SWHNY 000232–000233 (ECF 252-20 at 14–15).

**12.** Amendment No. 14, effective January 1, 2019, set the T1020 live-in rate at "$332.80 per diem (which includes 13 hours paid at $19.09 per hour for all worker wage and expense requirements … and $0.34 per hour for FLSA, plus $84.63 per diem for administrative expenses)." SWHNY 000237 (ECF 252-20 at 19).

**13.** Attachment A to the Administrative Agreement for Fiscal Intermediary Services between Extended MLTC and GreatCare, effective December 31, 2017, set the reimbursement for "Personal Care Services, per diem" under "T1020 Modifier U8 Live in rate for consumer directed fiscal intermediary" at "$277.29/Per Diem – NYS," expressed on the face of the schedule as "(21.33 x 13 hrs.)," against an hourly CDPAP rate of "$21.33/hr." GC 06.05.2025 002224 (Liu Decl. Ex. 22).

**14.** Aetna Better Health of New York's "Guide to Universal Billing," issued to GreatCare by letter of December 14, 2017 and effective February 1, 2018, defined the unit for "PCS Level II Live in" under T1020 as "per day (>=13 hrs)," and used the same unit for the live-in

two-client, weekend/holiday and CDPA live-in variants. GC 06.05.2025 002192 et seq. (Liu Decl. Ex. 22).

**15.** Appendix B to the Licensed Home Care Agency Ancillary Agreement between CenterLight Healthcare, Inc. and GreatCare, Inc. dated October 1, 2022 priced "Personal care services – Live-In one client, per diem (13 hours)" under T1020 at $325 per diem and "Live-In two clients, per diem (13 hours)" under T1020 modifier U2 at "$175 Each or $350 for both," against an hourly personal care rate of $6.75 per fifteen minutes. Friedman Decl. Ex. 111 at CenterLight 000113.

**16.** Senior Whole Health's claims payment extract records that every live-in day GreatCare billed for the six subject members from 2019 through 2023 was paid under procedure code T1020, personal care services per diem, at one unit per date of service, at $332.80 per day and later $362.92 per day; the single non-per-diem claim in the extract is a March 22, 2021 claim for member X.Y.W. under hourly code T1019 for eight quarter-hour units, paid $51.20. SWHNY Claims Extract of Payments, SWHNY001882 (3,161 T1020 line items; claim 21152E0003476) (SWHNY's production, served on all parties; not attached — verification schedule A-14).

**17.** Every Senior Whole Health authorization for member X.Y.W. from January 1, 2019 through January 31, 2021 approved "Personal Care Aide Level II – Live in per day ~ T1020 ~ PERSONAL CARE SERVICES PER DIEM" in a quantity of seven days weekly, in six consecutive approvals, and none stated a number of hours. GC 08.04.2025 007395–007422; GC03.01.2025-000007 to -000008 (Liu Decl. Ex. 21).

**18.** Senior Whole Health issued nine consecutive authorizations for member S.K.C.-1 from January 1, 2018 to March 8, 2021, each for seven units or days weekly under T1020, naming GREAT CARE, INC. as provider, and none of the nine stated a number of hours; its notices for

members P.C.P. and S.M.C.D. likewise expressed the authorized service only in days per week. GC 08.04.2025 008866–008904; GC 08.04.2025 008607–008665 (Liu Decl. Ex. 21); SWHNY005630; SWHNY005672; SWHNY005694.

**19.** Senior Whole Health authorized members K.W.P. and P.C.P. under the mutual code "Personal Care Aide Level II – Live in per day for two clients ~ T1020 ~ PERSONAL CARE SERVICES PER DIEM ~ U2 modifier," at seven units weekly for January 1 through April 30, 2018 and at four days weekly for each successive period through March 9, 2020. GC 08.04.2025 008563–008593 (Liu Decl. Ex. 21).

**20.** Senior Whole Health's February 1, 2023 "Formal Process on Authorizing Mutual Cases" instructed providers that the shared service hours of a mutual live-in pair "are not A+B, they should be either A or B, whichever is longer," and that "[a] LHCSA cannot submit claims to two different payors for the same worker for the same hours." SWHNY001238–001239.

**21.** Extended MLTC's authorization letters for CDPAP member S.Y.Y. show that effective April 23, 2018 the plan increased the service "from 35 HRS per week to LIVE-IN (New Suggested Schedule is 7Dx24HRS, SUN-SAT)" and changed the billing code from T1019 to T1020, and that for July 1 to September 30, 2018 the plan authorized "CDPAP 7D X 24HR LIVE IN" with "AUTHORIZED UNITS: 92 UNITS" under T1020 modifier U6. GC 08.04.2025 010741–010750, 010752–010754 (Liu Decl. Ex. 21).

**22.** CenterLight Health System's "Change in Aide Authorization" form for member P.C., dated April 13, 2017 (communication date April 20, 2017) and listing CenterLight nurse Qi Ding as the member's nurse, checked the box "Live In," set the authorization at 13.00 total hours for each of the seven days, 8:00AM to 8:00AM, and recorded that effective April 17, 2017 a different agency, Preferred, would cover the member Monday through Wednesday and that

effective April 20, 2017 GreatCare would cover Thursday through Sunday. GC03.01.2025-000014 (Liu Decl. Ex. 21); Pls.' Ex. 114 at CenterLight Confid. 003317.

**23.** Six of the eight CenterLight Plans of Care for member P.C. in the 2016–2019 certification periods state the aide order as "7 Days x 13 Hours" with the parenthetical "24 hrs live-in," and CenterLight's physician-certified Home Health Certification and Plan of Care for March 1 through August 31, 2018 ordered "Aide Services: HHA For 7 Days x 13 Hours ( 24 hrs live-ing)." CenterLight Confidential 002511–003150, at 003944/002523; CenterLight Confidential 003944.

**24.** CenterLight's Vice President of Clinical Services swore that CenterLight, and not GreatCare, made the initial determination authorizing services and the amount of services in days and hours per day, using input from doctors, nurses and social assessments. Descollines Decl. ¶ 5 (ECF 248-3).

**25.** GreatCare is not a party to either NYSDOH managed-long-term-care contract; each runs between the State and the plan. Pls.' Ex. 34 at SWHNY 000001; Pls.' Ex. 36 at CenterLight 000381.

**26.** The SWHNY–GreatCare services agreement and the CenterLight–GreatCare agreement each provide that the parties act "as independent contractors" and that nothing in the agreement creates "an employment relationship, partnership or joint venture." SWHNY 000261 (ECF 252-19 at 20); CenterLight 000053 (ECF 214-4 at 13).

## B. The written agreements and acknowledgments

### *The forms*

**27.** GreatCare's one-page "HOME CARE WORKER AGREEMENT – 'LIVE-IN' CASE" provided that for each 24-hour shift the aide "will be paid by the agency for 13 hours

worked for the Client," would be "provided 8 hours of sleep time," and would be provided three unpaid one-hour duty-free meal times. GC 08.04.2025 008015 (Liu Decl. Ex. 1(a)).

**28.** The same one-page agreement required the aide to "report to my Coordinator/Supervisor, in writing, immediately following each 24 hour shift, if I was (i) unable to receive 5 hours uninterrupted sleep time," if her sleep was interrupted by a call to duty, if she was unable to receive three one-hour meal times, or if a meal time was interrupted. GC 08.04.2025 008015 (Liu Decl. Ex. 1(a)); identical text at GC 07.28.2025 002909 (Liu Decl. Ex. 1(c)) and at GC03.01.2025-000029 (Xiu X. Zhu's copy; see ¶ 47).

**29.** GreatCare's separate two-page "'Live-In' or 24-Hour Caregivers Agreement" provided that during a 24-hour shift a caregiver is "expected to provide care to the patient for only 13 hours of the 24-hour case/shift and to receive a total of 11 hours of rest/breaks," and defined "Bona Fide Sleep Periods" as "regularly scheduled sleep periods, which include at least 5 consecutive hours that are not interrupted by a call to duty, in adequate sleeping facilities." GC 08.04.2025 008017–008018; GC 08.04.2025 012477–012478 (Liu Decl. Ex. 2(a), (k)).

**30.** GreatCare's "'Live-In' or 24-Hour Caregivers Agreement" defined Bona Fide Meal Periods as uninterrupted, duty-free periods of at least thirty minutes totaling at least three hours, provided that a caregiver may leave the work area during each meal period, and provided that "[n]o Caregiver will be forced to work a 24-hour case and any Caregiver who wishes to work a 24-hour case must sign this Agreement." GC 08.04.2025 008017 (Liu Decl. Ex. 2(a)).

**31.** Under the heading "Record-keeping," GreatCare's "'Live-In' or 24-Hour Caregivers Agreement" required the caregiver to certify on every weekly timesheet the start and end time of each meal period and of the sleep period, receipt of at least five consecutive uninterrupted sleep hours, the adequacy of the sleeping facilities, and the duration and times of any

interruption, and stated that "[s]hould Caregivers not receive a Bona Fide Meal Period and/or Bona Fide Sleep Period during a 24-hour shift, it is critical that the Caregiver report this on his/her timesheet." GC 08.04.2025 008018; GC 08.04.2025 012478 (Liu Decl. Ex. 2(a), (k)).

**32.** Under the heading "No Retaliation," GreatCare's "'Live-In' or 24-Hour Caregivers Agreement" provided that "[n]o employee will be subject to any reprisal or other adverse action for reporting missed or interrupted meal or sleep periods," and that an employee who knowingly submitted a false report of work time would be subject to discipline up to termination. GC 08.04.2025 008018; GC 08.04.2025 012478 (Liu Decl. Ex. 2(a), (k)).

**33.** GreatCare's "'Live-In' or 24-Hour Caregivers Agreement" instructed that "[i]f a Caregiver believes that he/she was not paid for all hours worked, the Caregiver must contact the Human Resources Department immediately and report the actual hours that he/she worked." GC 08.04.2025 008018 (Liu Decl. Ex. 2(a)).

**34.** GreatCare's "24-Hour or 'Live-In' Cases Declaration Letter" is a form addressed by the aide to GreatCare in which the aide declares that for all past live-in cases she accepted from GreatCare she "received all of the following accommodations every day since my first working day: (a) 3 hours of meal time in total for a day (b) 5 consecutive and uninterrupted sleeping hours every night" and adequate sleeping facilities provided by the patient. GC 08.04.2025 008016 (Liu Decl. Ex. 9(a)).

**35.** GreatCare produced a Chinese-language counterpart of the Home Care Worker Agreement bearing the same three numbered terms and a Chinese attestation reading "我已阅读所有以上声明，并遵守这些条例" ("I have read all of the above statements and will comply with these rules"), adding a sentence stating that any employee who intentionally reported false work

hours would be subject to discipline including termination. GC 08.04.2025011146; GC 08.04.2025 010759 (Liu Decl. Ex. 1(k), (l)).

***Per Plaintiff***

**36.** Hei Li signed the Home Care Worker Agreement — "Live-In" Case, printing "Li, Hei" and dating it 2/23/2018 (GC 08.04.2025 008015; also GC 07.28.2025 003464; GC03.01.2025-000047); signed the 24-Hour or "Live-In" Cases Declaration Letter dated 12/30/20 (GC 08.04.2025 008016; also GC 07.28.2025 003465; GC03.01.2025-000048); signed the "'Live-In' or 24-Hour Caregivers Agreement" on 12/30/20, countersigned by GreatCare witness Wynne Chen the same day (GC 08.04.2025 008018; also GC 07.28.2025 003467; GC03.01.2025-000050); and signed the trilingual Language Consent Form on 6/8/18 (GC 08.04.2025 008020). (Liu Decl. Exs. 1(a), 2(a), 3(a), 9(a)).

**37.** Hui Li signed the Home Care Worker Agreement, printing "Hui Li" and dating it 2/26/2018 (GC 08.04.2025 008373; also GC 07.28.2025 003780; GC 08.04.2025 008454), and signed the trilingual Language Consent Form on 1/27/2023 (GC 08.04.2025 008512; also GC 08.04.2025 008451). (Liu Decl. Exs. 1(b), 3(b)).

**38.** Li Chen signed the Home Care Worker Agreement, printing "Chen Li" and dating it 10/3/2018. GC 07.28.2025 002909; also GC03.01.2025-000240 (Liu Decl. Ex. 1(c)).

**39.** Mei F. Chen signed the Home Care Worker Agreement, printing "Chen Mei Fang" and dating it 1/26/2018. GC 08.04.2025 007423; also GC 07.28.2025 002910 (Liu Decl. Ex. 1(d)).

**40.** Xiu F. Chen signed the one-page HOME CARE WORKER AGREEMENT – "LIVE-IN" CASE, printing "chen xiu fang" and dating it 2/26/2018, and authenticated that signature at her deposition — "is that your signature? A. Yes. It's my signature." GC 08.04.2025 007519; also GC 07.28.2025 003006; X. F. Chen Dep. (Jan. 28, 2026) 98:15–17 (ECF 252-16)

(Liu Decl. Ex. 1(e)). She also signed the Chinese-language New York State Department of Labor form LS 62C on 10/7/2022, recording a $17.00 regular rate, $0.57 per hour in additional wages and supplemental wages of $3.52 per hour in New York City and $2.65 on Long Island. GC 07.28.2025 003036–003037 (Liu Decl. Ex. 4(o)). She signed the trilingual Language Consent Form on 2/10/17. GC 08.04.2025 007523 (Liu Decl. Ex. 3(c)).

**41.** Hui He signed the Home Care Worker Agreement, printing "He, Hui" and dating it 2/12/2018 (GC 08.04.2025007887; also GC 07.28.2025 003362); signed the Declaration Letter dated 11/11/19 (GC 08.04.2025007888; also GC 07.28.2025 003363); and signed the Caregivers Agreement as "He Hui" on 11/11/2019, countersigned by Wynne Chen on 11/11/19 (GC 07.28.2025 003407–003408, marked as He Dep. Ex. 4; also GC 08.04.2025 007889–007890 and GC 07.28.2025 003364–003365). (Liu Decl. Exs. 1(f), 2(c), 9(c)).

**42.** Zhan J. Li signed the Home Care Worker Agreement, printing "Li, zhan jin" and dating it 2/27/2018 (GC 08.04.2025 008717; also GC 07.28.2025 004092); signed the Declaration Letter dated 11/19/2019 (GC 08.04.2025 008718; also GC 07.28.2025 004093); and signed the Caregivers Agreement as "zhan Jin Li" on 11/19/19, countersigned by GreatCare witness Tzu Chen on 11/19/2019 (GC 08.04.2025 008720; also GC 07.28.2025 004095). (Liu Decl. Exs. 1(g), 2(d), 9(d)).

**43.** Zhu H.L. Lin signed the Home Care Worker Agreement, printing "Lin Zhu Huan Li" and dating it 2/23/2018 (GC 08.04.2025 009206; also GC 07.28.2025 004563); signed the Declaration Letter dated 11/8/2019 (GC 08.04.2025 009207; also GC 07.28.2025 004564); and signed the Caregivers Agreement as "Lin Zhu Huan" on 11/8/2019, countersigned by Wynne Chen on 11/8/2019 (GC 08.04.2025 009209; also GC 07.28.2025 004566). (Liu Decl. Exs. 1(h), 2(e), 9(e)).

**44.** Hui X. Ruan signed the Home Care Worker Agreement, printing "Ruan Hui Xiu" and dating it 1/31/2018 (GC 08.04.2025 009708; also GC 07.28.2025 005616); signed the Declaration Letter dated 12/20/2019 (GC 08.04.2025 009709; also GC 07.28.2025 005617); signed the Caregivers Agreement as "HUI XIU RUAN" on 12/20/19, countersigned by Tzu Chen on 12/20/2019 (GC 08.04.2025 009711; also GC 07.28.2025 005619); and signed the trilingual Language Consent Form on 3/24/17 (GC 08.04.2025 010063; also GC 07.28.2025 005377; GC03.01.2025-000241). (Liu Decl. Exs. 1(i), 2(f), 3(d), 9(f)).

**45.** Mu Z. Zhang signed the Home Care Worker Agreement, printing "zhang Mu zhen" and dating the English page 1/31/2018 and the Chinese page 8/31/2018 (GC 08.04.2025011145; also GC 07.28.2025 006366; GC03.01.2025-000030 to 000032); signed the Declaration Letter dated 1/28/2022 (GC 08.04.2025011147; also GC 07.28.2025 006368); signed the Caregivers Agreement as "Mu zhen zhang" on 1/28/2022, countersigned by Wynne Chen on 1/28/2022 (GC 08.04.2025011149; also GC 07.28.2025 006370); and signed the translation-confirmation form on 7/28/2016 (GC 08.04.2025011220; GC03.01.2025-000233; also GC 07.28.2025 006441). (Liu Decl. Exs. 1(l), 2(j), 3(g), 9(i)).

**46.** Bi Y. Zheng signed the Home Care Worker Agreement, printing "ZHENG BI YU" and dating it 10/11/2018. GC 08.04.2025 011852; also GC 07.28.2025006804 (Liu Decl. Ex. 1(m)).

**47.** Xiu X. Zhu signed the Home Care Worker Agreement, printing "Xiu Xia Zhu" and dating it 2/21/2018 (GC 08.04.2025 012097; also GC 07.28.2025 006956; GC03.01.2025-000029); signed the Declaration Letter dated 2/24/2020 (GC 08.04.2025 012486; also GC 07.28.2025 007099); and signed the Caregivers Agreement on 2/24/2020 before GreatCare witness

Tzu Chen (GC 08.04.2025 012477–012478; also GC 07.28.2025 007097). (Liu Decl. Exs. 1(n), 2(k), 9(j)).

**48.** Mei Z. Xiao signed a Home Care Worker Agreement — "Live-In" Case printed "XIAO MEIZHEN" and dated 4/30/18, two days before the start of her first period of GreatCare work (GC 08.04.2025 010386; also GC 07.28.2025 005974); signed the Declaration Letter dated 4/27/2023 (GC 08.04.2025 010382; also GC 07.28.2025 005973); signed the Caregivers Agreement as "XIAO MEIZHEN" on 4/27/2023, countersigned by Wynne Chen the same day (GC 08.04.2025 010381; also GC 07.28.2025 005972); signed an earlier Caregivers Agreement on 1/28/2022, also countersigned by Wynne Chen (GC 08.04.2025 010384–010385); and signed the trilingual Language Consent Form on 8/23/2021 (GC03.01.2025-000238). (Liu Decl. Exs. 1(j), 2(g)–(h), 3(e), 9(g))

**49.** [Intentionally omitted.]

**50.** Jian R. Xiao signed the Home Care Worker Agreement — "Live-In" Case in English and its Chinese-language counterpart on the same day, November 6, 2020, four days before the November 10, 2020 start date recorded on her CDPAP Fiscal Intermediary form (GC 08.04.2025 010760 and 010759; also GC 07.28.2025 005990–005991); signed the Declaration Letter dated 1/28/2022 (GC 08.04.2025 010756; also GC 07.28.2025 005987); and signed the Caregivers Agreement as "XIAO JIAN RONG" on 1/28/2022, countersigned by Wynne Chen the same day (GC 08.04.2025 010758; also GC 07.28.2025 005989). (Liu Decl. Exs. 1(k), 2(i), 9(h)).

**51.** [Intentionally omitted.]

***Plaintiffs' testimony authenticating the agreements and the translations***

**52.** Zhan J. Li testified that when she began working for GreatCare she agreed to work for 13 hours, and identified her signature on the Home Care Worker Agreement — Live-In Case

dated February 27, 2018, whose terms — 13 hours of pay, eight unpaid hours of sleep, three unpaid one-hour duty-free meal times, and a written report to her coordinator immediately following each 24-hour shift if she did not receive five uninterrupted sleep hours or three duty-free meal times — were read into the record. Z. Li Dep. 64:15–18, 77:5–79:6 (ECF 252-11).

**53.** Mu Z. Zhang identified her signature on all three pages of the Home Care Worker Agreement at GC03.01.2025-000030 to 000032, whose second page is in Chinese, and testified as to its first term: "regarding the first item it's stated that I worked 13 hours per day with the compensation, that is true." Zhang Dep. (Jan. 20, 2026) 85:20–88:4, 99:14–100:5 (ECF 252-15).

**54.** Mu Z. Zhang read the agreement at her deposition, identified the term requiring her to inform her coordinator or the company in writing after every 24-hour shift if she could not obtain five hours of continuous sleep, and testified "I could have reported it to my coordinator." Zhang Dep. (Jan. 20, 2026) 99:8–13 (ECF 252-15).

**55.** Hui Li identified her printed name, signature and date on the Home Care Worker Agreement — Live-In Case at GC 08.04.2025 008454 and testified that the 13-hour pay term "was said and it was written down that for 24 hour work the pay is 13 hours." Hui Li Dep. 97:8–101:24, 100:3–6 (ECF 252-17).

**56.** Hui He testified that GreatCare's assigner told her at hiring that the job was a 24-hour shift paid at 13 hours, that she saw that term written on a form she was given to fill out, and that she signed papers to that effect. He Dep. 63:12–19, 70:16–23, 74:20–24 (ECF 252-12).

**57.** Zhan J. Li identified her signature on a GreatCare service plan whose patient profile recited "live-in case 13 hours per day, from 8:00 a.m. to 8:00 a.m., three-hour mealtime, eight-hour sleeping time, five hours uninterrupted sleep time." Z. Li Dep. 69:5–70:17, 70:23–25 (ECF 252-11).

**58.** Mu Z. Zhang identified her signature on GreatCare's translation-confirmation form and testified that its statement — that all documents she signed with GreatCare were in English and had been translated into her primary language and that her questions were answered in her primary language — "should be accurate based on my understanding"; Xiu F. Chen identified her signature on the same form at GC 07.28.2025 003059, read the Chinese text herself and testified that the statement is accurate; and Hui Li identified her handwriting on the form at GC 08.04.2025 008451 and read from its Chinese text. Zhang Dep. (Jan. 20, 2026) 82:17–85:19 (ECF 252-15); X. F. Chen Dep. 95:14–97:11 (ECF 252-16); Hui Li Dep. 102:4–105:9 (ECF 252-17).

**59.** GreatCare delivered its 2021 in-service and electronic-visit-verification training to Plaintiff Lin in Chinese: she signed certificates of completion for "2021 InService 6 Hour (Chinese) (OSHA)" on March 4, 2021, "2021 InService 6 Hour (Chinese) (OBRA)" on March 16, 2021 and "2021 EVV Training (Chinese)" on June 7, 2021. GC 08.04.2025 009423–009425 (Liu Decl. Ex. 8(g)). The certificates in Exhibit 8(g) were issued by Ding Hui, R.N., a per diem nurse employed by GreatCare. Chen Tzu Wei Decl. ¶ 27.

**60.** Zhu H.L. Lin testified that she was given a Chinese version of GreatCare's home health aide competency test and that she knew every answer. Lin Dep. 140:2–142:3 (ECF 252-13).

**61.** Wang testified that GreatCare explained the live-in agreement to aides in Chinese and provided a Chinese version, and that aides were free to decline live-in work. Wang Dep. (May 1, 2026) 167:14–175:15, 177:11–178:5 (ECF 252-3).

**62.** Ouyang testified that before an aide was assigned to a live-in case she had to sign the live-in paperwork, that a Chinese version was given to the aide, and that Ouyang read the Chinese form to any aide who did not understand it. Ouyang Dep. (Feb. 9, 2026) (ECF 252-6) at PDF pp. 20–22, 62–64.

**C. The reporting mechanisms GreatCare provided**

**63.** GreatCare's Home Health Aide Living-In Time Sheet, the form on which an aide on a live-in case records her sleep and meal periods and any interruption of them, carries per-day columns for the start and stop of three meal breaks and of the sleep period and two printed columns headed "DID YOU RECEIVE 5 CONSECUTIVE UNINTERRUPTED HOURS OF SLEEP? (Enter Yes or No)" and "DID YOU RECEIVE ADEQUATE SLEEPING FACILITIES? (Enter Yes or No)." Liu Decl. Ex. 14 (Pls.' Ex. 60, ECF 264-10) at GC03.01.2025-000458, -000459 (the form's printed text only); Wang SJ Decl. ¶¶ 10, 24.

**64.** The same form carries a printed line directing the aide: "To the extent there were any interruptions to your Sleep or Meal Periods, identify the date/shift when the interruption occurred, the time the interruption started/ended, and the total length of the interruption." Liu Decl. Ex. 14 (Pls.' Ex. 60, ECF 264-10) at GC03.01.2025-000458 (printed text only).

**65.** The certification block on the same form requires the aide to certify that she "received, read, and agreed to the terms in the Sleep and Meal Period Agreement for 24-Hour Caregivers," that she "was scheduled to take a 8-hour sleep period between the hours of ___," that all work time has been reported, to state whether her sleep period started or did not start at the designated time, and to certify "under the threat of disciplinary action and potential prosecution, that the below signature is my own and that I personally provided the services identified above." Liu Decl. Ex. 14 (Pls.' Ex. 60, ECF 264-10) at GC03.01.2025-000458 (printed text only).

**66.** The only document Plaintiffs identified in response to GreatCare's request for documents concerning their work schedule, apart from the NYSDOL complaint forms, is a single page, GSD-000697. Pls.' Resps. & Objs. to GreatCare's First RFP, Resp. to Request No. 10 (June 20, 2025) (ECF 234-2 at 7).

**67.** Before a live-in aide began work, GreatCare told her that she would have "three time slots for eating breakfast, lunch and dinner, one hour each meal break, and that they can have an eight-hour sleep at night and includes a five-hour uninterrupted sleep." Y. Zhu Dep. (Jan. 14, 2026) (ECF 252-5) at PDF p. 47.

**68.** Y. Zhu testified that GreatCare learned whether an aide received five uninterrupted sleep hours through two channels — the aide's own time sheet and a telephone call to Zhu or Ouyang — and that she never received a call reporting missed sleep. Y. Zhu Dep. (Jan. 14, 2026) (ECF 252-5) at PDF pp. 73–75.

**69.** Ouyang testified that she told each aide, before assignment, what the job required and that on a live-in case "they get to sleep for eight hours and they have three hours to eat," and that aides must call the company about any change in the member's health or medication. Ouyang Dep. (Feb. 9, 2026) (ECF 252-6) at PDF p. 66.

**70.** About a week after a live-in assignment began, GreatCare called both the aide and the member to follow up, and on that call the coordinator asked the aide about the sleeping accommodation. Ouyang Dep. (Feb. 9, 2026) (ECF 252-6) at PDF pp. 21, 60–61.

**71.** GreatCare followed up with the aide the day after a live-in case began to confirm that everything was satisfactory, and before any insurance authorization for an aide assignment was confirmed with the plan, GreatCare's coordinators contacted the aide to confirm her willingness to accept the assignment. Wang Dep. (May 15, 2026) 130:6–21 (ECF 252-4); Wang May 22 Decl. ¶ 28 (ECF 228-2).

**72.** GreatCare trained aides that they must immediately report any change in the member's condition to GreatCare, and GreatCare in turn was required to report it to the plan

immediately. Wang Dep. (May 1, 2026) 97:14–98:4 (ECF 252-3); Wang Dep. (May 15, 2026) 131:14–132:24 (ECF 252-4).

**73.** Hui He testified that GreatCare maintained a 24-hour hotline that an aide could call if something happened, that she knew of it, and that she never used it; Zhu H.L. Lin testified that GreatCare gave her a paper with a number she could call at any hour, 24 hours a day, to reach Barbara Wang, and that she used it to report the member's hospitalization on her last day of work; and Xiu F. Chen testified that if she had an issue with her pay she would "call the company's number, and if I have any issue, then it would be transferred to someone." He Dep. 43:7–24 (ECF 252-12); Lin Dep. 63:9–64:16 (ECF 252-13); X. F. Chen Dep. (Jan. 28, 2026) 64:11–25 (ECF 214-26).

**74.** In the HHAeXchange electronic visit record, 106 of the 113 live-in shifts worked by any Plaintiff on or after April 1, 2023 (Jian R. Xiao 60, Mei Z. Xiao 48, Hui X. Ruan 5) carry the shift-level duty-tracking entries "Yes I received 8hours of sleep with 5 hours being uninterrupted" and/or "Yes I received 3 uninterrupted meals that were 1 hour each." A further Jian R. Xiao row, dated August 20, 2023, is marked "Not Billed" and records no clock-in or clock-out. HHAX EVV Records (HHAX Subpoena Prod., June 30, 2025, file 1.1 AppEVVDataPresentForCG512.csv) (Liu Decl. Ex. 19(a)) (9,505 rows for the fourteen Plaintiffs; 107 rows carrying an attestation).

**75.** GreatCare began instructing its then-active live-in aides in April 2023 to record in HHAeXchange whether they had received uninterrupted sleeping time and meal time, using the codes identified in the record as "801" and "802," and notified those aides of the codes by telephone. Wang Dep. (May 1, 2026) 146:3–147:11 (ECF 252-3). GreatCare makes no assertion as to when HHAeXchange first made those codes available within its system; the two codes appear, unmarked, on the plan-of-care template printed on GreatCare's 2021 consumer-directed duty

sheets for Bi Y. Zheng for the weeks ending July 2 through August 20, 2021. GC 08.04.2025 012088–012095 (Liu Decl. Ex. 18).

**76.** GreatCare's HHAeXchange "Duty Sheet" printout for the week of July 29 to August 4, 2023 records among the numbered plan-of-care codes the caregiver entered by telephone "801 – Yes I received 8hours of sleep with 5 hours being uninterrupted" and "802 – Yes I received 3 uninterrupted meals that were 1 hour each," each marked "Y" for August 1, 2023 for Jian R. Xiao and for August 2, 3 and 4, 2023 for Mei Z. Xiao, alongside entered Time In/Out of 08:30 to 08:30 and separate EVV Time In/Out. GC 06.05.2025002386–002387; also GC05.22.2025-000627-000628 (Liu Decl. Ex. 18).

**77.** GreatCare's written Wages policy required staff "to accurately record start of work time and end of work time and to deduct meal periods accurately," made payment contingent on the EVV record for each member being properly completed and submitted through HHAeXchange, barred overtime without supervisor approval, and committed the agency to take reasonable steps to ensure employees are paid accurately and that all applicable state, federal and local wage mandates are followed. GC 08.04.2025 007173 (Liu Decl. Ex. 5).

**78.** GreatCare's written Personnel Policies stated that work hours "must be recorded accurately on time slips and submitted to the agency, consistently on a weekly basis" and that "[s]ubmitting false work time for payment is grounds for termination," and its Employee Disciplinary Actions policy listed "making untrue statements on the employment application, time sheets or agency documents" among the grounds for immediate termination. GC 08.04.2025 007161; GC 08.04.2025 007141; GC 06.30.2025 002528 (Liu Decl. Ex. 6).

**79.** GreatCare gave Plaintiff Hui X. Ruan, and she signed on October 5, 2022, the New York State Department of Labor form LS 62C "Notice and Acknowledgement of Pay Rate and

Payday … (Home Care Aide Wage Parity and Other)" printed entirely in Chinese, whose printed note states that a live-in employee must be paid for at least 13 hours in each 24 hours and must be guaranteed 8 hours of sleep including five uninterrupted hours and 3 hours of meal breaks, and that if the employee does not receive five uninterrupted hours of sleep she must be paid in full for the 8 hours and if she does not receive her meal breaks she must be paid in full for the 3 hours of meal time: "注意：住宿员工每 24 小时应获得至少 13 小时的薪资，且应保证其有 8 小时的睡眠，其中包括五个小时无打扰的睡眠以及 3 小时的用餐休息时间。如果员工未获得 5 小时的无打扰睡眠，则应获得 8 小时的全薪。如果员工未获得用餐休息，则应获得用餐时间 3 小时的全薪。" GC 08.04.2025 009712; also GC 07.28.2025 005479 (Liu Decl. Ex. 4(ff)).

**80.** The same LS 62C notice records Ruan's regular rate as $17.00 per hour, additional wages of $0.57 per hour, supplemental wages of $3.52 per hour in New York City and $2.65 on Long Island, a weekly Friday payday, overtime at one and one-half times the regular rate over forty hours, and identifies her primary language as "Chinese" with an acknowledgment that she received the notice written in that language. GC 08.04.2025 009712 (Liu Decl. Ex. 4(ff)).

**81.** On January 17, 2024, GreatCare sent 2,050 aide-note messages (1,562 in Chinese, 433 in English and 55 in Spanish) asking aides to come to the office to sign the 2024 Department of Labor form by February 15, 2024 (the Spanish message says February 2, 2024); the Chinese message describes the documents as relating to the 2024 DOL wage adjustment, and the Spanish message refers to the increase in the New York State minimum wage. Between January 5 and March 14, 2024, GreatCare staff recorded 27 further notes and messages concerning individual aides that mention the DOL form, five of which refer to an electronic signature. On January 8, 2025, GreatCare sent 1,961 further messages (1,493 in Chinese, 428 in English and 40 in Spanish) telling aides that they would receive that week an electronic-signature link for the DOL form

regarding wage adjustments. HHAX Caregiver Aide Notes (HHAX Subpoena Prod., June 30, 2025, file 3.10 AppHHACaregiverdata512AideNote1.csv) (Liu Decl. Ex. 19(b), Tables 1–2) (730,420 rows; 4,038 rows containing "DOL").

**82.** The GreatCare Home Health Aide Living-In Time Sheet form carries two printed Yes/No columns — "DID YOU RECEIVE 5 CONSECUTIVE UNINTERRUPTED HOURS OF SLEEP?" and "DID YOU RECEIVE ADEQUATE SLEEPING FACILITIES?" — a certification block reciting an agreed eight-hour sleep period, and a printed line on which the aide is directed to report any interruption. Liu Decl. Ex. 14 (Pls.' Ex. 60, ECF 264-10, four pages of completed sheets on the form from GreatCare's production, GC03.01.2025-000458, -000459, -000476, -000477) (printed text only); Wang SJ Decl. ¶¶ 10, 24.

**83.** GreatCare used a bilingual Chinese/English version of the Living-In Time Sheet for Zhan J. Li's 2019 sheets, on which the sleep, meal, five-consecutive-hours, sleeping-facilities and total-hours column heads are printed in Chinese as well as English, the total-hours head reading "今日一共工作多少小时. 不算休息和吃饭时间"; eight of the twelve 2019 sheets use the bilingual form. GC 08.04.2025 008725–008731 (Liu Decl. Ex. 16 — the pages Ms. Li identified at her deposition, Liu Decl. ¶ 21, attached as her own statements and cited here for the form's printed features only) and 008736 (identified by date and Bates; not attached). Z. Li Dep. 61:13–15, 62:16–63:5 (ECF 252-11) confirmed that the sheets bore Chinese translations of the sleep, meal and sleeping-facilities columns.

**84.** Wang testified that aides on live-in cases were required to submit a signed weekly paper time sheet recording the time they slept and the times they took meals, in addition to telephone clock-in and clock-out, and that the time sheet was used "to indicate they really have

uninterrupted five hours sleeping time of total eight hours and also they received three hours of mealtime." Wang Dep. (May 1, 2026) 80:9–11, 140:8–24, 142:12–143:9 (ECF 252-3).

**85.** Ouyang testified that she gave blank Living-In Time Sheets to each aide when assigned, told the aide to fill in every day the times she slept and ate, and gave a Chinese sample, and read the form's columns as recording start of work, breakfast, lunch, dinner, the aide's hours of sleep and "the aide having five uninterrupted hours of sleep." Ouyang Dep. (Feb. 9, 2026) (ECF 252-6) at PDF pp. 35–39.

**86.** Y. Zhu testified that the Living-In Time Sheet was used specifically for live-in 13-hour aides, that aides were required to fill it out, that GreatCare distributed a Chinese-language version of the same form for reference, that she never filled out any aide's time sheet, and that the entries were "their true expression." Y. Zhu Dep. (Jan. 14, 2026) (ECF 252-5) at PDF pp. 79–83.

**D. What Plaintiffs recorded contemporaneously**

**87.** Jian R. Xiao's HHAeXchange record shows the sleep and meal attestations on 55 of her 57 live-in shifts between April 9, 2023 and August 15, 2023, including 16 shifts before she signed her NYSDOL complaint form on May 18, 2023. HHAX EVV Records (HHAX Subpoena Prod., June 30, 2025, file 1.1 AppEVVDataPresentForCG512.csv), Caregiver ID 4944, visit dates 4/9/2023–8/15/2023.

**88.** Mei Z. Xiao's HHAeXchange record shows the sleep and meal attestations on 46 of her 48 live-in shifts between May 3, 2023 and August 18, 2023, six of them before she signed her NYSDOL complaint form on May 18, 2023. HHAX EVV Records (HHAX Subpoena Prod., June 30, 2025, file 1.1 AppEVVDataPresentForCG512.csv), Caregiver ID 3567, visit dates 5/3/2023–8/18/2023.

**89.** Hui X. Ruan's HHAeXchange record shows the sleep and meal attestations on all five of her live-in shifts for a Senior Whole Health member between April 11, 2023 and May 9, 2023 under service code T1020. HHAX EVV Records (HHAX Subpoena Prod., June 30, 2025, file 1.1 AppEVVDataPresentForCG512.csv), Caregiver ID 1494, visit dates 4/11, 4/18, 4/25, 5/2 and 5/9/2023.

**90.** In the NYSDOL complaint attachment she signed and submitted through the Chinese Staff and Workers Association, Hei Li stated: "From June 2017 to March 2021, Claimant worked 24 hours a day for 1 day a week." GSD-000008; Pls.' Ex. 132 at GSD-000854; ECF 214-1 at 18.

**91.** Each Plaintiff's NYSDOL complaint attachment states the number of 24-hour days she worked per week, and none states more than three to four: Hei Li one day; Zhu H.L. Lin one, then two, then three days; Zhan J. Li one to three days; Xiu X. Zhu two days; Hui X. Ruan two to three days; Hui He three days; Bi Y. Zheng three days; Jian R. Xiao three days; Li Chen three days; Hui Li three to four days. GSD-000846; GSD-000854; GSD-000859; GSD-000867; GSD-000875; GSD-000883; GSD-000891; GSD-000937; GSD-000945; GSD-000953.

**92.** Thirteen of the fourteen Plaintiffs' NYSDOL attachments state a fixed amount of meal time per meal: thirty minutes for Hei Li, Hui He, Hui Li and Bi Y. Zheng; twenty-five minutes for Jian R. Xiao; fifteen minutes for Hui X. Ruan, Mei F. Chen, Mei Z. Xiao and Zhan J. Li (who states for one of her five assignments that she "had no time for any meals"); and ten minutes for Li Chen, Zhu H.L. Lin, Mu Z. Zhang and Xiu F. Chen. Xiu X. Zhu's attachment states no meal time. GSD-000846; GSD-000854; GSD-000859; GSD-000867; GSD-000875; GSD-000883; GSD-000891; GSD-000899; GSD-000907; GSD-000915; GSD-000929; GSD-000937; GSD-000945; GSD-000953.

**93.** The NYSDOL attachments describe the night-time call periods in bounded terms: Hei Li 9 p.m. to 6:30 a.m. with three to four interruptions; Hui He 11 p.m. to 5:30 a.m. with three interruptions; Hui Li 9 p.m. to 6:30 a.m. with three to four interruptions; Hui X. Ruan 10:30 p.m. to 4:30 a.m. with three interruptions; Li Chen 11 p.m. to 6 a.m. with at least three interruptions. GSD-000854; GSD-000859; GSD-000867; GSD-000875; GSD-000891.

**94.** Xiu X. Zhu's NYSDOL attachment states that "[d]uring the period of January 2015 to December 2017, Claimant worked 12 hours a day, 3 days week," and describes 24-hour shifts only from May 2018 forward, thereafter two 24-hour days a week through February 2021. GSD-000937; ECF 214-1 at 103.

**95.** Zhan J. Li's NYSDOL attachment describes five separate assignments with materially different night demands, ranging from a member needing help "at least 1 to 2 times" a night to one requiring her to get up "10 times per night," and states for one assignment that she "had no time for any meals." GSD-000945; ECF 214-1 at 111.

**96.** The NYSDOL attachments for the three aides who served member S.Y.Y. state different night-waking frequencies for the same member: Bi Y. Zheng "at least 3-4 times a night," Jian R. Xiao "4 to 5 times a night," and Mei Z. Xiao "5 to 6 times a night." ECF 214-1 at 9, 50, 78.

**97.** All fourteen Plaintiffs' NYSDOL Letters of Representation were signed by the same Chinese Staff and Workers Association organizer and are dated between May 1, 2021 and September 12, 2023: Li Chen 5/1/2021; Xiu X. Zhu 12/27/2021; Mei F. Chen 5/1/2022; Hui X. Ruan 5/12/2022; Zhu H.L. Lin 5/25/2022; Xiu F. Chen 7/17/2022; Hei Li 7/20/2022; Hui He 9/1/2022; Zhan J. Li 9/8/2022; Hui Li 10/30/2022; Bi Y. Zheng 11/21/2022; Jian R. Xiao 5/18/2023; Mei Z. Xiao 5/18/2023; Mu Z. Zhang 9/12/2023. GSD-000001; GSD-000839; GSD-

000847; GSD-000855; GSD-000860; GSD-000868; GSD-000876; GSD-000884; GSD-000892; GSD-000900; GSD-000908; GSD-000922; GSD-000930; GSD-000938; GSD-000946.

**98.** The LS 11 Letter of Representation for Xiu X. Zhu is dated December 27, 2021 and the letter for Xiu F. Chen is dated July 17, 2022, against pleaded DOL complaint dates of "on or about January 3, 2021" and "on or about August 8, 2022" respectively. Grajek Decl. Ex. 22 (NYSDOL Letters of Representation) (ECF 252-22) at PDF pp. 80, 88; Pls.' Ex. 132 at GSD-000922, GSD-000930.

**99.** Every "Office Use Only" block on the fourteen NYSDOL claim forms in Plaintiffs' Ex. 132 is blank: no Department of Labor date stamp, no received date and no entry on the "Case File ID or Order to Comply Number" line appears on any of the fourteen first pages, so the forms themselves fix no date of receipt by the Department. GSD-000839 to GSD-000953.

**100.** Hei Li checked "No" on her NYSDOL complaint form to the question "Did you complain to your employer about this or another labor law violation?"; Li Chen's form, signed May 1, 2021, states that her last day worked was April 30, 2016, that she left because she "Found other job," and checks "No" to the same question. GSD-000007; GSD-000886; GSD-000890.

**101.** Hui He's NYSDOL complaint form is unsigned and undated, leaves the Part 4 unpaid-wages table and the Part 7 weekly work schedule entirely blank, states a claim range of July 2, 2016 to July 14, 2018, gives a rate of pay of "$10 - 13," reports a last day worked of July 2020 with the reason "Travel is too difficult," and checks "No" to whether she complained to her employer. GSD-000043 to GSD-000048.

**102.** Plaintiffs produced more than 900 pages of GreatCare paystubs and pay vouchers for Hui He, Jian R. Xiao, Mei Z. Xiao, Mu Z. Zhang, Zhu H.L. Lin and Zhan J. Li, and 726 of those pages carry a machine-readable "Punches" table listing, for each work day in the pay period, the

clock-in time, the clock-out time, the hours credited and the first name of the member served. GSD-000049 to GSD-001129.

**103.** Mu Z. Zhang's paystub GSD-000548, for the pay week ending January 1, 2021, records two ordinary eight-hour day shifts for one member (Monday December 28, 8:47 a.m. to 4:47 p.m., and Tuesday December 29, 8:31 a.m. to 4:31 p.m.) and a single 24-hour live-in day for a different member on Friday January 1 (8:02 a.m. to 8:02 a.m., credited 13.00 hours). GSD-000548.

**104.** Across the paystubs Plaintiffs produced for Mu Z. Zhang, 966 distinct punch days are recorded, of which 229 carry a 13.00-hour live-in credit; the remaining days are ordinary shifts credited at 8, 10 or 12 hours, and the punch tables identify at least twenty different members by first name. GSD-000433 to GSD-000696; GSD-000954 to GSD-001129.

**105.** Jian R. Xiao's produced paystubs begin with the pay period November 7–13, 2020 and show a hire date of November 10, 2020, and of her 133 produced pay weeks, 132 show 39.00 live-in hours — three 13-hour live-in days per week. GSD-000150 to GSD-000285.

**106.** Plaintiffs' produced paystubs contain a distinct "Spread of Hours" earnings code, and for the week of January 5–11, 2019 GreatCare paid spread-of-hours amounts of $6.00 to Mei Z. Xiao, $6.00 to Zhu H.L. Lin and $4.00 to Mu Z. Zhang at $2.00 per day; they also carry recurring "Sick," "Sick1" and "In- Service" earnings codes with year-to-date balances, including a year-to-date In-Service amount of $180.00 and year-to-date Sick amounts of $437.55 and $15.00 on Mu Z. Zhang's voucher for the week ending November 25, 2022. GSD-000298; GSD-000598; GSD-000445; GSD-001000.

**107.** In response to GreatCare's document requests Plaintiffs produced no tax returns and no bank statements, objecting that the requests invade their privacy, and stated that they possess no documents responsive to the requests for internal complaints lodged with GreatCare, for

documents identifying their supervisors, for communications with the New York State Department of Health about CDPAP, or for any audio or video recordings. Pls.' Resps. & Objs. to GreatCare's First RFP, Resps. to Requests Nos. 9, 12, 14, 15, 17, 18 and 27 (June 20, 2025).

**108.** GreatCare produced 100 Living-In Time Sheets for Hui X. Ruan, GC 08.04.2025 009714–009813, of which the four she identified at her deposition — 009714, 009715, 009812 and 009813 — are attached as Liu Decl. Ex. 15. Each of the four attached sheets records a sleep period of seven to ten hours and answers "Y" to five consecutive uninterrupted hours of sleep, against her declaration that she was unable to sleep for more than approximately one or two hours at a time. The remaining 96 sheets are identified by Bates range only, and none is offered for the truth of its entries (Counterstatement, General Response 9). GC 08.04.2025 009714–009813 (produced); Liu Decl. ¶ 21, Ex. 15. *See also* Ruan Dep. (Jan. 12, 2026) 78:17–79:14 (ECF 214-19) ("I fill them out.").

**109.** The two handwritten Living-In Time Sheets Plaintiffs filed at ECF 214-28 record different meal and sleep times shift by shift: Hui X. Ruan's sheet for Friday November 8, 2019 records three thirty-minute meal breaks and a sleep period of 12:00 a.m. to 7:00 a.m., while her sheet for Sunday December 5, 2021 records three one-hour meal breaks and a sleep period of 10:00 p.m. to 7:30 a.m. GC 07.28.2025 005378 and 005477 (produced; not attached); ECF 214-28, PDF pp. 1, 10. *See also* Ruan Dep. (Jan. 12, 2026) 78:17–79:14 (ECF 214-19) ("I fill them out.").

**110.** The Living-In Time Sheets produced for Mei Z. Xiao cover exactly the three employment periods pleaded for her: the last sheet before the first break records shifts on November 1, 2 and 3, 2020, the next records September 1, 2 and 3, 2021, and the sheets resume with May 3, 4 and 5, 2023, with no sheet dated inside either gap. GC 08.04.2025 010437, 010438, 010471, 010472 (produced; not attached). *See also* M. Xiao Dep. (ECF 214-23) 70:14–25.

**E. What Plaintiffs testified**

**111.** Zhan J. Li testified that she never called GreatCare to report that she was not receiving the sleep time the Home Care Worker Agreement provided, that she did not call anyone at GreatCare including the nurse to report interrupted sleep ("No. Did not call the company."), and that she never put in a request or complaint to GreatCare that she was not being paid for 24-hour shifts. Z. Li Dep. 39:10–15, 46:4–13, 80:4–9, 85:22–86:4 (ECF 252-11).

**112.** Zhan J. Li testified that no one at GreatCare ever told her she could not sleep during her shifts, and that "out of a sense of duty, I'm afraid to go to sleep." Z. Li Dep. 42:20–24, 44:22–45:7 (ECF 252-11).

**113.** Zhan J. Li testified that she worked three days per week on the 24-hour live-in case for the married couple from the time the husband obtained 24-hour authorization until the pandemic, and that she first learned in 2022, from a GreatCare coworker, that a live-in aide might be entitled to pay for 24 hours. Z. Li Dep. 55:2–20, 56:5–7, 124:5–7, 126:2–21 (ECF 252-11).

**114.** Hui He testified that she was not working 24 hours straight and that she took a half-hour break to eat at lunch on her GreatCare live-in shifts. He Dep. 65:18–66:25 (ECF 252-12).

**115.** Hui He testified that she never told GreatCare she lacked time to rest or that she had to turn the member every two hours, and that she never spoke with anyone at GreatCare about not getting five hours of sleep. He Dep. 78:2–9, 151:15–152:15 (ECF 252-12).

**116.** Zhu H.L. Lin testified that when she telephoned in her duty codes to GreatCare she also reported the times of breakfast, lunch and dinner, and that code 101 stood for breakfast. Lin Dep. 57:3–58:5, 62:4–8 (ECF 252-13).

**117.** Zhu H.L. Lin testified that she provided 24-hour live-in care to only two GreatCare members — one for a single week in February 2016 and one from March 2016 until the member's

hospitalization in March 2021 — and that she asserts claims in this case only as to those two. Lin Dep. 35:16–19, 37:1–14, 38:20–22, 40:13–16, 73:18–74:4 (ECF 252-13).

**118.** Zhu H.L. Lin testified that GreatCare did not owe her pay, that she received her salary of $130 to $140 a day, and that she never raised any pay complaint with GreatCare's dispatcher. Lin Dep. 70:17–71:18, 162:22–163:3 (ECF 252-13).

**119.** Zhu H.L. Lin denied that the signature on the NYSDOL wage complaint form her own counsel produced as hers — GSD 000946 and GSD 000952, dated May 25, 2022 — was her signature, denied the handwriting at item 25A on GSD 000948, and did not know the named representative. Lin Dep. 145:9–150:19, 169:13–170:17 (ECF 252-13).

**120.** Xiu X. Zhu testified that the member she served was covered by three aides on fixed days — another aide Monday through Wednesday, Zhu Thursday through Saturday, and Zhan J. Li on Sunday — so that Zhu worked three 24-hour days a week on that case, that she had only one 24-hour live-in member at GreatCare plus one two-day fill-in, and that GreatCare paid her by direct deposit. X. Zhu Dep. 37:8–22, 39:5–20, 42:6–43:2, 53:20–54:4, 116:2–7 (ECF 252-14).

**121.** Xiu X. Zhu testified that on a 24-hour shift she was paid thirteen hours and that after allowing for the member's night-time needs she got "about 4.5 hour of sleeping." X. Zhu Dep. 34:11–20 (ECF 252-14); Pls.' Ex. 73 at 34:19–20.

**122.** Xiu X. Zhu identified her signature and her handwritten date of January 3, 2022 on the NYSDOL Labor Standards Complaint Form at GSD 000930–000937, whose Part 2 names the employer complained of as Premier Home Health Care Services, Inc. of White Plains and not GreatCare, and whose claim-range field (item 33b) is blank. X. Zhu Dep. 74:12–15, 80:11–18, 84:3–11, 84:18–85:8, 86:6–11 (ECF 252-14); GSD 000930–000937.

**123.** Mu Z. Zhang testified that GreatCare's HHAeXchange telephone clock-in records are the accurate record of her time and invited their use: "At the time we were already clocking in, you can check my records from HHA for my clock ins." Zhang Dep. (Jan. 20, 2026) 110:17–24 (ECF 214-18).

**124.** Mu Z. Zhang testified that she never raised the lack of sleep or meal breaks with her GreatCare coordinators, before or after she learned in about 2020 from a newspaper and from another agency's lawyer that the practice was unlawful, and that she continued working for GreatCare throughout. Zhang Dep. (Jan. 20, 2026) 89:5–11, 95:24–96:3, 96:11–20, 99:4–6 (ECF 252-15).

**125.** Xiu F. Chen testified that, from February 2016 until the member's death in February or March 2021, her schedule was a single continuous block from 8:00 a.m. Friday to 8:00 a.m. Monday, three days a week, and that co-plaintiff Mu Z. Zhang covered the other four days for the same member. X. F. Chen Dep. 16:14–17:5, 45:22–46:8 (ECF 252-16).

**126.** Xiu F. Chen testified that she never discussed the 13-hour structure with anyone at GreatCare after the first conversation, that she never told anyone at GreatCare that she was not getting meal breaks, and that although Ms. Ouyang would have been the person at GreatCare to raise a sleep-break problem with, "I rarely did. I didn't reach out to her." X. F. Chen Dep. 59:17–18, 60:9–61:4, 61:10–62:7, 116:2–21 (ECF 252-16).

**127.** Xiu F. Chen testified that she never had any problem with her GreatCare pay, that she was paid weekly by direct deposit, and that she cannot recall a single occasion when she raised a pay shortfall with GreatCare. X. F. Chen Dep. 44:15–45:11, 64:14–66:12 (ECF 252-16).

**128.** Xiu F. Chen testified that member X.Y.W. was the only 24-hour live-in member she ever worked for, at GreatCare or anywhere, that all her other GreatCare assignments were five- or

seven-hour hourly cases, and that she learned what to do for the member from her co-aide rather than from GreatCare. X. F. Chen Dep. 18:3–19:7, 27:24–28:12, 53:2–54:14, 55:22–56:6 (ECF 252-16).

**129.** Xiu F. Chen testified that GreatCare's telephone clock-in system used the member's landline, announced its prompts in Chinese, required her GreatCare employee identification number, and had separate numbers she entered to report the tasks she performed. X. F. Chen Dep. 38:7–39:22, 41:3–42:6 (ECF 252-16).

**130.** Xiu F. Chen first testified that she could not say whether the signature on her NYSDOL complaint at GSD 000922–000928 was hers and that the date did not look like her writing, and then identified both as hers after being told the document had been produced by her own attorney. X. F. Chen Dep. 118:12–121:15 (ECF 252-16).

**131.** Hui Li testified that before the telephone clock-in system existed she filled out a weekly GreatCare worksheet stating the date and the hours she worked, that the member had to sign it, that she then submitted it to GreatCare, and that once telephone clock-in began she no longer filled out any forms. Hui Li Dep. 74:9–75:24, 119:6–9 (ECF 252-17).

**132.** Hui Li testified that every January or February GreatCare called her in to sign papers that included her hourly wage rate for the year and an election between a benefits card and health insurance, that she read the Chinese text and roughly understood the wage documents at GC 08.04.2025 008436–008438, and that she wrote the printed name, signature and date on each page. Hui Li Dep. 84:8–88:12, 90:17–92:7 (ECF 252-17).

**133.** Hui Li testified that she never told anyone at GreatCare that she was not getting meal or sleep breaks or that her pay was wrong, and that she raised the burden of caring for two

members only with her own family and the members' family. Hui Li Dep. 52:6–55:8, 121:21–122:14, 126:2–127:5 (ECF 252-17).

**134.** Hui Li testified that she cared for the wife on a 24-hour live-in basis while a separate GreatCare aide covered the husband for four and a half hours a day, later increased to six, in the same home, overlapping with her shift, although she also testified that the husband later "no longer received those hours" and that she then cared for him; she worked three or four days a week on that case. Hui Li Dep. 27:10–13, 49:21–50:2, 52:8–17, 58:3–59:11, 71:10–72:3 (ECF 252-17).

**135.** Hei Li testified that for GreatCare she worked "just one day of work" per week at the member's home, that "PC has other companies," and that she also worked three days for another agency, True Care, during the same period. Hei Li Dep. (Oct. 9, 2025) (ECF 248-15) at PDF pp. 7–8, 12.

**136.** Hei Li testified that the demands of a 24-hour live-in shift varied from day to day: "each day the situation is different every day." Hei Li Dep. (Oct. 9, 2025) 75:25–76:2 (Liu Decl. Ex. 27).

**137.** Hei Li testified that, in March 2021, the member's authorization changed from 24 hours to ten hours and that from then on she worked ten hours: "PC in March 2021 changed to ten hours … From 24 hours … Ten hours working, yes"; and that another aide, "Lin Yang," cared for the same member "just like me." Hei Li Dep. (Oct. 9, 2025) 112:16–113:24 (ECF 263-3, Pls.' Ex. 3).

**138.** Hei Li testified that CenterLight's Nurse Ding instructed the member not to keep eating at night and not to keep the aide awake all night, so that the aide could rest and sleep, and that Nurse Ding's visits lasted about half an hour and occurred about once every two weeks. Hei Li Dep. (Oct. 9, 2025) 102:5–25 (ECF 263-3, Pls.' Ex. 3); (ECF 248-15) at PDF p. 13.

**139.** By stipulation dated February 2, 2026, subscribed by counsel of record for Plaintiffs, CenterLight, SWHNY and GreatCare, the parties agreed that "[d]uring the relevant period of time, Plaintiff Hei Li alleges that she worked one day per week for Defendant GreatCare" and that "Plaintiff Hei Li is not claiming any damages for unpaid overtime under either the Fair Labor Standards Act … and/or the New York Labor Law against any Defendant." Stipulation Regarding Certain Claims by Plaintiff Hei Li, Feb. 2, 2026 (ECF 248-2 at 2–3).

**140.** In every one of the five sworn Rule 33 interrogatory response sets in the record, the Plaintiff objects that the request "seeks information in the possession or control of Defendant that would allow the Plaintiff to accurately identify these specific dates" and "these specific weeks," and states that she worked "at rates of pay to be determined through discovery." L. Chen ROG Resps. Nos. 2–5 (ECF 248-8 at 5–6); Z. J. Li ROG Resps. Nos. 2–5 (ECF 248-10 at 5–6); Lin ROG Resps. Nos. 2–5 (ECF 248-12 at 5–6); Ruan ROG Resps. Nos. 2–5 (ECF 248-13 at 5–6); Hei Li Am. ROG Resps. Nos. 2–3, 12 (ECF 248-16 at 6–7).

**141.** In her amended interrogatory responses served February 1, 2026, Hei Li swore that between approximately June 2017 and approximately October 2021 she "did not work in excess of 40 hours under CenterLight and GreatCare's joint employment," and that she worked 24-hour shifts only from approximately June 2017 through approximately February 2021, with "10 or less hours per shift" from approximately March 2021 until approximately October 2021. Hei Li Am. ROG Resps. Nos. 3–4 (ECF 248-16 at 7).

**142.** Hui X. Ruan swore in her verified interrogatory responses that "she is unlikely to have worked in excess of 40 hours during her period of joint employment by CenterLight and GreatCare." Ruan ROG Resp. No. 4 (ECF 248-13 at 5) (verified Dec. 10, 2025).

**143.** Zhu H.L. Lin's verified interrogatory responses state that for two of her four CenterLight members she worked "approximately 10 hours per day," and 24 hours per day only on February 29, 2016 and from March 7 to June 27, 2016. Lin ROG Resp. No. 3 (ECF 248-12 at 5) (verified Nov. 18, 2025).

**144.** Li Chen's verified interrogatory responses state that for her first CenterLight member, from February 9 to December 7, 2015, she worked "approximately 4 hours per day," that she worked 24-hour days only from March 18 to April 11, 2016 and on May 2 through May 4, 2016, and that her over-40 weeks were "the weeks from approximately March 18, 2016 until approximately May 4, 2016." L. Chen ROG Resps. Nos. 3–4 (ECF 248-8 at 5) (verified Dec. 10, 2025).

**145.** Zhan J. Li's verified interrogatory responses state that her CenterLight joint employment consisted of two short windows only — approximately September 24 to October 24, 2016 and approximately November 12 to November 19, 2020. Z. J. Li ROG Resps. Nos. 2–4 (ECF 248-10 at 5–6) (verified Nov. 19, 2025).

**146.** Hei Li's amended interrogatory response identifies Plaintiffs' December 8, 2025 damages demand as listing nine categories of damages, every one of them a New York State category and none a federal FLSA category. Hei Li Am. ROG Resp. No. 6 (ECF 248-16 at 8).

**147.** Zhan J. Li identified her signature on Living-In Time Sheets dated November 11, 2019 and on two further sheets, confirmed that the sheets bore Chinese translations of the columns for the three meal breaks, sleep time, five consecutive uninterrupted hours of sleep and adequate sleeping facilities, and testified that she picked up blank sheets in person at GreatCare's Flushing office, filled them in and returned them to a GreatCare office employee. Z. Li Dep. 58:19–60:9, 61:13–15, 62:6–63:5, 66:4–67:20 (ECF 252-11); see also id. 65:5–7 ("Yes, I filled it in."). But see

id. 60:14–61:6 ("I signed. However, I didn't fill in those numeric numbers. My colleague did."; "in reality, our actual time was not like that"), 61:17–19 ("this was distributed for us to sign. And they said if we don't sign, then we won't have a job.").

**148.** Zhu H.L. Lin authenticated as her own handwriting and signature the Living-In Time Sheets at GC 07.28.2025-004567 through 004582 and every page of GC 07.28.2025-004732 through 004737 — "Yes. I wrote them and I signed them" — and described the process as GreatCare giving her a blank form, instructing her how to fill in when she slept, ate and rested, telling her "we have to write down the things exactly as is," and reviewing what she wrote for correctness. Lin Dep. 33:20–34:2, 43:23–44:23, 128:15–129:17, 139:9–15 (ECF 252-13). But see id. 42:8–10 ("They already -- they already printed out and it's all typed in and I just copy it."), 130:4–18, 134:19–22 (signatures on other sheets "copied from my signature and then paste[d] on it").

**149.** Xiu X. Zhu identified as her own every signature on the sixty-one pages of Living-In Time Sheets at GC03.01.2025-000385 through 000445 when first asked page by page, and testified that she filled out a sheet every week while working, got the blank form from GreatCare, signed it away from the member's home and returned it to GreatCare's office. X. Zhu Dep. 102:21–103:16, 141:23–144:11 (ECF 252-14). *But see id. 103:17–104:5 ("they give me the copy to copy it"; "If I don't sign the name, I will not get work."), 129:8–140:6 (disclaiming the pages from GC03.01.2025-000398 forward).*

**150.** Mu Z. Zhang testified that the GreatCare weekly time-sheet form was given to her with the week's days and the duty codes pre-printed, that she checked the box for each task she performed, that she signed it at the member's home with the member present and the member

signed it, and that she submitted it to GreatCare once a week and was paid according to it. Zhang Dep. (Jan. 20, 2026) 74:10–75:7 (ECF 252-15).

**151.** When shown Living-In Time Sheets marked as Exhibits 5, 6, 7 and 8, Hui X. Ruan recognized them and testified "Yes. I fill them out," that GreatCare "showed me a format," and "[t]hat if I did this and I am sure I did this, I put that information." Ruan Dep. (Jan. 12, 2026) 78:17–79:14 (ECF 214-19).

**152.** Hei Li gave two accounts of GreatCare's weekly paper form. She testified that GreatCare provided a weekly paper "work schedule form" that she filled out and returned to GreatCare each week, that GreatCare paid her on the basis of it, that it "also contained the patient's signature as well," and that this was "always the process" (51:25–52:21; 53:20–54:2); later, asked directly whether the paper was used only when the telephones were not working, she answered "No" and then described using the paper when the system was unavailable (87:18–88:12, the answer opening at 87:24); and she testified that when the landline failed she used the member's cellular telephone rather than paper (107:13–22). Hei Li Dep. (Oct. 9, 2025) (Liu Decl. Ex. 27).

**F. The plans' records on the members' night-time needs and whether an aide could sleep**

**153.** Senior Whole Health's utilization management review of member S.K.C.-1 dated May 9, 2019 found the member stable, with skin intact, "no unscheduled needs," that the member "sleeps most the time," and that adequate informal support was available from a daughter and grandson next door, and recommended reducing services to twelve hours a day, seven days a week. SWHNY001390.

**154.** Senior Whole Health's assessment records for member S.K.C.-1 state that, per the daughter and the personal care aide, the member "sleeps a lot nowadays, is usually only up to about

2-3 hours during the day to eat meals, get sponge bath, and simple exercises." SWHNY001989; SWHNY002356; Pls.' Ex. 46.

**155.** Senior Whole Health's UAS tasking tool for member S.K.C.-1, assessment date November 9, 2017, records authorized PCA hours of 13 hours per day, 7 days per week, 91 hours per week, annotated "live in 24x7d," computes total assessed task time at 42.05 hours per week from the UAS responses and 25.32 hours per week as assigned by the nurse, and prints "ERROR Request Greater than Tasked." SWHNY002486 (native.xlsx), sheet "Tasking Tool."

**156.** Senior Whole Health's UAS tasking tool for member X.J.L., signed by a registered nurse on March 15, 2022, records current PCA hours as 13 hours per day, 7 days per week, 91 hours per week from "great care," computes the member's total assessed task time at 31.32 hours per week, and prints "ERROR Request Greater than Tasked." SWHNY003244.

**157.** Senior Whole Health's UAS tasking tool for member P.C.P. records authorized PCA hours of 13 hours per day for 3 days per week from GreatCare, computes total assessed task time at 19.78 hours per week, prints "ERROR Request Greater than Tasked," and notes that the member "is mutual case, currently has 3Dx13hrs/wk, mutual case has PCA 4 days 13 hours=13Hx7days live in." SWHNY005075.

**158.** Senior Whole Health's tasking-tool and UAS notes assessed weekly care-task time for the subject members far below the authorized live-in hours: 27.82 to 32 hours per week for member X.J.L., 30 to 32.83 for member X.Y.W., 20 to 28.63 for member P.C.P. and 42 to 49.28 for member K.W.P. SWHNY001408; SWHNY001410; SWHNY001411; SWHNY001688; SWHNY001690; SWHNY001761; SWHNY001762; SWHNY001773; SWHNY001850; SWHNY001851; SWHNY001860.

**159.** Senior Whole Health's assessment of member K.W.P. dated September 4, 2019 records that she "is mutual case with spouse, who has PCA service 7Dx13H, Live in from Great Care. Spouse is able to provide help as needed," and its March 4, 2019 assessment describes the service GreatCare rendered in the same words. ECF 214-15 at 1; Pls.' Ex. 48 at SWHNY003665, SWHNY003843.

**160.** Senior Whole Health's case note of September 19, 2018 records that its registered nurse assessor "recommend PCA services 7dx6h individually however member is mutual case with spouse receiving 7 days x live in," and its note of April 30, 2018 records the plan's instruction that a single live-in aide serving both spouses be billed as one case split into day units, four units per week for the wife and three for the husband. SWHNY001769; SWHNY001785; SWHNY001754.

**161.** Senior Whole Health's community health assessment for member X.Y.W. dated January 28, 2019 records that she "is able to control both bowel and bladder, had episodes of incontinence, would not like to use supplies regularly," and "[n]eeds assistance with getting up 1-2 times to urinate at night. Has a bedside commode in place." Pls.' Ex. 49 at SWHNY005350; ECF 214-11 at 8.

**162.** At three of the four Senior Whole Health assessments of member X.Y.W. the plan answered "Can person be left alone safely? Yes," and at all four it answered "Can the needs be scheduled? … Yes." Pls.' Ex. 49 at SWHNY005342 (01/28/2019), SWHNY005467 (07/08/2019), SWHNY005318 (01/10/2020); SWHNY005398 (07/27/2018).

**163.** The Senior Whole Health assessments of member X.Y.W. code the member's Sleep Problems item — "Difficulty falling asleep or staying asleep; waking up too early; restlessness; non-restful sleep" — as "Not present," and the July 8, 2019 and January 10, 2020 assessments

record that the member "denied urine/bowel incontinence" with "urination x2 at night." Pls.' Ex. 49 at SWHNY005327, SWHNY005452, SWHNY005439, SWHNY005451, SWHNY005302, SWHNY005444.

**164.** On every Sign/Finalize page Plaintiffs cite for the proposition that member S.K.C.-1 could not be left alone, Senior Whole Health also answered "Yes" to whether the member's needs can be scheduled. Pls.' Ex. 46 at SWHNY002003, SWHNY002146; NYSDOH-000926.

**165.** The sixth Senior Whole Health assessment of member P.C.P. records the member's formal personal care as 5,460 minutes in the last week over seven days — 91 hours, or 13 hours a day — and answers "Can the needs be scheduled? … Yes" and "Can person be left alone safely? Yes." Pls.' Ex. 47 at SWHNY001822–001845.

**166.** The CenterLight PACE assessment for the member served by Zhan J. Li and Li Chen records that the member lived with her daughter, that the home was safe, that the member's needs "can be scheduled," that there were "no falls/hospitalizations/ER visits," and quantified the night-time burden at two diaper changes per night. Pls.' Ex. 71 at NYSDOH-000969, NYSDOH-000991, NYSDOH-001926.

**167.** Empire BlueCross BlueShield's own nurse recorded twice — on a form defining the term to include toileting, diaper changes and transfers to the commode — that the member served by Hui X. Ruan had no night-time needs: "NIGHT TIME NEEDS: NO." Pls.' Ex. 98 at DTK000076 and DTK000118.

**168.** ElderPlan authorized 91 total hours per week of live-in personal care worker service for the member Hui X. Ruan served — thirteen hours per day — and its companion Tasking Tool computed 6.05 task hours per day and 42.33 per week, recorded "Use Commode at Night

(Yes/No): Yes," and recorded a daughter caregiver available two days for two hours. Pls.' Ex. 87 at ELDERPLAN000204; Pls.' Ex. 88 at ELDERPLAN000205.

**169.** On every page Plaintiffs cite for "cannot be left alone" as to that member, ElderPlan also answered that the member's needs could be scheduled. Pls.' Ex. 88 at ELDERPLAN000119, ELDERPLAN000147, ELDERPLAN000225; NYSDOH-000444, NYSDOH-001363, NYSDOH-001453.

**170.** Fidelis's own task tool for the member Hui He served calculated nine task hours per day, seven days a week, answered "Can the needs be scheduled? Yes," coded the turning/repositioning and scheduled-toileting programs as neither ordered nor occurring, recorded sleep problems exhibited on only one of the last three days, and recorded trazodone 50 mg at bedtime. Pls.' Ex. 91 at NYSDOH-000841, NYSDOH-000832, NYSDOH-000826, NYSDOH-000835.

**171.** Aetna recorded that the insomnia of the member Zhan J. Li served was "receiving active treatment" with a 5 mg hypnotic at bedtime, that the member "remains safe in the community," and answered "Can the needs be scheduled? … Yes." Pls.' Ex. 90 at AET 0000947, AET 0000823, AET 0000824.

**172.** CenterLight's community health nurse recorded a "Sleep Notes" entry for member P.C. at each of eight semi-annual visits between February 12, 2016 and August 2, 2019, reading in sequence "waking up 2-3 time during the night," "sleeping and waking up 3-4 time to urinate/ BPH," "sleeping well via the night," "waking up 2-4 times to urinate," "waking up 2-3 time due to urination," "wakeing up 2-3 times," "sleeping well, will waking up during the night x 1 time" and "sleeping ok, waking up 2 time to urinate." CenterLight Confidential 003051, 003001, 002936, 002882, 002815, 002756, 002655, 002584.

**173.** CenterLight's physical therapist recorded on July 29, 2019 that member P.C. "lives with a 7x24 live-in PCW in a two-bedroom basement apartment," CenterLight's occupational therapist recorded on August 9, 2019 that the "Bedroom Safety Assessment" was "Safe," and CenterLight's nurse recorded on August 2, 2017 that the member "lives in the apartment by him self in the basement, brother visit the member often to meet his need." CenterLight Confidential 002600–002601; CenterLight Confidential 002575; CenterLight Confidential 002896; ECF 214-10 at 7.

**174.** Across the CenterLight assessment record for member P.C. from 2016 to 2021, the item "Patient Satisfied with Aide Services" was answered "Yes" on thirty-six occasions and was never answered "No." CenterLight Confidential 002546, 002556, 002562, 002586, 002630, 002635, 002657, 002667, 002682, 002695, 002724, 002757, 002780, 002785, 002796 and others.

**175.** CenterLight's own nursing notes for member P.C. record only "sometimes not sleeping well, waking up 2-3 times to urinate," and the nurse's disposition after documenting it was "Continue pcw living services"; the same notes record the member as only occasionally incontinent of urine and continent of bowel with daily bowel movements, with "limit fluids after evening meal" taught as the intervention. Pls.' Ex. 38 at CenterLight Confid. 003205, 003376, 003652, 003426.

**176.** [Intentionally omitted.]

**177.** [Intentionally omitted.]

**G. The electronic visit verification and payroll record**

**178.** For eleven of the fourteen Plaintiffs, the HHAeXchange record carries both an EVV clock-in and an EVV clock-out on 84.6% to 99.1% of their live-in shifts: Jian R. Xiao 99.1%, Xiu X. Zhu 98.6%, Zhu H.L. Lin 98.5%, Bi Y. Zheng 98.4%, Mei F. Chen 98.3%, Mei Z. Xiao 97.8%,

Hui X. Ruan 95.5%, Zhan J. Li 94.8%, Hui He 92.1%, Xiu F. Chen 91.0% and Hei Li 84.6%. HHAX EVV Records (HHAX Subpoena Prod., June 30, 2025, file 1.1 AppEVVDataPresentForCG512.csv), fields "EVV Clock in time" and "EVV Clock out time."

**179.** Clock-ins were overwhelmingly made by telephone from the member's home line: 7,819 of 9,505 rows record "IVR" as the EVV call-in method and 208 record "AUTO," with call-in and call-out telephone numbers recorded. HHAX EVV Records (HHAX Subpoena Prod., June 30, 2025, file 1.1 AppEVVDataPresentForCG512.csv), fields "EVV Method Call In" and "Call in Phone Number."

**180.** The 38 adjustment memos in the HHAeXchange record concern plan-of-care confirmations, hospitalizations, two deaths (one related to COVID-19), late timesheets and clock-in problems, aide illness, travel time and the suspension or end of service, and not one of the 9,505 rows carries any memo about sleep, meals, rest or a shift running long. HHAX EVV Records (HHAX Subpoena Prod., June 30, 2025, file 1.1 AppEVVDataPresentForCG512.csv), field "Adjustment Reason Code Memo."

**181.** The HHAeXchange aide-note file has 730,420 notes, dated February 20, 2023 to June 5, 2025. None contains "meal," "overtime," "wage parity," "13 hour" (or "13-hour"), "live-in," "unpaid" or "not paid," or any of the Chinese or Spanish equivalents searched. One note contains "over time": on June 13, 2023, an aide reported that she was still with a care recipient at a medical treatment and was told to stay and to obtain a document from the facility so that "over time" could be requested from the plan. Two contain "live in": an aide who declined a case and "prefer[s] 24 hours live in case," and an aide who declined a Staten Island case and is noted to "live in Bk." Of the ten notes containing "sleep," eight concern a care recipient who was asleep, overslept, fell from bed while sleeping or died in her sleep, and two concern an aide: one fell asleep

during a call with the office, and one, giving notice, reported "health issue, back pain and light sleep." None of these notes reports an interrupted sleep period, a missed meal period, unpaid hours, the 13-hour pay practice or unpaid overtime. HHAX Caregiver Aide Notes (HHAX Subpoena Prod., June 30, 2025, file 3.10 AppHHACaregiverdata512AideNote1.csv) (Liu Decl. Ex. 19(b), Table 1).

**182.** Through January 2018, GreatCare paid live-in work on a flat daily basis under the earnings code "Liv-in," in which the units column counts days: $130.00 per day in 2016, $143.00 per day in 2017 and $182.00 per day in January 2018, with half-day rates of $71.50 and $91.00. GreatCare Payroll Register for Zhan J. Li, check date 10/20/2016, check #35042 (Liu Decl. Ex. 11); Bates-stamped duplicate at GC 08.04.2025 008692–008715.

**183.** Each flat daily live-in rate equals exactly thirteen hours times the hourly rate GreatCare used in the same period — $130.00 = 13 × $10.00, $143.00 = 13 × $11.00 and $182.00 = 13 × $14.00 — and the same $10.00, $11.00 and $14.00 rates appear on the same registers as the "Hourly," "Sick" and "Vacation Old" rates. GreatCare Payroll Registers for Zhan J. Li, Hei Li, Hui Li, Xiu F. Chen and Mei F. Chen (Liu Decl. Ex. 11).

**184.** GreatCare changed from the flat daily live-in rate to a thirteen-hours-per-day hourly rate in the pay week ending January 12, 2018: the last "Liv-in" daily-rate checks are dated January 12 and January 19, 2018, and the first checks paying 13.00 hours at an hourly rate are dated January 19, 2018. GreatCare Payroll Register for Hei Li, check date 01/19/2018 (Liu Decl. Ex. 11). GreatCare's pay week runs Saturday to Friday (Wang SJ Decl. ¶ 15), so the pay week ending January 12, 2018 begins on the service date January 6, 2018, which is the date from which GreatCare's response to Plaintiffs' Rule 56.1 statement states the same change.

**185.** From January 2018 forward GreatCare paid each 24-hour live-in day as 13.00 hours at an hourly rate, under the earnings label "Hourly" and, from 2020, "Liv-in": $14.00 in 2018 (Hei Li's first hourly check, dated January 19, 2018, at $13.00), $16.00 in early 2019, $17.00 from 2019 through most of 2022 and $19.00 from late 2022 through 2023 — $221.00 for a 24-hour day at the $17.00 rate and $247.00 at the $19.00 rate. GC 08.04.2025 010318 (Ruan paystub, check 11/06/2020) (Liu Decl. Ex. 10).

**186.** Every one of the 1,372 weekly paystubs GreatCare produced for the Plaintiffs covers a seven-day period beginning on a Saturday and ending on a Friday. GC 08.04.2025 010237 (Ruan paystub, period 01/05/2019–01/11/2019) (Liu Decl. Ex. 10).

**187.** GreatCare's "Billing Vs Payroll" reports show that every live-in day was billed to the managed care plan as one live-in day unit at a per-diem rate with "Billed Hours" of 0:00 and not as hours: for Hui X. Ruan's January 1, 2021 live-in day, Aetna Better Health was billed "Billed Live-In 1" at a rate of $320.02, while "Pay Hours" were 13:00 at $17 for $221. GreatCare "Billing Vs Payroll" Report for Hui X. Ruan, 1/1/2021–1/16/2022, sheet "Detail Data," row for date of service 01/01/2021, invoice 789848, payroll batch GCIN0259 (Liu Decl. Ex. 12).

**188.** Across all 3,068 rows of the eleven billing-versus-payroll reports for nine Plaintiffs, not one row shows a managed care plan billed by the hour, or for more than one live-in day unit, on a live-in day, and the "OT Hours," "OT Amount," "Holiday Hours" and "Holiday Amount" columns are zero on every row; the eleven reports total 3,039 live-in day units billed for $1,014,804.16 against 39,708 pay hours and $668,953.00 paid to the aides, over service dates from October 3, 2018 to August 18, 2023. GreatCare "Billing Vs Payroll" Reports for Jian R. Xiao, Mei Z. Xiao, Lin, Ruan, Xiu X. Zhu, Xiu F. Chen, Zhang, Zheng and Zhan J. Li (Liu Decl. Ex. 12); tabulation, Liu Decl. Ex. 13, Table 1.

**189.** GreatCare's 2016–2018 payroll registers carry a separate "WP – M – Wage Parity" earnings line computed on thirteen hours per live-in day, at $3.56 and $3.90 per hour in 2016, $2.56 to $8.40 in 2017 and $2.62 to $3.09 in 2018, totalling $46,529.26 over 396 register lines ($6,210.32 in 2016, $18,793.33 in 2017, $21,457.41 in 2018 and $68.20 on one check dated January 4, 2019). GreatCare Payroll Registers for Zhan J. Li, Hei Li, Hui Li, Xiu F. Chen, Mei F. Chen, Ruan and Mei Z. Xiao, e.g. check 10/20/2016 #35042 ("WP M – Wage Parity 52.00 3.56 185.36") (Liu Decl. Ex. 11); GC 08.04.2025 008692 et seq.; *see also* Pls.' Ex. 61 at GC 003215–003216.

**190.** The same registers carry wage-parity benefit sub-lines "WPS – M – Sick Pay – WP" ($1,827.45 over 95 lines), "WPV – M – Vac Pay – WP" ($1,380.27 over 123 lines) and, from 2018, "WPSick – M – Sick Accrue – WP" ($3,088.30 over 229 lines). GreatCare Payroll Registers for the same seven Plaintiffs (Liu Decl. Ex. 11); Pls.' Ex. 61 at GC 003215–003216.

**191.** From 2019, the weekly paystubs carry an "Other Info – Benefits" block whose "Sick Accrue – WP" line accrues wage-parity sick benefit at the aide's hourly rate. GC 08.04.2025 010971 (J. Xiao paystub, check 11/20/2020) (Liu Decl. Ex. 10).

**192.** GreatCare filed an LS 300 "Annual Compliance Statement of Wage Parity, Hours and Expenses" with Senior Whole Health for calendar year 2021 on November 8, 2022, signed by Barbara Wang as Administrator, reporting 57,935.50 New York City wage parity hours and $1,105,988.70 in wage parity expenses — $19.09 per hour — a lowest base wage rate of $15 per hour, additional wage rates of $0.50, $0.53, $0.57 and $0.62 per hour and supplemental wage rates of $3.59, $2.56 and $1.52 per hour described as "Flex Benefits." SWHNY001350–001351; SWHNY 000317–000318 (ECF 252-21 at 2–3).

**193.** GreatCare's LS 300 for calendar year 2022, dated November 14, 2023 and transmitted to SWHNY on December 28, 2023, reported 244,171.25 New York City wage parity

hours and $4,820,722.16 in wage parity expenses — an average of $19.74 per hour — plus 2,023.75 hours and $40,920.23 for Westchester, Nassau and Suffolk at a $17 base wage, and itemized flex benefit rates of $0.50 to $0.68 per hour as additional wages and $1.45 to $3.59 per hour as other paid time benefits in lieu of health, education and pension benefits. SWHNY000919–000920; SWHNY000950–000951 (ECF 252-21 at 14–15); cover e-mail SWHNY000918.

**194.** GreatCare also filed an LS 300 for calendar year 2022 with CenterLight, dated November 14, 2023, reporting 10,559.75 New York City wage parity hours, $201,585.63 in wage parity expenses, a $15 lowest base wage, additional wages of $0.50, $0.53 and $0.57 per hour and supplemental "Flex Benefits" of $3.59, $2.56 and $1.52 per hour. GC 06.05.2025002374–002375 (Liu Decl. Ex. 22).

**195.** The New York State Department of Labor's LS 300 form defines "Additional Wages" as including "differentials or premiums for certain shifts (nights, weekends, and holidays) or assignments (sleep-in or live-in work, care for multiple clients during the same shift)." SWHNY000920; blank form at SWHNY001075–001076.

**196.** Page two of Plaintiff Ruan's LS 62C notice identifies the two components of her wage parity supplemental compensation as $0.57 per hour of sick leave provided by Greatcare Inc. under a "DOL Form," and $3.52 per hour in New York City or $2.65 on Long Island of benefits provided by JN Savasta Corp., 1350 Broadway Suite 410, New York, NY 10018, under a "JV SA Benefit Contract." GC 08.04.2025 009713 (Liu Decl. Ex. 4(ff)).

**197.** GreatCare's written Benefits policy provided Workers' Compensation at agency cost, full-cost unemployment insurance, short-term disability insurance with employee contributions capped at $.60 per week, five paid holidays for full-time employees paid at the usual rate, bereavement leave of one to three days, maternity and disability leave, jury duty leave, and

vacation leave for direct-care employees after three months of employment. GC 08.04.2025 007122 (Liu Decl. Ex. 7).

**198.** Senior Whole Health notified its contracted agencies on November 3, 2023 that it was required to submit Wage Parity Attestations to the Department of Health certifying that contracted agencies were paying at Wage Parity, and directed each provider to complete and return an LS-300 form for calendar year 2022 by December 15, 2023. SWHNY001080.

**H. Weekly hours and shift patterns**

**199.** Counting each 24-hour live-in day as 13 hours and each hourly visit at its adjusted hours, the HHAeXchange record shows Plaintiffs exceeded 40 hours in 328 of 3,169 GreatCare workweeks, and six of the fourteen Plaintiffs — Hei Li, Mei F. Chen, Jian R. Xiao, Mei Z. Xiao, Bi Y. Zheng and Xiu X. Zhu — never exceeded 40 hours in any workweek. HHAX EVV Records (HHAX Subpoena Prod., June 30, 2025, file 1.1 AppEVVDataPresentForCG512.csv), live-in rows deduplicated to one shift per Plaintiff-day.

**200.** No Plaintiff ever worked seven or more consecutive live-in days: across 6,285 billed live-in caregiver-days the longest unbroken run was six days (Mu Z. Zhang), four to five days for seven other Plaintiffs, and two to three days for the remaining six, with mean runs of 1.08 to 2.99 days. HHAX EVV Records (HHAX Subpoena Prod., June 30, 2025, file 1.1 AppEVVDataPresentForCG512.csv), live-in rows deduplicated to one shift per Plaintiff-day.

**201.** Each Plaintiff's live-in days cluster on a fixed set of weekdays consistent with a standing weekly rotation: Bi Y. Zheng on Wednesday, Thursday and Friday (394 of her 440 days), Xiu X. Zhu on Thursday, Friday and Saturday (478 of 495), Zhu H.L. Lin on Sunday, Monday and Tuesday (699 of 714), and Jian R. Xiao on Sunday, Monday and Tuesday (433 of 433). HHAX

EVV Records (HHAX Subpoena Prod., June 30, 2025, file 1.1 AppEVVDataPresentForCG512.csv), live-in shifts by day of week.

**202.** Hei Li's live-in work consisted almost entirely of single isolated days: her 181 live-in days fall into 167 separate runs, 153 of them a single day and the longest just two days, and 167 of the 181 days fell on a Sunday and 14 on a Saturday. HHAX EVV Records (HHAX Subpoena Prod., June 30, 2025, file 1.1 AppEVVDataPresentForCG512.csv), Caregiver ID 2868; *see also* Pls.' Ex. 1 (HHAX EVV Recs. for Hei Li), all 182 live-in rows.

**203.** Hui He, Hui Li and Zhan J. Li worked "mutual" live-in cases in which one aide cared for two members in the same household on a single 24-hour shift billed twice, on 32, 80 and 54 days respectively, so that the raw row count overstates their days worked by 166 shifts. HHAX EVV Records (HHAX Subpoena Prod., June 30, 2025, file 1.1 AppEVVDataPresentForCG512.csv), codes "PCA-LivingInMutual" and "HHA-LivingInMutual," e.g. VisitIDs 199250149 and 199250161 (EVV 7:20–7:29 and 7:22–7:30; identical adjusted span of 7:15 a.m. to 7:30 a.m., August 18–19, 2017).

**204.** GreatCare's HHAeXchange Duty Sheets for Hei Li record twelve weekly sheets for the weeks she worked between September 1 and November 30, 2018 (she worked no shift in the week of October 27 to November 2), each recording a single Sunday 24-hour shift for one CenterLight member, with scheduled Total Hours of 24:00 on eleven sheets and 23:45 on one, EVV Total Hours of 23:56 to 24:09, and a plan-of-care task list of ten items of which eight were marked "Y – Duty Performed" on eleven sheets and seven on one, with no entry in the "Refused Duty Notes" field on any sheet. GC 08.04.2025 008307–008318 (Liu Decl. Ex. 18).

**205.** GreatCare assigned three or four different aides to cover a single weekly live-in case, asked aides to "[w]ork no more than three days," and declined a live-in case if it could not staff enough aides. Wang Dep. (May 15, 2026) 46:16–24, 277:6–278:9 (ECF 252-4).

**I. The three CDPAP Plaintiffs**

**206.** GreatCare's "PA Attestation to Comply with CDPAP Regulations" states that the Personal Assistant understands GreatCare is the Fiscal Intermediary responsible only for processing payroll and benefits on behalf of the Consumer, that "I understand that Greatcare Home Care Agency is NOT my employer," and that "I understand that I am hired, trained, supervised and receive my schedule by the Consumer and/or their Designated Representative," who alone can terminate her. GC 08.04.2025 010392; GC 08.04.2025 010768; GC03.01.2025-000161 to -000162; GC 07.28.2025 005982, 005998 (Liu Decl. Ex. 25(a), (b)).

**207.** Mei Z. Xiao signed GreatCare's "FISCAL INTERMEDIARIES (CDPAP) CASES" form stating that she "is not an employee of Greatcare Home Care Agency, but is instead an independent contractor for [S.Y.Y.] … who is pay wages by Fiscal Intermediary," recording "I started to work with [S.Y.Y.] on 9/1/2021," and signed the accompanying PA Attestation on August 23, 2021 before a GreatCare witness. GC 08.04.2025 010391–010392; also GC 07.28.2025 005982; GC03.01.2025-000161 to -000162 (Liu Decl. Ex. 25(a)).

**208.** Jian R. Xiao signed the same Fiscal Intermediaries (CDPAP) Cases form recording "I started to work with [S.Y.Y.] on 11/10/2020," signed the English PA Attestation on November 6, 2020 before a GreatCare witness, and signed a Chinese-language PA Attestation dated April 7, 2021 stating "我了解 Greatcare Home Care Agency 优秀护理公司不是我的雇主." GC 08.04.2025 010767–010768; GC 08.04.2025 010769; also GC 07.28.2025 005998, 006000; GC03.01.2025-000010 to -000012 (Liu Decl. Ex. 25(b)).

**209.** The Administrative Agreement for the Provision of Fiscal Intermediary Services for the Consumer Directed Personal Assistance Program between Extended MLTC and GreatCare, effective December 31, 2017, recites that GreatCare "is a fiscal intermediary designated to provide wage and benefit processing for consumer directed personal assistants on behalf of an employing consumer" under what the agreement cites as 18 N.Y.C.R.R. § 505.28(i) (the subdivision lettering then in force; re-lettered November 8, 2021), and defines a consumer directed personal assistant as one who works "under the consumer's instruction, supervision and direction or under the instruction, supervision and direction of the consumer's designated representative." GC 06.05.2025 002211–002212 (Liu Decl. Ex. 26).

**210.** Wang swore that in CDPAP cases "the consumer (or the consumer's designated representative) — not GreatCare — selects, trains, and supervises the caregiver," who is frequently a family member, and that GreatCare's role is that of fiscal intermediary under N.Y. Soc. Serv. Law § 365-f. Wang May 22 Decl. ¶ 6 (ECF 228-2); Zhao May 22 Decl. ¶ 7 (ECF 228-1).

**211.** Extended MLTC's first 2018 authorization for member S.Y.Y. was for CDPAP at 35 hours per week under procedure code T1019, for January 1 to March 31, 2018; each Extended MLTC authorization for her from April 23, 2018 is for CDPAP live-in under procedure code T1020 and is addressed to GreatCare, the September 24, 2018 letter reading "LIVE-IN CDPAP WITH (GREAT CARE)" and the letters from December 2018 reading "CDPAP 24 HRS LIVE-IN"; and GreatCare's authorization spreadsheet lists fifteen consecutive authorizations from July 1, 2020 to August 31, 2023 each reading "CDPAS LIVE IN 7 DAYS X 24 HOURS (SUN - SAT) WITH GREATCARE INC." Pls.' Ex. 101 (ECF 265-1) at GC 07.28.2025 005634, 005638–005643; Wang SJ Decl. ¶ 32 GreatCare's authorization spreadsheet for consumer S.Y.Y. (native.xlsx, July 1, 2020 to August 31, 2023), sheet "Auths 7.1.20 to 8.31.23" (Liu Decl. Ex. 26).

**212.** In Plaintiffs' own HHAeXchange exhibits, every recorded shift of Jian R. Xiao and Mei Z. Xiao is a consumer-directed personal-assistant shift: all 437 rows for Jian R. Xiao and all 507 rows for Mei Z. Xiao are coded "PA-LivingIn," under "Extended Managed long term care CDPAP" (429 and 498 rows) or, in August 2023, "Hamaspik, Inc. CDPAP" (8 and 9 rows). Pls.' Ex. 22 (HHAX EVV Recs. for J. Xiao) (all 437 rows coded "PA-LivingIn"); Pls.' Ex. 24 (HHAX EVV Recs. for M. Xiao) (all 507 rows).

**213.** Extended MLTC's own monitoring forms record "Yes" to the item "Member is willing and able to interview, train, and supervise CDPAS personal assistants" (later answered for the member through her grandson as her designated representative), and name GreatCare as "Name of fiscal intermediary/LHCSA." Pls.' Ex. 103-2 at GSD-ExtendedMLTC00001460, 001496, 001501, 001506, 001517; Pls.' Ex. 103-1 at GSD-ExtendedMLTC00001408, 001412, 001417.

**214.** GreatCare's files hold certificates of completion in the names of the three CDPAP personal assistants, each stating that the course was created by GreatCare: for Plaintiff Mei Z. Xiao, a "2021 PA Training (Chinese)" certificate dated November 1, 2021; for Plaintiff Jian R. Xiao, two "2021 PA Training (Chinese)" certificates dated October 15, 2021 and December 1, 2022; and for Plaintiff Bi Y. Zheng, a "2020 CDPAP Training (Chinese)" certificate dated November 10, 2020, covering Fraud/Abuse & Neglect and Sexual Harassment, and a "2021 PA Training (Chinese)" certificate dated November 15, 2021. Each 2021 PA Training certificate lists EVV, Sexual Harassment and Elder Abuse as its topics. The certificates were issued on completion of the in-service training that GreatCare gives its home care workers, which GreatCare gave online, in Chinese, through a third-party provider, Showd.me. Chen Tzu Wei Decl. ¶ 27; GC 08.04.2025 010969–010970; GC 08.04.2025 010572; GC 08.04.2025 011923–011924; also GC 07.28.2025 006200 (Liu Decl. Ex. 8(i), (j), (l)).

**215.** GreatCare produced Home Care Registry profiles for nine of the fourteen Plaintiffs. The five without one are Hei Li, Mei F. Chen and the three who served the consumer under the Consumer Directed Personal Assistance Program — Jian R. Xiao, Mei Z. Xiao and Bi Y. Zheng; for those three, Liu Decl. Exhibit 8 contains training certificates only. GC 08.04.2025 007174, 007518, 007886, 008484, 008716, 009205, 009707, 011143, 012096 (Liu Decl. Ex. 8(a)–(f), (h), (k), (m)); GC 08.04.2025 010572, 010969–010970, 011923–011924 (Liu Decl. Ex. 8(i), (j), (l)).

**216.** GreatCare's patient note for member S.Y.Y. dated August 17, 2023 states "Our homecare agency, Greatcare on longer accepts Living-in case anymore. Patient changed homecare vendor effective 8/20/23. Last day of CDPAP Live-in will be 8/19/23." GC 08.04.2025 011128 (Liu Decl. Ex. 32); the same note was also produced at GC 08.04.2025 010740.

**J. Employment dates, other agencies and statute-of-limitations periods**

**217.** The New York State Home Care Registry profiles GreatCare produced for nine Plaintiffs show that each obtained her Home Health Aide or Personal Care Aide certification from an outside training program and in no case from GreatCare: Americare Inc. and Primary Home Care Services for Lin (2011, 2006), Kings Institute for Xiu X. Zhu (2011), FOB School of Health Careers for Zhang (2009), NY Care Training Inc. for Hui Li (2012), New York Career Training School for Ruan (2014), Prestige Care Inc. for Li Chen (2013), American Institute of Science and Technology for Xiu F. Chen and Zhan J. Li (2016), and Huaqiao Yihu Institute for Hui He (2016). GC 08.04.2025 007174, 007518, 007886, 008484, 008716, 009205, 009707, 011143, 012096 (Liu Decl. Ex. 8(a)–(f), (h), (k), (m)).

**218.** The same Home Care Registry profiles show that each of those nine Plaintiffs was simultaneously registered as employed by other licensed home care agencies during the same period she worked for GreatCare, including Amazing Home Care Services, Americare, True Care,

Human Care, Renaissance, Premier, Royal Care, CPC Home Attendant, Longevity, Better Choice, Xtreme, American Business Institute and Prestige. GC 08.04.2025 007174, 007518, 007886, 008484, 008716, 009205, 009707, 011143, 012096 (Liu Decl. Ex. 8(a)–(f), (h), (k), (m)).

**219.** Hui He testified that she worked for non-party Astra Home Care during the same period she worked for GreatCare, that she is a plaintiff in a separate lawsuit against Astra asserting the same claim — 24-hour shifts paid at 13 hours — and that Astra "paid with more money." He Dep. 156:17–20, 160:11–12, 165:25–166:3, 166:11–15 (ECF 252-12).

**220.** Hui He testified that she had never been a party to a lawsuit before this one — "Have you ever been a party to a lawsuit before this one? A. No." — and, separately, that she had no other employer while she worked for GreatCare. He Dep. 12:13–15, 59:4–7 (ECF 252-12). Her counsel stated on the record that the interrogatory response omitting the Astra suit would be corrected: "We'll be updating it." *Id.* 173:12.

**221.** A state-court complaint filed December 18, 2023 against Astra Home Care, Inc. d/b/a True Care Home Health Care — an attorney-signed pleading, not a verified one — alleged that Hei Li worked for True Care "from approximately November 2017 to January 2022" and "approximately two to three 24-hour shifts per week," and that Hui He worked for True Care "from approximately January 2017 to April 2022" and "approximately three 24-hour shifts per week." Complaint, *Lin v. Astra Home Care, Inc.*, Index No. 162316/2023 (Sup. Ct. N.Y. Cty.) ¶¶ 21, 23 (ECF 248-17 at 8).

**222.** Hei Li testified that she performed the same work on the same terms for non-party True Care, for the same care recipient, during the same years. When asked "At True Care, how many hours did you work per day for PC?" she answered "Same thing"; when asked how many hours she was paid for each day, she testified "Also, same thing, 13 hours of pay" (75:13–19); she

later testified "So we have to work 24 hours, but only get paid for 13 hours," and when asked "The same thing as GreatCare; right?" she answered "Yes" (76:15–19). She worked three days a week for True Care (73:18; 97:4) and one day a week for GreatCare (52:24–53:2), for the same member (72:11–13), over the same period, "From 2017 to 2021" (72:23–73:2), and she has a claim against True Care (76:20–21; 77:21–23). Hei Li Dep. (Oct. 9, 2025) (Liu Decl. Ex. 27).

**223.** By stipulation, the parties agreed that "Plaintiff Hei Li is not claiming any damages for or alleging any violations under the FLSA and/or New York Labor Law against any Defendant … for any days that she worked for Astra Home Care Inc., d/b/a True Care Home Health Care." Stipulation Regarding Certain Claims by Plaintiff Hei Li, Feb. 2, 2026 (ECF 248-2 at 2).

**224.** Zhu H.L. Lin testified that she worked three 24-hour days a week for GreatCare and, during the same period, about seven hours a day two days a week for non-party United, for a five-day working week; Hui Li testified that she is a plaintiff in a separate pending case against non-party Royal Care asserting the same claim, filed at about the same time as this one, and that she worked for Royal Care while she worked for GreatCare. Lin Dep. 91:21–93:3 (ECF 252-13); Hui Li Dep. 12:18–15:9, 27:6–9, 78:10–79:9 (ECF 252-17).

**225.** Hui Li testified that the Royal Care matter was filed with the New York State Department of Labor through the Chinese Staff and Workers Association, that the Department sent her a two-page document stating that the case was accepted and showing how much money she was owed, that the document is at her home, and that she never gave it to her attorneys in this case; the document was called for on the record at her deposition. Hui Li Dep. 55:9–57:23, 57:20–23 (ECF 252-17). GreatCare's deficiency letter of April 16, 2026 listed "Plaintiffs outside employment records" among the categories then outstanding. ECF 234-5 at 2–3.

**226.** Li Chen testified that she worked for two other home care agencies at the same time in 2014–2015 — “Amazing” three days a week and “Prestige”/“Family Home Care” four days a week — and that she received over $4,600 in compensation from Amazing arising out of a 2022 lawsuit, having “got compensated for five and a half hours.” L. Chen Dep. (ECF 248-7) Tr. 15–16, 18–19, at PDF pp. 5–6, 8–9.

**227.** Mu Z. Zhang testified that she received a letter from non-party Amazing offering to compensate her for the unpaid hours on her 24-hour shifts, signed the consent form and was sent a check around 2021, and that she worked for Amazing at the same time as GreatCare for two to four years, as well as for ADJ Wisdom Home Care and Better Choice Home Care. Zhang Dep. (Jan. 20, 2026) 14:9–15:5, 29:20–30:10, 37:15–40:14, 72:9–12 (ECF 252-15).

**228.** By stipulation, the claims of Plaintiffs Mu Z. Zhang, Xiu F. Chen, Mei F. Chen, Hui He, Hui Li, Jian R. Xiao, Bi Y. Zheng, Xiu X. Zhu and Mei Z. Xiao were dismissed with prejudice as against CenterLight Healthcare, Inc. Stipulation of Dismissal With Prejudice, Jan. 7, 2026 (ECF 248-1 at 2).

**229.** Hei Li’s W-2s from GreatCare, which she produced, report total annual wages of $5,863.00 for 2017, $8,892.00 for 2018, $9,384.00 for 2019, $9,938.00 for 2020 and $9,376.25 for 2021. GSD-000014 to GSD-000018.

**230.** Hei Li stated in her sworn interrogatory answers to CenterLight that, from about June 2017 through about March 2021, she worked approximately 72 hours per week of which 32 hours per week were overtime, and her NYSDOL complaint attachment for the same period states one 24-hour day per week. Pl. Hei Li’s Resps. & Objs. to CenterLight’s First Set of Interrogatories, Resp. to Interrogatory No. 4 (Apr. 9, 2025); GSD-000008.

**K. GreatCare's knowledge and good faith**

**231.** Wang testified that no Plaintiff ever told GreatCare that an at-issue member needed to be reassessed for night-time needs or should have been on a split shift rather than a live-in: "Q. Did any of the plaintiffs … ever tell Greatcare that the at-issue members … needed to be reassessed based on their medical needs throughout the night? A. Never." Wang Dep. (May 15, 2026) 132:3–133:18 (ECF 252-4).

**232.** Wang testified that she never heard an aide complain about sleeping arrangements on a live-in case or about being placed in a studio apartment, and that had such a complaint been made GreatCare would have had to report it to the MLTC immediately. Wang Dep. (May 15, 2026) 127:11–128:5 (ECF 252-4).

**233.** Ouyang testified that no aide ever told her she did not get enough sleep on a 24-hour live-in shift or that she was doing work during the night, and that aides were told to call the company if the sleep was not enough: "No. If they live in, they have eight hours of sleep and three hours to eat. They never told me that they didn't have enough time to sleep." Ouyang Dep. (Feb. 9, 2026) (ECF 252-6) at PDF pp. 19, 21–22.

**234.** Ouyang denied that Plaintiff Ruan complained to her about a difficult member or about being unable to sleep at night and denied telling Ruan that there would be no other work for her if she refused the case: "No. She has her freedom. If she said she didn't want to do that patient, I would find somebody else for her." Ouyang Dep. (Feb. 9, 2026) 67:20–21 (Liu Decl. Ex. 30; ECF 252-6 at PDF p. 68).

**235.** Y. Zhu testified that GreatCare told aides from the outset that, after the 13 hours, they could sleep with five uninterrupted hours, that if a member would not let the aide sleep "definitely a phone call would be made about that," and that "for my company I have never receive[d] such complaint"; she also testified that GreatCare received complaints that hours were

too short, too long or the travel too far, but never that an aide had too much work at night or could not sleep or rest on a 24-hour shift. Y. Zhu Dep. (Jan. 14, 2026) (ECF 252-5) at PDF pp. 23–26, 70.

**236.** Zhao testified that GreatCare "did not receive[ ] from any home aide that they did not sleep for — they did not have 8 hours rest time and 5 hours uninterrupted, undisturbed sleep time nor 3 hours mealtime," and that she never heard of a complaint by any GreatCare aide about pay or about not getting meal or rest breaks. M. Zhao Dep. (Feb. 11, 2026) Tr. 105 (ECF 252-7 at PDF p. 28); M. Zhao Dep. Vol. 2 44:9–13 (ECF 252-8).

**237.** Across the four GreatCare "communication with insurance company" patient-note logs produced for members P.C., S.K.C.-1, S.C. and X.Y.W. — eighty-four distinct notes spanning 2016 to 2023 — not one note records an aide report or complaint about sleep, meal breaks, rest, hours, pay or overtime. GC 08.04.2025 008138–008167; 009469–009493; 009955–009978; 007853–007857; 011818–011822; 012259–012283 (Liu Decl. Ex. 32).

**238.** The same patient-note logs record aides initiating contact with GreatCare about the member's condition and equipment, including on February 3, 2021 "AIDE called pt. wheelchair broken-belt broken and stop system broken. It is difficult to lift or move pt.," a March 22, 2021 report that a member had tremor, no strength, was eating and drinking less and "screamed last night," and a January 19, 2022 note that "Aide informed us that patient was expired at home." GC 08.04.2025 009970, 009975, 009976, 009978; 007854 (Liu Decl. Ex. 32).

**239.** On March 10, 2020, GreatCare faxed the Senior Whole Health case manager an incident report stating "Aide request get full paid from 8:00 AM of 03/09/20 to 8:00 AM of 03/10/20" after the member went to the emergency room at 5:30 p.m. Pls.' Ex. G at ECF 214-7 at 1; SWHNY004516.

**240.** When a live-in member needed only a few hours of service on a day, GreatCare notified the plan by fax, obtained a changed authorization code from T1020 to T1019, and billed and paid only the hours actually worked. Wang Dep. (May 1, 2026) 31:1–33:13, 35:1–25 (ECF 252-3).

**241.** The compensation appendix of the October 1, 2022 CenterLight–GreatCare agreement provides: "If a Member interrupts a Live-in Aide's sleep or meal time for more than an average of 1 hour per daily shift over a 4-week rolling period, CL will reassess whether additional hours or services should be authorized for such Member." Friedman Decl. Ex. 111 at CenterLight 000113.

**242.** The document GreatCare produced in response to the request for documents concerning paying aides according to state and federal law is the New York State Department of Health slide deck "Home Care Worker Minimum Wage Guidance, Wage Effective January 1, 2024 through March 31, 2024," dated December 13, 2023, which states that NYC Metro wage parity is $2.54 per hour and that the NYC regional average personal care unit cost of $28.17 is inclusive of 17.46% wage-dependent fringe. GC 06.05.2025002376–002385, at 002381; also GC05.22.2025-000617-000626 (Liu Decl. Ex. 24).

**243.** [Intentionally omitted.]

**244.** The SWHNY–GreatCare amendments recite that the plan increased GreatCare's base reimbursement rate "for the sole purpose of enabling Provider to comply with" NYLL § 652 and PHL § 3614-c wage parity, and Wang testified that an amendment issued every time the rate changed and that regardless of the rate an MLTC paid, GreatCare had to pay its aides the State minimum wage. Wang Dep. (May 15, 2026) 76:7–77:10 (ECF 252-4); Wang Dep. (May 1, 2026) 23:17–22 (ECF 252-3).

**245.** Senior Whole Health's Rule 30(b)(6) witness testified that the Medicaid regulations and responsibilities governing the five-hour sleep requirement "fall on the LHCSA, not the managed long-term care plan," that "unless GreatCare tells us the aide is not getting sleep, we just follow the medical necessity and create our authorization for a care plan based off of that," and that on such a report SWHNY would "do a retrigger assessment." Glapa Dep. (Jan. 26, 2026) 91:4–8, 91:20–23 (ECF 252-9); Glapa Dep. (Feb. 26, 2026) 11:5–16, 13:12–25 (ECF 252-10).

**246.** The New York State Department of Health fair hearing decision FH# 8874053Z, dated January 21, 2025, sets out that 18 NYCRR 505.14(a)(4) defines live-in 24-hour personal care services as care for a patient "whose need for assistance is sufficiently infrequent that a live-in 24-hour personal care aide would be likely to obtain, on a regular basis, five hours daily of uninterrupted sleep during the aide's eight hour period of sleep," and that where the need is more frequent, continuous care by more than one aide must be authorized. ECF 214-31 at 9–10.

**247.** The fair hearing decision FH# 8874053Z also sets out 18 NYCRR 505.14(b)(4)(i)(c)(1) and MLTC Policy 15.09, under which the social assessment in a live-in 24-hour case "shall also evaluate whether the patient's home has sleeping accommodations for a personal care aide," "[w]hen the patient's home has no sleeping accommodations for a personal care aide, continuous personal care services must be authorized," and the nursing assessment must document "whether, were live-in 24-hour personal care services to be authorized, the personal care aide would be likely to obtain, on a regular basis, five hours daily of uninterrupted sleep." ECF 214-31 at 10–11, 17–18.

**248.** GreatCare's Answer admits that, before live-in 24-hour services may be authorized, the MLTC Defendants are required to evaluate whether the member's home has sleeping accommodations for a home care aide. Answer ¶ 63 (ECF 187).

**249.** In the 9/1/26 Order, Magistrate Judge Parker held that Plaintiffs had not established that the declaration letters or the timesheets were fraudulent, that "while the competing testimony may bear on the evidentiary weight of particular timesheets … it falls short of establishing that the records themselves were fraudulently created or produced," and that because the documents were submitted solely in connection with the sanctions request there was no basis to impose sanctions for fraud on the Court. 9/1/26 Order, 2026 WL 2593180, at *10 (ECF 274 at 23–24).

**250.** The 9/1/26 Order further found that Plaintiffs' challenge to the patient declaration letters rests "largely on speculation and conjecture rather than hard evidence of fabrication," that the Court "has not, itself, identified any apparent misspelling from the cited submissions," and that Plaintiffs identified no testimony, handwriting evidence, admission or other competent proof that a letter was not signed by the person to whom it is attributed. 9/1/26 Order, 2026 WL 2593180, at *10 (ECF 274 at 21–22).

**251.** GreatCare did not create, alter, backdate or fabricate any Living-In Time Sheet, care-recipient declaration letter or nursing record, and did not instruct any aide to record sleep or meal periods she had not received. Wang SJ Decl. ¶ 23.

## L. Additional facts of record

***Pay and wage parity***

**252.** No paystub and no payroll-register check in GreatCare's production contains any overtime earnings line for any Plaintiff: zero of 1,372 weekly paystubs and zero of 377 register checks. GreatCare paystubs and payroll registers, May 23, July 28 and Aug. 4, 2025 volumes (Liu Decl. Exs. 10, 11).

**253.** [Intentionally omitted.]

**254.** GreatCare's paystubs carry a "Punches" block showing an 8:00 a.m.-in to 8:00 a.m.-out 24-hour span recorded as 13.00 hours — GreatCare's own record states on its face that a 24-hour shift was paid as 13 hours. GC 08.04.2025 010237 (Liu Decl. Ex. 10).

**255.** On every one of the 374 register checks carrying a wage-parity line, the wage-parity amount is excluded from gross pay and taxable wages (*e.g.*, Zhan J. Li, Oct. 20, 2016: Liv-in $520.00, Wage Parity $185.36, gross $520.00). GreatCare Payroll Register for Zhan J. Li, check #35042 (Liu Decl. Ex. 11).

**256.** From 2019, the paystubs' "Other Info – Benefits" block lists "Wage Parity" hours at a $0.00 rate, so that from 2019 no separate wage-parity amount was paid in cash on the paystub. GC 08.04.2025 011470 (Liu Decl. Ex. 10).

**257.** No earnings line labelled Holiday, Flex or Vacation (other than seven "Vacation Old" lines on six 2017–2018 registers totalling $2,180.00) appears on any Plaintiff's paystub or register, and the "Holiday Hours" and "Holiday Amount" columns of GreatCare's own billing-versus-payroll reports are zero on all 3,068 rows. GreatCare paystubs, registers and "Billing Vs Payroll" reports (Liu Decl. Exs. 10, 11, 12).

**258.** GreatCare paid spread-of-hours compensation in exactly one pay week — January 5–11, 2019, paid January 18, 2019 — to eight Plaintiffs, at $4.00 or $6.00, and never again; every later paystub carries a "Spread of Hours" line at 0.00 with the year-to-date frozen. GC 08.04.2025 010237; GC 08.04.2025 011379 (Liu Decl. Ex. 10).

**259.** A Molina compliance analyst wrote to GreatCare on January 2, 2024 that "[t]he LS300 form is incomplete and not signed. Also, the representative information is missing." SWHNY001092; SWHNY000938.

**260.** ECF 252-21 contains LS 300 statements for calendar years 2021 and 2022 only; no LS 300 for 2015–2020 or 2023–2024 appears. ECF 252-21 (31 pages).

**261.** The December 2012 Beth Abraham/CCM–GreatCare agreement provided that "Live-in Aides will be paid at the daily rate of 12.0 hours of applicable NYC rate." GC 06.05.2025002373 (Liu Decl. Ex. 24).

**262.** SWHNY wrote on January 30, 2023 that it was "experiencing some delays in loading all the new rates into our system" and that "all claim are still being paid at the old rate." SWHNY001148.

***Records and retention***

**263.** Of the 328 workweeks in which the HHAeXchange record shows a Plaintiff over 40 hours on the 13-hour method, GreatCare produced a weekly paystub for 2 (Mu Z. Zhang's weeks ending February 23 and May 24, 2024) and a payroll-register check for 3 (Zhan J. Li's weeks ending October 14 and November 11, 2016 and January 6, 2017); for the other 323 neither was produced. By Plaintiff, the 328 weeks are: Mu Z. Zhang (149), Hui X. Ruan (62), Li Chen (48), Hui Li (46), Lin (9), Xiu F. Chen (6), Hui He (5) and Zhan J. Li (3). Join of HHAX EVV Records (HHAX Subpoena Prod., June 30, 2025, file 1.1) to the produced paystubs and register checks.

**264.** The file produced twice as "zhang mu zhen 2015 to 2018 pay check list.xlsx" is in fact a 334-page PDF of Mu Z. Zhang's paystubs with check dates from January 4, 2019 to August 1, 2025, so no 2015–2018 pay record was produced for her although she worked live-in shifts from January 1, 2015. GreatCare Aug. 4, 2025 and July 28, 2025 volumes (production volumes; not an exhibit).

**265.** The "billing vs payroll" workbooks are byte-identical across four volumes, and no such report exists for Li Chen, Mei F. Chen, Hui He, Hei Li or Hui Li. GreatCare "Billing Vs Payroll" reports (Liu Decl. Ex. 12).

**266.** Wang testified that GreatCare shreds patient files once they are more than six years old, that "by law" it need not keep them longer, that she deletes e-mail she considers "garbage," and that she could not recall whether a specific missing 2019 patient file was shredded or lost. Wang Dep. (May 1, 2026) 184:11–14, 186:19–187:11, 217:19–218:10 (ECF 252-3).

**267.** Wang testified that no one searched GreatCare's off-site storage unit for responsive documents and that she could not recall when it was given up. Wang Dep. (May 1, 2026) 202:17–205:20, 216:8–217:7 (ECF 252-3).

**268.** Wang testified that GreatCare produced only the September–November 2018 duty-sheet period for Hei Li because the other periods were "all same thing." Wang Dep. (May 1, 2026) 155:14–161:12 (ECF 252-3).

**269.** GreatCare produced no complaint log, and Wang testified both that "[t]here's no complaint. We have nothing to produce" and that there are complaints but "none of them for this particular case." Wang Dep. (May 1, 2026) 93:1–94:10 (ECF 252-3).

**270.** The SWHNY–GreatCare services agreement requires that "[a]ll records required under the terms of this Agreement shall be maintained for a minimum of ten (10) years." SWHNY 000257 (ECF 252-19 at 16).

**271.** Beginning with the week ending March 6, 2020, the Living-In Time Sheets for Lin, Xiu X. Zhu and Zhan J. Li were produced with every field typed except the ink signature, 99 of 171 sheets carrying identical values. GC 08.04.2025 009299; 012111; 008755 (not attached — Decision 2).

**272.** Three of the four Living-In Time Sheets produced for Zhan J. Li for member S.K.C.-1 bear an employee signature set in a cursive script typeface with identical glyphs; the fourth bears an ink signature. GC 08.04.2025 008721–008723 against 008724 (not attached — Decision 2).

**273.** GreatCare produced Lin's 70 Living-In Time Sheets twice, and the two sets differ on two pages, including one page where quit time and total hours are filled in on one copy and blank on the other. GC 08.04.2025 009211/009281 and 009221/009291 (not attached — Decision 2).

**274.** All seven patient declaration letters were executed within a twelve-day window in March 2023, years after most of the work periods they describe and after Plaintiffs filed their NYSDOL claims. GC 08.04.2025 008019, 008374, 008761, 009814, 010475, 010911, 011853 (not attached — Decision 2).

**275.** Mei Mei Zhao swore that she personally drafted the declaration letters after telephoning each care recipient and that "I did not personally observe the signing." Zhao May 22 Decl. ¶¶ 4–6, 10 (ECF 228-1).

**276.** The sleep and meal duty codes first appear anywhere in the HHAeXchange record on April 9, 2023, and only three Plaintiffs worked any live-in shift on or after April 1, 2023, so no per-shift electronic attestation exists for the other eleven. HHAX EVV Records (HHAX Subpoena Prod., June 30, 2025, file 1.1).

**277.** The HHAX clock-in/clock-out printouts produced for Hei Li, Xiu X. Zhu and Mu Z. Zhang contain no duty codes 801 or 802 at all, and codes 801/802 appear unmarked on all eight of Bi Y. Zheng's 2021 duty sheets. GC 08.04.2025 008307–008318; 012479–012485; 011851; 012088–012095 (Liu Decl. Ex. 18).

**278.** Li Chen's EVV record is materially incomplete: only 5.4% of her 185 live-in rows carry both a clock-in and a clock-out, and 348 of her 491 rows have no Total Hours. HHAX EVV Records (HHAX Subpoena Prod., June 30, 2025, file 1.1), Caregiver ID 1387.

**279.** Plaintiffs' own cover letter states that they "were able to obtain information showing the precise clock-in and clock-out time of each shift worked by Plaintiffs, the total amount they were paid per week, and the hourly rate at which they were paid," and that "any gaps were filled by HHAX data and/or the Plaintiffs' own recollection." ECF 243-1 at 1, quoted at ECF 246 at 3.

***Reporting and knowledge***

**280.** Zhu H.L. Lin testified that GreatCare's dispatcher told her that even if she got no sleep she still had to write five hours of sleep on the Living-In Time Sheet. Lin Dep. 158:10–23 (ECF 252-13).

**281.** Zhu H.L. Lin testified that she complained to GreatCare's coordinator Ms. Ouyang by telephone that she was not getting sleep and that Ouyang answered "of course you cannot sleep. When the patient sleep and you sleep a little while." Lin Dep. 156:3–159:14 (ECF 252-13).

**282.** Xiu X. Zhu testified that she raised with Ms. Ouyang that the member did not sleep five hours and that she had to get up many times, and that the answer was that on a 24-hour job there is no sleeping time. X. Zhu Dep. 122:13–125:12 (ECF 252-14); Pls.' Ex. 73 at 122:13–123:24.

**283.** Hui Li testified that she told the GreatCare nurse the wife made noise at night and the aides could not sleep and had to get up, and that the nurse answered "you still have to get up." Hui Li Dep. 60:3–61:15 (ECF 252-17).

**284.** Mu Z. Zhang testified that she discussed her inability to get eight hours of sleep with a visiting nurse whose employer she could not identify. Zhang Dep. (Jan. 20, 2026) 88:14–19, 96:23–24 (ECF 252-15).

**285.** Ouyang conceded that some GreatCare aides slept in the same room as the member, separated by a curtain, and that some had a cot or fold-out mattress that had to be put away each day. Ouyang Dep. (Feb. 9, 2026) (ECF 252-6) at PDF pp. 58–59.

**286.** Wang testified that she did not know when aides ate or slept except from what the aides wrote on their own time sheets. Wang Dep. (May 1, 2026) 236:21–237:13 (ECF 252-3).

**287.** Wang testified that GreatCare stopped taking live-in cases after August 31, 2023 because "[p]eople lie … people complain … we don't need to take that risk." Wang Dep. (May 1, 2026) 245:4–17 (ECF 252-3).

**288.** Wang testified that GreatCare arranges aides among days so that "less than 40 hours, we can arrange it," and tells aides to "[w]ork no more than three days." Wang Dep. (May 1, 2026) 46:1–8 (ECF 252-3); Wang Dep. (May 15, 2026) 278:4–9 (ECF 252-4).

**289.** Hui Li testified that Barbara Wang telephoned her after she left GreatCare, asked why she was filing this lawsuit and told her "don't sue just because other people are suing as well." Hui Li Dep. 112:6–114:7 (ECF 252-17).

**290.** At her January 7, 2026 Rule 30(b)(6) deposition, Wang answered "Yes" when asked whether the three CDPAP aides "obviously worked for Greatcare when they were caring for the consumer." Wang Dep. (Jan. 7, 2026) Tr. 154–155 (ECF 252-2 at PDF p. 42). The word "obviously" is counsel's; her answer is the one word. In the same passage, Wang says she learned of the aides' move to another agency "through deposition," and at Tr. 153 she describes the case as "the CDPAP case." Ms. Wang's declaration in opposition to these motions states that that answer

and her May 1, 2026 answer stand, and describes the fiscal-intermediary functions GreatCare performed in that arrangement. Wang SJ Decl. ¶ 33.

**291.** GreatCare's own Fiscal Intermediaries (CDPAP) Cases form recites that "under CDPAP the Fiscal Intermediary (FI) acts as the employer on record for the aide and processes the payroll." GC 08.04.2025 010391; GC 08.04.2025 010767 (Liu Decl. Ex. 25(a), (b)).

**292.** GreatCare's 53-page Policy Manual contains no policy on 24-hour or live-in shifts, sleep or meal periods, spread of hours or Wage Parity; the terms "live-in," "24-hour," "sleep," "bona fide," "wage parity" and "spread of hours" appear nowhere in it. GC 08.04.2025 007121–007173; GC 06.30.2025 002515–002547 (Liu Decl. Ex. 5).

**293.** For eleven of the fourteen Plaintiffs, the Home Care Worker Agreement is dated after that Plaintiff's live-in work for GreatCare began — by roughly three years for Ruan and Zhang, and for Li Chen after her live-in work had ended (Counterstatement ¶ 3; AMF ¶ 144) — and no earlier live-in agreement for any Plaintiff appears in any of the nine GreatCare volumes. AMF ¶¶ 36–45, 47, 117, 143; Counterstatement ¶¶ 1–14; GC 08.04.2025 009206, 009708, 011145; GC 07.28.2025 002909 (Liu Decl. Ex. 1(c), (h), (i), (l)).

**294.** No Chinese-language version of either live-in agreement was produced for Hui X. Ruan, who testified she cannot read, write or understand English, and no Language Consent Form was produced for seven of the fourteen Plaintiffs. GC 08.04.2025 009708–009711; Ruan Dep. (Jan. 12, 2026) 8:14–24 (ECF 214-19).

**295.** No "Live-In" or 24-Hour Caregivers Agreement and no aide declaration letter was produced for Li Chen, Mei F. Chen, Hui Li or Bi Y. Zheng, and no patient declaration letter was produced for seven of the fourteen Plaintiffs. GreatCare July 28 and Aug. 4, 2025 volumes, per-Plaintiff folders (production volumes; not an exhibit).

***Member needs and shift reality***

**296.** Extended MLTC's Activity Form for member S.Y.Y., observation of March 1–2, 2020, records "Room available for live in: NO," one bedroom in the home, "Does anyone, other than member, sleep in the room? YES - aide," and in the NIGHT TIME block "With Human Assist" for using the toilet, the bedside commode and walking indoors. Pls.' Ex. 104 at GSD-ExtendedMLTC 00001259; Pls.' Ex. P at ECF 214-16 at 1–2.

**297.** Senior Whole Health's tasking tool for member S.K.C.-1 records that the member "sleeps a lot during day and is up at night," and its assessment for member X.J.L. records that the member "does not sleep well at night and does not sleep during the day either." SWHNY002486; SWHNY002951; SWHNY002968; SWHNY002845.

**298.** Senior Whole Health's September 19, 2018 note records that its assessor recommended only "PCA services 7dx6h individually" for member P.C.P. and that the seven-day live-in continued only because he was a mutual case. SWHNY001769; *see also* SWHNY005075.

**299.** CenterLight's nurse recorded that member P.C.'s "[u]rine frequency persists, especially during the night, member waking up 2-3 time to urination," and instructed him that "during the night don't eat too much food." CenterLight Confidential 002896; ECF 214-10 at 7, 9.

**300.** Fair hearing decisions in the SWHNY record reversed live-in authorizations where the member toileted three to four times a night, did not sleep more than three to three and a half hours at a time, or lived in a studio apartment. Glapa Dep. (Jan. 26, 2026) 74–75, 88–89, 105–107 (ECF 252-9) (reading the decisions).

**301.** SWHNY's Rule 30(b)(6) witness testified that the five-hour sleep regulations and responsibilities "fall on the LHCSA, not the managed long-term care plan," and that "the oversight of the worker — in this case, the aide — falls on GreatCare, not Senior Whole Health"; SWHNY

"is not their employer." Glapa Dep. (Jan. 26, 2026) 91:4–8, 91:20–23 (ECF 252-9); Glapa Dep. (Feb. 26, 2026) 82:11–18 (ECF 252-10).

**302.** CenterLight's declarations state that GreatCare is responsible under NYSDOH regulations for training and supervising its aides, for checking home attendance time cards and maintaining scheduling records, and for complying with all New York Labor laws and FLSA provisions, and that CenterLight "does not pay any home health aide." Descollines Decl. ¶¶ 7–8, 10 (ECF 248-3); Goris Decl. ¶¶ 5–10 (ECF 248-4).

**303.** Several of CenterLight's Service Authorizations for member P.C. carry in the Comments field "Aide Services: HHA For __7_ Days x _24 Hours live-in services." GC 08.04.2025 008168–008185 (Liu Decl. Ex. 21).

**304.** Plaintiffs' declarations and depositions place the night-time demand well above one or two interruptions for several members: Zhan J. Li testified her most demanding member needed help more than ten times a night; Jian R. Xiao testified the member "gets up six, seven … times a night"; Hui He testified on redirect that she never received five consecutive hours of sleep. Z. Li Dep. 136:15–138:4 (ECF 252-11); J. Xiao Dep. 59:10–13 (ECF 214-21); He Dep. 146:2–7, 148:23–150:14 (ECF 252-12).

**305.** Mu Z. Zhang testified that she got two to three hours of sleep a night with two to five awakenings, and Xiu X. Zhu testified to about four and a half hours. Zhang Dep. (Jan. 20, 2026) 92–93 (ECF 252-15); X. Zhu Dep. 34:11–20 (ECF 252-14).

**306.** GreatCare's supervisory visits recorded in the nurse records were short daytime visits of 40 to 45 minutes. ECF 214-9 at 8, 10; ECF 214-11 at 6, 7.

**307.** A number of the handwritten Living-In Time Sheets record less than three hours of total meal time while still entering "13" in the total-hours column. GC 07.28.2025 005378, 004573, 006008, 006112 (not attached — Decision 2).

**308.** GreatCare's discovery response stated that "all live-in employees are allowed to work up to three days a week of total 39 hours, therefore overtime is not at issue," a cap that cannot be asserted for the pre-2018 period on this record. GreatCare's Comprehensive and Supplemental Resps. to Pls.' RFP, Resp. to Request No. 20 (ECF 214-2 at 12).

***Plan of care, hiring statement and task records***

**309.** The HHAX plan of care for member X.Y.W. that Plaintiffs filed, with a start date of October 10, 2020 and "Shift: All," carries the POC Note "7D*24HRS Living In 3hours meal time and 8 hours sleeping time." Its task list marks each listed task for all seven days and assigns no time of day to any task. Pls.' Ex. 43 at GC 05.23.2025 002118.

**310.** Zhan J. Li declares that, when she applied for work at GreatCare, Ms. Ouyang "did explain that I would be paid for 13 hours for each 24-hour live-in shift" and "told me that after 9, I did not have to care for the patients and that I would have an hour to eat my meals"; the declaration continues, "That turned out to be absolutely false. I could not ignore the care recipients if they needed help." Pls.' Ex. 81 ¶ 11.

**311.** Of the 31 weekly HHAX duty sheets in Plaintiffs' Exhibit 123, task 115, "Toileting-Commode," appears as a row on one sheet only, Xiu X. Zhu's sheet for the week of January 2 to January 8, 2021, where it is marked once; the task rows of the other thirty sheets do not include it. Pls.' Ex. 123 at GC 08.04.2025 012480; *see id.* at GC 08.04.2025 008307–008318, 009004–009008, 009673–009678, 011851, 012479–012485.

***The over-forty workweeks on the thirteen-hour count***

**312.** Every workweek in which the HHAeXchange payroll record filed by Plaintiffs shows a Plaintiff over forty hours when each live-in day is counted as thirteen hours and the paid hours of her hourly visits (regular and overtime) are added falls between the week ending January 9, 2015 and the week ending December 29, 2017; none falls after January 5, 2018, when GreatCare moved from the daily live-in rate to hourly pay, and none falls on or after October 1, 2021. By Plaintiff, those weeks number: Mu Z. Zhang 147; Hui X. Ruan 60; Li Chen 48; Hui Li 45; Zhu H.L. Lin 9; Xiu F. Chen 5; Hui He 5; Zhan J. Li 3; the other six Plaintiffs none. Pls.' Exs. 134–147 (HHAX Payroll Detail, file 4.3), live-in rows deduplicated to one per Plaintiff-day, Saturday–Friday workweeks. That count excludes the paid payroll rows with VisitID 0, coded "HHA-HR." Counting those hours as well, twenty more weeks exceed forty hours, by two to eleven hours each: twelve after January 5, 2018, and three on or after October 1, 2021, namely Xiu F. Chen's weeks ending February 4 and February 11, 2022 (42 hours each) and Mu Z. Zhang's week ending August 9, 2024 (48 hours). Pls.' Exs. 135, 137, 139–141, 145 (VisitID 0 rows). Paragraphs 199 and 263 count hourly visits at their adjusted hours in HHAX file 1.1; this paragraph counts from the paid hours in payroll file 4.3, which pays scheduled visit hours, and that is one source of the difference between 328 and 322 weeks: Mu Z. Zhang's weeks ending February 23 and May 24, 2024 and Xiu F. Chen's week ending September 9, 2022, for example, show 40.17, 40.33 and 40.25 adjusted hours on hourly visits but exactly 40.00 paid hours.

Dated: New York, New York
October 16, 2026

BALANCE LAW PLLC

By: *B. Robert Liu*
B. Robert Liu

One World Trade Center, Suite 8500
New York, New York 10007
(212) 741-8080
robert.liu@balancelawfirm.com

Attorneys for Defendant GreatCare, Inc.